Steven Zinnel, Reg. #66138-097
Federal Correctional Institution
Terminal Island
P.O. Box 3007
San Pedro, CA 90733-3007

Defendant-Appellant, In Pro Se

RECEIVED
MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

MAY 2 9 2018

FILED
DOCKETED_____
DATE        INITIAL

14-10141, 14-10196

**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE NINTH CIRCUIT**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>      Plaintiff-Appellee,<br><br>v.<br><br>STEVEN ZINNEL and<br><br>DERIAN EIDSON,<br><br>      Defendants-Appellants. | Nos. 14-10141, 14-10196<br>(consolidated)<br>D.C. No. 11-cr-00234-TLN<br><br>**APPELLANT STEVEN ZINNEL'S REPORT AND COMPLAINT AGAINST THE ATTORNEYS REPRESENTING APPELLEE UNITED STATES OF AMERICA REPORTING ALLEGED CRIMES, RULE VIOLATIONS, MISREPRESENTATIONS TO JUDGES, VIOLATIONS OF CALIFORNIA STATE BAR RULES, CONDUCT UNBECOMING A MEMBER OF A COURT'S BAR AND CONTRARY TO PROFESSIONAL CONDUCT, VIOLATIONS OF**<br>**(1) STANDARDS IMPOSED BY LAW**<br>**(2) APPLICABLE RULES OF PROFESSIONAL CONDUCT, AND**<br>**(3) DEPARTMENT OF JUSTICE POLICY**<br>**IN SUPPORT OF HIS PETITION FOR REHEARING AND REHEARING EN BANC** |

Page 1

To Judges Fletcher, Paez, Wilken and the United States Court of Appeals for the Ninth Circuit:

Steven Zinnel (hereinafter "Zinnel," "Claimant," and/or "Appellant") hereby makes a Report and Complaint ("Complaint") to the United States Court of Appeals for the Ninth Circuit regarding five Department of Justice ("DOJ") attorneys that are currently counsel of record for Plaintiff and Appellee United States of America in a pending appeal before the United States Court of Appeals for the Ninth Circuit captioned as "United States of America v. Steven Zinnel and Derian Eidson," Court of Appeals for the Ninth Circuit nos. 14-10141 and 14-10196 (consolidated) (hereinafter "appeal"). The appeal is taken from the United States District Court judgment in "United States of America v. Steven Zinnel and Derian Edison," U.S.D.C. Eastern District of California, Sacramento, D.C. no. 2:11-cr-00234-TLN (hereinafter "Criminal Case").

This Department of Justice attorney misconduct Complaint arises out of a federal criminal bankruptcy fraud prosecution that went horribly wrong. In their drive to win at all costs, the offending Assistant United States Attorneys resorted to committing crimes, cheating, misrepresenting to judges, and conduct unbecoming a member of the court's bar. Further, the attorneys violated (1) standards imposed by law, (2) applicable rules of professional conduct, and (3) Department of Justice policy. The five (5) Department of Justice ("DOJ") attorneys are currently counsel of record for Plaintiff and Appellee United States of America in the appeal.

This Complaint concerns five Department of Justice ("DOJ") attorneys, that practice before the United States Court of Appeals for the Ninth Circuit and the United States District Court, Eastern District of California, Sacramento, that have engaged in conduct unbecoming a member of the court's bar and contrary to professional standards subjecting the offending attorneys discipline pursuant to California Business and Professions code sections 6068, 6103, and 6128 which concerns attorneys, State Bar of California Rules of Professional Conduct, and Federal Rules of Appellate Procedure 46(c). The offending attorneys have breach the most basic ethical tenets of candor and engaged in scorched earth litigation tactics. As prosecutors and officers of the court, the offending DOJ attorneys had the duty to prosecute fairly. Instead, the engaged in deplorable and illegal conduct. As a result, Seven Zinnel and attorney Derian Eidson ("Eidson") have been wrongly convicted and irreparably harmed.

IDENTIFICATION OF THE OFFENDING ATTORNEYS

This Complaint concerns the following attorneys, who are members of the State Bar of California, who are employed by the U.S. Department of Justice, and whose names all appear on Plaintiff and Appellee United States of America's Answering Brief filed on February 23, 2017 (DktEntry: 69, BS 6801) (hereinafter "GB"). Two of the attorneys argued on the government's behalf at oral argument before the Ninth Circuit on November 16, 2017.

    Matthew D. Segal, Assistant U.S. Attorney, State Bar of California number 190938   [argued at oral argument]
    Audrey B. Hemesath, Assistant US. Attorney, State Bar of California number 212757 [argued at oral argument]
    Kevin C. Khasigian, Assistant U.S. Attorney, State Bar of California number 251318
    Camil A. Skipper, Assistant U.S. Attorney, State Bar of California number 175895
    Phillip A. Talbert, Assistant U.S. Attorney, State Bar of California number 145263

The above-listed attorneys' mailing address and telephone number is:

United States Attorney's Office, Eastern District of California
501 I Street, Suite 10-100
Sacramento, CA  95814

T. 916-554-2700

The attorneys' crimes and misconduct occurred by the misrepresentations (bald-faced lies) and alleged "facts" without citations to the record that were made by the attorneys in the government's Answering Brief of the United States ("GB") filed with the court on February 23, 2017, in case no. 14-10141, and reflected as DktEntry: 69 (BS 6801) and at oral argument before the Ninth Circuit on November 16, 2017. Note that "BS" refers to the Bates number hand-written or typed at the right bottom of each page on the documents submitted with this report. As Zinnel's appellate briefs clearly demonstrate, the United State's Answering Brief and oral argument defends the indefensible. The five government lawyers' unsupported and untrue claims without a single citation to the record, repeated ad nauseam, does not magically make an untrue "fact" true. "Painting black lines on the side of a horse and calling it a zebra does not make it one." United States v. Vazquez-Rivera, 135 F.3d 172, 177 (1 CA, 1998). Further, "it is a cardinal rule of appellate practice that the facts are those found in the record and not those found in

the minds of the attorneys." United States v. Sigal, 341 F.2d 837, 850 (3 CA, 1965). Moreover, it is also alleged that three of the attorneys, AUSA Matthew Segal, AUSA Audrey Hemesath, and AUSA Kevin Khasigian, also committed crimes and attorney misconduct in the proceedings below in the underlying district court case that will be addressed in similar form as this submission, in a future submission to the Court of Appeals for the Ninth Circuit, the District Court, the State Bar of California, and the Department of Justice's Office of Professional Responsibility.

## HOW THIS SUBMISSION IS ORGANIZED

This submission contains thirty-four (34) claims numbered 1 - 34 in section #8 and having Bates nos. 5001-5999. Claims 1-27 involve misrepresentations in the Answering Brief filed with the Court of Appeals on February 23, 2017. Claims 28-33 involve misrepresentations to the Court of Appeals at oral argument on November 16, 2017. Claim 34 involves a bald-faced lie to the District Court that directly negatively affected Appellant at the first sentencing and if not exposed will negatively affect Appellants at any re-sentencing. The Claims involve conduct unbecoming a member of the court's bar and contrary to professional standards. The five DOJ prosecutors have engaged in conduct involving dishonesty, fraud, and deceit. Further, the government attorneys have made false representations to a federal court, by certifying facts known to be false. In doing so, the offending attorneys have committed fraud on the court. There are numerous factual contentions in the government's Answering Brief and at oral argument that do not have evidentiary or legal support subjecting the attorneys to Rule 11 sanctions. The government attorneys have abuse the legal system and are more interested in trying to win an appeal at all costs then seeking justice.

For ease reference, Zinnel has hand-written or typed Bates Numbers on the bottom right hand corner of each document. The sections of this submission are:

Section #1  Background
Section #2  Definitions
Section #3  Reporting Crimes & Violations of the Rules of Professional Conduct - Bates nos. 1501-1599
Section #4  Crimes - Bates nos. 2001-2999
Section #5  Laws and Rules Governing Lawyers for the Government - Bates nos. 3001-3040D
Section #6  Fraud on the Court - Bates nos. 3041-3042
Section #7  Distribution List
Section #8  Claims (34) regarding Alleged Crimes/Laws/Rules Violated - Bates nos. 5001-5999
Section #9  Exhibits - Bates nos. 6001-6999

The Claims in Section #8 are in the order the misrepresentations unfolded in the Answering Brief and then at oral argument. The Claim Numbers in Section #8 that are dispositive to this appeal are:
28-34, 4, 7, 15, 13, 10, 21, 1, 6, 7, 9, 11, 12, 22-24, and 27

Throughout Zinnel's case, from investigation through appeal, the offending DOJ attorneys were arrogantly judgmental, narcissistic, and very full of themselves. AUSA Matthew D. Segal was particularly contemptuous with his preferred set of facts, or delusions. AUSA Segal is closer to a legal terrorist than a model DOJ attorney. One thing is evident, AUSA Matthew Segal lies a lot. The DOJ lawyers were not as interested in justice as they were in winning. The offending DOJ attorneys falsely portrayed to the trial judge, the jury, and the Court of Appeals that Derian was Bonny, Steve was Clyde and their last name was Grifter. When a citizen lies to a court, he gets charged with a felony. When an Assistant United States Attorney lies to a court, it's business as usual. The Department of Justice has an obligation to its lawyers and to the public to prevent prosecutorial misconduct. Prosecutors, as servant of the law, are subject to constraints and responsibilities that do not apply to other lawyers; they must do justice first. United States v. Kojayan, 8 F.3d 1315, 1323 (9 CA, 1993). Their job is not just to win, but win fairly, staying within the rules. Berger v. U.S. 295 U.S. 78, 88 (1935). That did not happen here. When a prosecutor steps over the boundaries of proper conduct and into unethical territory, the government has a duty to own up to it and to give assurances that it will not happen again. Yet, one cannot find a single hint of appreciation of the seriousness of the misconduct within the pages of the government's brief on appeal. The Ninth Circuit, Department of Justice's Office of Professional Responsibility, and the State Bar of California, should take these allegations of government lawyers' misconduct seriously, thoroughly investigate, and discipline appropriately. The public will be harmed otherwise.

FEDERAL CRIMINAL STATUTES ALLEGED VIOLATED

False writing or document - 18 U.S.C. 1001 (BS 2001-2002)
Public officer delivering a writing he knows to be false - 18 U.S.C. 1018 (BS 2003)
Conspiracy to commit an offense or to defraud United States - 18 U.S.C. 371 (BS 2010-2012)
Fourteenth Amendment to the U.S. Constitution (BS 2020)
Deprivation of rights under color of law - 18 U.S.C. 242 (BS 2030)
Conspiracy against rights - 18 U.S.C. 241 (BS 2040)
Aiding and abetting - 18 U.S.C. 2 (BS 2050)


LAWS AND RULES ALLEGED VIOLATED

The rules that apply to the government attorneys are both succinct and clear. There are no gray areas or even grounds for debate. As delineated below, in Section #5, (BS 3001-3040D), and throughout this submission, an attorney owes a duty of candor and honesty to the court, opposing counsel and the parties, and at the very least, a duty to not to misrepresent the facts to several federal judges or opposing counsel. The Supreme Court has long emphasized "the special role played by the American prosecutor in the search for truth in criminal trials." Hayes v. Brown, 399 F.3d 972 (9 CA, 2005) citing Strickler v. Greene, 527 U.S. 263, 281 (1999) (BS 3040 B). As the Ninth Circuit observed in Commonwealth of the Northern Mariana Islands v. Mendiola, 976 F.2d 475, 486 (9 CA. 1997) (en banc), "The prosecuting attorney represents a sovereign whose obligation is to govern impartially and whose interest in a particular case in not necessarily to win, but to do justice...It is the sworn duty of the prosecutor, to assure that the defendant has a fair and impartial trial." (BS 3040 C). One of the bedrock principles of our democracy, "implicit in any concept of ordered liberty," is the United States government may not use false evidence to obtain a criminal conviction. Napue v. Illinois, 360 U.S. 264, 269 (1959) (BS 3040 B). Deliberate deception of a judge and jury is "inconsistent with the rudimentary demands of justice." Hayes, supra, citing Mooney v. Holohan, 294 U.S. 103, 112 (1935) (BS 3040 B).

The offending DOJ attorneys are trusted members of society, they represent the United States of America, and are officers of the court. However, in Zinnel's case, the offending DOJ attorneys misused their position to commit crimes and engaged in blatant violations of California attorney ethics rules which prohibit acts of dishonesty, deceit, and collusion with an intent to mislead a party. At the bare minimum the offending attorneys violated most of the rules of attorney conduct and it is alleged they committed federal crimes. It strains credulity that such seasoned prosecutors, with years of trial experience, could be so ignorant to the rules of professional conduct. Some of the rules and decisional law the offending attorneys violated are:

California Business and Professions Code section 6068(d)(f) & (g), codifying a lawyer's duty "not to seek to mislead the judge or any judicial officer by artifice or false statement of fact or law," "to not advance no fact prejudicial to the honor or reputation of a party or witness," and "not to encourage either the commencement or continuance of an action or proceeding from any corrupt motive of passion or interest." (BS 3003-3004)
American Bar Association Model Rules 3.3(a), 4.1(a), 8.4(c) concerning not making a false statement of fact or law to a court, not making a false statement to a third person, engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation (BS 3005)
Rules of Professional Conduct of the State Bar of California Rules 5-200(B) & (E), concerning an attorney not misleading a judge, misquoting a statute of decision, and not asserting personal knowledge of facts at issue except when testifying as a witness. (BS 3007)
Federal Rules of Civil Procedure, Rule 11(b)(3), concerning signing pleadings, motions, and other papers and representations to the court (BS 3008-3010)
F.R.A.P. 46(b)(1)(B) - engaging in conduct unbecoming a member of the bar, failure to comply with a court rule, and lack of diligence that impairs the deliberations of a court. (BS 3027)
9th Cir. Rule 28-2.8 - Failure to provide record citations in an appellate brief. (BS 3040 A)
Fraud on the court. (BS 3041-3042)

## DECISIONAL LAW ALLEGED VIOLATED

Berger v. United States, 295 U.S. 78 (1935), (BS 3014, 3011, 3012)
In re Robert J. Snyder, 472 U.S. 634 (1985), (BS 3013)
United States v. Kojayan, 8 F. 3d 1315 (9 CA, 1993), (BS 3024-3026)
United States v. Katter, 840 F.2d 118 (1 CA, 1988), (BS 3011)
Thomas v. Girardi, 611 F.3d 1027) (9 CA, 2010), (BS 3027)
Ausherman v. Bank of America, 212 F.Supp. 2d 435 (D.Maryland, 2002), (BS 3016-3020)
In re Stephen Randall Glass on Admission, 58 Cal. 4th 500 (CA S.Ct., 2014), (BS 3021-3023)
Pumphrey v. K.W. Thompson Tool, 62 F.3d 1128 (9 CA, 1995), (BS 3015)
Toscano v. Comm'r of the IRS, 441 F.2d 930 (9 CA, 1971), (BS 3015)
Olmstead v. United States, 277 U.S. 438 (1928), (BS 3040, 3040 D)
Robert Jackson, U.S. Attorney General in 1940, (BS 3015)
Strickler v. Green, 527 U.S. 263 (1999), (BS 3040 B, 3040 D)
Commonwealth of The Northern Mariana Islands v. Mendiola, 976 F.2d 478 (9 CA, 1992), (BS 3040 B, 3040 C)
Napue v. Illinois, 360 U.S. 264 (1959), (BS 3040 B)
Mooney v. Holohan, 294 U.S. 103 (1935), (BS 3040 B)
Hayes v. Brown, 399 F. 3d 972, (9 CA, 2005)

## THE GOVERNMENT ATTORNEYS' CONDUCT WAS WILLFUL AND THE ATTORNEYS MADE WILLFUL MISREPRESENTATIONS RATHER THAN MAKING PERMISSIBLE ARGUMENTS OF LAW OR FACTS ABOUT THE CASE

Day in and day out, federal prosecutors, like the five offending Assistant United States Attorneys, argue well-settled law in the Ninth Circuit to judges and juries concerning willful misrepresentations in fraud cases. Similarly, federal prosecutors, "win" convictions, usually by piling on inference upon inference and telling juries to use their common sense.

As the Supreme Court has observed, "willful" is a word of "many meanings" and "its construction [is] often influenced by its context." Ratliff v. United States, 510 U.S. 135, 141 (1994). Accordingly, Ninth Circuit cases have defined "willful" in different terms depending on the particular crime charged. See, e.g. United States v. Lloyd, 807 F.3d 1128, 1166 (9 CA, 2015) ("willfully" does not require actor to have known conduct was unlawful); United States v. Berry, 683 F.3d 1015, 1021 (9 CA, 2012) (in prosecution for fraud, "willfully" connotes a "culpable state of mind"); United States v. Reyes, 577 F.3d 1069, 1080 (9 CA, 2009) (in prosecution for securities fraud, "willfully" means "intentionally undertaking an act that one knows to be wrongful); United States v. Easterday, 564 F.3d 1004, 1006 (9 CA, 2009) ("willful defined as "a voluntary intentional violation of a known legal duty"); United States v. Awad, 551 F.3d 930, 939 (9 CA, 2009) (in health care fraud case, "willful" act is one undertaken with "bad purpose" with knowledge that conduct was unlawful).

Further, the law is clear that willfulness can be inferred and criminal intent is seldom proved by direct evidence:

A willful misrepresentation is a misrepresentation that is deliberate, voluntary, and knowingly false. Forbes v. INS, 48 F.3d 439, 442 (9 CA, 1995). Proof of an intent to deceive is not required Rather, knowledge of the falsity of a representation is sufficient. Id. The Ninth Circuit has clearly defined a willful act is one done with a bad purpose or evil motive. United States v. McIntyre, 582 F.2d 1221 (9 CA, 1978).

Some courts have interpreted "willful" to include acts that involved some form of inadvertence, oversight, or negligence. Stephen J. Brogan, Analysis of the term "Willful" in Federal Criminal; Statutes, 51 Notre Dame lire. 786, 787 (1976). Under this interpretation, a "judge can find an act to be willful even though it was committed intentionally." Id.

****"Criminal intent is seldom proved by direct evidence and often must be inferred from a defendant's conduct."
  People v. Gilbert, (1992) 5 Cal. App. 4th 1372, 1380.

***In Spies v. United States, 317 U.S. 492 (1943), the Supreme Court held that "the necessary intent may be inferred from conduct the likely effect of which would be to mislead or to conceal." The Spies Court set forth the example of the kind of conduct form which an affirmative willful attempts may be inferred:

  "any conduct, the likely effect of which would be to mislead or conceal."

When bad actors have had many opportunities to come forward and admit wrongdoing, as the offending government DOJ California attorneys have had here, but have never done so, a court can properly find willfulness.

THERE IS A HUGE DISTINCTION BETWEEN MAKING PERMISSIBLE ARGUMENT REGARDING THE LAW OR FACTS AND BLATANTLY MISREPRESENTING TO A COURT WHAT THE LAW SAYS, AND WHAT THE FACTS ARE, AS OPPOSED TO THIS IS HOW THE LAW CAN BE INTERPRETED OR ARGUING WHAT A FACT MEANS

The majority of the misrepresentations in the United States' Answering Brief were made in the section entitled "Statement of the Case." The legal treatise entitled "Winning on Appeal, Better Briefs and Oral Argument," instructs that the Statement of the Case does not give the attorney a license to embellish or throw in irrelevant, but juicy facts. The treatise goes on to state: "The Polestar is Accuracy. The principle directive in narrating the facts is accuracy. BE HONEST. DO NOT STEAL THE FACTS." Further, "A brief writer is entitled to the greatest leeway in his law, as in his reasoning, for they are his. "But, HONESTY ALLOWS NO LEEWAY IN HIS STATEMENT OF FACTS, for they are not his." Moreover, "Support every sentence in a statement of facts by references to the pages in the record where those facts appear...Someone other than the writer should check the final draft of statement of facts against the record." Therefore, the offending attorneys were not permitted to misrepresent the actual facts in their Statement of the Case, as they did.

There is a huge difference between misrepresenting the law and facts to a court and permissible arguments of law or about facts of the case. Misstating well-settled law and/or facts to a court is NEVER permissible argument.

THE COURT OF APPEALS CAN ALSO PROPERLY FIND WILLFULNESS BECAUSE THE OFFENDING ATTORNEYS, THEIR SUPERVISORS, AND THEIR EMPLOYER HAVE HAD MANY OPPORTUNITIES TO COME FORWARD AND ADMIT THEIR WRONGDOING, BUT HAVE FAILED TO DO SO

When bad actors have had many opportunities to come forward and admit wrongdoing, as the offending government DOJ California attorneys have had here, but have never done so, the Court of Appeals can properly find willfulness. Here the offending attorneys were given notice of their willful misrepresentations several times including Zinnel informing the Department of Justice Office of Professional Responsibility and making the State Bar Complaint and Claims part of District Court filings in the underlying Sacramento federal court case. Rather than correcting and mitigating their bad conduct, two of the offending attorneys, AUSA Matthew Segal and AUSA Audrey Hemesath doubled-down and lied to the Court of Appeals at oral argument in Zinnel's appeal on November 16, 2017.

When the offending attorneys tell a story that is blatantly contradicted by the record and well-settled law, as we have here, willful misrepresentations to two courts has been established by the Claimant.

THIS REPORT AND COMPLAINT IS ONLY THE FIRST REPORT OF GOVERNMENT ATTORNEY MISCONDUCT

This submission only concerns the United States of America's Answering Brief filed in Zinnel's appeal to the Court of Appeals for the Ninth Circuit and Oral Argument before the Ninth Circuit on November 16, 2017. The DOJ attorneys' prosecutorial misconduct described in the 34 Claims in Section #8 is just the tip of the iceberg of the Department of Justice prosecutors' dishonesty, fraud, and deceit that AUSA Matthew D. Segal, Audrey B. Hemesath, Kevin C. Khasigian, former U.S. Attorney Benjamin B. Wagner, IRS Special Agent Jason Lamb, attorney Frank Radoslovich, and Michelle Zinnel (Zinnel's ex-wife) committed at Zinnel's trial and sentencing before the United States District Court. Zinnel is in the process of compiling a second prosecutorial misconduct Complaint in the same format as this submission. Zinnel will submit the second Complaint to the United States District Court, the Department of Justice Office of Professional Responsibility, The State Bar of California, and the Court of Appeals for the Ninth Circuit. Zinnel will also copy the second Complaint to the Distribution List contained in Section #7.

WHY THIS IS JUST NOW COMING TO THE ATTENTION OF THE COURT OF APPEALS FOR THE NINTH CIRCUIT

The Ninth Circuit pondered in Kojayan, 8 F.3d 1315, 1320 (9 CA, 1993) [BS 3024-3026, 6938]:

"How can it be a serious claim of prosecutorial misconduct remaining unresolved-even unaddressed-until oral argument in the Court of Appeals and why didn't someone in the United States Attorney's Office take an independent, objective look at the issue?"

This Kojayan Court made it clear that misrepresentations are improper and untrue:

"When a lawyer asserts that something not in the record is true, he in effect, testifying. He is telling the jury [and the Court of Appeals] 'Look, I know a lot more about this case than you, so believe me when I tell you X is a fact.' This is definitely improper."..."The government's lawyer made factual assertions he well knew were untrue. This is the difference between fair advocacy and misconduct."

This case is Kojayan on steroids. Here, two government lawyers asserted to the jury and judge, facts that were not true, including Zinnel was charged with concealing his WAMU personal checking account, must be convicted on that uncharged property, and should be sentenced to twenty years in federal prison over a disclosed $256 bank account. The convictions and guideline calculations "strike as more than probably wrong. The strike as wrong as the force of a five-week old unrefrigerated dead fish." United States v. Bussell, 504 F.3d 956 (9 CA, 2007).

The prosecutorial misconduct that has occurred in Zinnel's case, makes Kojayan appear like a law-school text book example of a perfect prosecution. In aggravation, here, the serious claims of Prosecutorial Misconduct was not brought to the Court of Appeals' attention until AFTER or argument and Memorandum Opinion. A year ago, Zinnel gave detailed notice to Appellants' counsel Suzanne Luban and Becky James of the Prosecutorial Misconduct. Eight months ago Zinnel submitted a similar Report and Complaint as this one to the DOJ's Office of Professional Responsibility and the State Bar of California. On January 22, 2018 Zinnel gave notice to McGregor, the U.S. Attorney of the Eastern District of California of the Prosecutorial Misconduct, but NO ONE would fulfill their legal obligation to report the misconduct to the Court of Appeals. In fact, Zinnel was told by his appellate attorney not to report the misconduct until after the opinion came out.

ZINNEL'S TRIAL ATTORNEY THOMAS A. JOHNSON WOULD WOULD NOT BRING THE EGREGIOUS PROSECUTORIAL MISCONDUCT TO THE DISTRICT COURT'S ATTENTION EVEN THOUGH HE HAD A LEGAL OBLIGATION TO DO SO

If need be, this will be addressed in a massive 28 U.S.C. 2255 petition for Ineffective Assistance of Counsel and Prosecutorial Misconduct that Zinnel has been working on for over four years.

ZINNEL'S SENTENCING AND APPELLATE ATTORNEY SUZANNE LUBAN WOULD NOT REPORT THE EGREGIOUS PROSECUTORIAL MISCONDUCT TO THE COURT OF APPEALS, DOJ OPR, OR STATE BAR EVEN THOUGH SHE WAS GIVEN NOTICE OF HER LEGAL OBLIGATION TO DO SO

Since appellate attorney Suzanne Luban began represent Zinnel in late 2013, Zinnel has informed attorney Luban that lawyer

ethics rules require that "A lawyer who knows that another lawyer has committed a violation of the Rules of Professional Conduct that raises a substantial question as to that lawyer's honesty, trustworthiness, or fitness as a lawyer in other respects SHALL inform the appropriate professional authority." (BS 6989). When Zinnel read, fully digested, and researched the United States' Answering Brief filed on February 23, 2017 (DktEntry: 69), Zinnel was appalled by the government lawyers' misrepresentations to the Court of Appeals (BS 6989). As a result, on April 26, 2017, at great time and expense to him, Zinnel prepared a detailed report of the Factual Inaccuracies in the Government's Answering Brief that Zinnel transmitted to appellants' attorneys Suzanne Luban and Becky James (BS 6890-6985). Zinnel report was extremely detailed and specified exactly why the government lawyer's representations to the Court of Appeals were lies. Id. Further, Zinnel's report directed attorney Luban and attorney James to the record that proved them the inaccuracies. Id. Attorney Luban refused to inform the Court of Appeals, the DOJ's Office of Professional Responsibility, or the State Bar of California even though she had a legal duty to do so. (BS 6990). After much arm-twisting and venting by Zinnel, attorney Luban put a footnote in Zinnel's Reply Brief filed with the Court of Appeals: "Many of the 'facts' stated in the government's brief are inaccurate, but Zinnel lacks enough extra space to list them here." (BS 6950, 6990).

Because Zinnel was so negatively affected by the government lawyers' lies to the Court of Appeals, which are a continuation of the same lawyers' lies to the District Court and jury, Zinnel prepared a 256 page Complaint to be submitted to the Court of Appeals for the Ninth Circuit reporting the government lawyers' misconduct. In August 2017, Zinnel mailed relevant portions to attorney Suzanne Luban. (BS 6990). The Complaint contained 27 separate Claims of misconduct committed by the DOJ's government lawyers in the United States' Answering Brief filed on on February 23, 2017 (DktEntry: 69). On August 28, 2017, Suzanne Luban emailed Zinnel to not send anything to the Court while Zinnel's appeal was pending. (BS 6988).

Even though Zinnel's attorney's request that he not inform the Court of Appeals of the government attorney's bald-faced lies to the Court of Appeals went against every fiber of Zinnel's being and against attorney Luban's legal duties as an attorney, Zinnel relied on his attorney's advice, and because he was represented by counsel on appeal, Zinnel did not submit the Complaint to the Ninth Circuit. However, on August 31, 2017, Zinnel did send the 256 Complaint to the State Bar of California and the Department of Justice's Office of Professional Responsibility. (BS 6990).

Since then, there was oral argument before the Court of Appeals on November 16, 2017. On November 25, 2017, Zinnel watched the oral argument on DVD and again was appalled at AUSA Matthew Segal's and AUSA Audrey Hemesath's bald-faced lies to the Court of Appeals during their twenty minutes of oral argument. (BS 6990).

With the government lawyers' continued lies and willingness to win-at-all costs, Zinnel can no longer remain silent. (BS 6991). Therefore, Zinnel appended his Complaint to add seven (7) additional Claims of prosecutorial misconduct as a result of oral argument on November 16, 2017. (BS 6991, 5935-5966, 6081-6938).

On December 15, 2017, Zinnel wrote attorney Suzanne Luban a letter where he detailed the above. (BS 6989-6991). In his letter, Zinnel provided excellent excerpts from treatises on lawyer ethics and professional responsibility. (BS 6989, 1501-1511). Zinnel ended his letter imploring his appellate attorney to fulfill her legal and ethical obligations as an attorney to inform the Court of Appeals and the State Bar of California of AUSA Matthew Segal's and AUSA Audrey Hemesath's violations of the Rules of Professional Conduct that raises a substantial question as the lawyers' honesty, trustworthiness, and fitness as lawyers. (BS 6991). Zinnel received no response from attorney Luban o his December 15, 2017 letter.

U.S. ATTORNEY FOR THE EASTERN DISTRICT OF CALIFORNIA MCGREGGOR SCOTT, JUDGE TROY L. NUNLEY, THE DOJ'S OFFICE OFFICE OF PROFESSIONAL RESPONSIBILITY DID NOT REPORT THE EGREGIOUS PROSECUTORIAL MISCONDUCT TO THE COURT OF APPEALS OR THE STATE BAR EVEN THOUGH THEY TOO, WERE GIVEN NOTICE OF THEIR LEGAL DUTY TO DO SO

Next, Zinnel brought the prosecutorial misconduct to the attention of Judge Nunley and the U.S. Attorney's Office in district court filings. (CR 409, 426, 430, 433). Zinnel received no response nor was any action taken. On January 4, 2018, McGregor W. Scott became the United States Attorney for the Eastern District of California. Therefore, on January 22, 2018, Zinnel sent a sent a letter to U.S. Attorney McGregor Scott, District Court Judge Troy L. Nunley who presided over Zinnel's trial and sentencing, attorney Robin Ashton of the Department of Justice's Office of Professional Responsibility, and attorney Alex Hackert of the State Bar of California informing them of the prosecutorial misconduct and their legal obligations as lawyers to report the misconduct and do something about it. (BS 6992 - 6995). The letter was copied to Zinnel's attorney Suzanne Luban and ethics expert, Law Professor Ronald D. Rotunda. (BS 6995). Zinnel received no response to his January 22, 2018 letter from any of the six people that received it.

## WHY STEVEN ZINNEL IS SUBMITTING THIS GOVERNMENT ATTORNEY MISCONDUCT COMPLAINT

Based on the above, Zinnel, from prison, made herculean efforts to resolve and address serious claims of prosecutorial misconduct well before oral argument, but they went unaddressed by the appellate lawyers, the Department of Justice's Office of Professional Responsibility, and the U.S. Attorney's Office. Now the opinion is out, adverse to Zinnel and Eidson for the most part, based on the government lawyers' lies to the Court of Appeals that Zinnel tried so hard to expose over a year ago. There has been a miscarriage of justice in this case and Zinnel can no longer remain silent as the prosecutorial misconduct has resulted in unjust convictions and the convictions and Guidelines calculations were erroneously affirmed on appeal.

The five government attorneys' deplorable and illegal conduct has significantly harmed Zinnel: Zinnel and Eidson have been unlawfully and unjustly imprisoned for almost five years now. Zinnel has over $4.3 million in erroneous monetary obligations imposed against him. Zinnel's sweetheart and children have been taken from him, the Zinnel family home has been seized by the government and sold, and Zinnel has lost all of his professional licenses. Simply said, because of the five government attorneys' unlawful and unethical conduct, Zinnel has unlawfully and unjustly lost his reputation, freedom, family, friends, future, live savings, and livelihood.

There's a corner of contempt we reserve for those who hate us, when we've done them no wrong: Those who resent us without cause, and revile us without reason. The collateral damage from a wrongful prosecution and government attorneys cheating to win at all costs, is beyond measure. Marriages are shattered, children are left parentless, careers ended, families devastated, parents die, finances ruined--all for what? To satisfy the lust of vindictive prosecutors and advance the careers of headline-grabbing, ethically, morally, and legally corrupt prosecutors? "What we don't want in this country is anyone with unfettered power." (Judge T.S. Ellis in his Virginia federal courtroom on May 4, 2018 in the Paul Manafort case referring to prosecuting special counsel Robert Mueller). An indictment and corrupt criminal prosecution fractures lives forever. Minutes turn into hours, then days, months, and years. In Zinnel's case, thus far, it has been over 2,496,600 minutes, 41,610 hours, 1,733 days, 57 months, and 4.75 years. Zinnel's life has been stolen and destroyed in the calculated corruption of justice by the offending Department of Justice prosecuting attorneys who are the very people who are sworn and empowered to protect us.

When innocent people like Zinnel and Eidson are imprisoned, either the guilty person is still free, e.g. Thomas Wilbert who was the offending lawyers' star witness who committed bank fraud, wire fraud, mail fraud, tax fraud, insurance fraud, obstruction of justice, and perjury, or there is no guilty person at all because no actual crime has been committed, e.g. in Zinnel's case, there is no bankruptcy fraud or money laundering. In Zinnel's case, the administration of justice has been robbed of any validity, and society has lost on all sides. If the majority of the public, and good lawyers, knew what the offending DOJ prosecuting attorneys and even the judge have done in Zinnel's case, they would have no faith in the fairness of our system.

Because they can: The motto of power, since the idea of power over over others was born in our kind. Thus far, Zinnel has gotten chewed up by a system that was hitting on all cylinders. As a result, Zinnel was unlawfully convicted in a court of law and he is in prison rotting away. Zinnel wants to do the right thing because it is right. "The only thing necessary for the triumph of evil is for good men to do nothing." M. Scott Peck, MD.

Because of word-count limits in his appellate Reply Brief filed on May 16, 2017, instead of informing the Court of Appeals of all the offending attorneys' conduct unbecoming a member of the Court's bar and contrary to professional standards, Zinnel was relegated to the following line on page 1 of his Reply Brief: "Many of the 'facts' stated in the government's brief are inaccurate, but Zinnel lacks enough extra space to list them here." (BS 6950).

Upon the failure of the justice system at every level, the ethics rules require that attorneys report the conduct of these prosecutors. The rule states: "A lawyer who knows that another lawyer has committed a violation of the Rules of Professional Conduct that raises a substantial question as to that lawyers's honesty, trustworthiness, or fitness as a lawyer in other respects shall inform the appropriate professional authority." It is not only attorneys' legal and ethical duty to file charges, but also that attorneys have a moral obligation as lawyer-citizens not to just sit back silently and contently and do nothing. (BS 1505 - 1510).

Further, informing is a right or privilege secured by the constitution or laws of the United States. Velarde-Villarreal v. United States, 354 F. 2d 9, FN 3 (9 CA, 1965) citing In re Quarles & Butler, 158 U.S. 532, 535-36 (1895). It is the duty and right...of every citizen to assist in prosecuting, and securing the punishment of any breach of the peace of the United States. Id. A citizen has a constitutional right to inform the government of violations of federal law...a privilege of citizenship guaranteed by the Fourteenth Amendment. Equal Employment Opportunity Commission v. Pacific Press Publishing Association, 676 F.2d 1272 (9 CA, 1982).

18 U.S.C. 3332 concerns the powers and duties of a grand jury and requires the grand jury to inquire into offenses against the criminal laws of the United States alleged to have been committed within the district. The statute states any attorney appearing on behalf of the United States who receives information concerning alleged offenses from ANY person, SHALL, if requested, inform the grand jury of such alleged offenses. (BS 1501). The function of the grand jury is to investigate any alleged crime, no matter how or by whom suggested to them. In re Hale, 139 R. 496, 498 (C.Ct. SDNY 1905). (BS 1501).

The Supreme Court has found "SHALL" to be "the language of command." Escoe v. Zerbst, 295 U.S. 490, 493 (1935). "The word 'SHALL' generally indicates a command that admits of no discretion on the part of the person instructed to carry out the directive." Association of Civilian Technicians v. FLRA, 22 F.3d 1150, 1153 (D.C. 1994). (BS 1502).

18 U.S.C. 4 makes misprison of a felony a federal crime and the law requires "whoever having knowledge of the actual commission of a felony...and conceals and does not as soon as possible make know the same to some judge" SHALL be "fined and imprisoned for not more than three years." (BS 1503). It is apparent from 18 U.S.C. 4 that concealment of crimes and agreements to do so are not looked upon with favor." Branzburg v. Hayes, 408 U.S. 665 (1972). Further it is the duty of citizens having knowledge of commission of a felony to communicate such information to authorities. Bear v. United States, 59 F.2d 940 (CA 8, 1932). (BS 1503). Zinnel has been, and will to continue to be a law-abiding citizen. Further, Zinnel is fearful that if he did not make his knowledge known to some judge as soon as possible, the five offending Department of Justice attorneys are vindictive, creative, and bad enough, to charge and try Zinnel for Misprison of a Felony in violation of 18 U.S.C. 4.

18 U.S.C. 3 concerns Accessory after the Fact and makes it a federal crime subject to imprisonment for whoever "receives, comforts, or assists the offenders," in this case the five offending government attorneys, "in order to hinder or prevent their apprehension, trial, or punishment." (BS 1504).

Finally, Zinnel is foreclosing on the offending attorneys' karma as he has an overwhelming desire to make the cheating five government attorneys pay for what they have done. Lawyers that cheat and don't follow the rules, must be exposed. As Justice Brandeis said many years ago, "Sunlight is the best disinfectant."

ATTORNEY DISCIPLINE AND SANCTIONS

"A Court of Appeals may discipline an attorney who practices before it for conduct unbecoming a member of the bar for failure to comply with any court rule." See Fed.R.App.P.46(c), In Re: Thomas v. Girardi, Esq., 611 F.3d 1027

(9 CA, 2010) (BS 3027). Sanctions may be imposed for failure to comply with 9th Cir. Rule 28-2.8, particularly with respect to record references. Mitchel v. General Electric, 689 F.2d 877, 879 (9 CA, 1982). Likewise, the State Bar of California can also discipline an attorney for deceit, collusion, misleading a judge, advancing facts prejudicial to the honor or reputation of a party, or maintaining an action from any corrupt motive, passion, or interest. See Cal. Business and Professions Codes sections 6068 and 6128. (BS 3003-3004). As the Supreme Court of California said in Pickering v. State Bar, "Section 6103 of the Business and professions Code...provides that any violation by an attorney of his oath or professional duties constitutes cause for suspension or disbarment. (BS 3004). Moreover, within the Department of Justice, the Office of Professional Responsibility ("OPR") is required to "receive, review, investigate, and refer for appropriate action allegations of misconduct involving Department attorneys that related to the exercise of their authority to...litigate." 28 C.F.R. sec. 0.39a(a)(1).

Based on what has happened to Zinnel and others (for example former Senator Ted Stevens of Alaska as described by District Court Judge Emmet Sullivan and the conduct described in the May 19, 2016 order by District Court Judge Andrew S. Hanen in State of Texas, et. al. v. United States of America, 2016 U.S. Dist. Lexis 79546 (U.S.D.C., Southern District of Texas, Brownsville, 5/19/16) FN#1,) whatever it is that the Department of Justice Office of Professional Responsibility has been doing, it has not been effective. The DOJ's Office of Professional Responsibility purports to have as its mission, according to the DOJ's website, the duty to ensure that DOJ attorneys "perform their duties in accordance with the high professional standards expected of the Nations's principal law enforcement agency." The DOJ's lawyers in Zinnel's case did not meet the most basic expectations.

RELIEF REQUESTED FROM THE COURT OF APPEALS FOR THE NINTH CIRCUIT AND DISCIPLINE OPTIONS TO CONSIDER

1) Issue an order to the District Court to dismiss the Criminal Case against Steven Zinnel and Derian Eidson for egregious prosecutorial misconduct;

2) Issue an Order to Show cause as to why the attorneys should not be disciplined including being suspended from practicing before the Court of Appeals for the Ninth Circuit and the United States District Court, Eastern District of California for a period of time;

3) The Court exercise its supervisory power to make it clear that the misconduct was serious;

4) Issue an order preventing the five offending government attorneys from any further involvement in United States v. Steven Zinnel, C.A. case no. 14-10141 and U.S.D.C. ED CA case no. 11-cr-00234-TLN;

5) Refer the five offending government attorneys to the State Bar of California for investigation and appropriate discipline;

6) Refer the five offending government attorneys to the DOJ's Office of Professional Responsibility for investigation and appropriate discipline;

7) Strike the United States' Answering Brief filed in Zinnel's appeal on February 23, 2017, DktEntry: 69 (BS 6801);

8) Consider, in the interest of justice, the appointment of a nongovernment, disinterested attorney, to prosecute the matter;

9) Strike the five offending attorneys from the rolls of attorneys permitted to practice before the United States Court of Appeals for the Ninth Circuit pursuant to F.R.A.P. 46(b)(1)(A)(B); see Gadda v. Ashcroft, 377 F.3d 934 (9th Cir. 2004;

10) Order the Department of Justice and the offending attorneys to preserve all files, electronic correspondence-everything related to Steven Zinnel-and cooperate fully in the investigation, including providing any investigator access to investigative files and all witnesses;

11) Assess monetary sanctions against the five offending government attorneys;

12) Order the five offending government attorneys to take ethics classes like United States District Court Judge Andrew S. Hanen did on May 19, 2016 (FN#1);

13) Issue Rule 11 sanctions as appropriate; and

14) Refer to the Grand Jury for investigation pursuant to 18 U.S.C. 3332.

The Department of Justice is the world's largest law firm with unlimited resources. One wise district court judge noted over fifty years ago: "The Government is the strongest litigant in the world. They have the F.B.I. and all the government agencies available to them. Nevertheless, in the first trial, the government counsel staunchly opposed the defendant's motion for a bill of particulars, [like they did in Zinnel's case], which would have given the defendant some little warning of what he was to be tried for." Lenske v. United States, 383 F.2d 20 (9 CA, 1967) (defendant was improperly convicted of tax evasion and fraud where the government did not provide sufficient notice of the charges and did not prove guilt beyond a reasonable doubt).

Fairness is and must be the hallmark of federal-court litigation, and the essence of fairness is the provision of a level playing field. Misguided, ignorant, overzealous, ambitious, narcissistic, or dishonest current and former prosecutors, some of which destroyed innocent people such as Zinnel and Eidson while they misled the court, jury, and other attorneys, to win at all costs, are making daily decisions that affect all of our lives and the very future of this country. The offending attorneys' conduct stands in sharp contrast to the oath by which they swore to "uphold and defend the Constitution of the United States of America." (see California Business and Professions Code section 6067 (BS 3003)).

Much more must be required of those who have the honor, privilege, and responsibility of representing us in our courts. They hold in their hands the very lives of our citizens while they are entrusted with and wield the fearsome might and unbridled power of the Sovereign to seek Justice or deal egregious Injustice.

In the past, the various bar associations and the DOJ's Office of Professional Responsibility have abdicated all responsibility regarding the bar members that are employed by the Department of Justice as Assistant United States Attorneys prosecuting citizens of the United States. What's it going to take for bar and DOJ counsel to start taking seriously all those sweet flowery words that Justice Robert Jackson used to speak about the duties of a prosecutor? It is Zinnel's hope that this complaint will be different. If the facts contained in this submission are not enough to warrant a real investigation and actual appropriate attorney discipline, our laws and rules of ethics are meaningless.

We must have a justice system not a judicial system. Our system of justice is crying for a culture change. We must return to a system in which prosecutors seek justice more than headlines and in which judges are willing to judge. In Zinnel's case, the Department of Justice prosecutors Matthew D. Segal, Audrey B. Hemesath, and Kevin C. Khasigian along with District Court Judge Troy L. Nunley (FN#2) could be the poster children of injustice. Our Founding Fathers created these separate but equal branches of government. They intended the courts to serve as a check and balance on the executive branch, which runs the prosecutors, and on the legislative branch, which makes the laws. Judges are the only one ones who can save a defendant the unbelievable stress and anxiety of a trial on bogus charges and concocted facts. When judges hold prosecutors to the highest standards and provide a fair trial, they do justice.

Zinnel thanks you in advance for the serious attention this submission deserves and justice demands.

Seeking Justice,

Steven Zinnel                Dated: May 24, 2018
Claimant

cc: See Distribution List in Section #7

FN#1
In a May 19, 2016 order, based on deplorable conduct by DOJ attorneys, United States District Court Judge Andrew S. Hanen ordered in State of Texas v. United States of America, Civil No. B-14-254, 2016 U.S. Dist. Lexis 79546 (U.S.D.C., Southern District of Texas, Brownsville, 5/19/16) that the Attorney General was to inform him within sixty (60) days of what steps the Attorney General was taking to ensure that the Office of Professional Responsibility effectively polices the conduct of the Justice Department lawyers and appropriately discipline those whose actions fall below the standards that the American people rightfully expect from their Department of Justice.

In orders issued on December 19, 2008, April 8, 2009, October 12, 2010, and February 8, 2012, Judge Emmet Sullivan outline d the Department of Justice prosecutors' deplorable conduct in United States v. Theodore (Ted) Stevens, United States District Court for the District of Columbia case no, 08-cr-23-EGS. see 2008 U.S. Dist. Lexis 123464, 2009 U.S. Dist. Lexis 125267, 744 F. Supp. 2d 253 (2010 U.S. Dist. Lexis 108591), and 842 F. Supp. 2d 232 (2012 U.S. Dist. Lexis 15656).

The prosecutorial misconduct in Zinnel's and Eidson's case is orders of magnitude more egregious than Texas v. United States and United States v. Stevens

FN#2
Zinnel is well-aware of the lawyer phrase that "after every trial, the judge has made one temporary friend and one permanent enemy," but first-time federal Judge Troy L. Nunley was just an extension of the prosecution team. He might as well have been in the government's huddle when the play-calls were made. The government lawyers drive to win at all costs had no governor to keep them from over-revving once the turbo charger kicked in.

# SECTION #1
# BACKGROUND

Steven Zinnel, #66138-097
Federal Correctional Institution, Terminal Island
P.O. Box 3007
San Pedro, CA 90733-3007

_____BACKGROUND_____

This submission arises out of a federal criminal bankruptcy fraud case that went horribly wrong. The offending DOJ attorneys charged more offenses than warranted, deliberately misstated the evidence, allowed witnesses they knew were not truthful to testify, made improper and misleading statements to the jury, and made unsubstantiated statements to the media that were designed to arouse public indignation. In short, the government prosecutors struck foul blows and won at all costs. The trial was in Sacramento, California and the resulting appeal is pending in the Court of Appeals for the Ninth Circuit. The criminal defendants are Steven Zinnel ("Zinnel") and attorney Derian Eidson ("Eidson") and the courts and case numbers are:

United States v. Steven Zinnel & Derian Eidson, United States District Court, Eastern District of California no. 2:11-cr-00234
United States v. Steven Zinnel & Derian Eidson, United States Court of Appeals for the Ninth Circuit nos. 14-10141/14-10196

Steven Zinnel (BS 6971) was the only defendant who filed bankruptcy, over a decade ago. The triggering event was Enron filing bankruptcy owing Zinnel's corporations a significant amount of money. (ER 1246-1247).

Zinnel is now 54 years old, a father of two, highly educated including a MBA, was a holder of many professional licenses, a serial entrepreneur, and was the Chief Executive Officer of a holding company that owned various businesses including several large electrical contractors. (ZSER 21-41). As a result of his position and businesses, Zinnel personally guaranteed corporate construction bonds two decades ago. (ER 1246-1247). Zinnel's wife at the time, Michelle Zinnel, also personally guaranteed the corporate construction bonds. Enron's unprecedented massive fraud in 2001 and resulting non-payment to the electrical contractors, caused bond claims in 2002 on the corporate construction bonds that Mr. and Mrs. Zinnel had personally guaranteed during the marriage which ended in 1999 as a result of Michelle Zinnel's extramarital affair. After Mr. and Mrs. Zinnel defended themselves against the bonding companies' lawsuits against them for three years, they both threw in the towel and both filed bankruptcy. Mrs. Zinnel filed personal bankruptcy in January 2005 (ER 1226, RFJN Ex. 13, ZJN 123-124) and Mr. Zinnel followed six months later filing bankruptcy in July 2005. (SER 185). Both of the Zinnels' bankruptcy estates were closed by September 2006 with the bankruptcy estates fully administered. (SER 238).

The criminal case began based on a tip to the FBI from Mr. Zinnel's unfaithful, greedy, and vindictive ex-wife Michelle Zinnel. (Clerk's Record containing the Docket No., hereinafter "CR," #310, p. 18, BS 6094). Based on information Michelle Zinnel provided the FBI, the government agents found a business associate of Mr. Zinnel's, Tom Wilbert and his wife Julia, who had engaged in criminal conduct, i.e. bank fraud, wire fraud, mail fraud, tax fraud, insurance fraud, money laundering, obstruction of justice, and perjury. The government promised the Wilberts non-prosecution and the retention of their millions of dollars in ill-gotten wealth, if they would not only sing like a nightingale whenever it whistled the tune, but compose as well. The Wilberts and their lying attorney Frank Radoslovich, advanced the government's fantasy theory of bankruptcy fraud and money laundering against Mr. Zinnel and collaterally Ms. Eidson. The offending DOJ lawyers and government special agents staged a sting operation under the guise of confidentially protected settlement negotiations in a law office conference room and circumvented that confidentiality by including attendance at those negotiations in its indictment as "charged conduct" and as evidence at trial, even though no settlement was reached and no money changed hands. (ER 671, 674-676, 840, 1564, 1565, ER 791, 881, 1450).

Mr. Zinnel was indicted for bankruptcy fraud and money laundering on June 8, 2011 (CR 1) which was 90 days before the five-year statute of limitations would have expired. Derian Eidson, an attorney, was also indicted with the government alleging she assisted Mr. Zinnel with his purported transgressions. Count 1 of the indictment purposely omitted and/or was vague concerning alleged transfers and concealments of unspecified assets in contemplation of bankruptcy to confuse the defendants and the jury. Thus, the indictment was unconstitutionally vague as to what property Zinnel allegedly pre-petition transferred or post-petition concealed making preparation of his defense impossible. In contradiction, Count 2 was specific in alleging post-petition concealment of six (6) properties, identified by name, none of which included Zinnel's personal WAMU checking account, that allegedly belonged to the bankruptcy estate and were concealed from the bankruptcy court and creditors. The money laundering counts were based on nine checks written from one corporation to another corporation and deposited into the corporation's bank account. The checks were a mere transfer of money from one account to another, easily traceable by law enforcement, that cleared, with no one losing any money. By charging "money laundering" consisting of a check in the amount of $4,826.20 (ER 1402), the government was able to circumvent the five-year statutory maximum imprisonment for bankruptcy fraud (ER 214 & 488A) and seek 20 years in prison which government lawyer AUSA Matthew Segal requested at Zinnel's sentencing (ER 1231).

## PLEA OFFERS

Pre-trial, Zinnel and Eidson were offered two written plea offers by the government. (ER 1240-1241). The first one, the government offered to allow Ms. Eidson to plea to misdemeanor "extortion," so she would lose her livelihood as a 24-year attorney, and accept a sentence of a year and a day in prison which would have resulted in incarceration of around seven months. In the same plea offer, the government offered Zinnel just under five (5) years in prison. In the plea offer, the government detailed the base Offense Level and the enhancements the government represented applied to Zinnel which was represented to be Offense Level 26. (ER 1240). In the second written plea offer, the government raised Eidson's offer to five (5) years, but the Zinnel plea offer remained five (5) years in prison. With the second plea offer, the government actually included a draft Plea Agreement that was ready-to-file with the court that represented to the court, defense counsel, and the parties that "five years in prison was the appropriate sentence in this case." (ER 1241). Neither plea offer included a fine.

## PRE-TRAIL MOTIONS

Before trial, Zinnel moved to exclude evidence of settlement negotiations between Zinnel and Tom Wilbert and their respective lawyers Derian Eidson and Frank Radoslovich, and to exclude an email from Zinnel to his ex-wife, as violations of Federal Rule of Evidence 408. (CR 79). The offending DOJ attorneys vehemently opposed Zinnel's motion and the court sided with the government attorneys and denied the motion to exclude evidence of settlement negotiations.

## TRIAL

Trial started on July 1, 2013 before Judge Troy L. Nunley who was presiding over his first jury trial as a newly appointed federal judge. The offending DOJ attorneys created fictional theories for which they had no evidence such as "Zinnel faked his financial death," "Zinnel's motive was to file bankruptcy to dodge paying child child support," "Zinnel created shell companies," and Zinnel concealed millions of dollars worth of property from his bankruptcy estate. It is noteworthy that child support is not dischargeable in bankruptcy as a matter of law. (ER 494, 11 U.S.C. 523(a)(15)). Further, Zinnel did not file bankruptcy to shield from family law, reduce child support, or cheat creditors. (ER 1247).

During the trial, the Wilberts delivered what the offending DOJ lawyers requested. The Wilberts not only sang, but they composed as well by their lies under oath while testifying as witnesses at the trial. The offending DOJ attorneys suborned perjury by allowing their witnesses to commit perjury. Further, the offending DOJ attorneys allowed an attorney named Frank Radoslovich to testify wherein he admitted under oath that he lied to attorney Eidson during the confidential settlement negotiations in his law office conference room that were secretly recorded by the FBI. (ER 204, 791, 881, 1458). Neither Zinnel or Eidson testified at trial and no new facts came out at trial.

Over Zinnel's objections, the offending DOJ lawyers insured that the bankruptcy fraud jury instructions were fatally flawed because the DOJ prosecutors insisted on "the alleged" and "the above" items of concealed property with no items listed. Further, the government attorneys' drafted money laundering instructions gave inadequate guidance on "specified unlawful activity" and the meaning of proceeds, and improperly instructed that a simple transfer of cash from one corporation to another constituted money laundering in violation of 18 U.S.C. 1956.

The offending DOJ lawyers presented evidence that Zinnel concealed three properly interests not charged in the indictment. (ER 890, SER 47, ER 915, BS 6824, 6930, & 6933). The prosecutors' argument that jurors could convict Zinnel of bankruptcy fraud based on those uncharged concealments (ER 1053, 1054, 114, 119, BS 6934-6937), and the inadequate jury instructions enabled jurors to convict based on conduct not charged by the grand jury. (ER 221-225). This is a Constructive Amendment and/or a Variance. A Constructive Amendment is thought to be bad because it deprives the defendant of his right to be tried only upon the indictment as found by the grand jury. A Variance is thought to be bad because it deprives the defendant of notice of the details of the charges and protection against re-prosecution. The hallmark of due process is (1) notice of what crimes he is going to be tried for and (2) fair hearing. As a result of the court's and prosecutors' reversible errors, Zinnel was surprised at trial and unprepared to defend the previously undisclosed allegations. The constructive amendment and/or prejudicial variance requires reversal of all convictions because it is impossible to know whether the jury convicted Zinnel on the uncharged conduct. Reversal is also required on the money-laundering counts, which depend on the predicate offenses charged in Counts 1 and 2.

Zinnel objected to the jury instructions for Counts 1 and 2 and requested specification of the property interests charged in the indictment, citing the risk that without such clarification, the jury could convict on conduct not charged in the indictment. The court overruled the objection.

## INADMISSIBLE SETTLEMENT NEGOTIATIONS

The DOJ lawyers virtually forced the trial judge to error in allowing the secretly recorded evidence of settlement negotiations in a law office conference room between attorneys, based on improper pretrial findings of guilt. The evidence was used to prove the invalidity of disputed claims and to establish criminal liability, in violation of Federal Rule of Evidence 408. This evidence was prejudicial because the offending DOJ attorneys used it pervasively throughout the trial and arguments, and it impacted every count of conviction.

A central issue in this case is whether secret recordings of settlement discussions between two attorneys (one being defendant Eidson) in the sanctity of a law office were erroneously admitted into evidence in the criminal trial in violation of Federal Rule of Evidence 408 ("FRE 408"). Over a motion to suppress and trial objections, the government's evidence at trial consisted in large part of secret recordings of settlement negotiations. Both Zinnel and Eidson filed a motion to suppress the recordings under FRE 408 (ECF #79). In the government's opposition, the offending DOJ attorneys cited Ausherman v. Bank of America, 212 F. Supp. 2d 435 (U.S.D.C., District of Maryland) (ECF #102, p. 2, line 7). The case does discuss FRE 408, but it really holds that an attorney can never lie to another attorney or party in a settlement negotiation. During the trial, the government's agent, civil attorney Frank Radoslovich, admitted under oath on the witness stand, that he lied to attorney Eidson and that the two meetings in his conference room secretly recorded by the FBI were valid settlement discussions. Thus, the offending DOJ attorneys staged a private civil attorney lying in a settlement meeting. Further, Magistrate Judge Frank R. Zapata captured the essence of Rule 408 when he ruled: "It should be assumed that the law has written over the door of every such conference room the words 'ye who enter here do so without prejudice'...The court finds that the alleged statements made during the private confidential settlement negotiations are excludable under both Rule 408 and Rule 403. Defendant's motion in limine #1 is granted." (see Nomo Agroindustrial SA DE CV v. Enza Zaden North America, Inc., U.S.D.C. for the District of Arizona, case no. CV 05-351-TUC-FRZ, 2009 U.S. Dist. Lexis 8657; 2 Weinstein's Federal Evidence, 2d Ed. 2017). These cases confirm that the offending DOJ attorneys should not have condoned and encouraged lying by attorney Frank Radoslovich. (ER 791, 881, 1458).

If the government attorneys' interpretation of FRE 408 were allowed to stand, then no attorney could safely engage in settlement discussions where there is any claim of alleged fraud, past unlawful conduct, or untruthfulness by either party to the negotiations. Confidential settlement discussions are a fundamental aspect of the judicial system, and without the protections offered by FRE 408, the court system would grind to a halt. Every attorney in America should be concerned with the offending DOJ attorneys using a private civil attorney like Frank Radoslovich as their agent, telling him to lie in settlement meetings, secretly record the settlement discussions, charge attendance at the meetings in its indictment, and then use the recordings extensively at trial to establish guilt and argue for conviction.

The offending DOJ attorneys elicited prejudicial, inadmissible expert testimony from two lawyers, Radoslovich and Gee, on conclusions of law, including the disclosure obligations of bankruptcy debtors, Zinnel's alleged commission of bankruptcy fraud, and that paying Zinnel would constitute money laundering. Attorney Radoslovich was not disclosed or qualified as an expert, and the improper testimony invaded the province of the jury and denied Zinnel's Sixth Amendment rights.

Because of the offending DOJ lawyer's misconduct, Zinnel and Eidson were erroneously convicted of conspiracy to commit money laundering. The government lawyers failed to present sufficient evidence as to any of the elements of money laundering --a "financial transaction" or "monetary transaction" affecting interstate commerce, knowledge that the funds at issue represented the proceeds of bankruptcy fraud, and the transactions were done with the purpose of laundering the proceeds of bankruptcy fraud. Perhaps most fundamentally, the DOJ offending lawyers failed to prove any transaction that in fact involved the proceeds of bankruptcy fraud because the supposed settlement negotiations would never have led to money changing hands, much less laundering of that money, but were instead a government sting involving a government agent lawyer blatantly lying to attorney Eidson in his law office conference room. Further, the government lawyers failed to prove any agreement between Zinnel and attorney Eidson.

On July 16, 2013, a jury convicted Zinnel of concealment or transfer of property allegedly belong to the bankruptcy estate (ER 251-256), which according to the government was required to be disclosed on Zinnel's bankruptcy schedules filed with the bankruptcy court in 2005. Zinnel was also convicted of money laundering based on checks from System 3, Inc. to Done Deal, Inc. that were deposited into Done Deal's bank account and cleared with no one losing any money. One of the money laundering convictions was for a check in the amount of $4,826.20. (ER 1402). This one transaction, allowed the government to circumvent the statutory maximum of five (5) years in prison for bankruptcy fraud (SER 222), and seek the maximum of twenty (20) years in prison for money laundering which the government ultimately requested (ER 1231).

Even though Zinnel had two years of perfect pre-trial release conduct and was not a flight risk or danger to the community, Zinnel was remanded into Sacramento County Jail from the courtroom and never went back to the Zinnel Family Home. Zinnel spent over nine months in a concrete box for a cell locked inside for 23 hours per day, including a period of 56 hours straight, over the New Years holiday.

Prior to sentencing, Zinnel submitted to the court over 260 bankruptcy fraud cases (ER 416, 419. 422, 424-431, 440-447, 1173-1207, BS 6977-6978) that detailed that if Zinnel received more than a twenty-two (22) month prison sentence, there would be unwarranted disparity in violation of the law codified in 18 U.S.C. 3553(a)(6). One of the cases Zinnel presented to the court was Letantia Bussell who after being convicted at trial for bankruptcy fraud with loses exceeding $3,000,000, received a prison sentence of 36 months (ER 424, 1240, BS 6977).

After representing twice pre-trial that five (5) years in prison was the appropriate sentence for this case (ER 1241) and that Zinnel was Offense Level 26 (ER 1240), the government represented to the court that after trial Zinnel was an Offense Level 41 (27 to 33 years in prison) (ER 294, ECF 296-1 p. 6) and Ms. Eidson was an Offense Level 38 (19 to 24 years in prison). The government lawyers urged the new judge to sentence Zinnel to the money laundering statutory maximum of 20 years in prison. The same offending DOJ attorneys urged the court to sentence Eidson to 15 years in prison representing to the court that "in the Luong case, Judge Shubb gave a near life sentence for money laundering so [15 years] is relatively short." (ER 1319, BS 6081). This was just another blatant misrepresentation by the offending DOJ attorneys in this case as John That Luong, an Asian Triad gang leader, was convicted for causing death in a crime of violence, robbing computer chip companies, and being a large heroin dealer, but NOT money laundering. Judge Shubb actually sentenced Mr. Luong to life in prison plus 85 years in Sacramento. (BS 6082-6083; United States v. John That Luong, U.S.D.C. ED CA no. 99-cr-00433). In a similar case in the Northern District of California, Mr. Luong was sentenced after appeal to 65 years. (BS 6084-6085; see United States v. John That Luong, U.S.D.C. ND CA no. 96-0094 MHP). In neither case, was Mr. Luong charged with or convicted of money laundering (BS 6082-6085). Further, Eidson is convicted of attempted money laundering as a result of an illegal government sting wherein the government agent offered Ms. Eidson $4 million dollars, a figure to garner a nine-year sentencing enhancement, that she did not accept, which is just another example of the offending DOJ lawyers willful misleading a judge in this case and single-minded focus on winning at all costs.

The offending DOJ attorneys told the court twice during sentencing that the sentencing was "academic because we had a trial here." (ER 1176, 1180-1181). The offending DOJ attorneys represented to the court that Zinnel caused a loss of $3,615,758 comprising of eleven victims. (BS 6975-6976, Reply Brief). Loss and number of victims were hotly contested as all listed on Zinnel's bankruptcy schedules were disputed (Reply Brief pp. 33 & 34, BS 6975-6976). That is what Zinnel admitted under penalty of perjury eight years before sentencing (BS 6975-6976). However, at sentencing, the offending government lawyers did not call a single witness or submit evidence to refute Zinnel's objections on loss and number of victims. The government lawyers relied on Zinnel's bankruptcy schedules and verdicts. The offending DOJ lawyers ignored the glaring facts that Zinnel disputed every unsecured debt he listed on his bankruptcy schedules. To provide a complete picture of the offending DOJ attorneys' propaganda in loss and number of victims, in his Reply Brief filed in his appeal, Zinnel provided excerpts of his bankruptcy schedules copied and pasted for the eleven claims that the DOJ attorneys speciously represented to the District Court and the Court of Appeals comprised the loss amount and number of victims in Zinnel's case for sentencing purposes (BS 6975-6976). The proven loss in Zinnel's case is zero and the number of victims is zero. The DOJ lawyers have not proved otherwise. Incredibly, these two enhancements for Loss and Number of Victims, erroneously applied based on no evidence, shockingly raised Zinnel's sentence from 2 years to 17.67 years in prison.

The government prosecutors persuaded the trial judge to overstate Zinnel's Sentencing Guidelines by 28 Offense Levels. The jury, with their convictions, found Zinnel to be Offense Level 8 which should have been 0 to 12 months in prison. However, at sentencing, the offending DOJ lawyers represented to the court that Zinnel was Offense Level 36 with a Sentencing Guideline range of 188-235 months in prison and urged the new judge to sentence Zinnel to an above-guideline term of imprisonment of 240 months (20 years). (ER 1231).

A SENTENCE OVER 22 MONTHS WOULD RESULT IN UNWARRANTED DISPARITY WHEN COMPARED TO SIMILARLY SITUATED DEFENDANTS

Federal sentencing courts are explicitly directed to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. 3553(a)(6).

Zinnel challenged the government lawyers' requested sentence of 20 years (ER 1231) on disparity grounds as well. Congress has told sentencing courts that they MUST avoid unwarranted sentencing disparities as codified in 18 U.S.C. 3553(a)(6).

However, the offending DOJ attorneys misstated the law by representing to the new judge that under United States v. Treadwell, 593 F.3d 990 (CA 9, 2010), the judge could ignore Zinnel's disparity challenge "if you calculate the guidelines correctly." (ER 1229). The DOJ attorneys argued that Treadwell trumps section 3553(a)(6). (ER 1229). This flies in the face of 3553(a)(6) and the Supreme Court's holding that the guideline range is but one of the 3553(a) sentencing factors that must be considered. Kimbrough v. United States, 552 U.S. 85, 90 (2007). The government lawyers' misstatement of well-settled law misled the trial judge to not consider avoiding unwarranted disparity in violation of 18 U.S.C. 3553(a)(6).

In the Ninth Circuit, a landmark sentencing case is U.S. v. Carty, 520 F. 3d 984 (9 CA, 2008) (en banc) which holds that there is a three-step sentencing requirement: (1) properly calculate the guideline range, (2) the parties must be given a chance to argue for a sentence they believe is appropriate, and (3) the district court should consider the 3553(a) sentencing factors to decide if they support the sentence suggested by the parties. Id. 992-994. Carty also holds that the guidelines ARE NOT presumptively reasonable.

The government often shoots big cannons at small birds. Zinnel's sentencing, in which the government admitted was a typical mill run bankruptcy fraud case (AB 154), with no loss or number of victims proven by the government (BS 6975-6976), became an erroneous sentencing argument on child support with a liberal dousing of name calling; rhetoric won over reason. However, the government lawyers never even mentioned any alleged victim other than their manufactured "victim" of Zinnel's bitter and greedy ex-wife of 13 years previous. The PSR, albeit erroneously, identifies the largest "victims" in this case as being two big insurance companies and Wells Fargo Bank, this nation's third largest by assets, with an alleged loss of $8,506. The government's sentencing memorandum spewed the DOJ attorneys' unsupported propaganda that Zinnel was a bad dad and had an untrue and unproven motive to file bankruptcy to dodge paying child support which is not dischargeable as a matter of law. (ER 494, 11 U.S.C 523(a)(15)). AUSA Matthew D. Segal resorted to venomous name calling, writing that Zinnel was "incorrigible, a wicked man, and a vile man with nothing redeeming." The government lawyer's rancor was entirely refuted by the numerous positive character letters regarding Zinnel that were transmitted to the court and prosecutors. At sentencing, the prosecutor requested that Zinnel be given an above-guideline sentence of 20 years in prison, characterizing it as an "extremely deterrent sentence." (ER 1231). So is life plus cancer. AUSA Matthew Segal informed the court that "this was one of the longest sentences that he had ever asked for in 17 years as a prosecutor recognizing it is a very long sentence, but [Zinnel] did a terrible thing and deserves to suffer for it." The DOJ attorneys made a big deal in their sentencing memorandum that Zinnel told his son on the phone on his first day in jail ever, that "daddy got railroaded." Zinnel's appeal exposes how prophetic Zinnel's words were as he was "railroaded" by the Reading, Pennsylvania, B&O, and the Short Line.

Zinnel was sentenced on March 4, 2014. During the sentencing, the court cumulatively added 28 objected-to levels of enhancements. The court found that Zinnel was just like Letantia Bussell (ER 1182-1183), and the court did not even mention the word disparity. Even though Zinnel had no criminal history and similarly situated defendants were sentenced to twenty-two (22) months in prison (BS 6977-6978), the court imposed a 212-month prison sentence (17.67 years), near the statutory maximum of 20 years that the government requested, the maximum of three years of supervised release, the maximum $500,000 fine, $2,513,319 in restitution, and $1,297,158.20 in a forfeiture judgment. On April 2, 2014, attorney Derian Eidson was sentenced to over ten (10) years in prison, with no criminal history, loss, victims, or restitution.

As Zinnel informed the court at his sentencing, Zinnel filed bankruptcy because Zinnel personally guaranteed corporate construction bonds, two decades ago, and his company could not complete construction jobs in large part because Enron filed bankruptcy owing Zinnel's company around $800,000 (ER 1246-1247). Former Enron CEO Jeffrey Skilling and others, systematically defrauded investors and siphoned money from millions of people by manipulating prices and employing false accounting. Among the Enron corporate officers' many crimes, the Enron officers defrauded the State of California out of billions of dollars during the 2000-2001 energy crisis by creating artificial energy shortages and jacking up prices. At one time, based on its market capitalization, Enron was the 8th largest corporation in the United States of America. Enron's bankruptcy in December 2001 led to thousands of layoffs, the collapse of the company's stock price and loss of billions of dollars by investors, including many of the company's own employees. Enron's unprecedented collapse wiped out two billion dollars in employee pension, as well as $60 billion in stock. Five thousand employees lost their jobs, and 20,000 people lost their entire savings.

During Jeff Skilling's tenure as CEO of Enron, between 1999-2001, Mr. Skilling received over $151 million dollars in salary and bonuses, or more than 60 times the bogus fictitious restitution of $2,513,319 ordered in Zinnel's case. By contrast, Zinnel received none of the $2,513,319 in ordered restitution because the completely disputed creditors in Zinnel's bankruptcy case are primarily as the result of his personal guarantee of corporate insurance policies in the form of corporate construction bonds. Enron's unprecedented collapse, will likely go down as the white collar crime of the century. However, ironically, for an alleged loss of $2,513,319 with an alleged eleven (11) victims, miniscule when compared to the $2,000,000,000.00 ($2 billion) in Enron losses and 20,000 Enron victims, Zinnel is currently sentenced to prison 11 years more than Enron CFO Andrew Fastow, the true architect of the fraud within Enron, 15 years more than Fastow's corrupt protege Michael Kopper, 4 years more than Fastow's boss Enron CEO Jeff Skilling, 15 years more than Charles Ponzi, and 7 years longer than Al Capone. Any rational jurist, prosecutor, or citizen would consider 18 years in prison and a decade in prison in a bankruptcy fraud case as draconian and unprecedented.

In a government press release issued on March 4, 2014 within hours of Zinnel's sentencing (ZJN 175; Exhibit 16), the government bragged that Zinnel received the longest prison sentence for bankruptcy fraud in the history of the Eastern District of California thus demonstrating the offending DOJ attorneys' advanced knowledge of unwarranted disparity. Zinnel's research reveals that he actually received the longest prison sentence for bankruptcy fraud in the history of the United States by almost double (BS 6131-6134). In the same press release, the offending DOJ attorneys lied by stating that Zinnel's motive in filing bankruptcy was to avoid paying child support. Steven Zinnel was not charged with not paying child support, the criminal indictment does not contain the words "child support," and child support is not dischargeable in bankruptcy as a matter of law (ER 494; 11 U.S.C. 523(a)(15)). Zinnel was completely current on child support when the trial started and had been for years, and not a shred of evidence was presented at trial that Zinnel's motive was to avoid paying child support (ER 1247). It is tragic and unconscionable that Mr. Zinnel's teenage children have read the government attorneys' lies in their press release. (ZJN 175; Exhibit 16).

In aggravation, it appears that the longest prison sentence in the history of the Sixth Circuit for bankruptcy fraud is the case of U.S. v. Dale, 429 Fed. Appx. 576 (6 CA, 2011). (BS 6134). Dale went to trial and was convicted of bankruptcy fraud for violating 18 U.S.C. 152(1) like Zinnel. Unlike Zinnel's case, in Dale, the indictment actually alleged that Dale filed the bankruptcy petition for the purpose of executing a concealing scheme to defraud his child's mother of child support. (BS 6134). Dale was sentenced to prison for 21 months (BS 6134), 90% less than Zinnel, and no fine.

Trial Tax

The law is well-settled. An accused must not be subjected to more severe punishment for exercising his constitutional right to stand trial. U.S. v. Stockwell, 742 F.2d 1186 (9 CA, 1973). However, as all criminal practitioners, law professors, and defendants know, the trial penalty is the outrageous tax that is imposed upon the accused who dares to seek trial. The trial tax is a product of many factors that imbue prosecutors with virtually unbridled authority to punish criminal defendants disproportionally simply for exercising a fundamental constitutional right. The resulting injustice is pervasive, when a prosecutor concluded that justice will be served by sending a person to prison for one or two years, but then seeks 15 to 20 years just because the person exercised the right to let a jury decide the question of guilt--that is a travesty of justice. If these practices are not restrained, the Sixth Amendment right to a trial will soon be extinct.

If Eidson and Zinnel would have taken a plea, the offending DOJ attorneys would have represented to the district court that I was O.L. 26 and urged a prison sentence of 57 months and 12 months for Eidson. Thus, the federal prosecutors were either lying in their written plea offers when they represented the Offense Levels or lying to the court at sentencing. Under Carty, there can only be one guideline calculation and government attorneys, as officers of the court, are never allowed to misrepresent in settlement offers or misrepresent to the court.

Absurdity of Economic Crime sentences

The sentences urged by the offending DOJ attorneys are long and wrong. As Zinnel's Appellant's Opening Brief recites under the Substantive Unreasonable argument, Justice Bea in U.S. v. Edwards wrote five years ago that "Sooner or later our circuit [Ninth] must come to the final question of...what term of incarceration is unreasonable."

In their consolidated appeal, appellants in their fifties, with no criminal history, but a long history as dedicated parents, decent human beings, an entrepreneur job-creator, and a seasoned attorney, appeal both their convictions and record-setting sentences, resulting in appellants being sent to prison six times longer than similarly situated defendants. After rejecting two five-year plea offers and a one year plea offer, which were represented by the government as being the appropriate sentences in this case, Zinnel was convicted by a jury for bankruptcy fraud and related money laundering predicated on one alleged concealed property. Thereafter, after spending eight months in Sacramento County jail, Zinnel was sentenced by the first-time judge to a miscalculated guideline mid-range sentence of 17.67 years in prison and a $500,000 maximum fine without sufficient explanation.

MASS INCARCERATION IN AMERICA IS CAUSED IN PART, BY VENGEFUL, CHEATING, AND UNETHICAL PROSECUTORS SUCH AS AUSA MATTHEW D. SEGAL, AUDREY B. HEMESATH, AND KEVIN C. KHASIGIAN WHO THUS FAR, REMAIN UNCHECKED BY THE DOJ, STATE BAR, OR JUDGES

"Because we can: The motto of power since the idea of power over others was born in our kind."

"Distrust all in whom the impulse to punish is strong." Friedrich Nietzsche

"The degree of civilization in a society can be judged by entering its prisons."
   Russian writer Fyodor Dostoyevski

Freedom is the United States' founding creed. "Every spot of the old world is overrun with oppression," cried Thomas Paine, but America promises "asylum for the persecuted lovers of civil and religious liberty." Andrew Jackson later told his countrymen, "Providence has showered on this favored land blessings without number, and has chosen you as the guardians of freedom, to preserve it for the benefit of the human race." Subsequent presidents, in wartime and peace, have renewed this sacred charge, proclaiming freedom as America's supranational mission, its unifying cause. In his inaugural address, Barack Obama cast the tradition forward. "Let it be said by our children's children," he said, that "we carried forth that great gift of freedom and delivered it safely to future generations."

America purports to be "the land of the free," yet by one vital measure, it is less free than any other country on earth: it incarcerates a greater portion of its citizenry than any other, about 1 out of every 100 adults. With some 2.4 million person under lock and key, the United States manages the largest penal system in the world, the grandest ever conceived by a democratic government. Just as slavery once stood as a glaring exception to the American promise, so does imprisonment more than two centuries after the birth of the republic.

The United States, by far, incarcerates more of its citizens, for longer periods of time, than any other nation on the planet. The United States is home to 5% of the world's population, but has 25% of the world's prisoners. The United States' incarceration rate is 57% higher than Russia and 36% higher than Cuba, both repressive regimes. No other liberal democracy has an incarceration rate anything like the United States, which is more than 370% higher than the United Kingdom's, almost 800% higher than Germany, and 10 times most other European countries. In fact, we keep more people behind bars that the top 35 European countries combined. The United States has a population of around 350 million and China has around 1.3 billion people. However, communist China with a billion more people, locks up 700,000 people LESS than that United States. Thus, our incarceration rate is four times higher than China's.

The prison population in the United States has increased from 300,000 people in the early 1970s to 2.2 million today. Over the last 30 years, the female prison population has grown by over 800% while the male prison population grew 416% during the same time frame. Sixty-eight percent of the women in prison left behind minor children. According to USA Today, 1 in 14 children in America has a parent in prison. There are nearly six million people on probation or on parole. There's an estimated sixty-eight million Americans with criminal records. One in every fifteen people born in the United States in 1997 is expected to go to jail or prison; one in every three black male babies born in this century is expected to be incarcerated. The United States is the only country in the world that condemns minor children to death behind bars i.e. life in prison without the possibility of parole. The United States, with a highly productive economy, but a troubled society, now has 960,000 farmers and 2.2 million prison inmates--more than twice as many people in jail as live on the land.

Hundreds of thousands of nonviolent offenders have been forced to spend decades in prison. We've created laws that make writing a bad check an offense that can result in life in imprisonment. There are more than a half-million people in state or federal prisons for drug offenses today, up from just 41,000 in 1980. We have abolished parole in many states and in the entire federal system. We've institutionalized policies that reduce people to their worst acts and permanently label them a "criminal." We also make terrible mistakes. Scores of innocent people have been exonerated after being sentenced to long prison terms or even death. Presumptions of guilt and political dynamics have created a system that is defined by error, a system in which thousands of innocent people now suffer in prison. Mass incarceration is one of the biggest social problems the United States faces today. Every year the United States spends $80 billion to keep people locked up, yet one in five kids in America goes to bed hungry every night.

Imprisonment in the United States has achieved unprecedented scale. Combining law enforcement, courts, and prisons, the U.S. criminal justice system consumes $212 billion a year and employs 2.4 million people, more than Wal-Mart and McDonalds combined, the nation's two largest private employers. A new research study has estimated the total cost of incarceration in the United States has surged to a staggering $1 trillion per year--eleven times the $80 billion spent annually on corrections alone, and 6% of the nation's gross domestic product (GDP). For many families across the United States, the high cost of incarceration is nothing new. Many affected families love remanded the federal poverty line and are struggling to pay for raising the children of incarcerated parents, jail phone calls, and placing money on prisoners' institutional accounts. Then there is the "opportunity cost" on the incarcerated person, and his family, because he is not earning money, paying for his children's college, or saving money for retirement. According to the study, an estimated $923 billion in incarcerated-related costs are not factored into annual government budgets. Those hundreds of billions of "invisible dollars" are an enormous drain on overall social welfare, and account for more than 90% of the overall costs of incarceration. There are more than eighteen hundred separate prisons in operation across the country--not counting local jails, juvenile lockups, and immigration facilities. Concrete and concertina wire have become integral features of the American landscape.

So what makes for the madness of American incarceration? According to a new book, "Locked In" by law professor John F. Pfaff, there is a simple explanation: America's prosecutors. Few people in the criminal justice system are as powerful, or central to prison growth, as the prosecutor. Yet here's the remarkable thing. For all their power, prosecutors are almost completely ignored by the public, the DOJ, State Bars, and Courts. If the public were able to observe how often federal prosecutors incarcerate Americans for relatively minor crimes, there would be a backlash. While the police, DEA, FBI, IRS, and other alphabet agencies most often determine who "enters" the criminal justice process, prosecutors have complete control over which cases they file and which ones they pass on. Prosecutors decide sentences until they become judges. Prosecutors can use their discretion to be lenient, but there is basically no limit to how prosecutors can use the charges and sentencing enhancements available to them to imprison Americans for any length of time they want.

It is even more so today, than it was almost 80 years ago, when in 1940 the U.S. Attorney General, Robert Jackson, stated:

"The prosecutor has more control over life, liberty, and reputation, than any other person in America. If the prosecutor is obliged to choose his case, it follows that he can choose his defendants. Therein is the most dangerous power of the prosecutor; he will pick the people that he thinks he should get, rather than cases that need to be prosecuted. With the law books filled with a great assortment of crimes, a prosecutor stands a fair chance of finding at least a technical violation of some act on the part of almost anyone. In such a case, it is not a question of discovering the commission of a crime and then looking for the man who has committed it, it is a question of picking the man and then searching the law books, or putting investigators to work, to pin some offense on him. It is in this realm--in which the prosecutor picks some person whom he dislikes or desires to embarrass, then looks for an offense, that the greatest danger or abuse of prosecuting power lies. It is here that law enforcement becomes personal, and the real crime becomes that of being unpopular or being personally obnoxious to or in the way of the prosecutor himself."

Much of what the United States Attorney's office does isn't open to public scrutiny or judicial review. See United States v. Redondo-Lemos, 955 F.2d 1296 (9 CA, 1992). It is therefore particularly important that the DOJ attorneys discharge their responsibilities fairly, consistent with due process. But the temptation is always there: It's the easiest thing in the world for people trained in the adversarial ethic to think a prosecutor's job is simply to win. "It is disturbing to see the Justice Department change the color of its stripes to such a significant degree, portraying an individual as virtuous and honorable or as corrupt and perfidious, depending on the strategic necessities of the separate litigations." U.S. v. Katter, 840 F.2d 118, 137 (1 CA, 1988).

According to a report by the Project on Government Oversight, the Department of Justice identified more than 650 instances of federal prosecutors violating the profession's rules and ethical standards between 2002 and 2013. More than 400 of these were "at the more severe end of the scale." Prosecutors have been and remain the engines driving mass incarceration in America. This especially true when the prosecutors cheat, lie, and win at all costs like AUSAs Segal, Hemesath, and Khasigian did in Zinnel's case.

Department of Justice prosecutors are supposed to be wearing white hats and riding white stallions. Assistant United States Attorneys are required to act beyond reproach. Government lawyers should not even be in gray areas or come close to crossing legal and ethical lines. Unfortunately, throughout Zinnel's case, AUSA Segal and Hemesath have dressed in all black and have dipped so far below the legal and ethical lines to warrant Ninth Circuit, DOJ OPR, and State Bar intervention.

From the halls of Congress to the classrooms in our schools, we pledge allegiance to one nation under God with liberty and justice for all. Justice means that the punishment must fit the crime. Steven Zinnel and Derian Eidson were prosecuted, remanded into county jail, and sentenced to prison as if they were repeat violent offenders, drug cartel, mafia, or bigger than

this nation's biggest financial fraudsters. In this case, no one was killed, disfigured, raped, assaulted, had their innocence stolen, poisoned by drugs, had their identity stolen, or had their house burned down. In this case, there was no trust abused, no loss of someone's livelihood, no psychological scars, no violence, no loss of reputation, no life irreparably scared, no life changing event, or no life destroyed except for Zinnel's and Eidson's. Since being at Federal Correctional Institution, Terminal Island (BS 6971-6972), Zinnel has shared a prison cell with two convicted murderers who each were sentenced to less time in prison than Zinnel. This is one of those cases in which calculations under the sentencing guidelines lead to a result so patently unreasonable as to require the court to place a substantially greater emphasis on other sentencing factors to derive at a sentence that comports with federal law.

As the court and prosecution was aware, similarly situated defendants received between 2 to 4 years in prison (ER 416, 419, 422, 424-431, 440-447; BS 6977-6978). At sentencing, the district court compared Zinnel to Letantia Bussell, who after being convicted of sophisticated bankruptcy fraud by a jury, was sentenced to 3 years in prison (ER 1182-1183; BS 6977). The prison sentences and maximum fine are far beyond the norm for the offenses of conviction. Something is wrong in Denmark; The convictions and record-setting draconian sentences "strike as more than probably wrong, they strike as wrong with the force of a five-week old unrefrigerated dead fish."
U.S. v. Bussell, 504 F.3d 956, 962 (9 CA, 2007).

As Justice Douglas once warned, "The function of the prosecutor under the Federal Constitution is not to tack as many skins of victims as possible to the wall. His function is to vindicate the right people as expressed in the laws and give those accused of crime a fair trial." "Donnelly v. DeChristofra, 416 U.S. 637, 648-49 (1974). Judge T.S. Ellis put it this way in his Virginia courtroom on May 4, 2018 in the Paul Manafort case: "What we don't want in the country is anyone with unfettered power" referring to prosecuting special counsel Robert Mueller.

We have become far too punitive as a society, mistakenly believing that prison is the answer for all transgressions of law. Rather than skinning every defendant, eradicating his hope and decimating his life, sanctions should include some mechanism through which offenders can work to redeem themselves.

The longer an individual languishes in prison, the less effective the intended punishment becomes. As the months turn into years, and the years turn into decades, the prisoner becomes alienated from society and retreats into a kind of hibernation, accepting the prison environment as the only world he knows. For nonviolent offenders it doesn't serve any interest other than vengeance. And who wins when the pursuit is vengeance? History has shown vengeance does not work to the benefit of anyone. It is not the Christian way, and yet it is frequently those who proclaim to uphold the Christian faith that call for the pound of flesh. Shakespeare illustrated the errors of vengeance in his timeless play "The Merchant of Venice" more than 400 years ago, yet the United States continues to perpetuate them today.

**ZINNEL'S BANKRUPTCY TRUSTEE DID NOT MAKE A SINGLE CLAIM THAT ANY OF THE ALLEGED CONCEALED ASSETS BELONGED TO ZINNEL'S BANKRUPTCY ESTATE AND CREDITORS DID NOT BENEFIT FROM THE PROSECUTION**

Even though there was an indictment and conviction, Zinnel's bankruptcy trustee never made a single claim that even one of the alleged concealed assets was actually part of Zinnel's bankruptcy estate and creditors did not receive any significant recovery as a result of Zinnel's bankruptcy fraud convictions.

After Zinnel's bankruptcy was closed with the estate fully administered for almost five years, in an obviously well-choreographed move, Zinnel's bankruptcy was reopened within days of him being indicted on June 8, 2011 with allegations of six (6) concealed property interests allegedly belonging to Zinnel's bankruptcy estate. The appointed bankruptcy trustee's first act was to to retain seasoned bankruptcy attorneys and a Certified Public Account who stopped at nothing to create billing opportunities. The trustee, her attorneys, and accountants, investigated and litigated in an attempt to marshal additional property for creditors. The trustee's attorneys issued lots of subpoenas, took depositions, and received all the government's 40,000 plus pages of discovery produced in Zinnel's criminal case. The trustee and her attorneys attended Zinnel's trial and sentencing. Zinnel's bankruptcy remained opened from June 2011 through November 2016. Therefore, Zinnel's bankruptcy was open for 65 months, almost five and a half years, which included 25 months pre-trial and 40 months post-conviction. During the 65 months, the trustee, her attorneys, and accountants were relentless in tracking down "concealed property" and were paid $313,195.35 for their work.

At trial, the offending DOJ attorneys put on evidence of the alleged six concealed properties contained in the indictment plus an additional three uncharged allegedly concealed properties by Zinnel. One of the uncharged allegedly concealed properties was Zinnel's one and only Washington Mutual checking account with a balance of $256 that was actually listed on Zinnel's bankruptcy schedules as Zinnel's property. The offending DOJ lawyers argued vigorously to the jury that they could find Zinnel guilty of concealment of the WAMU checking account and two other uncharged properties which created a Constructive Amendment. The jury instructions and verdict form the offending DOJ attorneys created, did not list the six charged concealed properties or the the three uncharged properties. The verdict form simply requested that the jury check a box of GUILTY / NOT GUILTY of bankruptcy fraud concealment in violation of 18 U.S.C. 152(1). It is likely Zinnel was convicted by the jury finding him guilty of concealing the uncharged WAMU checking account with a value of $256 as a result of the offending DOJ attorneys drive to win at all costs.

As Zinnel was found guilty by the jury and sentenced to almost 18 years in prison, the jury evidently believed the offending DOJ attorneys' propaganda and unanimously agreed that Zinnel concealed some piece of property that belonged to Zinnel's bankruptcy estate. However, incredibly, even though Zinnel was convicted and has been incarcerated for over 57 months, in the 65 months while Zinnel's bankruptcy remained open, the bankruptcy trustee who had a fiduciary duty to marshal assets, never made a single claim on the six properties charged concealed or the three uncharged properties Zinnel was likely convicted on, based on the DOJ lawyers unlawful evidence and argument. This is because none of the property the offending DOJ attorneys accused Zinnel of unlawfully concealing was actually part of Zinnel's bankruptcy estate. Thus, as a result of the criminal prosecution, conviction, and imprisonment of Zinnel, the government lawyers alleged victims are receiving no additional money.

The only people enriched by Zinnel's prosecution and conviction are the offending DOJ attorneys' egos and careers, for now, and the trustee's and her professionals' bank accounts.

Zinnel's sentence is so excessively severe that it takes one's breath away. In a DOJ press release issued within hours of sentencing, the government bragged that Zinnel's sentence was the longest for bankruptcy fraud in the history of the Eastern District of California (ZJN 175; Exhibit 16), thus demonstrating the prosecutors' advanced knowledge of disparity. In fact, Zinnel's 212 month sentence is the longest in the history of the United States for bankruptcy fraud by almost double. (BS 6131-6134). Almost two decades long because the sentencing guidelines for economic crime cases are absurd, fatally flawed, and abused by vengeful prosecutors if not tamed by an experienced judge. Further, the district court erroneously calculated appellants' guidelines with the unproven enhancements supersizing Zinnel's sentence from 12 months to 212 months in prison. Appellants could be the poster children of the absurdity of sentencing for economic crimes, based on the piling on of enhancements based on judge-found facts determined in about an hour without any clear and convincing evidence by the government. Zinnel received 30 levels of enhancements with each 2 level enhancement adding 42 months in prison. Therefore, with Zinnel's 11th alleged victim making an unsubstantiated claim of $141, a claim that was objected to, Zinnel was enhanced 2 levels for 11-50 victims and sentenced to an additional 3.5 years in prison over $141. Moreover, even though the bedrock of all sentencing is the 18 U.S.C. 3553(a) sentencing factors, at the offending DOJ lawyers' urging, the first-time judge did not consider a single 18 U.S.C. 3553(a) factor, including 3553(a)(6) avoiding unwarranted disparity, which Zinnel alerted the district court of with flashing neon lights. Additionally, Zinnel was denied his rite and right to a meaningful allocution, and received a mid-range guideline sentence without sufficient explanation for meaningful appellate review. The court pre-announced its sentence twice and provided the following statement of reasons for the 7,540 day record-setting sentence: "due to the nature, circumstances, and seriousness of the offense."

Steven Zinnel and Derian Eidson received record-setting sentences in an era of purported sentencing reform. The prison sentences and fine in this case not just high, they are shockingly high for a run-of-the-mill bankruptcy fraud and questionable "money laundering" convictions. Questionable, because with the money laundering convictions, the "criminal conduct" was endorsing nine checks (ER 1399-1408), only five by Zinnel as an employee of a corporation, issued from one corporation to another, and depositing them into a bank account that cleared. However, this simple act, allowed the prosecutors to circumvent the five year statutory maximum for bankruptcy fraud by 3.5 times, adding thirteen years eight months to the sentence because of the money laundering convictions. Further, Zinnel had his sweetheart and children taken from him, the Zinnel family home seized by the government, Zinnel lost all of his professional licenses, and over $4.3 million in erroneous monetary obligations assessed against him. Simply said, Zinnel and Eidson have unlawfully and unjustly lost their reputations, freedom, family, friends, future, life, life savings, and livelihoods.

We must stop sentencing people by numbers. Federal sentencing law must be implemented in a manner that coherently and fairly advances its purpose. Justice has never been easy to achieve, but it's always worth fighting for. Zinnel fights for justice now, in a highly unjust case thus far. Zinnel's case can be summarized in a few words: wrongful convictions, shockingly high unsupportable sentences, and prosecutors trying to win at all costs. What happened in Zinnel's case, certainly leaves a bad taste on one's mouth on how justice was served. Zinnel's trial was infected with errors requiring reversal of all convictions and his 212 month sentence was fundamentally flawed as it was based on failures of proof that mirrored the government's failures of proof at trial. The procedural errors at sentencing coupled with the fact that the sentences are substantively unreasonable also requires vacating the sentences and remanding for resentencing.

According to Bill Nettles, former U.S. Attorney for South Carolina, "the goal of any legal preceding is for the community to have faith in the outcome." Here there is more than enough to undermine the confidence in the fairness of the proceedings.

# SECTION # 2
# DEFINITIONS

DEFINITIONS

ZINNEL refers to defendant and appellant Steven Zinnel

EIDSON refers to defendant and appellant Derian Eidson

GOVERNMENT refers to plaintiff and appellee United States of America

CRIMINAL CASE refers to United States v. Steven Zinnel, Derian Eidson, U.S.D.C. ED CA (Sacramento) #2:11-cr-00234-TLN

CR refers to Clerk's Record and is followed by the applicable document number of a court filing in the CRIMINAL CASE

RT refers to Reporter's Transcript

APPEAL refers to United States v. Steven Zinnel, Derian Eidson, United States Court of Appeals for the Ninth Circuit case nos. 14-10141 & 14-10196 (consolidated)

ER refers to the Excerpt of Record filed in the APPEAL by Appellant Steven Zinnel

SER refers to the Supplemental Excerpt of Record filed in the APPEAL by Appellee United States of America

COURT refers to United States District Court for the Eastern District of California

COURT OF APPEALS refers to the United States Court of Appeals for the Ninth Circuit

JUDGE NUNLEY refers to United States District Court Judge Troy L. Nunley

AUSA refers to Assistant United States Attorney

SEGAL refers to AUSA Matthew D. Segal, State Bar of California Number 190938

HEMESATH refers to AUSA Audrey B. Hemesath, State Bar of California Number 212757

KHASIGIAN refers to AUSA Kevin C. Khasigian, State Bar of California Number 251318

TALBERT refers to U.S. Attorney, ED CA Phillip A. Talbert, State Bar of California Number 145263

SKIPPER refers to AUSA and Appellate Chief Camila A. Skipper, State Bar of California Number 175895

WAGNER refers to former U.S. Attorney, ED CA Benjamin B. Wagner, State Bar of California Number 163581

RADOSLOVICH refers to attorney Frank Radoslovich, State Bar of California Number 161457

LAMB refers to Jason Lamb, Special Agent with the Internal Revenue Service

DIVORCE refers to In re the Marriage Dissolution of Steven and Michelle Zinnel, Sacramento Superior Court # 99FL07781

LUYUNG PROPERTY refers to vacant 1 acre lot located at 3151 Luyung Dr., Rancho Cordova, CA 95741, APN 072-0450-015

ZINNEL FAMILY HOME refers to residence located at 11966 Old Eureka Way, Gold River, CA 95670, APN 069-0620-054

BS refers to Bate Stamp number at the bottom of each page of the attached documents

Ex refers to Exhibits attached starting at BS 6000

U.S.C. refers to the United States Code

Rule 11 refers to Federal Rule of Civil Procedure 11 and the inherent power of the "Court" to deal with abuses

ABA refers to the American Bar Association

B&P refers to California Business and Professions Code

BAR RULES refers to Rules of Professional Conduct of the State Bar of California

---

LAW

1 st  AMEND. refers to the First Amendment to the United States Constitution

14th AMEND. refers to the Fourteenth Amendment to the United States Constitution

BERGER refers to Berger v. United States, 295 U.S. 78, 79 LED 1314 (1935)

SNYDER refers to In re Robert J. Snyder, 472 U.S. 634, 86 LED 2d 504 (1985)

BRADY refers to Brady v. Maryland, 373 U.S. 83, 10 LED 2d 215 (1963)

BRECHT refers to Brecht v. Abrahamson, 507 U.S. 619 (1993)

SCHWARE refers to Schware v. Board of Bar Examiners of the State of New Mexico, 353 U.S. 232, 1 LED 2d 796 (1957)

KOJAYAN refers to United States v. Kojayan, 8 F.3d 1315 (9 CA, 1993)

KATTAR refers to United States v. Kattar, 840 F.2d 118 (1 CA, 1988)

BOWEN refers to United States v. Bowen, 2015 U.S. App. Lexis 14498 (5 CA, 2015)

AUSHERMAN refers to Ausherman v. Bank of America, 212 F.Supp. 2d 435 (D. Maryland, 2002)
  (cited by AUSA Segal and Hemesath in CR 102 & 106 and th Government's Answering Brief filed on th APPEAL. pgs 80 & 81)

GLASS refers to In re Stephen Randall Glass on Admission, 58 Cal. 4th 500 (CA S.Ct., 2014)
  (cited by AUSA Segal and Hemesath in CR 305)

GIRARDI refers to In re Thomas v. Girardi, 611 F.3d 1027 (9 CA, 2010)

PUMPHREY refers to Pumphrey v. K.W. Thompson Tool, 62 F.3d 1128 (9 CA, 1995)

TOSCANOA refers to Toscano v. Comm'r of the IRS, 441 F.2d 930 (9 CA, 1971)

OLMSTEAD refers to Olmstead v. United States, 277 U.S. 438, 471-485 (1928), Dissenting opinion by Justice Brandeis

STRICKLER refers to Strickler v. Green, 527 U.S. 263 (1999)

COMMONWEALTH refers to Commonwelath of The Northern Mariana Islands v. Mendiola, 976 F.2d 475 (9 CA, 1992)

NAPUE refers to Napue v. Illinois, 360 U.S 264 (1959)

MOONEY refers to Mooney v. Holohan, 294 U.S. 103 (1935)

# SECTION #3

## REPORTING CRIMES & VIOLATIONS OF RULES

### BS 1501-1599

18 U.S.C. § 3332.    Powers and duties

(a) It shall be the duty of each such grand jury impaneled within any judicial district to inquire into offenses against the criminal laws of the United States alleged to have been committed within that district. Such alleged offenses may be brought to the attention of the grand jury by the court or by any attorney appearing on behalf of the United States for the presentation of evidence. Any such attorney receiving information concerning such an alleged offense from any other person shall, if requested by such other person, inform the grand jury of such alleged offense, the identity of such other person, and such attorney's action or recommendation.

(b) Whenever the district court determines that the volume of business of the special grand jury exceeds the capacity of the grand jury to discharge its obligations, the district court may order an additional special grand jury for that district to be impaneled.

> It is the duty and right ... of every citizen to assist in prosecuting, and in securing the punishment of any breach of the peace of the United States.

*In re Quarles*, 15 S.Ct. 959, 960-961 (1894).

> The function of the grand jury is to investigate any alleged crime, no matter how or by whom suggested to them.

*In re Hale*, 139 R. 496, 498 (C.Ct. S.D.N.Y. 1905) (quoting *Frisbie v. United States*, 15 S.Ct. 586 (1895)).

> [I]nforming is a right or privilege secured by the Constitution or laws of the United States.

*Velarde-Villarreal v. United States*, 354 F.2d 9 footnote 3 (9th Cir. 1965).

BS 15.01

The Supreme Court has found "shall" to be "the language of command." *Escoe v. Zerbst*, 295 U.S. 490, 493, 55 S.Ct. 818, 820 (1935).

"The word 'shall' generally indicates a command that admits of no discretion on the part of the person instructed to carry out the directive." *Association of Civilian Technicians v. FLRA*, 22 F.3d 1150, 1153 (D.C. 1994).

**Shall.** As used in statutes . . . this word is generally imperative or mandatory.

*Black's Law Dictionary* 1375 (6th ed. 1990).

---

**148 LED2D 635, 531 US 230  LOPEZ v DAVIS**

**CHRISTOPHER A. LOPEZ, Petitioner**

*vs.*

**RANDY J. DAVIS, WARDEN, et al.**

**531 US 230, 148 L Ed 2d 635, 121 S Ct 714**

[No. 99-7504]

**Argued October 30, 2000.**

**Decided January 10, 2001.**

**1d][3]**  We turn now to the Bureau's reading of the statutory text, which instructs that the agency "may" reduce the sentence of a nonviolent offender who has successfully completed a drug treatment program. Congress' use of the permissive "may" in § 3621(e)(2)(B) contrasts with the legislators' use of a mandatory "**shall**" in the very same section. Elsewhere in § 3621 Congress used "**shall**" to impose discretionless obligations, including the obligation to provide drug treatment when funds are available. See 18 USC § 3621(e)(1) [18 USCS § 3621(e)(1)] ("Bureau of Prisons **shall**, subject to the availability of appropriations, provide residential substance abuse treatment (and make arrangements for appropriate aftercare)"); see also, e.g., § 3621(b) ("The

BS 1502

18 USC § 4. Misprision of felony

Whoever, having knowledge of the actual commission of a felony cognizable by a court of the United States, conceals and does not as soon as possible make known the same to some judge or other person in civil or military authority under the United States, shall be fined under this title or imprisoned not more than three years, or both.

## I. IN GENERAL

### 1. Generally

It was duty of citizens having knowledge of commission of felony to communicate such information to authorities. Beard v United States (1932, CA8 Neb) 59 F.2d 940 (criticized in United States v Kemp (1995, NMCCA) 42 MJ 839, 1995 CCA LEXIS 200)

Contracts to suppress evidence, stifle prosecution, or conceal crime are void. Fidelity & Deposit Co. v Grand Nat'l Bank (1934, CA8 Mo) 69 F.2d 177

Misprision is nothing more than word used to describe misdemeanor which does not possess specific name; misprision of felony is concealment of felony without giving any degree of maintenance to felon. United States v Perlstein (1942, CA3 NJ) 126 F.2d 789, cert den (1942) 316 US 678, 86 L Ed 1752, 62 S Ct 1106 and (criticized in United States v Davis (1999, CA3 NJ) 183 F.3d 231, 52 Fed Rules Evid Serv 732)

### 2. Relationship to other federal laws

"Misprision", requiring concealment of commission of felony but not intent to benefit principal offender, states offense separate from 18 USCS § 3, Accessory After Fact. United States v Daddano (1970, CA7 Ill) 432 F.2d 1119, cert dismd (1971) 401 US 967, 28 L Ed 2d 250, 91 S Ct 990 and cert den (1971) 402 US 905, 28 L Ed 2d 645, 91 S Ct 1366 and cert den (1971) 402 US 905, 28 L Ed 2d 645, 91 S Ct 1367 and cert den (1971) 402 US 905, 28 L Ed 2d 645, 91 S Ct 1391

Misprision of felony, 18 USCS § 4, was crime of moral turpitude for purposes of 8 USCS § 1227(a)(2)(A)(i) because it necessarily involved affirmative act of concealment or participation in felony, behavior that ran contrary to accepted societal duties and involved dishonesty or fraudulent activity. Itani v Ashcroft (2002, CA11) 298 F.3d 1213, 15 FLW Fed C 838

Misprision of felony, 18 USCS § 4, does not constitute aggravated felony, as it does not sufficiently relate to obstruction of justice. Denis v AG of United States (2011, CA3) 633 F.3d 201

18 USCS §§ 4, 286, 371, 1711, 1726, 1901, 2071(b) do not secure rights to state prisoner; accordingly, prisoner can neither sue directly under them, nor can prisoner use them as predicate for action under 42 USCS § 1983. Dugar v Coughlin (1985, SD NY) 613 F Supp 849

### 5. Miscellaneous

It is apparent from 18 USCS § 4 that concealment of crime and agreements to do so are not looked upon with favor; such conduct deserves no encomium, and is not afforded First Amendment protection by denigrating duty of citizen, whether reporter or informer, to respond to grand jury subpoena and answer relevant questions put to him. Branzburg v Hayes (1972) 408 US 665, 92 S Ct 2646, 33 L Ed 2d 626, 1 Media L R 2617 (criticized in Asociacion De Periodistas De P.R. v Mueller (2007, DC Puerto Rico) 2007 US Dist LEXIS 97793)

BS 1503

**18 USC** § 3.   Accessory after the fact

Whoever, knowing that an offense against the United States has been committed, receives, relieves, comforts or assists the offender in order to hinder or prevent his apprehension, trial or punishment, is an accessory after the fact.

Except as otherwise expressly provided by any Act of Congress, an accessory after the fact shall be imprisoned not more than one-half the maximum term of imprisonment or (notwithstanding section 3571 [18 USCS § 3571]) fined not more than one-half the maximum fine prescribed for the punishment of the principal, or both; or if the principal is punishable by life imprisonment or death, the accessory shall be imprisoned not more than 15 years.

## I. IN GENERAL

### 1. Generally

Accessory after fact is one who, knowing felony to have been committed by another, receives, relieves, comforts or assists felon in order to hinder felon's apprehension, trial, or punishment. Skelly v United States (1935, CA10 Okla) 76 F.2d 483, cert den (1935) 295 US 757, 79 L Ed 1699, 55 S Ct 914; Government of Virgin Islands v Aquino (1967, CA3 VI) 378 F.2d 540;  United States v Barlow (1972, App DC) 152 US App DC 336, 470 F.2d 1245;  United States v Anthony (1956, DC Pa) 145 F Supp 323

Under 18 USCS § 3, offense of accessory after fact only occurs when person assists offender; person committing accessory after fact is not "offender" himself. United States v Taylor (2003, CA9 Ariz) 322 F.3d 1209, 2003 CDOS 2494, 2003 Daily Journal DAR 3122, cert den (2004) 541 US 939, 158 L Ed 2d 362, 124 S Ct 1653

While statutory silence on subject of secondary liability generally meant there was none, in that it had been held that § 10(b) of Securities and Exchange Act of 1934 did not reach aiding and abetting for failing to reference to secondary liability of kind that statutes such as 18 USCS §§ 2, 3, created, by chain of incorporations by reference, 18 USCS § 2333(a) to 18 USCS § 2331(1), to 18 USCS § 2339A, to 18 USCS § 2332, donation to terrorist group that targets Americans abroad can violate § 2333, and it is contribution itself, not amount of contribution, that is key to liability, but one must either know that organization engages in such acts or is deliberately indifferent to whether it does or not. Boim v Holy Land Found. for Relief & Dev. (2008, CA7 Ill) 549 F.3d 685

Defendant may be convicted as accessory after fact even where he is present before, during, and after crime.  Smith v United States (1962, App DC) 113 US App DC 126, 306 F.2d 286

### 4. Knowledge or scienter

Scienter as to federal nature of offense is not required under 18 USCS §§ 3 and 371.  United States v Hobson (1975, CA9 Cal) 519 F.2d 765, cert den (1975) 423 US 931, 46 L Ed 2d 261, 96 S Ct 283

Defendant need not know of precise nature of underlying offense; all that is required is that defendant know there has been offense committed against United States.  United States v Balano (1979, CA10 Kan) 618 F.2d 624, 5 Fed Rules Evid Serv 291, cert den (1980) 449 US 840, 101 S Ct 118, 66 L Ed 2d 47 and (ovrld in part on other grounds as stated in United States v Willis (1996, CA10 Kan) 102 F.3d 1078) and (criticized in United States v Harrell (2006, MD Ga) 2006 US Dist LEXIS 28181) and (criticized in United States v Harrell (2006, MD Ga) 2006 US Dist LEXIS 29691)

Defendant must have knowledge of underlying offense in order to be convicted as accessory after fact. United States v Henning (1996, CA10 Kan) 77 F.3d 346

Judgment of acquittal was required on defendant's 18 USCS § 3 conviction for accessory-after-the-fact because by successfully blocking evidence of what defendant knew on day she was helping to hide her boyfriend, government had failed to prove second element of accessory-after-the-fact offense. United States v Head (2013, CA8 Minn) 707 F.3d 1026   BS 1504

Upon the failure of the justice system at every level, the ethics rules required that we report the conduct of these prosecutors. The rule states, "A lawyer who knows that another lawyer has committed a violation of the Rules of Professional Conduct that raises a substantial question as to that lawyer's honesty, trustworthiness or fitness as a lawyer in other respects, shall inform the appropriate professional authority." Our cocounsel Bill Hodes, a former law professor and widely regarded legal ethics expert, was adamant that we report these violations, and he took the lead in doing so. Bill said that not only was it our legal and ethical duty to file charges, but also that we had a moral obligation as lawyer-citizens not to just sit back—silent and content—

Tyranny cannot come to America except by a failure of the judiciary to consistently be intellectually honest…

Kilgore, *Judicial Tyranny*, p. 14 (1977).

A passive judiciary merely ratifies the status quo; instead of acting as a bulwark against undue political power, it becomes an actor in concert with the political branches against the individual.

Bandes, *Reinventing Bivens: The Self-Executing Constitution*, 68 So. Cal. L. Rev. 289, 317 (Jan. 1995).

BS 1505

# Professional
# Responsibility

### Ronald D. Rotunda

BS 1506

BLACK LETTER OUTLINES



BS 1506, **WEST**.

the lawyer, in order to be satisfied, to become a self-appointed investigator, but if the lawyer (who has been asked to recommend an applicant) happens to know or come across unfavorable information, then the lawyer should report it to the bar authorities.

Model rule 8.1(b) makes this clear: if the lawyer believes that the applicant is of good moral character notwithstanding the unfavorable information, the lawyer still must report the unfavorable information, and may argue that it should not be disqualifying, but should let the bar authorities evaluate it. That is the position of Model Rule 8.1(b), which prohibits the lawyer or applicant from failing to disclose a fact necessary to correct a misapprehension known to have arisen in the matter, unless Rule 1.6 ("Confidentiality of Communications") mandates that the lawyer keep the information confidential.

*Examples:* Lawyer hired a summer Law Clerk in her law office. From that experience Lawyer, based on several incidents, believes that Law Clerk is mentally unstable. Law Clerk is now applying for admission to the bar, but does not ask Lawyer for a reference. Lawyer, after learning of Law Clerk's application, does nothing; however, if the bar asks for a reference she intends to reply truthfully.

Lawyer has violated no provision of the Model Rules. Some may argue that Lawyer has failed to meet the aspirational level of EC 1–3. However, Lawyer has violated no DR of the old Model Code.

## II. The Lawyer's Role Regarding Reporting Disciplinable Violations of Lawyers

*Lawyers have an obligation to volunteer information of another lawyer's disciplinable violations unless the information is privileged under the ethics rules.*

### A. The General Rule

The Code required, under threat of discipline, a lawyer to voluntarily report any disciplinable violation by another lawyer to the appropriate authority. DR 1–103(A); EC 1–4. This affirmative duty of whistle-blowing applied not only against a lawyer in another firm but also against a partner or associate in the reporting lawyer's own firm. ABA Informal Opinion 1203 (Feb. 9, 1972).

This DR conferred standing on a lawyer to report an alleged conflict of interest by an opposing counsel in litigation. The charge of conflict, if

BS 1507

successful, could then lead to that opposing counsel's disqualification. See, e.g., *Estates Theatres, Inc. v. Columbia Pictures Industries, Inc.*, 345 F.Supp. 93, 98 (S.D.N.Y.1972).

Rule 8.3(a), in general, *requires* a lawyer to report *another* lawyer's substantial violation of the Rules *if* the lawyer "knows" of the violation. The reference to "another lawyer" means that there is no duty to self-report. Some argued that the former Model Code required a lawyer to report himself to the disciplinary authorities. The Model Rules clearly reject that.

"Knows" means "actual knowledge. Rule 1.0(f). In addition, this violation must raise a "substantial" question about the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects. Hence, the lawyer need not report a violation of many of the ethics rules that do not relate to things like honesty. For example, illegal solicitation of clients (if it is not misleading), many conflicts of interest, aiding unauthorized practice of law, etc.—all of these matters do not trigger the mandatory reporting obligation if they do not relate to things like honesty.

*Note on the Impaired Lawyer:* There are matters that do not relate to honesty but do clearly relate to a lawyer's "fitness as a lawyer in other respects." A lawyer who believes that another lawyer's known violations of an ethics rule raises substantial questions about her fitness to practice must report those violations to the appropriate professional authority. A lawyer who believes that another lawyer's *mental condition* materially impairs her ability to represent clients, and who knows that that lawyer continues to do so, *must report* that lawyer's consequent violation of Rule 1.16(a)(2), which requires that she withdraw from the representation of clients. ABA Formal Opinion 03–431 (Aug. 8, 2003). Lawyer Alpha need not report his law partner, Lawyer Beta, if the mental condition that caused Beta's competence violation has ended. "Thus, if partners in the firm and the supervising lawyer reasonably believe that the previously impaired lawyer has resolved a short-term psychiatric problem that made the lawyer unable to represent clients competently and diligently, there is nothing to report." But if the impairment continues, the duty to take action continues. The

BS1508

impaired lawyer's departure from the law firm does not eliminate the lawyer's obligation to report that impaired lawyer's violation of the Model Rules. ABA Formal Opinion 03–429, at 5, 6 (June 11, 2003) (footnote omitted).

Note that Alpha and Beta are in the same law firm. "Although partners and supervising lawyers have a responsibility to ensure that lawyers in their own firms comply with the rules of professional conduct, see ABA Formal Opinion 03–429, no lawyer is obligated under the Model Rules to take any action to ensure compliance with the rules by lawyers in other firms." ABA Formal Opinion 03–431, at 4 n. 14 (August 8, 2003).

Rule 8.3(b) has similar requirements as to lawyers reporting judges, if the lawyer's "knowledge" of the judge's violation of the Code of Judicial Conduct raises a "substantial" question about the judge's fitness for office.

On its face, DR 1–103(A) applied to *all* disciplinable violations, whether they were, in the reporting lawyer's view, flagrant and substantial, or minor and technical. However, an element of judgment remains, because the lawyer need not (but may) report suspected violations that are not clear violations of the discipline rules. ABA Informal Opinion 1379 (Dec. 7, 1976). See also EC 1–4 (reporting conduct believed *"clearly* to be in violation of the Disciplinary Rules") (emphasis added).

DR 1–103(A) was largely unenforced, and lawyers rarely reported other lawyers. See Note, *The Lawyer's Duty to Report Professional Misconduct,* 20 Ariz.L.Rev. 509 (1978). Usually, in those rare cases where a court actually reprimanded a lawyer for failing to report another lawyer's wrongdoing, the lawyer was also being disciplined for other wrongs. E.g., *Matter of Bonafield,* 75 N.J. 490, 383 A.2d 1143 (1978) (per curiam) (attorney disciplined for failing to report another *and* for aiding another lawyer's misconduct); *Attorney Grievance Commission of Maryland v. Kahn,* 290 Md. 654, 431 A.2d 1336 (1981) (attorney disciplined for failing to report another *and* for aiding unethical conduct of his law firm).

 The Illinois Supreme Court, in 1988, became the first court that disciplined a lawyer (who was suspended for a year) who was charged with nothing *except* failing to report another lawyer's misconduct, under circumstances where the client specifically told him not to report the other lawyer's conduct. *In re*

BS 1509

misconduct arising from purely personal activity must be reported if it reflects adversely on the lawyer's fitness to practice law. A lawyer violates the Model Rules and is subject to professional discipline when she fails to report such professional misconduct, in circumstances in which Rule 8.3 requires such reports." ABA Formal Opinion 04–433 (Aug. 25, 2004).

*Examples:*     A lawyer in private practice discovers than the in-house accountant whom her law firm employs has stolen substantial sums from the law firm. The lawyer knows that the accountant is admitted to law practice. The lawyer must report under Rule 8.3(a).

                  Law Professor Alpha, who does not practice law, learns that Law Professor Beta has plagiarized several major articles. Neither professor practices law but both are licensed. Alpha must report Beta under Rule 8.3(a).

## B. The Applicability of the Rule to the Lawyer's Own Conduct

### 1. Blowing the Whistle on Oneself

Must a lawyer report her own disciplinary violation? Is that not asking too much of anyone? DR 1–103(A) required a lawyer to report knowledge of unprivileged information of disciplinable conduct. Given the way in which it is drafted, DR 1–103(A) could be interpreted to require a lawyer to report his or her own misconduct. Failure to report would then be a separate disciplinable violation. This interpretation is supported by the contrasting language in DR 1–103(B), which specifically referred to "another lawyer." Of course, this interpretation would not require a lawyer to waive the fifth amendment privilege against self-incrimination because DR 1–103(A) only refers to "unprivileged knowledge or information." Thus, ABA Informal Opinion 1279 (Aug. 29, 1973) concluded:

> "Does [DR 1–103(A) ]require a lawyer to 'report' his knowledge that he has, himself, violated DR 1–102, in the situation where his unethical conduct is not privileged because, for example, he clearly cannot be exposed to criminal sanctions for having engaged in such unethical conduct? We construe DR 1–103(A) as requiring the lawyer to report himself in that situation."

Some commentators argued, without discussion, that the "reporting provision" of DR 1–103(A) "does not appear to apply to the lawyer's

BS 1510

# SECTION #4
# CRIMES
## BS 2001 - 2999

# 18 U.S.C. § 1001. Statements or entries generally

(a) Except as otherwise provided in this section, whoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully—

(1) falsifies, conceals, or covers up by any trick, scheme, or device a material fact;

(2) makes any materially false, fictitious, or fraudulent statement or representation; or

(3) makes or uses any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry;

shall be fined under this title or imprisoned not more than 5 years, or both.

## 7. Purpose

18 USCS § 1001 was intended to serve vital public purpose of protecting governmental functions from frustration and distortion through deceptive practices. Ogden v United States (1962, CA9 Cal) 303 F.2d 724

18 USCS § 1001 is designed to protect authorized functions of government departments and agencies from perversion which might result from deceptive practices enumerated. United States v Shanks (1979, CA2 NY) 608 F.2d 73, cert den (1980) 444 US 1048, 62 L Ed 2d 736, 100 S Ct 740

Purpose of 18 USCS § 1001 is clearly to protect Government from fraud and deceit and reach of § 1001 covers all materially false statements, including non-monetary fraud, made to any branch of Government. United States v Fern (1983, CA11 Fla) 696 F.2d 1269, 83-1 USTC ¶ 9151, 51 AFTR 2d 819

Purpose of 18 USCS § 1001 is to protect United States Government from fraud or deceit. Lee v Denro, Inc. (1992) 91 Md App 822, 605 A2d 1017, 7 BNA IER Cas 720, 126 CCH LC ¶ 57549

Purpose of 18 USCS § 1001 is to punish those who render positive false statements designed to pervert or undermine functions of governmental departments and agencies. United States v Harrison (1985, ACMR) 20 MJ 710

BS 2001

## 33. Generally

It constitutes violation of 18 USCS § 1001 for anyone willfully to make or use false writing or document, knowing that it contains false, fictitious, or fraudulent statement or entry, and intending that it shall bear relation or purpose as to source matter which is within jurisdiction of department or agency of United States, and with false, fictitious, or fraudulent statement or entry which it contains having materiality on department or agency matter. Ebeling v United States (1957, CA8 Mo) 248 F.2d 429, cert den (1957) 355 US 907, 2 L Ed 2d 261, 78 S Ct 334; Gilbert v United States (1966, CA9 Cal) 359 F.2d 285, 66-1 USTC ¶ 9386, cert den (1966) 385 US 882, 87 S Ct 169, 17 L Ed 2d 109

Five elements necessary to sustain conviction under 18 USCS § 1001 are: (1) statement, (2) falsity, (3) materiality, (4) specific intent, and (5) agency jurisdiction. United States v Godwin (1978, CA5 Ga) 566 F.2d 975

Elements of 18 USCS § 1001 violation include: (1) knowingly making false statements; (2) which is material; and (3) made with regard to any matter within jurisdiction of any department or agency of United States. United States v Rose (1978, CA9 Wash) 570 F.2d 1358 (criticized in United States v LeMaster (1995, CA6 Ky) 54 F.3d 1224, 42 Fed Rules Evid Serv 494, 1995 FED App 157P) and (criticized in United States v Wiener (1996, CA2 NY) 96 F.3d 35) and (criticized in United States v Solis (1997, CAAF) 46 MJ 31, 1997 CAAF LEXIS 5) and (criticized in United States v Huber (2002, DC ND) 2002 US Dist LEXIS 306)

Elements of violation of 18 USCS § 1009 are (1) statement, (2) falsity, (3) materiality, (4) specific intent, and (5) agency jurisdiction. United States v Gilbertson (1978, CA8 Minn) 588 F.2d 584

18 USCS § 1001 imposes criminal penalties on one who: (1) makes statement that, (2) was false, (3) was material, (4) was made knowingly and willfully, and (5) was made in matter within jurisdiction of any department or agency of United States. United States v Brantley (1986, CA7 Ill) 786 F.2d 1322, 20 Fed Rules Evid Serv 302, cert den (1986) 477 US 908, 106 S Ct 3284, 91 L Ed 2d 572 and (ovrld on other grounds as stated in United States v Pearson (1995, CD Ill) 897 F Supp 1147) and (criticized in United States v McGuire (1996, CA5 Miss) 96-1 USTC ¶ 50163)

Elements of an offense under 18 USCS § 1001 are: (1) that defendant made a statement; (2) that statement was false and defendant knew it was false; (3) that statement was made knowingly and willfully; (4) that statement was within jurisdiction of a federal agency; and (5) that statement was material. United States v Clearfield (1973, ED Pa) 358 F Supp 564

In order to be convicted under 18 USCS § 1001, defendant must be shown to have made statement or representation that was false, material, made knowingly and willfully, and made in matter within jurisdiction of federal agency. Lee v Denro, Inc. (1992) 91 Md App 822, 605 A2d 1017, 7 BNA IER Cas 720, 126 CCH LC ¶ 57549

BS 2002

§ 1018.    Official certificates or writings

Whoever being a public officer or other person authorized by any law of the United States to make or give a certificate or other writing knowingly makes and delivers as true such a certificate or writing, containing any statement which he knows to be false in a case where the punishment thereof is not elsewhere expressly provided by law, shall be fined under this title or imprisoned not more than one year, or both.

**18 U.S.C. § 371.** Conspiracy to commit offense or to defraud United States

If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined under this title or imprisoned not more than five years, or both.

If, however, the offense, the commission of which is the object of the conspiracy, is a misdemeanor only, the punishment for such conspiracy shall not exceed the maximum punishment provided for such misdemeanor.

#### Doing of unlawful act or lawful act by unlawful means

[Conspiracy is combination of two or more persons, by concerted action, to accomplish criminal or unlawful purpose, or some purpose not in itself criminal or unlawful, by criminal or unlawful means.] Pettibone v United States (1893) 148 US 197, 37 L Ed 419, 13 S Ct 542

### IV. ELEMENTS OF CONSPIRACY

#### A. In General

##### Generally

[Gravamen of offense under predecessor to 18 USCS § 371, rendering all persons conspiring to commit offense against or to defraud United States liable to criminal prosecution, is conspiracy.] United States v Hirsch (1879) 100 US 33, 10 Otto 33, 25 L Ed 539

Gist of offense of criminal conspiracy as defined by predecessor to 18 USCS § 371, is agreement among conspirators to commit offense attended by act of one or more of conspirators to effect object of conspiracy; and persons having no knowledge of conspiracy are not conspirators. United States v Falcone (1940) 311 US 205, 85 L Ed 128, 61 S Ct 204 (criticized in United States v Salerno (1973, CA3 NJ) 485 F.2d 260)

[Conspiracy consists of agreement and commission of overt act to effect its object.] United States v Falcone (1940) 311 US 205, 85 L Ed 128, 61 S Ct 204 (criticized in United States v Salerno (1973, CA3 NJ) 485 F.2d 260);

[Elements of crime of conspiracy described in 18 USCS § 371 are (1) agreement by two or more persons to combine efforts to achieve illegal purpose or to use illegal means to accomplish legal purpose and (2) overt act by at least one of those persons in furtherance of conspiracy.] United States v Fontenot (1973, CA5 Ga) 483 F.2d 315

Conspiracy is combination of two or more persons to accomplish some unlawful purpose, or some lawful purpose by unlawful means. United States v Heck (1974, CA9 Cal) 499 F.2d 778, 74-2 USTC ¶ 9729, 74-2 USTC ¶ 9730, 34 AFTR 2d 5470, cert den (1974) 419 US 1088, 95 S Ct 677, 95 S Ct 678, 42 L Ed 2d 680

[Combination to effect unlawful object through lawful means constituted conspiracy.] United States v Rintelen (1916, DC NY) 233 F 793

BS 2010

## 5. Purpose

[ Two independent values served by law of conspiracy are protection of society from dangers of concerted criminal activity and identification of agreement to engage in criminal venture as event of sufficient threat to social order to permit imposition of criminal sanctions for agreement alone, plus overt act in pursuit of it, regardless of whether crime agreed upon actually is committed. ] United States v Feola (1975) 420 US 671, 43 L Ed 2d 541, 95 S Ct 1255

Purpose of predecessor to 18 USCS § 371 was to protect government from impositions through conspiracy to cheat and defraud in respect to its rights and privileges, as well as in respect to its property. Berenbeim v United States (1947, CA10 Colo) 164 F.2d 679, cert den (1948) 333 US 827, 92 L Ed 1113, 68 S Ct 454

[ Purpose of 18 USCS § 371 is to protect society from dangers of concerted criminal conduct, and to define point between preparation and consummation of crime that likelihood of crime being committed is sufficiently great and criminal intent is sufficiently formed to justify intervention of criminal law. ] United States v Beil (1978, CA5 Ga) 577 F.2d 1313, reh den (1978, CA5 Ga) 585 F.2d 521 and cert den (1979) 440 US 946, 59 L Ed 2d 634, 99 S Ct 1422

One purpose of 18 USCS § 371 is to punish concerted action involving plurality of actors which makes crime easier to perpetrate and harder to detect. United States v Kohne (1972, WD Pa) 347 F Supp 1178

## III. CONSPIRACY TO DEFRAUD UNITED STATES

### 34. Generally

[ "Defraud," meant not only pecuniary loss but included any defeat of lawful governmental function, such as defrauding United States of doing justice. ] Outlaw v United States (1936, CA5 Tex) 81 F.2d 805, cert den (1936) 298 US 665, 80 L Ed 1389, 56 S Ct 747

It was immaterial whether acts were crime independent of conspiracy statute, if there was shown conspiracy to defraud United States. United States v Whalan (1868, DC Mass) 28 F Cas 531, No 16669

[ Defrauding United States was not limited to conspiracies to frauds as to revenue, but applied to property and rights. ] United States v Owen (1887, DC Or) 13 Sawy 53, 32 F 534

Term "defraud" as used in 18 USCS § 371 not only reaches schemes that deprive government of money or property but also protects integrity of U.S. and its agencies, and § 371 covers acts that interfere with or obstruct lawful governmental functions by deceit, craft, or trickery, or at least by means that are dishonest [ four elements of Klein conspiracy are (1) defendant entered into agreement with one or more people, (2) to obstruct lawful government function, (3) by deceitful or dishonest means, and (4) committed at least one overt act in furtherance of conspiracy. ] Coluccio v United States (2004, ED NY) 313 F Supp 2d 150, 93 AFTR 2d 1944

### 41. Private benefit

[ Agreement whereby federal employee will act to promote private benefit in breach of his duty comes within provision of 18 USCS § 371 that proscribes conspiracy to defraud United States, if proper functioning of Government is significantly affected thereby. ] United States v Peltz (1970, CA2 NY) 433 F.2d 48, CCH Fed Secur L Rep ¶ 92836, 20 ALR Fed 216, cert den (1971) 401 US 955, 91 S Ct 974, 28 L Ed 2d 238

BS 2011

### .-Partnership in crime

Conspiracy is partnership in crime; and overt act of one partner may be act of all without any new agreement specifically directed to that act. United States v Socony-Vacuum Oil Co. (1940) 310 US 150, 84 L Ed 1129, 60 S Ct 811, reh den (1940) 310 US 658, 84 L Ed 1421, 60 S Ct 1091

Criminal conspiracy is partnership in crime. Pinkerton v United States (1946) 328 US 640, 66 S Ct 1180, 90 L Ed 1489, 34 AFTR 1277, reh den (1946) 328 US 818, 67 S Ct 26, 91 L Ed 697 and (criticized in State v Stein (2001) 144 Wash 2d 236, 27 P3d 184) and (criticized in State v Israel (2002) 113 Wash App 243, 54 P3d 1218) and (criticized in State v Nevarez (2005, App) 142 Idaho 616, 130 P3d 1154); Fiswick v United States (1946) 329 US 211, 91 L Ed 196, 67 S Ct 224 (criticized in Spencer v Kemna (1998) 523 US 1, 140 L Ed 2d 43, 118 S Ct 978, 98 CDOS 1477, 98 Daily Journal DAR 2047, 1998 Colo J C A R 1001, 11 FLW Fed S 351)

Each conspirator was in law partner and agent of every other member of conspiracy. Braatelien v United States (1945, CA8 ND) 147 F.2d 888

Conspiracy is partnership for criminal purposes in which each member becomes agent for every other member when conspiracy has been proven to exist, and that person charged was one of its members.  United States v Heck (1974, CA9 Cal) 499 F.2d 778, 74-2 USTC ¶ 9729, 74-2 USTC ¶ 9730, 34 AFTR 2d 5470, cert den (1974) 419 US 1088, 95 S Ct 677, 95 S Ct 678, 42 L Ed 2d 680

### Nature of conspiracy

Criminal conspiracy may have multiple objectives.  Ingram v United States (1959) 360 US 672, 79 S Ct 1314, 3 L Ed 2d 1503, 59-2 USTC ¶ 15245, 4 AFTR 2d 6128, reh den (1959) 361 US 856, 80 S Ct 42, 4 L Ed 2d 96

Concepts of law of conspiracy and complicity manifest general principles that society, having power to punish dangerous behavior, is not powerless against those who work to bring about that behavior. Scales v United States (1961) 367 US 203, 6 L Ed 2d 782, 81 S Ct 1469, reh den (1961) 366 US 978, 6 L Ed 2d 1267, 81 S Ct 1912 and (superseded by statute on other grounds as stated in Davis v United States (1973) 411 US 233, 36 L Ed 2d 216, 93 S Ct 1577)

Basic rationale of law of conspiracy is that conspiracy may be evil in itself, independently of any other evil it seeks to accomplish. Iannelli v United States (1975) 420 US 770, 43 L Ed 2d 616, 95 S Ct 1284

Conspiracy to commit crime was in itself substantive offense denounced by predecessor to 18 USCS § 371 and was completed by unlawful agreement, overt act was no part of conspiracy.  Bell v United States (1924, CA8 Utah) 2 F.2d 543

BS 2012

# UNITED STATES CONSTITUTION
## AMENDMENT 14

Section 1.     [Citizens of the United States.]

All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

Section 5.     [Power to enforce amendment.]

The Congress shall have the power to enforce, by appropriate legislation, the provisions of this article.

\* [ Due process clause of Fourteenth Amendment is designed to protect fragile values of vulnerable citizenry from overbearing concern for efficiency and efficacy which may characterize praiseworthy government officials no less, and perhaps more, than mediocre ones.] Stanley v Illinois (1972) 405 US 645, 31 L Ed 2d 551, 92 S Ct 1208; Fuentes v Shevin (1972) 407 US 67, 92 S Ct 1983, 32 L Ed 2d 556, 10 UCCRS 913, reh den (1972) 409 US 902, 93 S Ct 177, 34 L Ed 2d 165 and (Overruled as stated in Mayo Corp. v Bomarsi (1997) 5 LCR 106, 1997 Mass LCR LEXIS 38)

Touchstone of due process is protection of individual against arbitrary action of government. Wolff v McDonnell (1974) 418 US 539, 94 S Ct 2963, 41 L Ed 2d 935,

## 1. Generally

Fourteenth Amendment is to be construed liberally, to carry out purposes of its framers. Strauder v West Virginia (1880) 100 US 303, 10 Otto 303, 25 L Ed 664

## C. Persons Protected

[Fourteenth Amendment may be invoked by alien or citizen or by corporation or individual.] Universal Adjustment Corp. v Midland Bank, Ltd. (1933) 281 Mass 303, 184 NE 152, 87 ALR 1407

BS 2020

## 18 U.S.C. § 242. Deprivation of rights under color of law

Whoever, under color of any law, statute, ordinance, regulation, or custom, willfully subjects any person in any State, Territory, Commonwealth, Possession, or District to the deprivation of any rights, privileges, or immunities secured or protected by the Constitution or laws of the United States, or to different punishments, pains, or penalties, on account of such person being an alien, or by reason of his color, or race, than are prescribed for the punishment of citizens, shall be fined under this title or imprisoned not more than one year, or both; and if bodily injury results from

### III. ELEMENTS OF OFFENSE

#### 18. Generally

Elements of offense described in 18 USCS § 242 are: defendant's acts must have deprived someone of right secured or protected by Constitution or laws of United States; defendant's illegal acts must have been committed under color of law; person deprived of his rights must have been inhabitant of state, territory, or district; and defendant must have acted willfully. United States v Senak (1973, CA7 Ind) 477 F.2d 304, cert den (1973) 414 US 856, 38 L Ed 2d 105, 94 S Ct 157

In any prosecution under 18 USCS § 242 following elements must be established by government, namely: (1) that defendants' acts must have deprived someone of right secured or protected by Constitution or laws of United States; (2) that defendants' illegal acts must have been committed under color of law; (3) that person deprived of his rights must have been inhabitant of state, territory, or district; and (4) that defendants must have acted willfully. United States v Shafer (1974, DC Ohio) 384 F Supp 496

Elements of offense under 18 USCS § 242 are (1) that action was taken under color of state law, (2) wilfully to deprive rights protected by Constitution and laws of United States, (3) from inhabitant of any state of United States. United States v Fleming (1975, ED Mo) 399 F Supp 77, revd on other grounds (1975, CA8 Mo) 526 F.2d 191, cert dismd (1976) 423 US 1082, 47 L Ed 2d 93, 96 S Ct 872

#### 15. State or federal officers or agents

While 18 USCS § 242 was enacted to enforce Fourteenth Amendment, it punishes acts by federal officers and acts by state officers, whether they act under color of state or federal law. Screws v United States (1945) 325 US 91, 65 S Ct 1031, 89 L Ed 1495, 162 ALR 1330 (criticized in Caves v Yarbrough (2007, Miss) 2007 Miss LEXIS 710)

18 USCS § 242 was directed only against activities of state and of its authorized agents; it did not create or add to rights of one citizen as against another; it was rather, guaranty against encroachment by state and its authorized agents upon rights of citizens under United States Constitution. United States v Trierweiler (1943, DC Ill) 52 F Supp 4

#### 5. -18 USCS §§ 1512 and 1513

Defendants violated 18 USCS § 1512(b)(3) by obstructing justice despite fact that false information they gave was directed at state investigators because likelihood existed that information would be transferred to federal investigators to determine whether shooting violated 18 USCS §§ 241 and 242; from time that defendant entered conspiracy to mislead investigators, federal investigation into shooting was not only possible, it was highly probable, and there was no requirement for specific intent to mislead federal officials. United States v Ronda (2006, CA11 Fla) 455 F.3d 1273, 19 FLW Fed C 765, reh den, reh, en banc, den (2006, CA11) 214 Fed Appx 972 and cert den (2007) 549 US 1212, 127 S Ct 1327, 167 L Ed 2d 86 and cert den (2007) 549 US 1212, 127 S Ct 1338, 167 L Ed 2d 86 and cert den (2007) 549 US 1212, 127 S Ct 1327, 167 L Ed 2d 86

Victim and Witness Protection Act (18 USCS §§ 1512-1513) does not supersede and implicitly repeal 18 USCS § 241 by specifically proscribing harming of witnesses. United States v Castellano (1985, SD NY) 610 F Supp 1359

BS 2030

18 U.S.C. § 241. Conspiracy against rights

If two or more persons conspire to injure, oppress, threaten, or intimidate any person in any State, Territory, Commonwealth, Possession, or District in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States, or because of his having so exercised the same; or

If two or more persons go in disguise on the highway, or on the premises of another, with intent to prevent or hinder his free exercise or enjoyment of any right or privilege so secured--

They shall be fined under this title or imprisoned not more than ten years, or both; and if death results from the acts committed in violation of this section or if such acts include kidnapping or an attempt to kidnap, aggravated sexual abuse or an attempt to commit aggravated sexual abuse, or an attempt to kill, they shall be fined under this title or imprisoned for any term of years or for life, or both, or may be sentenced to death.

[18 USCS § 241 not only guarantees safety and protection of persons in exercise of rights dependent on Constitution, but also those guaranteed by federal law.] Bergman v United States (1983, WD Mich) 565 F Supp 1353, 37 FR Serv 2d 442

## III. ELEMENTS OF OFFENSE

### 19. Generally

[Elements of crime defined by 18 USCS § 241 are unlawful conspiracy based on unlawful agreement of defendants.] Steedle v United States (1936, CA3 Pa) 85 F.2d 867, 107 ALR 1361; Walker v United States (1937, CA8 Mo) 93 F.2d 383, cert den (1938) 303 US 644, 82 L Ed 1103, 58 S Ct 642, reh den (1938) 303 US 668, 82 L Ed 1124, 58 S Ct 755; Cartello v United States (1937, CA8 Mo) 93 F.2d 412

[Conspiracy is gravamen of offense under 18 USCS § 241.] United States v Purvis (1978, CA5 Ala) 580 F.2d 853, reh den (1978, CA5 Ala) 585 F.2d 520 and cert den (1979) 440 US 914, 59 L Ed 2d 463, 99 S Ct 1229

[Violation of 18 USCS § 241 occurs when there is conspiracy to deprive individuals of constitutional rights with specific intent to violate such constitutional rights; however, it is not required that immediate intent to violate such rights predominate over ultimate purposes that violations were designed to achieve.] United States v Ellis (1979, CA3 Pa) 595 F.2d 154, cert den (1979) 444 US 838, 62 L Ed 2d 49, 100 S Ct 75

While specific intent to interfere with federally protected right must be shown, it is not necessary that defendant be shown to have legalistic appreciation of federally protected nature of right. United States v Redwine (1983, CA7 Ind) 715 F.2d 315, cert den (1984) 467 US 1216, 81 L Ed 2d 367, 104 S Ct 2661

BS 2040

# 18 U.S.C. § 2.  Principals

(a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.

(b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

## 1. Generally

Two subsections of 18 USCS § 2 are not mutually exclusive forms charging aiding and abetting, but are two statements of indirect illegal actions which carry same consequences for actor as direct violation of criminal statutes. United States v Maselli (1976, CA6 Ohio) 534 F.2d 1197

Whatever differences there may once have been between aiding and abetting liability and liability as principal no longer existed under either federal or California law; scope of aiding and abetting liability in California, though broad, did not in practice differ from that under federal law. Roman-Suaste v Holder (2014, CA9) 766 F.3d 1035

18 USCS § 2 proscribes two distinct forms of conduct, namely: (1) participation in criminal plan involving others who act with criminal state of mind, and (2) commission of crime by use of innocent or irresponsible agent; conviction as principal under first subsection requires proof of criminal conduct on behalf of more than one person while conviction under second subsection requires proof of criminal conduct on behalf of only one person. United States v Grasso (1973, ED Pa) 356 F Supp 814, affd without op (1973, CA3 Pa) 485 F.2d 682 and affd without op (1973, CA3 Pa) 485 F.2d 682

BS 2050

SECTION #5
LAW & RULES
GOVERNING LAWYERS
FOR THE GOVERNMENT
B S 3001 - 3061

# 'NOBODY IS ABOVE THE LAW. HOW MANY TIMES DO I HAVE TO SAY IT?'



**PRESIDENT OBAMA**, vowing that political considerations will not affect the federal investigation into Hillary Clinton's use of a private email server while she was Secretary of State

No man in this country is so high that he is above the law.

*Butz v. Economou*, 438 U.S. 478, 506, 98 S.Ct. 2894, 2910, 57 L.Ed.2d 895 (1978) (citation omitted).

[Courts] must guard against the danger of sliding unconsciously from the narrow confines of law into the more spacious domain of policy.

*Ryan Heating Co. Inc. v. N.L.R.B.*, 942 F.2d 1287, 1290 (8th Cir. 1991) (citations omitted).

[N]o person, even a President, is above the law...

*United States v. Fromme*, 405 F.Supp. 578, 582 (E.D. Cal. 1975).

On March 7, 2002, in the Press Room of the Department of Justice in Washington DC regarding the indictment of accounting firm Arthur Anderson, LLP, Deputy Attorney General Larry Thompson announced to the world that "Obstruction of Justice is a grave matter and one this Department takes very seriously. Obstruction of Justice is a crime that attacks the justice system itself by impeding discovery of the truth...It would be unfortunate for our criminal justice system if any individual or any entity could say that he or she or it was too big or too important, so as it couldn't be indicted."

"To do the job right, federal prosecutors are required to have a strong sense of honor, integrity, objectivity, and fairness. Federal Prosecutor has immense, unbridled power along a broad spectrum of discretion. In the hands of the wrong people, the damage that power can cause is beyond measure. A prosecutor does play God."
    Former Assistant United States Attorney and author Sidney Powell in her book "Licensed to Lie"

Multitudo Imperitorum Perdit Curiam -- A multitude of ignorant practitioners destroys a court.

28 U.S.C. § **530B**.　　　Ethical standards for attorneys for the Government

(a) An attorney for the Government shall be subject to State laws and rules, and local Federal court rules, governing attorneys in each State where such attorney engages in that attorney's duties, to the same extent and in the same manner as other attorneys in that State.

(b) The Attorney General shall make and amend rules of the Department of Justice to assure compliance with this section.

(c) As used in this section, the term 'attorney for the Government' includes any attorney described in section 77.2(a) of part 77 of title 28 of the Code of Federal Regulations and also includes any independent counsel, or employee of such a counsel, appointed under chapter 40 [28 USCS §§ 591 et seq.].

U.S.D.C.
ED CA
LOCAL **RULE 180**　　(Fed. R. Civ. P. 83) ATTORNEYS

　　**(a) Admission to the Bar of this Court**. Admission to and continuing membership in the Bar of this Court are limited to attorneys who are active members in good standing of the State Bar of California.

　　**(b) Practice in this Court**. Except as otherwise provided herein, only members of the Bar of this Court shall practice in this Court.

　　**(1) Attorneys for the United States**. An attorney who is not eligible for admission under (a), but who is a member in good standing of and eligible to practice before, the Bar of any United States Court or of the highest Court of any State, or of any Territory or Insular Possession of the United States, may practice in this Court in any matter in which the attorney is employed or retained by the United States or its agencies. Attorneys so permitted to practice in this Court are subject to the jurisdiction of this Court with respect to their conduct to the same extent as members of the Bar of this Court.

L.R. 180　　**(e) Standards of Professional Conduct**. Every member of the Bar of this Court, and any attorney permitted to practice in this Court under (b), shall become familiar with and comply with the standards of professional conduct required of members of the State Bar of California and contained in the State Bar Act, the Rules of Professional Conduct of the State Bar of California, and court decisions applicable thereto, which are hereby adopted as standards of professional conduct in this Court. In the absence of an applicable standard therein, the Model Code of Professional Responsibility of the American Bar Association may be considered guidance. No attorney admitted to practice before this Court shall engage in any conduct that degrades or impugns the integrity of the Court or in any manner interferes with the administration of justice.

BS 3002

[6067.] Every person on his admission shall take an oath to support the Constitution of the United States and the Constitution of the State of California, and faithfully to discharge the duties of any attorney at law to the best of his knowledge and ability. A certificate of the oath shall be indorsed upon his license.

[6068.] It is the duty of an attorney to do all of the following:
(a) To support the Constitution and laws of the United States and of this state.
(b) To maintain the respect due to the courts of justice and judicial officers.
(c) To counsel or maintain those actions, proceedings, or defenses only as appear to him or her legal or just, except the defense of a person charged with a public offense.
(d) To employ, for the purpose of maintaining the causes confided to him or her those means only as are consistent with truth, and never to seek to mislead the judge or any judicial officer by an artifice or false statement of fact or law.
(e) (1) To maintain inviolate the confidence, and at every peril to himself or herself to preserve the secrets, of his or her client.
(2) Notwithstanding paragraph (1), an attorney may, but is not required to, reveal confidential information relating to the representation of a client to the extent that the attorney reasonably believes the disclosure is necessary to prevent a criminal act that the attorney reasonably believes is likely to result in death of, or substantial bodily harm to, an individual.
(f) To advance no fact prejudicial to the honor or reputation of a party or witness, unless required by the justice of the cause with which he or she is charged.
(g) Not to encourage either the commencement or the continuance of an action or proceeding from any corrupt motive of passion or interest.

## 2. Business and Professions Code § 6128

To the extent that Liao attempts to state a claim for relief based on Yu's alleged violation of Business and Professions Code § 6128, the court finds that this claim fails as a matter of law. Section 6128 provides, in pertinent part: "Every attorney is guilty of a misdemeanor who . . . (a) Is guilty of any deceit or collusion, or consents to any deceit or collusion, with intent to deceive the court or any party." Cal. Bus. & Prof.Code § 6128(a). A violation of § 6128(a) "is punishable by imprisonment in the county jail not exceeding six months, or by a fine not exceeding two thousand five hundred dollars ($ 2,500), or by both." Cal. Bus. & Prof.Code § 6128(c). 2

California Business & Professions Code sections 6067 and 6068 provide the oath requirement for attorneys in California and the duties imposed on attorneys in California, respectively.

As the Supreme Court of California said in Pickering v. State Bar:

> "Section 6103 of the Business and Professions Code * * * provides that any violation by an attorney of his oath or professional duties constitutes cause for suspension or disbarment.
>
> 'And section 6068 of that code prescribes, in part, that it shall be the duty of an attorney 'never to seek to mislead the judge or any judicial officer by an artifice or false statement of fact or law.' The presentation to a court of a statement of fact known to be false presumes an intent to secure a determination based upon it and is a clear violation of the quoted provision.
>
> 'The conduct denounced by the Business and Professions Code is not the act of an attorney by which he successfully misleads the court, but the presentation of a statement of fact, known by him to be false, which tends to do so. It is the endeavor to secure an advantage by means of falsity which is denounced.

California Business and Professions Code section 6068(f) and (h), which state the following:

It is the duty of an attorney to do all of the following:

(f) To advance no fact prejudicial to the honor or reputation of a party or witness, unless required by the justices of the cause with which he or she is charged.. . .(h) Never to reject, for any consideration personal to himself or herself, the cause of the defenseless or the oppressed. The SAC asserts that this statute is binding on the U.S. Attorney's office because "[a]n attorney for the Government shall be subject to State laws and rules, and local Federal court rules, governing attorneys in each State where such attorney engages in that attorney's duties, to the same extent and in the same manner as other attorneys in that State." (quoting 28 U.S.C. § 530B(a)).

The government argues that these false statements violated the standards of professional conduct required by Local Rule 180(e), Cal. Bus. & Prof. Code § 6068(d) and ABA Model Rules 4.1(a) and 8.4(c). Because the court grants the instant motion on grounds that the communications violated the no contact rule, the court does not address this issue.

EDCA

BS 3004

*ABA MODEL RULES 3.3(a)(i), 4.1(a), 8.4(c)* [handwritten]

a. Holmes Violated His Duty of Candor

The record reveals that Holmes has violated his ethical duty to act with candor. "A lawyer shall not knowingly: (1) make a false statement of fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer . . . ." ABA Model Rule 3.3(a)(1); *see also* DCRPC 3.3(a)(1) (same); MRPC 3.3(a)(1) ("A lawyer shall not knowingly . . . make a false statement of material fact or law to a tribunal . . . ."). Additionally, "[i]n the course of representing a client a lawyer shall not knowingly . . . make a false statement of material fact or law to a third person . . . ." **ABA Model Rule 4.1(a)** *see also* DCRPC 4.1(a) (same); MRPC 4.1(a) (same) "It is professional misconduct for a lawyer to . . . engage in conduct involving dishonesty, fraud, deceit or misrepresentation . . . ." ABA Model Rule 8.4(c) DCRPC 8.4(c) (same); MRPC 8.4(c) (same).

*AS CITED IN:* [handwritten]

UNITED STATES ex rel. HOLMES, PLAINTIFF v. NORTHROP GRUMMAN CORPORATION AND HUNTINGTON INGALLS INCORPORATED, DEFENDANTS
UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF MISSISSIPPI, SOUTHERN DIVISION
2015 U.S. Dist. LEXIS 71804
CIVIL NO.: 1:13cv85-HSO-RHW
June 3, 2015, Decided
June 3, 2015, Filed

BS 3005 [handwritten]

# Current Rules

*Rules of Professional Conduct*

**NOTE:** *Operative January 1, 2012, Business & Professions Code section 6010, in part, provides that the State Bar is governed by a board known as the board of trustees of the State Bar and that any provision of law referring to the "board of governors" shall be deemed to refer to the "board of trustees." In accordance with this law, references to the "board of governors" included in the current Rules of Professional Conduct are deemed to refer to the "board of trustees."*

# Rule 1-100 Rules of Professional Conduct, in General

(A) Purpose and Function.

The following rules are intended to regulate professional conduct of members of the State Bar through discipline. They have been adopted by the Board of Governors of the State Bar of California and approved by the Supreme Court of California pursuant to Business and professions Code sections 6076 and 6077 to protect the public and to promote respect and confidence in the legal profession. These rules together with any standards adopted by the Board of Governors pursuant to these rules shall be binding upon all members of the State Bar.

For a willful breach of any of these rules, the Board of Governors has the power to discipline members as provided by law.

The prohibition of certain conduct in these rules is not exclusive. Members are also bound by applicable law including the State Bar Act (Bus. & prof. Code, §6000 et seq.) and opinions of California courts. Although not binding, opinions of ethics committees in California should be consulted by members for guidance on proper professional conduct. Ethics opinions and rules and standards promulgated by other jurisdictions and bar associations may also be considered.

(E) These rules may be cited and referred to as "Rules of Professional Conduct of the State Bar of California."

BS 3006

# Rule 5-110 Performing the Duty of Member in Government Service

A member in government service shall not institute or cause to be instituted criminal charges when the member knows or should know that the charges are not supported by probable cause. If, after the institution of criminal charges, the member in government service having responsibility for prosecuting the charges becomes aware that those charges are not supported by probable cause, the member shall promptly so advise the court in which the criminal matter is pending.

# Rule 5-200 Trial Conduct

In presenting a matter to a tribunal, a member:

(A) Shall employ, for the purpose of maintaining the causes confided to the member such means only as are consistent with truth;

(B) Shall not seek to mislead the judge, judicial officer, or jury by an artifice or false statement of fact or law;

(C) Shall not intentionally misquote to a tribunal the language of a book, statute, or decision;

(D) Shall not, knowing its invalidity, cite as authority a decision that has been overruled or a statute that has been repealed or declared unconstitutional; and

(E) Shall not assert personal knowledge of the facts at issue, except when testifying as a witness.

BS 3007

**F.R.C.P.**

Rule 11.    Signing Pleadings, Motions, and Other Papers; Representations to the Court; Sanctions

(a) **Signature.** Every pleading, written motion, and other paper must be signed by at least one attorney of record in the attorney's name-or by a party personally if the party is unrepresented. The paper must state the signer's address, e-mail address, and telephone number. Unless a rule or statute specifically states otherwise, a pleading need not be verified or accompanied by an affidavit. The court must strike an unsigned paper unless the omission is promptly corrected after being called to the attorney's or party's attention.

(b) **Representations to the Court.** By presenting to the court a pleading, written motion, or other paper-whether by signing, filing, submitting, or later advocating it-an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances:

(1) it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;

(2) the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law;

 (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and

(4) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on belief or a lack of information.

(c) **Sanctions.**

(1) *In General.* If, after notice and a reasonable opportunity to respond, the court determines that Rule 11(b) has been violated, the court may impose an appropriate sanction on any attorney, law firm, or party that violated the rule or is responsible for the violation. Absent exceptional circumstances, a law firm must be held jointly responsible for a violation committed by its partner, associate, or employee.

(2) *Motion for Sanctions.* A motion for sanctions must be made separately from any other motion and must describe the specific conduct that allegedly violates Rule 11(b). The motion must be served under Rule 5, but it must not be filed or be presented to the court if the challenged paper, claim, defense, contention, or denial is withdrawn or appropriately corrected within 21 days after service or within another time the court sets. If warranted, the court may award to the prevailing party the reasonable expenses, including attorney's fees, incurred for the motion.

(3) *On the Court's Initiative.* On its own, the court may order an attorney, law firm, or party

to show cause why conduct specifically described in the order has not violated Rule 11(b).

(4) *Nature of a Sanction.* A sanction imposed under this rule must be limited to what suffices to deter repetition of the conduct or comparable conduct by others similarly situated. The sanction may include nonmonetary directives; an order to pay a penalty into court; or, if imposed on motion and warranted for effective deterrence, an order directing payment to the movant of part or all of the reasonable attorney's fees and other expenses directly resulting from the violation.

(5) *Limitations on Monetary Sanctions.* The court must not impose a monetary sanction:

   (A) against a represented party for violating Rule 11(b)(2); or

   (B) on its own, unless it issued the show-cause order under Rule 11(c)(3) before voluntary dismissal or settlement of the claims made by or against the party that is, or whose attorneys are, to be sanctioned.

(6) *Requirements for an Order.* An order imposing a sanction must describe the sanctioned conduct and explain the basis for the sanction.

### 18. Generally

Rule 11 guidelines apply to any attorney or party who signs document, whether or not that individual was required to sign, and voluntary signature of represented party is capable of violating rule. Business Guides, Inc. v Chromatic Communications Enters., Inc. (1991) 498 US 533, 112 L Ed 2d 1140, 111 S Ct 922, 91 CDOS 1588, 91 Daily Journal DAR 2366, 55 BNA FEP Cas 279, 18 FR Serv 3d 1153

Sanctions may be imposed only on attorney who actually signs document or on clients he represents. Robinson v National Cash Register Co. (1987, CA5 Tex) 808 F.2d 1119, 6 FR Serv 3d 1202 (ovrld in part on other grounds by Thomas v Capital Sec. Servs. (1988, CA5 Miss) 836 F.2d 866, 45 CCH EPD ¶

Rule 11 is aimed at lawyers who put their names on pleadings without first making proper inquiry into relevant law and facts. Rodgers v Lincoln Towing Service, Inc. (1984, ND Ill) 596 F Supp 13, 40 FR Serv 2d 703, affd (1985, CA7 Ill) 771 F.2d 194, 2 FR Serv 3d 1414 (ovrld in part on other grounds as stated in Parmelee v True (1995, ND Ill) 1995 US Dist LEXIS 17314) and (ovrld on other grounds as stated in Marliere v Village of Woodridge (1997, ND Ill) 1997 US Dist LEXIS 4379)

Spirit and intent of Rule 11 is requirement that attorney make reasonable inquiry before signing any pleading, paper or motion. Florida Monument Builders v All Faiths Memorial Gardens (1984, SD Fla) 605 F Supp 1324

Rule 11 is designed to insure that allegations in complaint are supported by sufficient factual predicate at time that claims are asserted; thus, it is no answer to motion for Rule 11 sanctions for plaintiffs to suggest that they needed discovery to ascertain whether claim they asserted was well founded. Yonkers v Otis Elevator Co. (1985, SD NY) 106 FRD 524

Rule 11 sanctions are not intended to chill attorney's enthusiasm or creativity in pursuing factual or legal theories and court should avoid using wisdom of hindsight in examining attorney's conduct at time of pleading. Marco Holding Co. v Lear Siegler, Inc. (1985, ND Ill) 606 F Supp 204, 1985-1 CCH Trade Cases ¶ 66446, 3 FR Serv 3d 394

Sanctions may be imposed under Rule 11 only for necessary response to frivolous pleading or paper, and Rule was not intended to provide mechanism for imposing sanctions for any and all improper conduct of party or counsel during litigation. Associated Indem. Corp. v Fairchild Industries, Inc. (1991, SD NY) 138 FRD 384, revd on other grounds (1992, CA2 NY) 961 F.2d 32, 22 FR Serv 3d 570, 22 ELR 20811

Main purpose of FRCP 11 is to deter frivolous claims and curb abuses of legal system, thereby speeding up and reducing costs of litigation. Binghamton Masonic Temple v Bares (1996, ND NY) 168 FRD 121

Fed. R. Civ. P. 11 sanctions are risk borne by all litigants. Park v Thomson Corp. (2009, SD NY) 633 F Supp 2d 8, 2009-2 CCH Trade Cases ¶ 76775

BS 3009

### 14. Inherent power of court

Rule 11 does not repeal or modify existing authority of federal courts to deal with abuses under court's inherent power; further, reliance on inherent power does not thwart purposes of sanctioning mechanisms of Rule 11 which are cast in mandatory terms where much of bad faith conduct by party is beyond reach of Rule. Chambers v NASCO (1991) 501 US 32, 111 S Ct 2123, 115 L Ed 2d 27, 91 CDOS 4222, 91 Daily Journal DAR 6585, 19 FR Serv 3d 817, reh den (1991) 501 US 1269, 112 S Ct 12, 115 L Ed 2d 1097 and (criticized in Conner v Travis County (2000, CA5 Tex) 209 F.3d 794) and (criticized in Nusbaum v Berlin (2007) 273 Va 385, 641 SE2d 494)

Rule 11 does not bar District Court from assessing fees against party under its inherent power when party's conduct is not within reach of rule. Nasco, Inc. v Calcasieu Tel. & Radio (1990, CA5 La) 894 F.2d 696, 18 FR Serv 3d 1357, affd (1991) 501 US 32, 111 S Ct 2123, 115 L Ed 2d 27, 91 CDOS 4222, 91 Daily Journal DAR 6585, 19 FR Serv 3d 817, reh den (1991) 501 US 1269, 112 S Ct 12, 115 L Ed 2d 1097 and (criticized in Conner v Travis County (2000, CA5 Tex) 209 F.3d 794) and (criticized in Nusbaum v Berlin (2007) 273 Va 385, 641 SE2d 494)

Courts retain inherent power to sanction bad faith conduct during litigation, and this power exists independent of Rule 11. Western Sys. v Ulloa (1992, CA9 Guam) 958 F.2d 864, 92 CDOS 1870, 92 Daily Journal DAR 2921, amd on other grounds (1992, CA9 Guam) 92 CDOS 5389, 92 Daily Journal DAR 8538 and cert den (1993) 506 US 1050, 113 S Ct 970, 122 L Ed 2d 125 and (criticized in Conner v Travis County (2000, CA5 Tex) 209 F.3d 794) and (criticized in Stanley v Wong (2006, ED Cal) 2006 US Dist LEXIS 35273) and (criticized in Jones v St. Paul Cos. (2006, DC Minn) 450 F Supp 2d 1003) and (criticized in Jones v St. Paul Cos. (2007, CA8 Minn) 495 F.3d 888, 101 BNA FEP Cas 710, 26 BNA IER Cas 989) and (criticized in Weyerhaeuser Co. v Wyatt (2007, CA10 Okla) 505 F.3d 1104, 26 BNA IER Cas 1462, 155 CCH LC ¶ 10934)

Court may sua sponte impose sanctions against plaintiff's second attorney, even though defendant had requested only that court sanction plaintiff's first attorney, and when imposing sanctions sua sponte, court is not limited by time requirements controlling party's request for sanctions. Burda v M. Ecker Co. (1993, CA7 Ill) 2 F.3d 769, 26 FR Serv 3d 1071 (criticized in Reed-Union Corp. v Turtle Wax (1995, ND Ill) 1995 US Dist LEXIS 3777) and (criticized in Hardwick v John & Mary E. Kirby Hosp. (2012, CD Ill) 2012 US Dist LEXIS 51652)

Full measure of plaintiff's vexatious conduct could not be addressed under Fed. R. Civ. P. 11 alone, where plaintiff's written submissions violated Fed. R. Civ. P. 11, and she also committed fraud upon court and her opponents by disrupting litigation process and by affirmatively lying to court in effort to prevent ruling on her motions; because federal rules and applicable statutes were insufficient to reach full measure of plaintiff's bad faith conduct, court was authorized to proceed under its inherent power to police itself. Parker v N.C. Agric. Fin. Auth. (2006, ED Va) 341 BR 547, affd (2007, CA4 Va) 249 Fed Appx 304

Defendant manufacturer's motion for attorney's fees was denied where it failed to describe plaintiff's counsel's conduct as violating to Fed. R. Civ. P. 11, instead relying on inherent powers of court. New Eng. Surfaces v E. I. Dupont De Nemours Co. (2008, DC Me) 553 F Supp 2d 116

Court relied on its inherent power to impose sanctions on party for bad faith conduct that offends legal process rather than Fed. R. Civ. P. 11, which reached narrower range of conduct, or 28 USCS § 1927, which applied only to attorneys. Am. Sci. & Eng'g, Inc. v Autoclear, LLC (2008, ED Va) 606 F Supp 2d 617

BS 3010

The Supreme Court has long emphasized our Constitution's "overriding concern with the justice of finding guilt." *United States v. Agurs*, 427 U.S. 97, 112, 49 L. Ed. 2d 342, 96 S. Ct. 2392 (1976). In particular, the Due Process Clause guarantees for every defendant the right to a trial that comports with basic tenets of fundamental fairness. *Lassiter v. Department of Soc. Servs.*, 452 U.S. 18, 24-25, 68 L. Ed. 2d 640, 101 S. Ct. 2153 (1981); *see also Turner v. Louisiana*, 379 U.S. 466, 471-72, 13 L. Ed. 2d 424, 85 S. Ct. 546 (1965); *In re Murchison*, 349 U.S. 133, 136, 99 L. Ed. 942, 75 S. Ct. 623 (1955).

The prosecutor, as the agent of the people and the State, has the unique duty to ensure fundamentally fair trials by seeking not only to convict, but also to vindicate the truth and to administer justice. The Supreme Court recognized, over sixty years ago, that

> because the prosecutor is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer . . ., it is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate method to bring about one. *Berger v. United States*, 295 U.S. 78, 88, 79 L. Ed. 1314, 55 S. Ct. 629 (1935), *overruled on other grounds by Stirone v. United States*, 361 U.S. 212, 4 L. Ed. 2d 252, 80 S. Ct. 270 (1960).

This court has reaffirmed that this duty of furthering just convictions "is [the prosecutor's] highest purpose." *Bruno v. Rushen*, 721 F.2d 1193, 1195 (9th Cir. 1983). In *United States v. Kojayan*, **8 F.3d 1315**, 1323 (9th Cir. 1993), we further stated: "While lawyers representing private parties may - indeed, must - do everything ethically permissible to advance their clients' interests, lawyers representing the government in criminal cases serve truth and justice first. The prosecutor's job isn't just to win, but to win fairly, staying well within the rules." *See also United States v. Kattar*, 840 F.2d 118, 127 (1st Cir. 1988) (stating that the function of the prosecutor "is not merely to prosecute crimes, but also to make certain that the truth is honored to the fullest extent possible"); *Bruno*, 721 F.2d at 1195. 1 This is so because "society wins not only when the guilty are convicted but when criminal trials are fair; our system of justice suffers when any accused is treated unfairly." *Brady v. Maryland*, 373 U.S. 83, 87, 10 L. Ed. 2d 215, 83 S. Ct. 1194 (1963).

The prosecutor may not "[become] the architect of a proceeding that does not comport with the standards of justice." *Id*. The prosecutor, therefore, violates the Due Process Clause if he knowingly presents false testimony - whether it goes to the merits of the case or solely to a witness's credibility. *Napue v. Illinois*, 360 U.S. 264, 3 L. Ed. 2d 1217, 79 S. Ct. 1173 (1959); *Mooney v. Holohan*, 294 U.S. 103, 79 L. Ed. 791, 55 S. Ct. 340 (1935). 2 Moreover, the prosecutor has a constitutional duty to correct evidence he knows is false, even if he did not intentionally submit it. *Giles v. Maryland*, 386 U.S. 66, 17 L. Ed. 2d 737, 87 S. Ct. 793 (1967).

("It's the easiest thing in the world for people trained in the adversarial ethic to think a prosecutor's job is simply to win.") (citing instances of prosecutorial misconduct). In so doing, the government failed in its duty to "win fairly, staying well within the rules" and, more importantly, to "serve truth and justice first." *Kojayan*, 8 F.3d at 1323. The district court found that the government, in this case, strayed from its responsibility "to vindicate the right of people as expressed in the laws and give those accused of crime a fair trial." *Id*. Thus,

> in a situation like this, the judiciary - especially the court before which the primary misbehavior took place - may exercise its supervisory power to make it clear that the misconduct was serious, that the government's unwillingness to own up to it was more serious still and that steps must be taken to avoid a recurrence of this chain of events. *Kojayan*, 8 F.3d at 1325. The district court



The Department of Justice has an obligation to its lawyers and to the public to prevent prosecutorial misconduct. Prosecutors, as servants of the law, are subject to constraints and responsibilities that do not apply to other lawyers; they must serve truth and justice first. *United States v. Kojayan*, **8 F.3d 1315**, 1323 (9th Cir. 1993). Their job is not just to win, but to win fairly, staying within the rules. *Berger*, 295 U.S. at 88. That did not happen here, and the district court swiftly and correctly declared a mistrial when Albert's misquotation was revealed.



When a prosecutor steps over the boundaries of proper conduct and into unethical territory, the government has a duty to own up to it and to give assurances that it will not happen again. Yet, we cannot find a single hint of appreciation of the seriousness of the misconduct within the pages of the government's brief on appeal. Instead, the government attempts to shift blame by stating that "the prosecutor gave the defense counsel an opportunity to stop the offending question before the prosecutor asked it," but "defense counsel did not realize, or even inquire about, how the question from the change of plea transcript had been redacted." Gov't Br. 26-27. Of course, as we have explained, Albert told the district court what he intended to *say*. Albert did not tell the court or opposing counsel that what he intended to say was not a full nor fair recitation of the magistrate's question to Lopez-Avila.

Finally, upon initial release of this opinion, the government filed a motion requesting that we remove Albert's name and replace it with references to "the prosecutor." The motion contended that naming Albert publicly is inappropriate given that we do not yet know the outcome of any potential investigations or disciplinary proceedings. We declined to adopt the government's suggestion and denied its motion. We have noticed that the U.S. Attorney's Office in Arizona regularly makes public the names of prosecutors who do good work and win important victories. *E.g.*, Press Release, U.S. Attorney's Office for the District of Arizona, "Northern Arizona Man Sentenced to Federal Prison for Arson," (January 31, 2012) ("The prosecution was handled by Christina J. Reid-Moore, Assistant U.S. Attorney, District of Arizona, Phoenix"), *available at* PR_01312012_Nez.html. If federal prosecutors receive public credit for their good works-as they should-they should not be able to hide behind the shield of anonymity when they make serious mistakes.

BS 3012

"Membership in the bar is a privilege burdened with conditions. An attorney is received into that ancient fellowship for something more than private gain. He becomes an officer of the court, and, like the court itself, an instrument or agency to {377 F.3d 943} advance the ends of justice." In re Snyder, 472 U.S. 634, 644, 86 L. Ed. 2d 504, 105 S. Ct. 2874 (1985) (quoting People ex rel. Karlin v. Culkin, 248 N.Y. 465, 470-71, 162 N.E. 487 (1928) (internal quotations and alterations omitted). We have both statutory and inherent power to suspend or disbar an attorney who has been admitted to this court's bar.

---

## 86 LED2D 504, 472 US 634  IN RE SNYDER

### In re ROBERT J. SNYDER, Petitioner

### 472 US 634, 86 L Ed 2d 504, 105 S Ct 2874

[No. 84-310]

**Argued April 16, 1985.**

**Decided June 24, 1985.**

The phrase "conduct unbecoming a member of the bar" must be read in light of the "complex code of behavior" to which attorneys are subject. In re Bithoney, 486 F.2d 319, 324 (CA1 1973). Essentially, this reflects the burdens inherent in the attorney's dual obligations to clients and to the system of justice. Justice Cardozo once observed:<*pg. 513>

"'Membership in the bar is a privilege burdened with conditions.' [An attorney is] received into that ancient fellowship for something more than private gain. He [becomes] an officer of the court, and, like the court itself, an instrument or agency to advance the ends of justice." People ex rel. Karlin v Culkin, 248 NY 465, 470-471, 162 NE 487, 489 (1928) (citation omitted).

As an officer of the court, a member of the bar enjoys singular powers that others do not possess; by virtue of admission, members of the bar share a kind of monopoly granted only to lawyers. Admission creates a license not only to advise and counsel clients but also to appear in court and try cases; as an officer of the court, a lawyer can cause persons to drop their private affairs and be called as witnesses in court, and for depositions and other pretrial processes that, while subject to the ultimate control of the court, may be conducted outside courtrooms. The license granted by the court requires members of the bar to conduct themselves in a manner

[472 US 645]

compatible with the role of courts in the administration of justice.

[2b][3a] Read in light of the traditional duties imposed on an attorney, it is clear that "conduct unbecoming a member of the bar" is conduct contrary to professional standards that shows an unfitness to discharge continuing obligations to clients or the courts, or conduct inimical to the administration of justice. More specific guidance is provided by case law, applicable court rules, and "the lore of the profession," as embodied in codes of professional conduct.[6]

RS 3013

**HARRY BERGER, Petitioner,**

*vs.*

## UNITED STATES OF AMERICA.

## [79 led 1314] (295 US 78-89.)

[No. 544.]

**Argued and submitted March 7, 1935.  Decided April 15, 1935.**



The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor-indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.

It is fair to say that the average jury, in a greater or less degree, has confidence that these obligations, which so plainly rest upon the prosecuting attorney, will be faithfully observed. Consequently, improper suggestions, insinuations and, especially, assertions of personal knowledge are apt to carry much weight against the accused when they should properly carry none. The court below said that the case against Berger was not strong; and from a careful examination of the record we agree. Indeed, the case against Berger, who was convicted only of conspiracy and not of any substantive offense as were

**[295 US 89]**

the other defendants, we think may properly be characterized as weak-depending, as it did, upon the testimony of Katz, an accomplice with a long criminal record.

In these circumstances prejudice to the cause of the accused is so highly probable that we are not justified in assuming its non-existence. If the case against Berger had been strong, or, as some courts have said, the evidence of his guilt "overwhelming," a different conclusion might be reached.  Compare Fitter v. United States (C. C. A. 2d) 258 F. 567, 573; Johnson v. United States (C. C. A. 7th) 215 F. 679, 685, L.R.A.1915A, 862; People v. Malkin, 250 N. Y. 185, 201, 202, 164 N. E. 900; State v. Roscum, 119 Iowa, 330, 333, 93 N. W. 295. Moreover, we have not here a case where the misconduct of the prosecuting attorney was slight or confined to a single instance, but one where such misconduct was pronounced and persistent, with a probable cumulative effect upon the jury which cannot be disregarded as inconsequential.  A new trial must be awarded.  Compare New York C. R. Co. v. Johnson, 279 U. S. 310, 316-318, 73 L. ed. 706, 709, 710, 49 S. Ct. 300.

BS 3014

Justice Robert Jackson, when he was Attorney General, gave a speech to the U.S. Attorneys in the Department of Justice. His words are worth repeating for they really refer to the present case.

*If the prosecutor is obliged to choose his case, it follows that he can choose his defendants.* Therein is the most dangerous power of the prosecutor: that *he will pick people that he thinks he should get, rather than cases that need to be prosecuted.* With the law books filled with a great assortment of crimes, a prosecutor stands a fair chance of finding at least a technical violation of some act on the part of almost anyone. In such a case, it is not a question of discovering the commission of a crime and then looking for the man who has committed it. *It is a question of picking the man and then searching the law books, or putting investigators to work, to pin some offense on him.* It is in this realm — in which the prosecutor picks some person whom he dislikes or desires to embarrass, or selects some group of unpopular persons and then looks for an offense, that the greatest danger of abuse of prosecuting power lies. It is here that law enforcement becomes personal, and *the real crime becomes that of being unpopular with the predominant or governing group*, being attached to the wrong political views, or being personally obnoxious to or in the way of the prosecutor himself.

Robert Jackson, *The Federal Prosecutor, Address Delivered at the Second Annual Conference of United States Attorneys*, April 1, 1940 [Italics and bold added].[1]

---

[1] See also, Ronald D. Rotunda, The Case Against Special Prosecutors, Wall Street Journal, Jan. 15, 1990, at p. A8.



The prosecutor has more control over life liberty and reputation than any other person in America said Robert Jackson the US. Attorney General in 1940

BS 3015

CASE CITED BY GOVERNMENT IN
IT'S OPPOSITION TO DEFENDANTS'
MOTION TO SUPPRESS PURSUANT TO
FED. R. EVID. 408   ECF 102, 2:1-7
AND IN THE "ANSWERING BRIEF OF THE UNITED STATES" ON APPEAL. P. 80 & 81

**EARLE E. AUSHERMAN, ET AL. v. BANK OF AMERICA CORPORATION, ET AL.**
**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND**
212 F. Supp. 2d 435; 2002 U.S. Dist. LEXIS 13510; 53 Fed. R. Serv. 3d (Callaghan) 412
**CIVIL ACTION NO. MJG-01-CV-438**
**July 24, 2002, Decided**

**Disposition:**
 Plaintiff's counsel was sanctioned.

Legal treatises on the subject of attorney ethics are in agreement with the commentary to the ABA Model Rules 13 and further amplify the scope of Rule 4.1. For example, the duty of candor required in Rule 4.1 "corresponds to the identically phrased duty [of candor] that a lawyer owes to the tribunal under Model Rule 3.3(a)(1)." ABA/BNA Lawyers' Manual on Professional Conduct § 71:201 (1997); *see also* 2 Geoffrey C. Hazard, Jr. & W. William Hodes, *The Law of Lawyering* § 37.3 (3d ed. 2000). ("Rule 4.1(a) applies to statements a lawyer makes to third persons out of court, statements to a court or other tribunal are governed by Rule 3.3(a)(1), which is otherwise identical.").

The treatises also make reference to an issue that extensively is discussed in legal publications: recognizing just where the line is to be drawn between ethical and unethical behavior during the negotiation process can be difficult to discern. Patently, certain aspects of the process unavoidably involve statements that are less than completely accurate, such as posturing or puffery, intentional vagueness regarding a negotiating party's "bottom line," estimates of price or value, and the party's ultimate intentions regarding what an acceptable settlement would be—all of which are thought to encompass representations that are not "material." ABA/BNA Manual at § 71:211 (1997), 2 Geoffrey C. Hazard, Jr. & W. William Hodes, *The Law of Lawyering* § 37.3. Nevertheless, the core requirement of Rule 4.1(a) is simple and clearly grasped:

"in its simplest application, Rule 4.1(a) merely codifies a simple proposition: although lawyers are supposed to be zealous partisans of their clients, they must draw the line at lying. The law generally and all lawyer codes of conduct have always been clear that a lawyer may not make misrepresentations to a court, a client, or to a third person. Rule 4.1(a) recodifies the traditional rule that a lawyer's word is his bond.2 Geoffrey C. Hazard, Jr. & W. William Hodes, *The Law of Lawyering* § 37.2. Further, while the legal journals have debated extensively the contours of what is acceptable under Rule 4.1, the federal and state courts that have focused on this issue have made it clear that lawyers face discipline and potential civil liability if they fail to comply with the rule.

BS 3016

In *Slotkin v. Citizens Casualty of New York*, 614 F.2d 301 (2d Cir. 1980), an attorney, representing a defendant in a personal {212 F. Supp. 2d 447} injury case, stated during settlement negotiations that "to the best of his knowledge" there was only $ 200,000.00 in potential insurance coverage. Documents in his possession, however, reflected that he should have known of the existence of an additional $ 1 million excess policy. Based on the misrepresentation of coverage, the plaintiff settled the case and thereafter learned of the true facts. The plaintiff did not seek to set aside the settlement but instead brought a lawsuit in federal court alleging, among other claims, that the defense attorney was liable for fraud. The jury found for the plaintiff, but the trial judge granted the lawyer a judgment as a matter of law. The Second Circuit reversed, concluding that the scienter needed to establish fraud was satisfied by the lawyer's "reckless indifference to error" and rendered him liable in fraud to the plaintiff. 614 F.2d at 314.

In *Virzi v. Grand Trunk Warehouse and Cold Storage Co.*, 571 F. Supp. 507 (E.D. Mich. 1983), an attorney for an injured person filed a diversity personal injury action in federal court. Pursuant to a court-ordered mediation, a settlement was reached. Before it was finalized, however, the plaintiff died of causes unrelated to the claim, yet his attorney failed to disclose this and allowed the settlement to go forward. The defendant learned of this development and filed a motion to set aside the settlement. The court analyzed the conduct of plaintiff's counsel under Rule 4.1 and concluded that the failure to disclose the plaintiff's death was a material misrepresentation by omission and amounted to a failure to adhere to the requirement of candor to others. The court stated, relevantly:

The handling of a lawsuit and its progress is not a game. There is an absolute duty of candor and fairness on the part of counsel to both the Court and opposing counsel. At the same time, counsel has a duty to zealously represent his client's interests. That zealous representation of interest, however, does not justify a withholding of essential information, such as the death of the client, when the settlement of the case is based largely upon the defense attorney's assessment of the impact the plaintiff would make upon a jury, because of his appearance at depositions. Plaintiff's attorney clearly had a duty to disclose the death of his client both to the Court and to opposing counsel prior to negotiating the final agreement. *Id.* at 512.

More recently, in *Pendleton v. Central New Mexico Correctional Facility*, 184 F.R.D. 637 (D.N.M. 1999), the court resolved a Rule 11 motion filed against an attorney who represented a plaintiff in a job discrimination suit. The motion was based on the attorney failing to disclose during settlement negotiations his knowledge of a retaliation claim, arising out of the underlying employment claim that ultimately was settled. When the attorney filed a second suit based on the retaliation claim, the defendant argued that it had been duped into the first settlement. Although the court ruled, for procedural reasons, that the Rule 11 motion would not be granted, it was less than charitable in its comments regarding the conduct of plaintiff's counsel. The court stated:

As we go through this life we learn, and sometimes the hard way, who we can trust to be candid and who we cannot. It is unfortunate that some attorneys apparently feel no obligation to their fellow attorneys, but then again, as the saying goes, "it's a short road that doesn't have a bend in it." The Rules of Professional Conduct and the case law suggest that, even in the context of finalizing a settlement agreement and release, a knowing failure to disclose a non-confidential, material and objective {212 F. Supp. 2d 448} fact upon inquiry by opposing counsel is improper. *Id.* at 641 (internal citations deleted).

The state court decisions also have shown little appetite for attorney breaches of the duty of candor to others, predominantly in the form of decisions upholding the imposition of disciplinary sanctions. *See, e.g., The Florida Bar v. Cramer*, 678 So. 2d 1278 (1996) (disbarring an attorney, who, among other things, misrepresented to leasing company the identity of who would be using leased office

© 2015 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

BS 3017

equipment); *In Re Carl C. Hendricks,* 319 S.C. 465, 462 S.E.2d 286 (1995) (disbarring attorney for multiple violations, including Rule 4.1, by misrepresenting facts to a title insurance company during negotiations to obtain a title policy). Similarly, in *Monroe v. The State Bar of California,* 55 Cal. 2d 145, 358 P.2d 529, 10 Cal. Rptr. 257 (Ca. 1961), the court found that the attorney had, among other charges, misrepresented to opposing counsel that certain funds would be deposited in escrow with his firm in connection with an agreement negotiated to stay the execution against the lawyer's clients. In fact, the deposit never was made. The court, ordering a thirty-day suspension of the attorney, stated that "intentionally deceiving opposing counsel is grounds for disciplinary action." 358 P.2d at 533.

In *Nebraska State Bar Assoc. v. Addison,* 226 Neb. 585, 412 N.W.2d 855 (Neb. 1987), the plaintiff's attorney negotiated a reduction of the hospital's lien against proceeds of personal injury recovery by a plaintiff at a very favorable amount by failing to disclose the existence of a $ 1 million umbrella policy potentially affording an additional source of recovery. The court affirmed a finding that the attorney had violated DR 7-102(A)(5), the predecessor to Rule 4.1, and imposed a six-month suspension. Just recently, in *In Re Disciplinary Proceeding Against Stephen T. Carmick,* 146 Wn.2d 582, 48 P.3d 311, 2002 WL 1342228 (Wash. 2002), the court upheld a sixty-day suspension of an attorney for several infractions, including misrepresentations made to a third person during settlement negotiations, in violation of Rule 4.1.

Finally, although not a disciplinary action, in *Kingsdorf v. Kingsdorf,* 351 N.J. Super. 144, 797 A.2d 206 (N.J. Sup. Ct. 2002), the court refused to enforce a settlement agreement negotiated in a divorce case where the wife agreed to give up her claims to a valuable piece of jointly owned property in favor of receiving a lesser valued, encumbered property as an exchange from her husband. Counsel for the husband failed to disclose that her client died before the divorce decree was finalized, meaning the property in question should have become the wife's upon the husband's death as a joint owner. The Court stated:

> The failure to disclose a material fact to a tribunal is an ethical violation. . . . A lawyer's responsibility to act with candor and honesty necessarily requires disclosure of significant facts, even though the disclosure might not be in the interest of the client. . . . An attorney is not merely a hired gun, but, rather, a professional required to act with candor and honesty . . . Lawyers have an obligation of candor to each other and to the judicial system, which includes a duty of disclosure to the court and opposing counsel. *Id.* at 154.

Viewed collectively, these cases demonstrate that both the federal and state courts have been ready to discipline or hold liable attorneys who make knowing, material misrepresentations to third persons during settlement negotiations. While there still may be legitimate debate regarding which aspects of the negotiation process demand strict adherence to the requirements of candor, as the legal journals demonstrate, this much at least is not subject to principled argument: Rule 4.1(a)(1) prohibits an attorney from knowingly **{212 F. Supp. 2d 449}** deceiving a third person, including an opposing counsel, during negotiations. The misrepresentation may be either express or by a failure to disclose. It also must involve a fact or the law that is material to the negotiation, which necessarily must be evaluated on a case-by-case basis.

While the term "material" is not defined in Rule 4.1 or its commentary, it is not a difficult concept to comprehend. A fact is material to a negotiation if it reasonably may be viewed as important to a fair understanding of what is being given up and, in return, gained by the settlement. While the legal journals engage in some hand-wringing about the vagueness of this aspect of Rule 4.1, in reality, it seldom is a difficult task to determine whether a fact is material to a particular negotiation. In cases of real doubt, disciplinary committees and ultimately the courts will decide.

1ydcases                                       3

© 2015 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

BS 3018

Because of its critical relation to the litigation process itself, there can be no real doubt that, to borrow the words of the Fourth Circuit in *Shaffer Equipment, supra*, during the settlement phases of a case, like the litigation phase, "the system can provide no harbor for clever devices to divert the search, mislead opposing counsel, or cover up what is necessary for justice in the end." 11 F.3d at 457-58. In the context of a settlement, "justice" means a fairly negotiated resolution, based on candor and integrity with respect to all material representations.

As noted, the law journals reflect an extensive debate regarding the ethics of misrepresentation during the negotiation process. One usefully summarized the various schools of thought on this issue as follows:

In relation to lawyers representing clients in negotiations, there is a wide chasm dividing expert opinion on the applicable standard of truthfulness. At one extreme on the 'truthfulness spectrum' is Judge Alvin B. Rubin of the United States Circuit Court of Appeals for the Fifth Circuit. Writing in the mid-1970s, Judge Rubin proposed two 'precepts' to guide a lawyer's conduct in negotiations: (1) 'The lawyer must act honestly and in good faith' and (2) 'The lawyer may not accept a result that is unconscionably unfair to the other party.' In 1980, Professor James J. White published an article in which he asserted his belief that misleading the other side is the very 'essence of negotiations' and is all part of the game. White observed that truth is a relative concept that depends on the definition one chooses and the circumstances of the negotiator. He further noted that lawyers hunt 'for the rules of the game as the game is played in the particular circumstance.' He identified the paradox of lawyers' goals in negotiation--how to 'be fair but also mislead.' In 1981 Yale law Professor Geoffrey C. Hazard, Jr., principal draftsman of the Model Rules of Professional Conduct, after reviewing Judge Rubin's and Professor White's articles and other pertinent literature of the day concluded that 'legal regulation of trustworthiness [could not] go much farther than to proscribe fraud.' In 1982, Professor Thomas F. Guernsey sought a middle-ground solution. He suggested that conventions regarding truthfulness dilemmas can be formulated to guide those lawyers aspiring to be ethical, but that the default standard in all negotiations should be 'caveat lawyer.' More recently, other commentators have advocated various truthfulness standards for lawyers in negotiating in terms of maintaining 'total candor,' minimizing 'an unreasonable risk of harm,' forbidding all deception, permitting 'conventions of untruthfulness' seeking 'advantageous results . . . consistent with honest dealings with others, practicing the 'golden rule'-reciprocal candor, and scrutinizing 'what {212 F. Supp. 2d 450} is not lie and what lies are ethically permissible.'John W. Cooley, *Mediation Magic: Its Use and Abuse*, 29 Loy. U. Chi. L.J. 1, 42 (1997). Other journals have identified the difficulty inherent in trying to impose proper norms in an area of activity that typically takes place "behind closed doors," but all recognize, as they must, that however difficult this task may be, and however desirable it is to develop a set of norms that are easily understood and applied, Rule 4.1 creates a floor below which lawyer-negotiators may not go. 14

The above discussed cases and journal articles help to define the problem associated {212 F. Supp. 2d 451} with fashioning a workable rule governing attorney conduct during settlement negotiations, as well as to suggest its solution. In the end, Professor Hazzard well may have stated it correctly. While the duty imposed by Rule 4.1(a)(1) may be a narrow one--not to misrepresent knowingly facts or law material to the negotiation--it is also an absolute one.

In each instance the questions for the negotiating attorney, as well as a reviewing disciplinary committee or court if called upon to do so, is to determine: (1) what is the statement or omission in dispute? (2) is it untrue or deceptively incomplete in any significant respect? (3) reasonably viewed, is it important to the subject that is being negotiated? and (4) at the time it was made, did the

© 2015 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

BS 3019

attorney know or should have known under the circumstances that the statement was untrue. In the pending case, answering these questions easily shows why there is abundant evidence requiring the referral of Mr. Sweetland's statements in his settlement letter to the Defendants' attorney to the Court's disciplinary committee.

In the April 24, 2002, settlement letter, Mr. Sweetland made the following statements that are relevant to the issue in dispute, which may be paraphrased as follows: (a) that if Defendants paid the demanded sum, or any agreed upon reduction thereof, Mr. Sweetland would provide to them the name and other identifying information regarding John Doe Number 3, described as the "kingpin of the network which obtained credit reports" from Defendants; (b) that Mr. Sweetland did not then know the identity of John Doe Number 3 because he had taken steps not to learn this until his deposition had passed but had made confidential arrangements to have that information provided to him once there was no longer any threat of his deposition; and (3) it was Mr. Sweetland's understanding that "it will be relatively easy to unravel the situation [regarding who 'penetrated' the security of Defendants] once I provide you with John Doe # 3's identity." In return for Mr. Sweetland's disclosures, Mr. Sweetland would recommend that each Plaintiff settle for $ 75,000. 15

During his deposition, Mr. Sweetland was asked what the confidential arrangements were that he had made to learn John Doe Number 3's identity, to which he answered, "There were none. That was language put there for the purposes of settlement bluster." Defendant's counsel pointedly asked, "So this is a lie?" Mr. Sweetland's succinctly stated "That is correct. It is not true." Next, he was asked, "So you never made any arrangements to find out the identity of John Doe Number 3?" Mr. Sweetland answered, "No. I was attempting to find out the identity of John Doe Number 3, but while we were in settlement discussions, I wanted to make the representation, for the purposes of maximizing my clients' settlement position, that I could obtain an individual to provide to your in-house counsel." Defendants' counsel persisted, "So at the time you made this statement, you were lying?" Mr. Sweetland answered, "That's correct."

It is clear, therefore, from Mr. Sweetland's own admission under oath that, at the time he wrote the letter, he knew he was not being truthful. With respect to whether his untruthful statements were material, there is little doubt that, from Defendants' perspective, they were. This entire lawsuit involves asserted liability against the Defendants because, allegedly, {212 F. Supp. 2d 452} an employee, John Doe Number 1, sold information to a non-employee co-conspirator, John Doe Number 2, all, according to the settlement letter, at the instance of the "kingpin," John Doe Number 3. Throughout the case, Defendants have protested that they were not able to locate any employee that may have disclosed Plaintiffs' credit information. In response, Plaintiffs essentially have contended that the identities of the John Doe Defendants are irrelevant in determining whether Defendants are liable. Even assuming arguendo that Plaintiffs are correct, it still would be of paramount importance to the Defendants to learn the identity of John Doe Number 3 so they could take action to end his/her activities and cut off any potential future liability. Given that the only real term suggested by Mr. Sweetland for the more than $ 1.8 million that Defendants were being asked to pay was the identification of John Doe Number 3, it certainly is not unreasonable to conclude that the misrepresentation concerned facts material to the negotiations.

Mr. Sweetland views his comments as "settlement bluster," and may therefore believe that they did not address material statements of fact. However skeptically the Court might regard any such position, it is not my call to make. But what is clear is that there is more than a sufficient factual basis to compel the referral of this matter to the disciplinary committee of this Court. While the principal ethical rule discussed in this order was Rule 4.1, the cases and commentary make clear that other rules might potentially overlap with that rule when evaluating the conduct involved here. One such rule is 8.4(c) that states that it is professional misconduct for a lawyer to engage in conduct involving

© 2015 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

BS 3020

58 Cal. 4th 500, *; 316 P.3d 1199, **;
167 Cal. Rptr. 3d 87, ***; 2014 Cal. LEXIS 427

[In re STEPHEN RANDALL GLASS on Admission.

S196374

[SUPREME COURT OF CALIFORNIA

[58 Cal. 4th 500;]316 P.3d 1199; 167 Cal. Rptr. 3d 87; 2014 Cal. LEXIS 427

January 27, 2014, Filed

**SUBSEQUENT HISTORY:** Reported at *Glass on Admission,* 2014 Cal. LEXIS 1867 (Cal., Jan. 27, 2014)

**PRIOR HISTORY:**
State Bar Court, No. 09-M-11736.
*Glass on Admission,* 2011 Cal. LEXIS 12077 (Cal., Nov. 16, 2011)

**COUNSEL:** Law Offices of Michael A. Willemsen, Michael A. Willemsen; Eisenberg & Hancock, Jon B. Eisenberg; William N. Hancock; Greines, Martin, Stein & Richland, Kent L. Richland; Margolis & Margolis, Susan L. Margolis and Arthur L. Margolis for Applicant Stephen Randall Glass. [*504]

Aaron Nathan Shechet and Leigh Anne Chandler as Amici Curiae on behalf of Applicant Stephen Randall Glass.

Starr Babcock, Richard J. Zanassi, Rachel Grunberg; and Brandon Tady for Petitioner Committee of Bar Examiners of The State Bar of California.

Robert McMahon as Amicus Curiae.

**OPINION**
[***89] [**1201]

**THE COURT.**--Stephen Randall Glass made himself infamous as a dishonest journalist by fabricating material for more than 40 articles for The New Republic magazine and other publications. He also carefully fabricated supporting materials to delude The New Republic's fact checkers. The articles appeared between June 1996 and May 1998, and included falsehoods that reflected negatively on individuals, political groups, and ethnic minorities. During the same period, starting in September 1997, he was also an evening law student at Georgetown University's law school. Glass made every effort to avoid detection once suspicions were aroused, lobbied strenuously to keep his job at The New [**1202] Republic, and, in the aftermath of his exposure, did not fully cooperate with the publications to identify his fabrications.

* Cantil-Sakauye, C. J., Kennard, J., Baxter, J., Werdegar, J., Chin, J., Corrigan, J., and Mosk, J.

+ Associate Justice, Court of Appeal, Second Appellate District, Division Five, assigned by the Chief Justice pursuant to *article VI, section 6 of the California Constitution.*

Glass applied to become a member of the New York bar in 2002, but withdrew his application after he was informally notified in 2004 that his moral character application would be rejected. In the New York bar application materials, he exaggerated [***90] his cooperation with the journals that had published his work and failed to supply a complete list of the fabricated articles that had injured others.

Glass passed the California Bar examination in 2006 and filed an application for determination of moral character in 2007. It was not until the California State Bar moral character proceedings that Glass reviewed all of his articles, as well as the editorials The New Republic and other journals published to identify his fabrications, and ultimately identified fabrications [*505] that he previously had denied or failed to disclose. In the California proceedings, Glass was not forthright in acknowledging the defects in his New York bar application.

At the 2010 State Bar Court hearing resulting in the decision under review, Glass presented many character witnesses and introduced evidence regarding his lengthy course of psychotherapy, along with his own testimony and other evidence. Many of his efforts from the time of his exposure in 1998 until the 2010 hearing, however, seem to have been directed primarily at advancing his own well-being rather than returning something to the community. His evidence did not establish that he engaged in truly exemplary conduct over an extended period. We conclude that on this record he has not sustained his heavy burden of demonstrating rehabilitation and fitness for the practice of law.

I. FACTS

required of Glass. "We consider his present character in light of his previous moral shortcomings [citation], and we are at a loss to understand how monetary restitution would mitigate the reputational harm that Glass had caused." The majority found more significant evidence that he has made amends both to the journalistic community in his public admissions concerning his fabrications and to his victims in the letters he sent them.

The majority concluded that "even those who have committed serious, indeed egregious, misconduct, are capable of overcoming their past misdeeds" and that persons who had reformed should be rewarded with an opportunity to serve as lawyers.

The Review Department panel's dissenting opinion concluded that Glass had not proven full rehabilitation, pointing to his " 'staggering' " two-year period of "multi-layered, complex and harmful course of public dishonesty." The dissenting judge found especially troubling Glass's omissions and misstatements in his application to practice law in New York. "[T]o gain admission to practice law in New York, Glass understated the number of articles he had fabricated and exaggerated his efforts to help the magazines identify those articles. At a time when he should have been scrupulously honest, he presented an inaccurate application because it benefitted him--the same behavior as his earlier misconduct." The dissenting opinion concluded: "Given the magnitude of his misconduct and his subsequent misrepresentations on his New York bar application, Glass has not shown proof of reform by a lengthy period of exemplary conduct which 'we could with confidence lay before the world' to justify his admission."

II. DISCUSSION

A. *Applicable Law*

**(1)** To be qualified to practice law in this state, a person must be of good moral character. (*Bus. & Prof. Code, §§ 6060, subd. (b), 6062, subd. (a)(2).*) [*520] Good moral character includes "qualities of honesty, fairness, candor, trustworthiness, observance of fiduciary responsibility, respect for and obedience to the law, and respect for the rights of others and the judicial process." (State Bar Rules Regulating Admission to Practice Law, rule 4.40(B); see *Bus. & Prof. Code, § 6068.*) Persons [***102] of good character ... do not commit acts or crimes involving moral turpitude--a concept that embraces a wide range of deceitful and depraved behavior." (*In re Gossage (2000) 23 Cal.4th 1080, 1095 [99 Cal. Rptr. 2d 130, 5 P.3d 186]* (*Gossage*).) A lawyer's good moral character is essential for the protection of clients and for the proper functioning of the judicial system itself. (See *In re Johnson (1992) 1 Cal.4th 689, 705-706 [4 Cal. Rptr. 2d 170, 822 P.2d 1317]* (conc. & dis. opn. of Kennard, J.).)

**(2)** When the applicant has presented evidence that is sufficient to establish a prima facie case of his or her good moral character, the burden shifts to the State Bar to rebut that case with evidence of poor moral character. Once the State Bar has presented evidence of moral turpitude, the burden "falls squarely upon the applicant to demonstrate his [or her] rehabilitation." (*Gossage, supra,* 23 Cal.4th at p. 1096.)

Of particular significance for the present case is the principle that "the more serious the misconduct and the bad character evidence, the stronger the applicant's showing of rehabilitation must be." (*Gossage, supra,* 23 Cal.4th at p. 1096.) "Cases authorizing admission on the basis of rehabilitation commonly involve a substantial period of *exemplary* conduct following the applicant's misdeeds." (*Ibid.,* italics added.) Moreover, "truly exemplary" conduct ordinarily includes service to the community. (*In re Menna (1995) 11 Cal.4th 975, 990 [47 Cal. Rptr. 2d 2, 905 P.2d 944]* (*Menna*).)

**(3)** We independently weigh the evidence that was before the State Bar Court (*Gossage, supra,* 23 Cal.4th at p. 1096), [**1213] recognizing that the applicant bears the burden of establishing good moral character (*Menna, supra,* 11 Cal.4th at p. 983). We ask whether the applicant is fit to practice law, paying particular attention to acts of moral turpitude (*Kwasnik v. State Bar (1990) 50 Cal.3d 1061, 1068 [269 Cal. Rptr. 749, 791 P.2d 319]* (*Kwasnik*)) and prior misconduct that bears particularly upon fitness to practice law (*Hallinan v. Committee of Bar Examiners (1966) 65 Cal.2d 447, 452 [55 Cal. Rptr. 228, 421 P.2d 76]* (*Hallinan*)).

In reviewing moral fitness findings made by the State Bar, we accord significant weight to the State Bar Court hearing judge's findings of fact to the extent they are based on witness demeanor and credibility. (*Gossage, supra,* 23 Cal.4th at p. 1096.) Although "the moral character determinations of the Committee and the State Bar Court play an integral role in the [*521] admissions decision, and both bear substantial weight within their respective spheres," we are not bound by the determinations of the Committee or the State Bar Court. (*Ibid.*) Rather, we "independently examine and weigh the evidence" to decide whether the applicant is qualified for admission. (*Ibid.*; see *In re Rose (2000) 22 Cal.4th 430, 455 [93 Cal. Rptr. 2d 298, 993 P.2d 956]* ["we afford de novo review of questions of fact and law ..."]; *Menna, supra,* 11 Cal.4th at p. 985.)

**(4)** Contrary to the Review Department majority's view that Glass's burden was significantly lighter than it would be for an attorney seeking readmission because he was a first-time applicant, in many respects the difference between admission and disciplinary proceedings is "more apparent than real." (*Hallinan, supra,* 65 Cal.2d at p. 452.) "Because both admission

Moreover, Glass's lack of integrity and forthrightness continued beyond the time he was engaged in journalism. Once he was exposed, Glass's response was to protect himself, not to freely and fully admit and catalogue all of his fabrications. He never fully cooperated with his employers to clarify the record, failed to carefully review the editorials they published to describe the fabrications to their readership, made misrepresentations to The New Republic regarding some of his work during the period he purported to be [**1215] cooperating with that magazine, and indeed some of his fabrications did not come to light until the California State Bar proceedings. He refused to speak to his editor at George magazine when the latter called to ask for help in identifying fabrications in the articles Glass wrote for that magazine.

(6) The record also discloses instances of dishonesty and disingenuousness occurring after Glass's exposure, up to and including the State Bar evidentiary hearing in 2010. In the New York bar proceedings that ended in 2004, as even the State Bar Court majority acknowledged, he made misrepresentations concerning his cooperation with The New Republic and other publications and efforts to aid them identify all of his fabrications. He also submitted an incomplete list of articles that injured others. We have previously said about omissions on bar applications: "Whether it is caused by intentional concealment, reckless disregard for the truth, or an *unreasonable refusal to perceive the need for disclosure*, such an omission is itself strong evidence [***105] that the applicant lacks the 'integrity' and/or 'intellectual discernment' required to be an attorney." (*Gossage, supra,* at p. *1102,* italics added.)

Our review of the record indicates hypocrisy and evasiveness in Glass's testimony at the California State Bar hearing, as well. We find it particularly disturbing that at the hearing Glass persisted in claiming that he had made a good faith effort to work with the magazines that published his works. He went through many verbal twists and turns at the hearing to avoid acknowledging the obvious fact that in his New York bar application he exaggerated his level of assistance to the magazines that had published his fabrications, and that he omitted from his New York bar list of fabrications some that actually could have injured real persons. He also testified that he told his lawyer to work with Harper's Magazine to identify his fabrications, yet [*524] evaded questions concerning whether his lawyer had done so, while insisting that he took responsibility for an inferred failure to follow what obviously were significant instructions. He asserted that he had been too distraught to recognize that the list of fabrications The New Republic gave his lawyer was incomplete--or that in his response he had denied that articles including the egregious *Taxis and the Meaning of Work* were in fact fabricated--while

acknowledging that within a few days of his firing he made arrangements to reschedule a final examination for the end of the exam period and did well on the exam he took within a week of his exposure. Indeed, despite his many statements concerning taking personal responsibility, and contrary to what he suggested in his New York bar application, it was not until the California Bar proceedings that he shouldered the responsibility of reviewing the editorials his employers published disclosing his fabrications, thus failing to ensure that all his very public lies had been corrected publically and in a timely manner. He has "not acted with the 'high degree of *frankness* and truthfulness' and the 'high standard of integrity' required by this process." (*Gossage, supra, 23 Cal.4th at p. 1102,* italics added.)

(7) Honesty is absolutely fundamental in the practice of law; without it, " ' " 'the profession is worse than valueless in the place it holds in the administration of justice' ... .' " ' " (*Menna, supra, 11 Cal.4th at p. 989.*) "[M]anifest dishonesty ... provide[s] a reasonable basis for the conclusion that the applicant or attorney cannot be relied upon to fulfill the moral obligations incumbent upon members of the legal profession." (*Hallinan, supra, 65 Cal.2d at p. 471.*) As the dissent in the Review Department pointed out, "if Glass were to fabricate evidence in legal matters as readily and effectively as he falsified material for magazine articles, the harm to the public and profession would be immeasurable."

We also observe that instead of directing his efforts at serving others in the community, much of Glass's energy since the end of his journalistic career seems to have been directed at advancing his own career and financial and emotional well-being. [**1216]

(8) As Justice Kennard did in her concurring opinion in *Kwasnik, supra, 50 Cal.3d 1061,* we do well to repeat Justice Felix Frankfurter's "eloquent description" of the moral character required of lawyers: " 'It is a fair characterization of the lawyer's responsibility in our society that he [or she] stands "as a shield ..." ... in defense of right and to ward off wrong. From a profession charged with such responsibilities there must be exacted those qualities of truth-speaking, [***106] of a high sense of honor, of granite discretion, of the strictest observance of fiduciary responsibility, that have, throughout the centuries, been compendiously described as "moral character." ' " (*Id. at p. 1076* (conc. opn. of Kennard, J.).) [*525]

(9) As for Glass's case for admission, although he points to his youth at the time of his employment as a journalist and an asserted period of rehabilitation of 12 years (measured between the time he was fired and the hearing in the State Bar Court), we have outlined instances of dishonesty and disingenuousness persisting throughout that period, including at the California State Bar evidentiary hearing. In addition, Glass's behavior

BS 3023

UNITED STATES OF AMERICA, Plaintiff-Appellee, v. CHAKE G. KOJAYAN, Defendant-Appellant.
UNITED STATES OF AMERICA, Plaintiff-Appellee, v. Hratch Meguerdity Kalfayan,
Defendant-Appellant.
UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT
8 F.3d 1315; 1993 U.S. App. LEXIS 19873; 93 Cal. Daily Op. Service 5859; 93 Daily Journal DAR
10030
No. 91-50875, No. 91-50876
November 5, 1992, Argued, December 7, 1992, Submitted, Pasadena, California
August 4, 1993, Filed

How can it be that a serious claim of prosecutorial misconduct remains unresolved - even unaddressed - until oral argument in the Court of Appeals? Surely when such a claim is raised, we can expect that someone in the United States Attorney's office will take an independent, objective look at the issue. The claim here turned entirely on verifiable facts: A dispassionate comparison between the transcript of Sinek's statement to the jury and Nourian's plea agreement would have disclosed that the defense was right and Sinek was wrong. Yet the United States Attorney allowed the filing of a brief in our court that did not own up to the problem, a brief that itself skated perilously close to misrepresentation. See pp. 8303-04 & notes 7 & 8 supra.

But that's not all. After the oral argument before us, we gave the government an opportunity to rethink its position. Order of 11/5/92. United States Attorney Terree A. Bowers wrote us a week later, saying he'd "now had an opportunity to review the issues raised in these appeals" and requesting that he "be afforded an opportunity to modify [his] position regarding the nature of certain statements made by government counsel during closing argument." Letter of 11/12/92. Having granted the additional time, see Order of 11/13/92, we infer that the Supplemental Brief filed on November 30, 1992, is the United States Attorney's reasoned response to the issue.

This supplemental brief falls disappointingly short. While for the first time "recognizing and conceding that the prosecutor's comments in closing argument were misleading" and "improper,"

While casting aspersions at opposing counsel, the government's supplemental brief overlooks two significant differences between defense counsel's argument and its own. First, unlike defense counsel, Sinek went well beyond asking the jury to infer matters outside the record. He actually made unsupported factual claims. When a lawyer asserts that something not in the record is true, he is, in effect, testifying. He is telling the jury: "Look, I know a lot more about this case than you, so believe me when I tell you X is a fact." This is definitely improper.

Defense counsel also asked the jury to infer only things that he believed in good faith might be true. While defense counsel didn't know that Nourian had a cooperation agreement, see p. 5 supra, he had no reason to doubt it. The government's lawyer, by contrast, made factual assertions he well knew were untrue. This is the difference between fair advocacy and misconduct. Compare note 7 supra.

### III

Prosecutors are subject to constraints and responsibilities that don't apply to other lawyers. See, e.g., Berger v. United States, 295 U.S. 78, 88, 79 L. Ed. 1314, 55 S. Ct. 629 (1935). While lawyers representing private parties may - indeed, must - do everything ethically permissible to advance their clients' interests, lawyers representing the government in criminal cases serve truth and justice first. The prosecutor's job isn't just to win, but to win fairly, staying well within the rules. See United States v. Hill, 953 F.2d 452, 458 (9th Cir. 1991). Barbara Allen Babcock, Fair Play: Evidence Favorable to an Accused and Effective Assistance of Counsel, 34 Stan. L. Rev. 1133, 1141 (1982). As Justice Douglas once warned, "the function of the prosecutor under the Federal Constitution is not to tack as many skins of victims as possible to the wall. His function is to vindicate the right of people as expressed in the laws and give those accused of crime a fair trial." Donnelly v. DeChristoforo, 416

about? The answer isn't particularly edifying: It is because the government's lawyer made a strategic decision to present Nourian's evidence by way of hearsay, and then did everything he could to keep the defense from learning Nourian's whereabouts and the existence and nature of the cooperation agreement. While we're in no position to second-guess the government's decision not to bring Nourian to court, we see no justification for the prosecutor's refusal to give the defense whatever information he had about Nourian - the status of his criminal case, the nature and extent of any cooperation agreement. The government has never articulated why it withheld this information, saying only that "the government . . . is not required to be defendant's investigator." CR 23 at 4. Such hard-bitten litigation tactics are unbecoming a prosecutor. See Monroe H. Freedman, *Understanding Lawyers' Ethics* (Chapter 11 - "Prosecutors' Ethics") (1990).

Turning to the remedy, the government vigorously argues that whatever error may have been committed by its lawyer, it was minor and harmless, and that defendants would have been convicted anyhow. We are less sanguine. This was a close case: The jury deliberated for over two days after a one-and-a-half-day trial. CR 56, 57, 63. Evidence of Nourian's plea agreement might well have helped convince the jury to reach a not guilty verdict for one or both of the defendants. Had Sinek done his job - had he disclosed to the defendants that Nourian was cooperating, as required by *Brady*, had he stuck to the truth in his arguments - the verdict could well have been different. Evidence matters; closing argument matters; statements from the prosecutor matter a great deal. Sinek deprived the defendants of an opportunity to {8 F.3d 1324} put on what could have been a powerful defense. See *United States* v. *Agurs*, 427 U.S. 97, 103, 49 L. Ed. 2d 342, 96 S. Ct. 2392 (1976) (where prosecutor knowingly uses perjured testimony, error isn't harmless unless there's no reasonable likelihood that the misconduct influenced the verdict).

Having determined the convictions must be reversed, we must next consider whether to allow the government to retry the defendants. The normal rule, of course, is that where prejudicial error is committed at trial, the case will be sent back for a retrial. But where, as here, the error is one of prosecutorial misconduct, we must take into account considerations beyond this case. Quite as important as assuring a fair trial to the defendants now before us is assuring that the circumstances that gave rise to the misconduct won't be repeated in other cases.

Much of what the United States Attorney's office does isn't open to public scrutiny or judicial review. See, e.g., *United States* v. *Redondo-Lemos*, 955 F.2d 1296 (9th Cir. 1992). It is therefore particularly important that the government discharge its responsibilities fairly, consistent with due process. The overwhelming majority of prosecutors are decent, ethical, honorable lawyers who understand the awesome power they wield, and the responsibility that goes with it. But the temptation is always there: It's the easiest thing in the world for people trained in the adversarial ethic to think a prosecutor's job is simply to win. See, e.g., *United States* v. *Montgomery*, Nos. 89-50592, 91-55512, slip op. 7253, 7273 (9th Cir. July 13, 1993) (finding a "complete absence of effort, a complete absence of control, and a near complete absence of demonstrated cooperation" on part of government in producing confidential informant); *United States* v. *Wallach*, 935 F.2d 445, 457 (2d Cir. 1991) ("We fear that given the importance of [a witness's] testimony to the case, the prosecutors may have consciously avoided recognizing the obvious - [that he] was not telling the truth."); *Brown* v. *Borg*, 951 F.2d 1011, 1015 (9th Cir. 1991) (state prosecutor kept exculpatory evidence secret); *Reutter* v. *Solem*, 888 F.2d 578, 581 (8th Cir. 1989) (state prosecutor withheld *Brady* information and made grossly misleading statements in closing argument); *United States* v. *Kattar*, 840 F.2d 118, 127 (1st Cir. 1988) ("it is disturbing to see the Justice Department change the color of its stripes to such a significant degree, portraying an organization, individual, or series of events variously as virtuous and honorable or as corrupt and perfidious, depending on the strategic necessities of the separate litigations.")

One of the most important responsibilities of the United States Attorney and his senior deputies is ensuring that line attorneys are aware of the special ethical responsibilities of prosecutors, and that they resist the temptation to overreach. "Training to impart awareness of constitutional rights is an essential function of an office . . . whose administration of justice the public [relies on]." *United States v. Foster*, 985 F.2d 466, 469 (9th Cir. 1993). A recent Second Circuit case, *Walker v. City of New York*, 974 F.2d 293 (2d Cir. 1992) illustrates the disastrous consequences that can follow when this responsibility is not met. The prosecutors in *Walker* persisted in prosecuting a defendant - and lied and concealed evidence in the process - even though they were aware of his probable innocence. It took Mr. Walker nearly two decades to win his freedom. The *Walker* court found that the district attorney's failure to train or supervise her employees as to "such basic norms of human conduct [as] the duty not to lie or persecute the innocent" could be the basis of 42 U.S.C. § 1983 liability. *Id.* at 301.

Commenting on Mr. Walker's plight, Professor Stephen Gillers noted the great danger in "untrained lawyers wielding public power." *Under Color of Law*, ABA J., Dec. 1992, at 121. We share his concern. What we find most troubling about this case is not Sinek's initial transgression, but that he seemed to be totally unaware he'd done anything at all wrong, and that there was no one in the United States Attorney's office to set him straight. Nor does the government's considered response, filed after we pointed out the problem, inspire our confidence that this kind of thing won't happen again.

The prosecutorial misconduct in this case deprived the defendants of due process of law. It contaminated their trial, and we {8 F.3d 1325} cannot say it was harmless. *See United States v. Kerr*, 981 F.2d 1050 (9th Cir. 1992) (prejudicial vouching cause for reversal); *Brown v. Borg*, 951 F.2d 1011 (9th Cir. 1991) (reversal where prosecutor knowingly introduced and argued from false evidence). In a situation like this, the judiciary - especially the court before which the primary misbehavior took place - may exercise its supervisory power to make it clear that the misconduct was serious, that the government's unwillingness to own up to it was more serious still and that steps must be taken to avoid a recurrence of this chain of events. We therefore *VACATE* the judgment of conviction and *REMAND* for the district court to determine whether to retry the defendants or dismiss the indictment with prejudice as a sanction for the government's misbehavior. *See United States v. Williams*, 118 L. Ed. 2d 352, 112 S. Ct. 1735, 1742 (1992) (supervisory power "may be used as a means of establishing standards of prosecutorial conduct before the courts themselves"); *United States v. Bernal-Obeso*, 989 F.2d 331, 337 (9th Cir. 1993); *United States v. Restrepo*, 930 F.2d 705, 712 (9th Cir. 1991); *United States v. Barrera-Moreno*, 951 F.2d 1089, 1091 (9th Cir. 1991).

BS 3026

## 2. Applicable Legal Standard

"A member of the court's bar is subject to suspension or disbarment by the court if the member . . . is guilty of conduct unbecoming a member of the court's bar." Fed. R. App. P. 46(b)(1)(B); *see Gadda v. Ashcroft*, 377 F.3d 934, 947 (9th Cir. 2004) (listing examples of "conduct unbecoming"). Furthermore, the court "may discipline an attorney who practices before it for conduct unbecoming a member of the bar or for failure to comply with any court rule." Fed. R. App. P. 46(c). A court need not find intentional conduct to discipline an attorney for conduct unbecoming a member of the bar pursuant to Federal Rule of Appellate Procedure 46; lack of diligence that impairs the deliberations of the court is sufficient. *See Gadda*, 377 F.3d at 947.

"Conduct unbecoming a member of the court's bar" means "conduct contrary to professional standards that shows an unfitness to discharge continuing obligations to clients or the courts, or conduct inimical to the administration of justice." *In re Snyder*, 472 U.S. 634, 645, 105 S. Ct. 2874, 86 L. Ed. 2d 504 (1985); *see also Gadda*, 377 F.3d at 946. In addition to case law and applicable court rules, the court may consider codes of professional conduct in determining whether an attorney's conduct falls below the standards of the profession. *See In re Snyder*, 472 U.S. at 645, 646 n.7 (referring to state rules of professional conduct, and the American Bar Association's ("ABA") Model Rules of Professional Conduct and Model Code of Professional Responsibility).

Here, the conduct identified in the order to show cause clearly constitutes "conduct unbecoming a member of the court's bar," because it violates the ABA's Model Rules as well as California rules of professional conduct. *See* Model Rule 3.1 ("A lawyer shall not bring or defend a proceeding, or assert or controvert an issue therein, unless there is a basis in law and fact for doing so that is not frivolous, which includes a good faith argument for an extension, modification or reversal of existing law."); Model Rule 3.3(a) ("A lawyer shall not knowingly . . . make a false statement of fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer"); Cal. Rule Prof. Conduct 5-200 ("In presenting a matter to a tribunal, a member: (A) Shall employ, for the purpose of maintaining the causes confided to the member such means only as are consistent with truth; (B) Shall not seek to mislead the judge, judicial officer, or jury by an artifice or false statement of fact or law[.]"); *see also* Cal. Bus. & Prof. Code § **6068**(d) (codifying lawyer's duty not "to seek to mislead the judge or any judicial officer by an artifice or false statement of fact or law.").

In assessing the appropriateness of a particular disciplinary sanction, this court may consider, although it is not bound by, the ABA's Standards for Imposing Lawyer Sanctions, which were promulgated to aid enforcement of the ABA's Model Rules of Professional Conduct. *See United States v. Swanson*, 943 F.2d 1070, 1076 (9th Cir. 1991); *see also* ABA Joint Comm. on Prof'l {611 F.3d 1036} Standards, *Standards for Imposing Lawyer Sanctions* (1984, rev. 1992), *available at* ("*Standards*"). Under these standards, a court should generally consider: (a) the duty violated; (b) the lawyer's mental state; (c) the actual or potential injury caused by the lawyer's misconduct; and (d) the existence of aggravating or mitigating factors. *See Standards* § 3.0. The *Standards* also set out various forms of suggested discipline based on the type of misconduct involved. *See id.* §§ 4.0-8.4.

## Officers in Katrina Shootings Get New Trial Due to Prosecutors' Anonymous Online Posts

**F**ive former New Orleans police officers charged with gunning down unarmed civilians in the chaotic aftermath of Hurricane Katrina will get a new trial because high-ranking federal prosecutors tainted the convictions by whipping up a "21st century carnival atmosphere" with a series of anonymous online comments about the investigation and the trial, a divided U.S. Court of Appeals for the Fifth Circuit ruled Aug. 18 (*United States v. Bowen*, 2015 BL 265824, 5th Cir., No. 13-31078, 8/18/15).

In an opinion by Judge Edith H. Jones, the court ruled that the government tampering was so egregious and pervasive that this is among the rare cases in which the defendants don't need to show prejudice.

It is impossible to evaluate, let alone uncover, the full impact of the government's transgressions because the government refused to adequately investigate its errors, covered up what it knew to be misleading omissions, and in some instances lied directly to the court," Jones wrote.

**Proof of Prejudice Waived.** In *Brecht v. Abrahamson*, 507 U.S. 619 (1993), the U.S. Supreme Court held that as a general principle, habeas petitioners can't obtain collateral relief unless they first prove actual prejudice by showing there was a reasonable probability that the error had a substantial and injurious effect on the jury's verdict. The justices made clear, however, that this actual prejudice standard

> does not foreclose the possibility that in an unusual case, a deliberate and especially egregious error of the trial type, or one that is combined with a pattern of prosecutorial misconduct, might so infect the integrity of the proceeding as to warrant the grant of habeas relief, even if it did not substantially influence the jury's verdict.

According to the Fifth Circuit, this case presents one of those uncommon situations where proof of prejudice isn't required because the "breadth of the government's misconduct and continued obfuscation" so permeated every step of the prosecution that the federal district court could neither uncover the extent of the prosecution's transgressions nor determine the severity of the prejudice suffered by the defendants."

---

**"Just as a mob protesting outside the courthouse has the potential to intimidate parties and witnesses, so do streams of adverse online comments."**

JUDGE EDITH H. JONES

---

Indeed, there are strong indications that the full extent of the online misconduct hasn't yet come to light, the court said. It cited testimony implying that the online commenting was widely known within the U.S. Attorney's Office and within the Department of Justice.

**'Grotesque' Misconduct.** The court said it was well aware of its duty to affirm convictions that are blemished only by harmless error but said this situation is "*sui generis*."

"In this extraordinary case, however, harmless error cannot even be evaluated because the full consequences of the federal prosecutors' misconduct remain uncertain after less-than-definitive DOJ internal investigations," it said.

All five police officers were convicted of multiple counts in a 25-count indictment that charged them with shooting unarmed pedestrians on the Danziger Bridge in New Orleans—killing two and wounding four—and then engaging in a cover-up that involved planting a gun and trying to frame an innocent man for supposedly shooting at the police.

BS 3028

The reasons for prosecutorial self-restraint are manifest.

Although '[s]tatements to the press may be an integral part of a prosecutor's job, and . . . may serve a vital public function, that function is strictly limited by the prosecutor's overarching duty to do justice. Those who wield the power to make public statements about criminal cases must 'be guided solely by their sense of public responsibility for the attainment of justice.'*Aversa v. United States*, 99 F.3d 1200, 1216 (1st Cir. 1996) (quoting *Souza v. Pina*, 53 F.3d 423, 427 (1st Cir. 1995)). Insulating the prosecution and trial from bias, prejudice, misinformation, and evidence revealed outside the courtroom are crucial to the fairness of our processes. Equally important, the prosecutor must respect the presumption of innocence even as he seeks to bring a defendant to justice.

Justice Sutherland eloquently captured the prosecutor's calling. A government prosecutor

is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor-indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.*Berger v. United States*, 295 U.S. 78, 88, 55 S. Ct. 629, 79 L. Ed. 1314 (1935), *overruled on other grounds by Stirone v. United States*, 361 U.S. 212, 80 S. Ct. 270, 4 L. Ed. 2d 252 (1960). In short, that the prosecutors' misconduct was so incongruous with their duties buttresses our conclusion that this is the rare case involving *Brecht* error.

Finally, the inevitable impression left by the government's misconduct and ongoing pettifoggery is of a prosecution determined to convict these defendants by any means.

In sum, while a demonstration of prejudice is ordinarily a prerequisite for the grant of a new trial, the Supreme Court specifically identified the type of extraordinary errors that will dispense with this burden.26 Such errors occurred here. Prosecutorial misconduct commenced even before indictments were handed down and continued throughout trial and into the post-trial proceedings, and that misconduct affected the prosecution and trial in ways that cannot be fully evaluated due to the government's mishandling-to put it politely-of the investigation into cyberbullying. The online anonymous postings, whether the product of lone wolf commenters or an informal propaganda campaign, gave the prosecution a tool for public castigation of the defendants that it could not have used against them otherwise, and in so doing deprived them of a fair trial. The district court's steady drip of discoveries of misconduct infecting every stage of this prosecution, combined with the government's continued obfuscation and deceit, renders this the rare case in which imposition of the *Brecht* remedy is necessary.

**RUDOLPH SCHWARE, Petitioner,**

*vs.*

**BOARD OF BAR EXAMINERS OF THE STATE OF NEW MEXICO**

**353 US 232, 1 L Ed 2d 796, 77 S Ct 752**

[No. 92]

**Argued January 14 and 15, 1957.**

**Decided May 6, 1957.**

## SEPARATE OPINION

Mr. Justice *Frankfurter,* whom Mr. Justice *Clark* and Mr. Justice *Harlan* join, concurring.

Certainly since the time of Edward I, through all the vicissitudes of seven centuries of Anglo-American history, the legal profession has played a role all its own. The bar has not enjoyed prerogatives; it has been entrusted with anxious responsibilities. One does not have to inhale the self-adulatory bombast of after-dinner speeches to affirm that all the interests of man that are comprised under the constitutional guarantees given to "life, liberty and property" are in the professional keeping of lawyers. It is a fair characterization of the lawyer's responsibility in our society that he stands "as a shield," to quote Devlin, J. in defense of right and to ward off wrong. From a profession charged with such responsibilities there must be exacted those qualities of truth-speaking, of a high sense of honor, of granite discretion, of the strictest observance of fiduciary responsibility, that have, throughout the centuries, been compendiously described as "moral character."

Federal judges—especially at the district court level but even at the appellate level—want and expect to be able to believe that what the prosecutors say is true. The judges know the Supreme Court's rule of *Berger* demands that the US attorney seek justice. Federal judges at all levels are loath to reverse a criminal conviction, and they rely—rightly or wrongly—on the federal prosecutors to do the right thing.

Noting how truly dangerous and destructive prosecutorial misconduct is, Mr. Sullivan said, "This case is a sad story and a warning to everyone. Any citizen can be convicted if prosecutors are hellbent on ignoring the Constitution and willing to present false evidence."

JUDGE NUNLEY AT ZINNEL'S SENTENCING IN THE CRIMINAL CASE. 3/4/14 RT 103:21-22
ER 1252



```
21        *    You don't lie to a court of law and before a court of
22   law.  And you don't proceed, once you've caught lying to a
23   court of law, to continue to lie to that same court, which is
24   what you did.
25
```

KATHY L. SWINHART, OFFICIAL COURT REPORTER, USDC -- (916) 446-1347

BS 3031

"Truth-seeking is mission of the Department of Justice"
   David Ogden, Assistant Attorney General,
   in his Formal Memorandum Establishing DOJ Guidance for Prosecutors issued on January 4, 2010

   As Justice Douglas once warned, "the function of the prosecutor under the Federal Constitution is not to tack as many skins of victims as possible to the wall.  His function is to vindicate the right people as expressed in the laws and give those accused of a crime a fair trial."  Donnelly v. DeChristofra, 416 U.S. 637, 648-49 (1974).

"To do the job right, federal prosecutors are required to have a strong sense of honor, integrity, objectivity, and fairness.  Federal Prosecutor has immense, unbridled power along a broad spectrum of discretion.  In the hands of the wrong people, the damage that power can cause is beyond measure.  A prosecutor does play God."
   Former Assistant United States Attorney and author Sidney Powell in her book "Licensed to Lie"

On March 7, 2002, in the Press Room of the Department of Justice in Washington DC regarding the indictment of accounting firm Arthur Anderson, LLP Deputy Attorney General Larry Thompson announced to the world that "Obstruction of Justice is a grave matter and one this Department takes very seriously  Obstruction of Justice is a crime that attacks the justice system itself by impeding discovery of the truth...It would be unfortunate for our criminal justice system if any individual or any entity could say that he or she or it was too big or too important, so as it couldn't be indicted."

"Every word of this incredible story is true....The moral and ethical degeneracy and decay of our government and of our world is deeper and more cancerous than most comprehend.  And it lurks just beyond the shadows in every police station and courthouse and capitol.: Preface of book "I'm gonna bury you! A true story"  written by former prosecutor and criminal defense attorney Gene Neill.  Published 41 years ago in 1975.
***
"This is just the way the criminal business works.  It stinks and degrades and pulls you down.  And only the inner circle of judges and prosecutors and defense lawyers and law enforcement officers are in on the corruption and the degeneracy.  Human lives are traded like kids trade marbles.  Prosecutors will let a defendant "slide" on a case.  They'll let him go free - but exchange for the life of another man!  Criminal lawyers will plead a man guilty just to pay back a prosecutor for a not guilty they got the day before... One great big hoax!  The big lie.  The toilet of the world.  There's no morality.  Not the bar.  Nor the State Attorney's office.  Crime and corruption run wild."  Id. at p. 106.

misconduct was also powerfully expressed by Justice Brandeis in his famous

dissenting opinion in *Olmstead v. United States*, 277 U.S. 438, 471-485 (1928):

> Decency, security and liberty alike demand that government officials
> shall be subjected to the same rules of conduct that are commands to
> the citizen.  In a government of laws, existence of the government will
> be imperilled if it fails to observe the law scrupulously.  Our
> government is the potent, the omnipresent teacher.  For good or for ill,
> it teaches the whole people by its example.  Crime is contagious.  If the
> Government becomes a lawbreaker, it breeds contempt for law; it
> invites every man to become a law unto himself; it invites anarchy.  To
> declare that in the administration of the criminal law the end justifies
> the means to declare that the government may commit crimes in
> order to secure the conviction of a private criminal would bring terrible
> retribution.  Against that pernicious doctrine this Court should
> resolutely set its face.

3. Both the appellant and this court have been prejudiced in this matter by the unprofessional conduct of Scott E. Combs, counsel for Rockwell. Combs' answering brief failed to provide record citations, as Circuit **Rule 28-2.8** requires. *See* 9th Cir. R. 28-2.8 ("Every assertion in briefs regarding matters in the record shall be supported by a reference to the location in the excerpts of record where the matter is to be found."); Circuit Advisory Committee Note to Rule 28-2 ("Sanctions may be imposed for failure to comply with this rule, particularly with respect to record references."); *Mitchel v. Gen. Elec. {614 Fed. Appx. 918} Co.*, 689 F.2d 877, 879 (9th Cir. 1982) (imposing sanctions for failing to provide record citations). In addition, Combs failed to appear for oral argument and, although he later stated he had misfiled a motion to appear by telephone, he was not in his office when the Deputy Clerk called to inquire about his absence, causing significant inconvenience to the court and appellant's counsel, and he failed to confirm that his motion was granted before disregarding his obligation to appear for argument. *See* Fed. R. App. P. 46(c) ("A court of appeals may discipline an attorney who practices before it for conduct unbecoming a member of the bar or for failure to comply with any court rule."); *McGinnis v. Anchorage Sch. Dist.*, 166 F.3d 343 (9th Cir. 1998) (mem.). Although we refrain from imposing sanctions, we admonish Combs that his conduct in this matter does not satisfy the professional standards of this court. *See Latch v. United States*, 842 F.2d 1031, 1032 n.1 (9th Cir. 1988).

BLUFFORD HAYES, JR., Petitioner-Appellant, v. JILL BROWN, Warden of the California State
Prison at San Quentin, * Respondent-Appellee.
UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT
399 F.3d 972; 2005 U.S. App. LEXIS 3744
No. 99-99030
October 12, 2004, Argued and Re-submitted En Banc
March 7, 2005, Filed

**Editorial Information: Prior History**

Appeal from the United States District Court for the Eastern District of California. D.C. No.
CV-92-00603-GGH P. David F. Levi, District Judge, Presiding. Hayes v. Woodford, 301 F.3d 1054,
2002 U.S. App. LEXIS 17654 (9th Cir. Cal., 2002)

**Disposition:**
Reversed and remanded.

The Supreme Court has long emphasized "the special role played by the American prosecutor in the
search for truth in criminal trials." *Strickler v. Greene*, 527 U.S. 263, 281, 144 L. Ed. 2d 286, 119 S.
Ct. 1936 (1999). As we observed in *Commonwealth of The Northern Mariana Islands v. Mendiola*,
976 F.2d 475, 486 (9th Cir. 1992) (citations omitted), *overruled on other grounds by George v.
Camacho*, 119 F.3d 1393 (9th Cir. 1997) (en banc):

The prosecuting attorney represents a sovereign whose obligation is to govern impartially and
whose interest in a particular case is not necessarily to win, but to do justice. . . . It is the sworn
duty of the prosecutor to assure that the defendant has a fair and impartial trial.

One of the bedrock principles of our democracy, "implicit in any concept of ordered liberty," is that
the State may not use false evidence to obtain a criminal conviction. *Napue v. Illinois*, 360 U.S. 264,
269, 3 L. Ed. 2d 1217, 79 S. Ct. 1173 (1959) (internal citation omitted). Deliberate deception of a
judge and jury is "inconsistent with the rudimentary demands of justice." *Mooney v. Holohan*, 294
U.S. 103, 112, 79 L. Ed. 791, 55 S. Ct. 340 (1935). Thus, "a conviction obtained through use of false
evidence, known to be such by representatives of the State, must fall under the Fourteenth
Amendment." *Napue*, 360 U.S. at 269 (citations omitted). "Indeed, if it is established that the
government knowingly permitted the introduction of false testimony reversal is 'virtually automatic.'"
*United States v. Wallach*, 935 F.2d 445, 456 (2d Cir. 1991) (quoting *United States v. Stofsky*, 527
F.2d 237, 243 (2d Cir. 1975)).

In addition, the state violates a criminal defendant's right to due process of law when, although not
soliciting false evidence, it allows false evidence to go uncorrected when it appears. *See Alcorta v.
Texas*, 355 U.S. 28, 2 L. Ed. 2d 9, 78 S. Ct. 103 (1957); *Pyle v. Kansas*, 317 U.S. 213, 87 L. Ed.
214, 63 S. Ct. 177 (1942).

A

In this case, the State knowingly presented false evidence to the jury and made false representations
to the trial judge.

BS 3040 B

**COMMONWEALTH OF THE NORTHERN MARIANA ISLANDS, Plaintiff-Appellee, v. Mariano Faisao Mendiola, Defendant-Appellant.**
**UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT**
**976 F.2d 475; 1992 U.S. App. LEXIS 22896; 92 Cal. Daily Op. Service 8004; 92 Daily Journal DAR 13074**
**No. 91-10093**
**January 15, 1992, Argued and Submitted, San Francisco, California**
**September 23, 1992, Filed**

**Editorial Information: Prior History**

Appeal from the Supreme Court of the Northern Mariana Islands. Sup. Ct. No. 90-027, D.C. No. CR 88-00043-DC. Dela Cruz, Borja, and Hillblom, Justices, Presiding.

*IV. Prosecutorial Misconduct*

Mendiola contends that the closing argument by the prosecutor was calculated to inflame the passions and fears of the jury. Because this issue may arise upon retrial, we address his contention.

It is well established that misconduct by a prosecuting attorney during closing argument may be grounds for reversal. *See Berger v. United States,* 295 U.S. 78, 79 L. Ed. 1314, 55 S. Ct. 629 (1935). The prosecuting attorney represents a sovereign whose obligation is to govern impartially and whose interest in a particular case is not necessarily to win, but to do justice. *See Berger,* 295 U.S. at 88. It is the sworn duty of the prosecutor to assure that the defendant has a fair and impartial trial. The prosecuting attorney may "prosecute with earnestness and vigor - indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one." *Id.* Because the members of the jury have confidence that a prosecuting attorney will abide by these obligations, inappropriate comments and suggestions may improperly influence the jury against the defendant. *Id.*

We recognize that in the context of argument, attorneys may get carried away by the force of their rhetoric. For this reason, we feel it important to set forth some general principles to guide prosecuting attorneys in their tasks. "The prosecutor should not use arguments calculated to inflame the passions or prejudices of the jury." ABA Standards for Criminal Justice 3-5.8(c) (2d ed. 1979); *see Viereck v. United States,* 318 U.S. 236, 247-48, 87 L. Ed. 734, 63 S. Ct. 561 (1943). "The prosecutor should refrain from argument which would divert the jury from its duty to decide the case on the evidence, by injecting issues broader than the guilt or innocence of the accused under the controlling law, or by making predictions of the consequences of the jury's verdict." ABA Standards for Criminal Justice 3-5.8(d). In accord with these standards, references to the future dangerousness of the defendant in the guilt-innocence phase of a trial are improper. *Cf. Campbell v. Kincheloe,* 829 F.2d 1453, 1457-58 (9th Cir. 1987) (future dangerousness of defendant relevant only in capital sentencing phase), *cert. denied,* 488 U.S. 948, 102 L. Ed. 2d 369, 109 S. Ct. 380 (1988).

A prosecutor's use of illegitimate means to obtain a verdict brings his office and our system of justice into disrepute.

AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.

BS 3040 C

DELMA BANKS, Jr., Petitioner

*vs.*

DOUG DRETKE, DIRECTOR, TEXAS DEPARTMENT OF CRIMINAL JUSTICE,
CORRECTIONAL INSTITUTIONS DIVISION

540 US 668, 157 L Ed 2d 1166, 124 S Ct 1256

[No. 02-8286]

Argued December 8, 2003.

Decided February 24, 2004.

We have several times underscored the "special role played by the **American prosecutor** in the search for truth in criminal trials." Strickler, 527 US, at 281, 144 L Ed 2d 286, 119 S Ct 1936; accord, Kyles, 514 US, at 439-440, 131 L Ed 2d 490, 115 S Ct 1555; United States v Bagley, 473 US 667, 675, n 6, 87 L Ed 2d 481, 105 S Ct 3375 (1985); Berger, 295 US, at 88, 79 L Ed 1314, 55 S Ct 629. See also Olmstead v United States, 277 US 438, 484, 72 L Ed 944, 48 S Ct 564 (1928) (Brandeis, J., dissenting). Courts, litigants, and juries properly anticipate that "obligations [to refrain from improper methods to secure a conviction] . . . plainly rest[ing] upon the prosecuting attorney, will be faithfully observed." Berger, 295 US, at 88, 79 L Ed 1314, 55 S Ct 629. Prosecutors' dishonest conduct or unwarranted concealment should attract no judicial approbation. See Kyles, 514 US, at 440, 131 L Ed 2d 490, 115 S Ct 1555 ("The prudence of the careful prosecutor should not . . . be discouraged.").

BS 3040 D

# What Went Wrong At the FBI

**By Thomas J. Baker**

Americans have grown increasingly skeptical since 2016 of the Federal Bureau of Investigation, an institution they once regarded as the world's greatest law-enforcement agency. I spent 33 years in a variety of positions with the FBI, and I am troubled by this loss of faith. Many lapses have come to light, and each has been thoroughly covered. But why did they happen? The answer is a cultural change that occurred in the wake of the 9/11 attacks.

For reasons that seemed justified at the time, the bureau set out to become an "intelligence driven" organization. That had unintended consequences. The FBI's culture had been rooted in law enforcement. A law-enforcement agency deals in facts, to which agents may have to swear in court. That is

## After 9/11, the bureau lost its law-enforcement ethos as it tried to become more of an intelligence agency.

why "lack of candor" has always been a firing offense. An intelligence agency deals in estimates and best guesses. Guesses are not allowed in court. Intelligence agencies often bend a rule, or shade the truth, to please their political masters. In the FBI, as a result, there now is politicization, polarization, and no sense of the bright line that separates the legal from the extralegal.

Part of making the FBI more like an intelligence agency was the centralization of case management at headquarters in Washington, rather than the field offices around the country. With this came the placing of operational decisions in the hands of more "politically sensitive" individuals at headquarters.

The 9/11 investigations and related matters were the first to be moved from the field to headquarters. But the trend culminated with the investigations into Hillary Clinton's emails and Russian election interference—both run from headquarters as well. Levels of review—and independent judgment—were eliminated. Thus, we learn that Peter Strzok—who held the relatively high rank of deputy assistant director of counterintelligence —found himself conducting interviews — both politically sensitive investigations.

After 9/11 there was much talk of the negative consequences of a "wall" between criminal and intelligence investigations. There was always—it was part of our culture—a discussion about how to proceed at the outset of a counterintelligence or terrorism investigation. To seek a warrant under the Foreign Intelligence Surveillance Act, with its lower standard of probable cause, when one would ultimately pursue a prosecution was considered an abuse of FISA. It is still an abuse. To shade the truth in a FISA application—as occurred with the "Steele Dossier"—is characteristic behavior of an intelligence agency, not a "swear to tell the truth" law-enforcement organization.

FISA was never intended as a tool to pursue Americans. It was to be used to gather intelligence about agents of a foreign power operating in the U.S. The aim of this monitoring was to produce intelligence for our national decision makers. It was not intended to be used in criminal prosecutions. If an American is suspected of operating as an agent of a foreign power, that individual should be pursued under the Espionage Act, a criminal statute. The fruits of that monitoring could then be used in court for a prosecution. The use of FISA to target a U.S. citizen is the most egregious abuse uncovered so far.

As former FBI Director William Webster repeatedly told us agents: "We must do the job the American people expect of us, in the way that the Constitution demands of us." All actions and decisions must once again be viewed though that prism. The Justice Department inspector general and others are now looking at specific alleged abuses.

Perhaps Deputy Director Andrew McCabe's statement, in response to his firing, that "the big picture is a tale of what can happen when law enforcement is politicized" is, ironically, true.

What is needed is much more—a renewal of the FBI's culture. When the smoke clears from the current controversies, Director Christopher Wray must help the bureau turn the page on this intelligence chapter and get the bureau back to the law-enforcement culture of fact-finding and truth-telling that once made us all so proud.

*Mr. Baker is a retired FBI special agent and legal attaché.*

BS 3040 E

B. Definition of "Fraud on the Court"

The Supreme Court has "justified the 'historic power of equity to set aside fraudulently begotten judgments' on the basis that 'tampering with the administration of justice . . . involves far more than an injury to a single litigant. It is a wrong against the institutions set up to protect and safeguard the public.'" In re Levander, 180 F.3d 1114, 1118 (9th Cir. 1999) (quoting Chambers, 501 U.S. at 44). Still, "[a] court must exercise its inherent powers with restraint and discretion in light of their potency." Id. at 1119.

Relief for fraud on the court must be "reserved for those cases of 'injustices which, in certain instances, are deemed sufficiently gross to demand a departure' from rigid adherence to the doctrine of res judicata." United States v. Beggerly, 524 U.S. 38, 46, 118 S. Ct. 1862, 141 L. Ed. 2d 32 (1998) (quoting Hazel-Atlas Glass Co. v. Hartford-Empire Co., 322 U.S. 238, 244, 64 S. Ct. 997, 88 L. Ed. 1250, 1944 Dec. Comm'r Pat. 675 (1944), overruled on other grounds by Standard Oil Co. v. United States, 429 U.S. 17, 97 S. Ct. 31, 50 L. Ed. 2d 21 (1976)). The Ninth Circuit has repeatedly emphasized that "[e]xceptions which would allow final decisions to be reconsidered must be construed narrowly in order to preserve the finality of judgments." Abatti v. Comm'r of the I.R.S., 859 F.2d 115, 119 (9th Cir. 1988); see also Appling, 340 F.3d at 780; Dixon v. C.I.R., 316 F.3d 1041, 1046 (9th Cir. 2003).

Fraud on the court "'embrace[s] only that species of fraud which does or attempts to, defile the court itself, or is a fraud perpetrated by officers of the court so that the judicial machinery can not perform in the usual manner its impartial task of adjudging cases that are presented for adjudication.'" Appling, 340 F.3d at 780 (quoting In re Levander, 180 F.3d at 1119) (alteration in original). A finding of fraud on the court "must involve an unconscionable plan or scheme which is designed to improperly influence the court in its decision." Pumphrey v. K.W. Thompson Tool Co., 62 F.3d 1128, 1131 (9th Cir. 1995) (internal quotations marks omitted); see also Appling, 340 F.3d at 780 ("Fraud on the court requires a 'grave miscarriage of justice,' and a fraud that is aimed at the court." (quoting Beggerly, 524 U.S. at 47)).

"In determining whether fraud constitutes fraud on the court, the relevant inquiry is not whether fraudulent conduct 'prejudiced the opposing party,' but whether it '"harm[ed]" the integrity of the judicial process.'" Estate of Stonehill, 660 F.3d at 444 (quoting Alexander v. Robertson, 882 F.2d 421, 424 (9th Cir. 1989)); see also Estate of Stonehill, 660 F.3d at 444 ("Fraud on the court involves 'far more than an injury to a single litigant' . . .'" (quoting Hazel-Atlas Glass Co., 322 U.S. at 246)). Although "one of the concerns underlying the 'fraud on the court' exception is that such fraud prevents the opposing party from fully and fairly presenting his case," this showing alone is not sufficient. Abatti, 859 F.2d at 119; see also Abatti, 859 F.2d at 118 ("[W]e have said that it may occur when the acts of a party prevent his adversary from fully and fairly presenting his case or defense. Fraud on the court must involve 'an unconscionable plan or scheme which is designed to improperly influence the court in its decision.'" (quoting Toscano v. Comm'r of the I.R.S., 441 F.2d 930, 934 (9th Cir. 1971) (internal citation omitted) (emphasis added)). At the same time, a showing of prejudice to the party seeking relief is not required. Dixon, 316 F.3d at 1046.

BS 3041

UNITED STATES OF AMERICA, Plaintiff-Appellee, v. SIERRA PACIFIC INDUSTRIES, INC.; W.M. BEATY AND ASSOCIATES, INC.; ANN MCKEEVER HATCH, as trustee of the Hatch 1987 revocable DBA Howell's Forest Havesting Company, individually, Defendants-Appellants.

UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

2017 U.S. App. LEXIS 12528

No. 15-15799

May 17, 2017, Argued and Submitted, San Francisco, California

July 13, 2017, Filed

Appeal from the United States District Court for the Eastern District of California. D.C. No. 2:09-cv-02445-WBS-AC. William B. Shubb, Senior District Judge, Presiding.United States v. Sierra Pac. Indus., 100 F. Supp. 3d 948, 2015 U.S. Dist. LEXIS 51113 (E.D. Cal., Apr. 17, 2015)

Federal Rule of Civil Procedure 60 enumerates several possible grounds for setting aside a judgment. While Rule 60(c) sets a one-year time limit for a Rule 60(b)(3) motion based on "fraud . . . , misrepresentation, or misconduct," Rule 60(d)(3) provides that "[t]his rule does not limit a court's power to . . . set aside a judgment for fraud *on the court*" (emphasis added). Therefore, relief based on fraud on the court is not subject to the one-year time limit. *Appling*, 340 F.3d at 784.7 Because its motion was made more than a year after the entry of judgment in this case, Sierra Pacific moved for relief under Rule 60(d)(3) and therefore must show fraud on the court, rather than the lower showing required for relief under Rule 60(b)(3).

A court's power to grant relief from judgment for fraud on the court stems from "a rule of equity to the effect that under certain circumstances, one of which is after-discovered fraud, relief will be granted against judgments regardless of the term of their entry." *Hazel-Atlas*, 322 U.S. at 244 (citing *Marine Ins. Co. v. Hodgson*, 11 U.S. (7 Cranch) 332, 3 L. Ed. 362 (1813); *Marshall v. Holmes*, 141 U.S. 589, 12 S. Ct. 62, 35 L. Ed. 870 (1891)). However, the Supreme Court has noted that "[o]ut of deference to the deep-rooted policy in favor of the repose of judgments . . . , courts of equity have been cautious in exercising [this] power." *Id.* (citing *United States v. Throckmorton*, 98 U.S. 61, 25 L. Ed. 93 (1878)). Thus, relief from judgment for fraud on the court is "available only to prevent a grave miscarriage of justice." *United States v. Beggerly*, 524 U.S. 38, 47, 118 S. Ct. 1862, 141 L. Ed. 2d 32 (1998).

Our own cases, similarly, have emphasized that "not all fraud is fraud on the court." *In re Levander*, 180 F.3d 1114, 1119 (9th Cir. 1999). "In determining whether fraud constitutes fraud on the court, the relevant inquiry is not whether fraudulent conduct 'prejudiced the opposing party,' but whether it 'harmed the integrity of the judicial process.'" *Estate of Stonehill*, 660 F.3d at 444 (internal alterations omitted) (quoting *Alexander v. Robertson*, 882 F.2d 421, 424 (9th Cir. 1989)).Fraud on the court must be an "intentional, material misrepresentation." *In re Napster, Inc. Copyright Litig.*, 479 F.3d 1078, 1097 (9th Cir. 2007), *abrogated on other grounds by Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100, 130 S. Ct. 599, 175 L. Ed. 2d 458 (2009). Thus, fraud on the court "must involve an unconscionable plan or scheme which is designed to improperly influence the court in its decision." *Pumphrey v. K.W. Thompson Tool Co.*, 62 F.3d 1128, 1131 (9th Cir. 1995) (quoting *Abatti v. Commissioner*, 859 F.2d 115, 118 (9th Cir. 1988)).

In addition, the relevant misrepresentations must go "to the central issue in the case," *Estate of Stonehill*, 660 F.3d at 452, and must "affect the outcome of the case," *id.* at 448. In other words, the newly discovered misrepresentations must "significantly change the picture already drawn by previously available evidence." *Id.* at 435. In that vein, "[m]ere nondisclosure of evidence is typically not enough to constitute fraud on the court, and 'perjury by a party or witness, by itself, is not normally fraud on the court'" unless it is "so fundamental that it undermined the workings of the adversary process itself." *Id.* at 444-45 (quoting *In re Levander*, 180 F.3d at 1119). However, perjury may constitute fraud on the court if it "involves, or is suborned by, an officer of the court." 12 J.W. Moore, Moore's Federal Practice § 60.21[4][c]; *see In re Intermagnetics Am., Inc.*, 926 F.2d 912, 917 (9th Cir. 1991). Despite Sierra Pacific's arguments to the contrary, our Court and the Supreme Court have consistently applied this standard for fraud on the court even in cases involving government attorneys, rather than creating some different standard for these cases. *Beggerly*, 524 U.S. at 47; *Pizzuto*, 783 F.3d at 1181; *Estate of Stonehill*, 660 F.3d at 449. Finally, relief for fraud on the court is available only where the fraud was not known at the time of settlement or entry of judgment. *See, e.g., Hazel-Atlas*, 322 U.S. at 244 (allowing relief for "after-discovered fraud"); *Haeger v. Goodyear*

BS 3042

legal community, need to do to safeguard the integrity of our criminal justice system."

Judge Sullivan had thought about this a great deal. He was extremely troubled by what he had seen. He spoke to the government's "obligation to pursue convictions fairly and in accordance with the Constitution. . . . When the government does not meet its obligations to turn over evidence, the system falters."

He catalogued the government's multiple failures and excuses. They were the usual "mistake," "unintentional," "inadvertent," or "immaterial." He was especially and rightly critical of the department's outrageous response to FBI Agent Joy's complaint of government misconduct. "Not only did the government seek to keep that complaint a secret, but the government claimed that the allegations had nothing to do with the verdict and no relevancy to the defense; that the allegations could be addressed by the Office of Professional Responsibility's investigation; and that any misconduct had already been addressed and remedied during the trial."

Everyone in the courtroom was hanging on Judge Sullivan's every word. Senator Stevens and his defense team knew this would have ramifications across the country and throughout the department—or, at the very least, it should.

Of course, Stevens's defense team and every experienced criminal defense attorney also knew that the Justice Department would never do the same kind of investigation or reach the same conclusion as would a truly independent prosecutor. The department was way too political, incestuous, self-serving, and self-institutionalized to do so. Some lawyers opined that it really needed to be cleaned out from top to bottom with bleach and fire hoses. Too many people had been there too long. A select few merely moved in and out of the upper echelon of the department depending on the political party in power. "Main

Justice," as insiders called it, had descended to inbreed arrogance and political abuse of power, and the narcissists who wielded it produced disregard for the rule of law.

Judge Sullivan paused, glared at the prosecutors, and then continued. "In fact, as recently as February 6, the government told the court that there was no need for any posttrial discovery and that the government was, and I quote, 'confident that its response to the defendant's posttrial motions would resolve the need for further inquiry into the allegations as they relate to the trial and the convictions of the defendant'. . . ."

Judge Sullivan continued, "And yet, after the court held three senior attorneys in contempt for blatantly failing to comply with this court's order to produce documents, and a new team of prosecutors was assigned to the case, we learned for the first time what may well be the most shocking and serious *Brady* violations of all—that the government failed to tell the defense of an interview with Bill Allen in which Allen stated that he did not recall a conversation with Bob Persons about sending the senator a bill and that Allen estimated the value of the VECO work on the senator's home at $80,000, far less than the hundreds of thousands of dollars the government had alleged at trial."

The judge was angry about what he had seen. If Judge Sullivan had not held the attorneys in contempt, triggering the appointment of new prosecutors, the original team would have buried the exculpatory evidence forever. It was only the pressure the judge put on the department that caused the truth to surface, and he couldn't be sure that he had all of it yet.

He continued with great emphasis: "This is not about prosecution by any means necessary." Moreover "the fair administration of justice does not depend on the luck of the draw or a lucky day or a lucky

211

continuance. Indeed it should not depend on who represents the defendant, whether an FBI agent blows a whistle, a new administration, a new attorney general, or a new trial team. The fair administration of justice depends on the government meeting its obligations to pursue convictions fairly and in accordance with the Constitution."

Judge Sullivan took those obligations seriously, and he intended that the prosecutors do so as well. "The importance of these obligations cannot be overstated. As the Supreme Court explained in its 1999 decision in a case of *Strickler v. Green*: 'In *Brady*, this court held that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.'"

Judge Sullivan continued, "These cases, together with earlier cases condemning the knowing use of perjured testimony, illustrate the special role played by the American prosecutor in the search for truth in criminal trials." Quoting the Supreme Court's decision in *Berger*, he said, "the United States Attorney is the representative, not of an ordinary party to a controversy but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all, and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done."

He was not finished. "We must never forget the Supreme Court's directive that a criminal trial is a search for the truth. Yet in several cases recently this court has seen troubling failures to produce exculpatory evidence in violation of the law and this court's orders.

"Whether you are a public official, a private citizen, or a Guantanamo Bay detainee, the prosecution, indeed the United States government, must produce exculpatory evidence so that justice *shall* be done."

Then Judge Sullivan expressed a much-needed and wise word of caution for his colleagues on the bench across the country. "I, therefore, urge my judicial colleagues on every trial court everywhere to be vigilant and to consider entering an exculpatory evidence order at the outset of every criminal case, whether requested to do so or not, and to require that the exculpatory material be turned over in a useable format because, as we've seen in this case, the use of summaries is an opportunity for mischief and mistake."

He encouraged the new attorney general "to require *Brady* training for new and veteran, experienced prosecutors throughout the country." He also asked Holder to "open dialogue between defense attorneys and prosecutors regarding these discovery obligations."

He urged the president, the attorney general, and the senate to consider this issue in the appointment and confirmation process for new US attorneys, and to obtain from nominees a commitment to fulfill their *Brady* obligations.

Judge Sullivan thanked O'Brien, Jaffe, and Stuckwisch for their massive effort.

With that direct cue, O'Brien stood. "The United States respectfully moves this court to set aside the verdict and dismiss the indictment with prejudice." He went on, though, with prepared remarks, still trying to make the department look better than it did—or was.

O'Brien credited Rita Glavin, then acting criminal division head, with appointing the three new attorneys in February 2009 to handle the "litigation arising from the complaint filed by Special Agent Joy." O'Brien wanted everyone to know that they had conducted interviews and started the "investigation" in response to Agent Joy's complaint, then wanted to "be as transparent as possible with the court and with the defense." He claimed that was why they "voluntarily produced the

The courts and system of justice to which I had devoted my entire professional life—and had wanted to be a part of since I was five years old—had failed to rectify the most egregious legal wrong that I had ever personally witnessed. The only remaining possibility was that the state bar associations for each prosecutor would investigate based on the Fifth Circuit's determination that they had "plainly suppressed" evidence favorable to the defense. That alone was a finding of the violation of the plain text of the ethical rule governing prosecutors.

# EPILOGUE

Judge Sullivan's excoriation of the Stevens prosecutors and the department and his appointment of a special prosecutor were legal watersheds, but apparently water under the bridge for the department. We have a long way to go. The collateral damage from a wrongful prosecution is beyond measure. Marriages are shattered, children left parentless, careers ended, families devastated, finances ruined—all for what? To advance the career of a headline-grabbing, ethically, morally, and legally corrupt prosecutor? An indictment and corrupt criminal prosecution fracture lives forever. Minutes turn into hours, then days, months, and years—stolen and destroyed in the calculated corruption of justice by the very people who are sworn and empowered to protect us. When an innocent person is imprisoned, either the guilty person is still free or there is no guilty party at all because no actual crime has been committed. The administration of justice is robbed of any validity, and society loses from all sides. The majority of the public—and now even good lawyers—have no faith in the fairness of our system.

As for the many prosecutors discussed in this book—

BS 3054

In 1992 University of Minnesota law professor Myron Orfield sent a questionnaire to Chicago judges, prosecutors, and defense attorneys to determine the state of the Fourth Amendment in that city. Even cynics would find the results dispiriting. More than one-fifth of Chicago judges believed that police lie in court more than half the time when questioned about searches and seizures. *Ninety-two percent* of judges said that police lie "at least some of the time," and 38 percent of judges said that they believed that police superiors encourage subordinates to lie in court. More than 50 percent of respondents believed that at least "half of the time" the prosecutor "knows or has reason to know" that police fabricate evidence. Another 93 percent of respondents (including 89 percent of the prosecutors) reported that prosecutors have knowledge of perjury "at least some of the time." Sixty-one percent of respondents, including half of the surveyed prosecutors, believed that prosecutors know or have reason to know that police fabricate evidence in case reports, and half of prosecutors believed the same to be true when it comes to warrants. Prosecutors also described the unspoken understandings they often shared with cops, including prosecutors articulating cases to police in terms like, "If this happens, we win. If that happens, we lose." Yet Chicago judges went on approving search warrants with little to no scrutiny. Orfield asked one more question. Did the Exclusionary Rule really deter police misconduct? Every judge, every defense attorney, and every prosecutor but one answered yes.[12]

Former narcotics cop Russ Jones says it wasn't always like that. "When I first started writing search warrants, I had to take it to the DA, who would thoroughly review it. Then I'd take it to the judge, who'd also give it a close look. Then the judge always read the warrant, always asked questions. By the time I left law enforcement, and certainly since, it had gotten to the point where the DEA no longer needed to have warrants reviewed by a federal prosecutor, and often the judge wouldn't even read it. It just became a rubber-stamp process. And I understand it's happening more and more."[13]

In many jurisdictions, search warrants can be approved by magistrates who needn't even have any legal training. A 1984 study of the

warrant process in seven US cities by the National Center for State Courts found that magistrates spend an average of two minutes and forty-eight seconds reviewing warrant affidavits before (almost always) approving the warrant. The study also found evidence that police "magistrate shop"—they seek out magistrates with a reputation for approving warrants quickly and with no hassles, and avoid those who ask questions. In one city, a single magistrate approved 54 percent of the search warrants over the period the study was conducted. The most popular magistrate in another city had rejected just one search warrant in fifteen years on the bench. Not surprisingly, "most police officers interviewed could not remember having a search warrant turned down."[14]

After the botched raid that ended the life of Ismael Mena in 1999, the *Denver Post* looked into how judges in the Mile High City handled requests for no-knock warrants. Again, the results were unsettling. Over a twelve-month period, police in Denver requested 163 no-knock warrants. The city's judges granted 158 of them. Defense attorneys told the paper they were surprised to learn that the judges had rejected even five. Perhaps Denver police had come to the judges with more than adequate probable cause? Perhaps. But the paper also found that, astonishingly, many of the city's judges would sign off on no-knock warrants *even though the police hadn't requested one*. In fact, about 10 percent of the no-knock warrants were changed from knock-and-announce warrants merely by the judge's signature—the police hadn't presented any additional information establishing exigent circumstances. The paper also found that in eight of ten raids over that period, police assertions in affidavits that they would find weapons during the search turned out to be wrong. In only seven of the 163 no-knock affidavits did police present any evidence that the suspect had been seen with a gun. Of those seven raids, just two turned up an actual weapon. The Denver Police Department requires that all no-knock raids be preapproved by the DA's office. In about one-third of the raids, that never happened. And nearly all the no-knock warrants were granted on little more than a police officer's assertion that a confidential informant had told him the suspect was

SECTION #6
FRAUD ON THE COURT
BS 3041 - 3042

## B. Definition of "Fraud on the Court"

The Supreme Court has "justified the 'historic power of equity to set aside fraudulently begotten judgments' on the basis that 'tampering with the administration of justice . . . involves far more than an injury to a single litigant. It is a wrong against the institutions set up to protect and safeguard the public.'" In re Levander, 180 F.3d 1114, 1118 (9th Cir. 1999) (quoting Chambers, 501 U.S. at 44). Still, "[a] court must exercise its inherent powers with restraint and discretion in light of their potency." Id. at 1119.

Relief for fraud on the court must be "reserved for those cases of 'injustices which, in certain instances, are deemed sufficiently gross to demand a departure' from rigid adherence to the doctrine of res judicata." United States v. Beggerly, 524 U.S. 38, 46, 118 S. Ct. 1862, 141 L. Ed. 2d 32 (1998) (quoting Hazel-Atlas Glass Co. v. Hartford-Empire Co., 322 U.S. 238, 244, 64 S. Ct. 997, 88 L. Ed. 1250, 1944 Dec. Comm'r Pat. 675 (1944), overruled on other grounds by Standard Oil Co. v. United States, 429 U.S. 17, 97 S. Ct. 31, 50 L. Ed. 2d 21 (1976)). The Ninth Circuit has repeatedly emphasized that "[e]xceptions which would allow final decisions to be reconsidered must be construed narrowly in order to preserve the finality of judgments." Abatti v. Comm'r of the I.R.S., 859 F.2d 115, 119 (9th Cir. 1988); see also Appling, 340 F.3d at 780; Dixon v. C.I.R., 316 F.3d 1041, 1046 (9th Cir. 2003).

Fraud on the court "'embrace[s] only that species of fraud which does or attempts to, defile the court itself, or is a fraud perpetrated by officers of the court so that the judicial machinery can not perform in the usual manner its impartial task of adjudging cases that are presented for adjudication.'" Appling, 340 F.3d at 780 (quoting In re Levander, 180 F.3d at 1119) (alteration in original). A finding of fraud on the court "must involve an unconscionable plan or scheme which is designed to improperly influence the court in its decision." Pumphrey v. K.W. Thompson Tool Co., 62 F.3d 1128, 1131 (9th Cir. 1995) (internal quotations marks omitted); see also Appling, 340 F.3d at 780 ("Fraud on the court requires a 'grave miscarriage of justice,' and a fraud that is aimed at the court." (quoting Beggerly, 524 U.S. at 47)).

"In determining whether fraud constitutes fraud on the court, the relevant inquiry is not whether fraudulent conduct 'prejudiced the opposing party,' but whether it '"harm[ed]" the integrity of the judicial process.'" Estate of Stonehill, 660 F.3d at 444 (quoting Alexander v. Robertson, 882 F.2d 421, 424 (9th Cir. 1989)); see also Estate of Stonehill, 660 F.3d at 444 ("Fraud on the court involves 'far more than an injury to a single litigant' . . ." (quoting Hazel-Atlas Glass Co., 322 U.S. at 246)). Although "one of the concerns underlying the 'fraud on the court' exception is that such fraud prevents the opposing party from fully and fairly presenting his case," this showing alone is not sufficient. Abatti, 859 F.2d at 119; see also Abatti, 859 F.2d at 118 ("[W]e have said that it may occur when the acts of a party prevent his adversary from fully and fairly presenting his case or defense. Fraud on the court must involve 'an unconscionable plan or scheme which is designed to improperly influence the court in its decision.'"(quoting Toscano v. Comm'r of the I.R.S., 441 F.2d 930, 934 (9th Cir. 1971) (internal citation omitted) (emphasis added)). At the same time, a showing of prejudice to the party seeking relief is not required. Dixon, 316 F.3d at 1046.

BS 3041

UNITED STATES OF AMERICA, Plaintiff-Appellee, v. SIERRA PACIFIC INDUSTRIES, INC.; W.M. BEATY AND ASSOCIATES, INC.; ANN MCKEEVER HATCH, as trustee of the Hatch 1987 revocable DBA Howell's Forest Havesting Company, individually, Defendants-Appellants.
UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT
2017 U.S. App. LEXIS 12528
No. 15-15799
May 17, 2017, Argued and Submitted, San Francisco, California
July 13, 2017, Filed

Appeal from the United States District Court for the Eastern District of California. D.C. No. 2:09-cv-02445-WBS-AC. William B. Shubb, Senior District Judge, Presiding.United States v. Sierra Pac. Indus., 100 F. Supp. 3d 948, 2015 U.S. Dist. LEXIS 51113 (E.D. Cal., Apr. 17, 2015)

Federal Rule of Civil Procedure 60 enumerates several possible grounds for setting aside a judgment. While Rule 60(c) sets a one-year time limit for a Rule 60(b)(3) motion based on "fraud . . . , misrepresentation, or misconduct," Rule 60(d)(3) provides that "[t]his rule does not limit a court's power to . . . set aside a judgment for fraud *on the court*" (emphasis added). Therefore, relief based on fraud on the court is not subject to the one-year time limit. *Appling*, 340 F.3d at 784.7 Because its motion was made more than a year after the entry of judgment in this case, Sierra Pacific moved for relief under Rule 60(d)(3) and therefore must show fraud on the court, rather than the lower showing required for relief under Rule 60(b)(3).

A court's power to grant relief from judgment for fraud on the court stems from "a rule of equity to the effect that under certain circumstances, one of which is after-discovered fraud, relief will be granted against judgments regardless of the term of their entry." *Hazel-Atlas*, 322 U.S. at 244 (citing *Marine Ins. Co. v. Hodgson*, 11 U.S. (7 Cranch) 332, 3 L. Ed. 362 (1813); *Marshall v. Holmes*, 141 U.S. 589, 12 S. Ct. 62, 35 L. Ed. 870 (1891)). However, the Supreme Court has noted that "[o]ut of deference to the deep-rooted policy in favor of the repose of judgments . . . , courts of equity have been cautious in exercising [this] power." *Id.* (citing *United States v. Throckmorton*, 98 U.S. 61, 25 L. Ed. 93 (1878)). Thus, relief from judgment for fraud on the court is "available only to prevent a grave miscarriage of justice." *United States v. Beggerly*, 524 U.S. 38, 47, 118 S. Ct. 1862, 141 L. Ed. 2d 32 (1998).

Our own cases, similarly, have emphasized that "not all fraud is fraud on the court." *In re Levander*, 180 F.3d 1114, 1119 (9th Cir. 1999). "In determining whether fraud constitutes fraud on the court, the relevant inquiry is not whether fraudulent conduct 'prejudiced the opposing party,' but whether it 'harmed the integrity of the judicial process.'" *Estate of Stonehill*, 660 F.3d at 444 (internal alterations omitted) (quoting *Alexander v. Robertson*, 882 F.2d 421, 424 (9th Cir. 1989)). Fraud on the court must be an "intentional, material misrepresentation." *In re Napster, Inc. Copyright Litig.*, 479 F.3d 1078, 1097 (9th Cir. 2007), *abrogated on other grounds by Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100, 130 S. Ct. 599, 175 L. Ed. 2d 458 (2009). Thus, fraud on the court "must involve an unconscionable plan or scheme which is designed to improperly influence the court in its decision." *Pumphrey v. K.W. Thompson Tool Co.*, 62 F.3d 1128, 1131 (9th Cir. 1995) (quoting *Abatti v. Commissioner*, 859 F.2d 115, 118 (9th Cir. 1988)).

In addition, the relevant misrepresentations must go "to the central issue in the case," *Estate of Stonehill*, 660 F.3d at 452, and must "affect the outcome of the case," *id.* at 448. In other words, the newly discovered misrepresentations must "significantly change the picture already drawn by previously available evidence." *Id.* at 435. In that vein, "[m]ere nondisclosure of evidence is typically not enough to constitute fraud on the court, and 'perjury by a party or witness, by itself, is not normally fraud on the court'" unless it is "so fundamental that it undermined the workings of the adversary process itself." *Id.* at 444-45 (quoting *In re Levander*, 180 F.3d at 1119). However, perjury may constitute fraud on the court if it "involves, or is suborned by, an officer of the court." 12 J.W. Moore, Moore's Federal Practice § 60.21[4][c]; *see In re Intermagnetics Am., Inc.*, 926 F.2d 912, 917 (9th Cir. 1991). Despite Sierra Pacific's arguments to the contrary, our Court and the Supreme Court have consistently applied this standard for fraud on the court even in cases involving government attorneys, rather than creating some different standard for these cases. *Beggerly*, 524 U.S. at 47; *Pizzuto*, 783 F.3d at 1181; *Estate of Stonehill*, 660 F.3d at 449. Finally, relief for fraud on the court is available only where the fraud was not known at the time of settlement or entry of judgment. *See, e.g.*, *Hazel-Atlas*, 322 U.S. at 244 (allowing relief for "after-discovered fraud"); *Haeger v. Goodyear*

BS 3042

# SECTION #7

## DISTRIBUTION LIST

DISTRIBUTION LIST

Department of Justice Office of Professional Responsibility, Robin Ashton, Counsel

The State Bar of California, Office of the Chief Trial Counsel, Alex Hackert, Esq.

Sidney Powell, Esq., former AUSA and currently an appellate attorney, author of "Licensed to Lie; Exposing Corruption in the Department of Justice." "Licensed to Lie" is a true story of the strong-arm, illegal, unethical tactics used by headline-grabbing federal prosecutors in their narcissistic pursuit of power. Its scope reaches from the U.S. Department of Justice to the U.S. Senate to the White House and is a scathing attack on prosecutors, judges, and all those who turned a blind eye to egregious injustice in the aftermath of the Enron collapse.

In "Licensed to Lie," Ms. Powell leads readers through the disturbing events, missteps, cover-ups, malfeasance, and corruption of justice that have caused her to question the system she has been committed to for over thirty years. The book is a disturbing, enlightening, and superbly presented account of the most dramatic and chilling examples of injustice in America judicial history. Nevertheless, the prosecutorial misconduct and judicial error in Zinnel's Criminal Case far exceeds anything described in Ms. Powell's book. The book is written with the skill of a novelist, the keen eye of a memoirist, and the passion of an early American pamphleteer, Ms. Powell takes readers on a journey through an institutional landscape created to protect the innocent and punish the guilty. She reveals a house of "legal' horrors characterized by sacrificing innocent people, concealing and altering evidence, ignoring the law, and constantly displaying an ego-driven desire to win at all costs. Her message resonates throughout the book. "The greatest human ideal of Justice is only as good as the character of those who administer it, existing only of its guardians are devotes to integrity and fairness." Judge Kozinski's forward in the book lists twelve (12) types of prosecutorial misconduct, ten (10) of which were committed by the offending prosecutors in Mr. Zinnel's case.

Ronald Rotunda, Esq. distinguished law professor, Chapman University, legal ethics expert and author

Bennett L. Gershman, law professor, Pace University, expert on prosecutorial misconduct

John Holloway, Associate Dean, University of Pennsylvania, expert on prosecutorial misconduct

William Hodes, Esq., former law professor and widely regarded legal ethics expert and co-author of "The Law of Lawyering." Mr. Hodes served as law clerk to Justice Ruth Bader Ginsburg, who had been his Civil Procedure and Conflicts of Law professor some thirty years earlier, during her Rutgers days.

John Pfaff, Law Professor, Fordham Law School, expert on mass-incarceration in America, author of "Locked In"

Marc Morje' Howard, Professor of Government and Law and Director of of the Prison Reform Initiative at Georgetown University. He is also the author of "Unusually Cruel; Prisons, Punishment, and the Real American Exceptionalism" published in July 2017

Douglas A. Berman, Law Professor, The Ohio State University Michael E. Moritz College of Law, federal sentencing expert

Lauren-Brooke Eisen, senior counsel and director, Brennan Center for Justice

Glen Greenwald, author of, "With Liberty and Justice for Some; How the law is used to destroy equality and protect the powerful"

Dinesh D'Souza, author of "Stealing America"

Walter Pavlo, freelance journalist who writes about white-collar crime

Denny Walsh, Cathy Locke, and Scott Lebar, The Sacramento Bee

Gerald L. Saizman, Publisher / Editor-in-chief, Daily Journal, Los Angeles' legal newspaper

Daily Recorder, Sacramento's legal newspaper

John Balazs, attorney, publisher of the Eastern District Blog

William B. Shubb, United States District Court Judge, Eastern District of California (Sacramento)

Dale A. Drozd, United States District Court Judge, Eastern District of California (Sacramento)

Troy L. Nunley, United States District Court Judge, Eastern District of California (Sacramento)

Christopher Klein, United States Bankruptcy Judge, Eastern District of California

Andrew S. Hanen, United States District Court Judge, U.S.D.C. for the Southern District of Texas, Brownsville

Emmet G. Sullivan, United States District Court Judge, U.S.D.C. for the District of Columbia, Washington, DC, Trial judge in United States v. Ted Stevens, Senator

William Alsup, United States District Court Judge, Northern District of California
In August 2017, Judge Alsup found that a State Bar of California attorney misled him and a defense lawyer for Uber misled him. Judge Alsup is critical on lawyers that appear before him and lie.

John Gleeson, United States District Court Judge, Brooklyn New York

Joseph Nacchio, former CEO of Quest Communications

SECTION #8
CLAIMS
BS 5001 - 5999

#8

#8

#8

<u>CLAIM #</u> 1

<u>DESCRIPTION</u>

Engaging in conduct involving dishonesty, fraud, deceit, and misrepresentation. Making false representations to a federal court, by certifying a fact known to be false, designed to mislead and prejudice the honor and reputation of a party. Fraud on the court. Failure to make a proper inquiry into relevant facts before putting government attorneys' names on, or signing, pleadings, papers, motions, oppositions, or replies filed with the court. Government attorneys making factual contentions in court filings that did not have evidentiary support. Abuse of the legal system. Government lawyers doing everything they could to win at all costs. Conduct unbecoming a member of the court's bar. Conduct contrary to professional standards.

<u>CRIME, STATUTE, RULE AND/OR LAW VIOLATED</u>

18 U.S.C. §1001 (BS 2001-2002), 18 U.S.C. §1018 (BS 2003), 18 U.S.C. §371 (BS 2010-2012), 14th Amendment (BS 2020), 18 U.S.C.§242 (BS 2030), 18 U.S.C. §241 (BS 2040), 18 U.S.C. §2 (2050), 28 U.S.C. §530(B)(a)(BS 3002), U.S.D.C. ED CA Local Rule 180(e) (BS 3002), B&P §6068 (d), (f), (g) (BS 3003-3004) B&P §6067 (BS 3003), B&P §6128(a) (BS 3003), ABA Model Rules 3.3(a), 4.1(a), 8.4(c) (BS 3005), BAR RULES 5-200(B) & (E) (BS 3007), Rule 11(b)(3) (BS 3008-3010), SNYDER (BS 3013), BERGER (BS 3014, 3011, 3012), AUSHERMAN (BS 3016-3020), GLASS (BS 3021-3023), KOJAYAN (BS 3024-3026), KATTAR (BS 3011), GIRARDI (BS 3027), BOWEN (BS 3028-3029), SCHWARE (BS 3030), PUMPHREY, TOSCANO, Robert Jackson. U.S. Attorney General in 1940 (BS 3015), Judge Nunley on 3/4/14 during Zinnel's sentencing (BS 3031), David Ogden, Assistant Attorney General on 1/4/10 (BS 3040), Larry Thompson, Deputy Attorney General on 3/7/02 (BS 3040), Attorneys and Authors Sidney Powell and Gene Neill (BS 3040), OLMSTEAD (BS 3040), Conduct unbecoming a member of the court's bar and contrary to professional standards. (BS 3027)

<u>WHO VIOLATED THE LAW, STATUTE, AND/OR RULE</u>

AUSA SEGAL, HEMESATH, KHASIGIAN, SKIPPER, U.S. ATTORNEY TALBERT

<u>UNLAWFUL CONDUCT</u>

Falsely represented to the COURT OF APPEALS:
    "Through the Tom Cologna loan [Zinnel] was able to access the cash he needed to fund his next, secret business venture. Zinnel launched a new secret business [System 3]." No cite to the record

These representations to the COURT OF APPEALS by AUSA SEGAL, HEMESATH, KHASIGIAN, SKIPPER, U.S. ATTORNEY TALBERT are bald-faced lies.

<u>WHEN/WHERE</u>

2/23/17 COURT OF APPEALS filing in APPEAL, Answering Brief of the United States, DktEntry: 69 (BS 6801), Pg. 35 (BS 6803)

<u>WHY CRIME/VIOLATION OF STATUTE, RULE, AND/OR LAW</u>

The Luyung property transaction provided no "cash" to Zinnel to fund any business especially System 3, Inc. The Luyung Property transaction closed on May 3, 2002. ER 1341 (BS 6804). Net Proceeds to Zinnel were a mere $4,742.69. ER 1341 (BS 6804) & ER 1342 (BS 6805).

However, System 3 was incorporated seven (7) months earlier on 10/3/01. SER 58 (BS 6806). System 3 was funded on 10/31/01, 11/30/01, 12/19/01, & 5/28/01 for a total of over $400,000. Def. Ex. N-21 (BS 6807),(BS 6809) Ex. 104g ER 1336 (BS 6808). The source of funds were from Corporate Control. (BS 6811).

BS 5801

<u>CLAIM #</u> 2

<u>DESCRIPTION</u>

Engaging in conduct involving dishonesty, fraud, deceit, and misrepresentation. Making false representations to a federal court, by certifying a fact known to be false, designed to mislead and prejudice the honor and reputation of a party. Fraud on the court. Failure to make a proper inquiry into relevant facts before putting government attorneys' names on, or signing, pleadings, papers, motions, oppositions, or replies filed with the court. Government attorneys making factual contentions in court filings that did not have evidentiary support. Abuse of the legal system. Government lawyers doing everything they could to win at all costs. Conduct unbecoming a member of the court's bar. Conduct contrary to professional standards.

<u>CRIME, STATUTE, RULE AND/OR LAW VIOLATED</u>

18 U.S.C. §1001 (BS 2001-2002), 18 U.S.C. §1018 (BS 2003), 18 U.S.C. §371 (BS 2010-2012), 14th Amendment (BS 2020), 18 U.S.C.§242 (BS 2030), 18 U.S.C. §241 (BS 2040), 18 U.S.C. §2 (2050), 28 U.S.C. §530(B)(a)(BS 3002), U.S.D.C. ED CA Local Rule 180(e) (BS 3002), B&P §6068 (d), (f), (g) (BS 3003-3004) B&P §6067 (BS 3003), B&P §6128(a) (BS 3003), ABA Model Rules 3.3(a), 4.1(a), 8.4(c) (BS 3005), BAR RULES 5-200(B) & (E) (BS 3007), Rule 11(b)(3) (BS 3008-3010), SNYDER (BS 3013), BERGER (BS 3014, 3011, 3012), AUSHERMAN (BS 3016-3020), GLASS (BS 3021-3023), KOJAYAN (BS 3024-3026), KATTAR (BS 3011), GIRARDI (BS 3027), BOWEN (BS 3028-3029), SCHWARE (BS 3030), PUMPHREY, TOSCANO, Robert Jackson. U.S. Attorney General in 1940 (BS 3015), Judge Nunley on 3/4/14 during Zinnel's sentencing (BS 3031), David Ogden, Assistant Attorney General on 1/4/10 (BS 3040), Larry Thompson, Deputy Attorney General on 3/7/02 (BS 3040), Attorneys and Authors Sidney Powell and Gene Neill (BS 3040), OLMSTEAD (BS 3040), Conduct unbecoming a member of the court's bar and contrary to professional standards. (BS 3027)

<u>WHO VIOLATED THE LAW, STATUTE, AND/OR RULE</u>

AUSA SEGAL, HEMESATH, KHASIGIAN, SKIPPER, U.S. ATTORNEY TALBERT

<u>UNLAWFUL CONDUCT</u>

Falsely represented to the COURT OF APPEALS:
   "Zinnel's initial capitalization of System 3 was $150,000." No cite to record.

This representation to the COURT OF APPEALS by AUSA SEGAL, HEMESATH, KHASIGIAN, SKIPPER, U.S. ATTORNEY TALBERT is a bald-faced lie.

<u>WHEN/WHERE</u>

2/23/17 COURT OF APPEALS filing in APPEAL, Answering Brief of the United States, DktEntry: 69 (BS 6801), Pg. 51 (BS 6810)

<u>WHY CRIME/VIOLATION OF STATUTE, RULE, AND/OR LAW</u>

System 3's initial capitalization was $1,500 deposited by Tom Wilbert. ER 769 (BS 6809), (BS 6807). There was never a $150,000 check deposited into System 3 to capitalize it. (BS 6807). Further, Zinnel never contributed any money to capitalize System 3. Tom Wilbert and Corporate Control did. ER 769 (BS 6809), ER 782 (BS 6811).

CLAIM # 3

## DESCRIPTION

Engaging in conduct involving dishonesty, fraud, deceit, and misrepresentation. Making false representations to a federal court, by certifying a fact known to be false, designed to mislead and prejudice the honor and reputation of a party. Fraud on the court. Failure to make a proper inquiry into relevant facts before putting government attorneys' names on, or signing, pleadings, papers, motions, oppositions, or replies filed with the court. Government attorneys making factual contentions in court filings that did not have evidentiary support. Abuse of the legal system. Government lawyers doing everything they could to win at all costs. Conduct unbecoming a member of the court's bar. Conduct contrary to professional standards.

## CRIME, STATUTE, RULE AND/OR LAW VIOLATED

18 U.S.C. §1001 (BS 2001-2002), 18 U.S.C. §1018 (BS 2003), 18 U.S.C. §371 (BS 2010-2012), 14th Amendment (BS 2020), 18 U.S.C.§242 (BS 2030), 18 U.S.C. §241 (BS 2040), 18 U.S.C. §2 (2050), 28 U.S.C. §530(B)(a)(BS 3002), U.S.D.C. ED CA Local Rule 180(e) (BS 3002), B&P §6068 (d), (f), (g) (BS 3003-3004) B&P §6067 (BS 3003), B&P §6128(a) (BS 3003), ABA Model Rules 3.3(a), 4.1(a), 8.4(c) (BS 3005), BAR RULES 5-200(B) & (E) (BS 3007), Rule 11(b)(3) (BS 3008-3010), SNYDER (BS 3013), BERGER (BS 3014, 3011, 3012), AUSHERMAN (BS 3016-3020), GLASS (BS 3021-3023), KOJAYAN (BS 3024-3026), KATTAR (BS 3011), GIRARDI (BS 3027), BOWEN (BS 3028-3029), SCHWARE (BS 3030), PUMPHREY, TOSCANO, Robert Jackson. U.S. Attorney General in 1940 (BS 3015), Judge Nunley on 3/4/14 during Zinnel's sentencing (BS 3031), David Ogden, Assistant Attorney General on 1/4/10 (BS 3040), Larry Thompson, Deputy Attorney General on 3/7/02 (BS 3040), Attorneys and Authors Sidney Powell and Gene Neill (BS 3040), OLMSTEAD (BS 3040), Conduct unbecoming a member of the court's bar and contrary to professional standards. (BS 3027)

## WHO VIOLATED THE LAW, STATUTE, AND/OR RULE

AUSA SEGAL, HEMESATH, KHASIGIAN, SKIPPER, U.S. ATTORNEY TALBERT

## UNLAWFUL CONDUCT

Falsely represented to the COURT OF APPEALS:
    "Eidson helped him accomplish this by paying various checks out of the Done Deal account totaling $60,000 to buy Zinnel's house out of the bankruptcy estate."

This representation to the COURT OF APPEALS by AUSA SEGAL, HEMESATH, KHASIGIAN, SKIPPER, U.S. ATTORNEY TALBERT is a bald-faced lie.

## WHEN/WHERE

2/23/17 COURT OF APPEALS filing in APPEAL, Answering Brief of the United States, DktEntry: 69 (BS 6801), Pg. 48 (BS 6812)

## WHY CRIME/VIOLATION OF STATUTE, RULE, AND/OR LAW

The four (4) checks add up to $30,000 which is the correct figure. ER 226-229 (BS 6813-6815)

BS 5810

## CLAIM # 4

### DESCRIPTION

Engaging in conduct involving dishonesty, fraud, deceit, and misrepresentation. Making false representations to a federal court, by certifying a fact known to be false, designed to mislead and prejudice the honor and reputation of a party. Fraud on the court. Failure to make a proper inquiry into relevant facts before putting government attorneys' names on, or signing, pleadings, papers, motions, oppositions, or replies filed with the court. Government attorneys making factual contentions in court filings that did not have evidentiary support. Abuse of the legal system. Government lawyers doing everything they could to win at all costs. Conduct unbecoming a member of the court's bar. Conduct contrary to professional standards.

### CRIME, STATUTE, RULE AND/OR LAW VIOLATED

18 U.S.C. §1001 (BS 2001-2002), 18 U.S.C. §1018 (BS 2003), 18 U.S.C. §371 (BS 2010-2012), 14th Amendment (BS 2020), 18 U.S.C.§242 (BS 2030), 18 U.S.C. §241 (BS 2040), 18 U.S.C. §2 (2050), 28 U.S.C. §530(B)(a)(BS 3002), U.S.D.C. ED CA Local Rule 180(e) (BS 3002), B&P §6068 (d), (f), (g) (BS 3003-3004) B&P §6067 (BS 3003), B&P §6128(a) (BS 3003), ABA Model Rules 3.3(a), 4.1(a), 8.4(c) (BS 3005), BAR RULES 5-200(B) & (E) (BS 3007), Rule 11(b)(3) (BS 3008-3010), SNYDER (BS 3013), BERGER (BS 3014, 3011, 3012), AUSHERMAN (BS 3016-3020), GLASS (BS 3021-3023), KOJAYAN (BS 3024-3026), KATTAR (BS 3011), GIRARDI (BS 3027), BOWEN (BS 3028-3029), SCHWARE (BS 3030), PUMPHREY, TOSCANO, Robert Jackson. U.S. Attorney General in 1940 (BS 3015), Judge Nunley on 3/4/14 during Zinnel's sentencing (BS 3031), David Ogden, Assistant Attorney General on 1/4/10 (BS 3040), Larry Thompson, Deputy Attorney General on 3/7/02 (BS 3040), Attorneys and Authors Sidney Powell and Gene Neill (BS 3040), OLMSTEAD (BS 3040), Conduct unbecoming a member of the court's bar and contrary to professional standards. (BS 3027)

### WHO VIOLATED THE LAW, STATUTE, AND/OR RULE

AUSA SEGAL, HEMESATH, KHASIGIAN, SKIPPER, U.S. ATTORNEY TALBERT

### UNLAWFUL CONDUCT

Falsely represented to the COURT OF APPEALS:
   "Zinnel omitted a personal bank account Zinnel held at Washington Mutual."

This representation to the COURT OF APPEALS by AUSA SEGAL, HEMESATH, KHASIGIAN, SKIPPER, U.S. ATTORNEY TALBERT is a bald-faced lie.

### WHEN/WHERE

2/23/17 COURT OF APPEALS filing in APPEAL, Answering Brief of the United States, DktEntry: 69 (BS 6801), Pg. 44 (BS 6816)

### WHY CRIME/VIOLATION OF STATUTE, RULE, AND/OR LAW

Zinnel was not charged with concealing his personal Washington Mutual Checking account. Zinnel made a mistake on two digits of the account number of his one and only checking account number, but the balance of $250 is correct.

The government confirms in its Answering Brief filed in the APPEAL that Zinnel was not given notice that he was going to have to defend at trial an alleged concealment of his ONLY Washington Mutual personal checking account which Zinnel knew he disclosed on Schedule B of his bankruptcy schedules. SER 189 (BS 6817).

CLAIM # 4 (cont.)

The government wrote in its appellate Answering Brief filed in the APPEAL:

> "Zinnel is correct that the Washington Mutual Personal Bank Account
> was not specifically listed in the indictment as an item of
> the bankruptcy estate." GB 77 (BS 6818)

Likewise, in the government's Trial Brief filed a mere three weeks before
trial, the Washington Mutual personal checking account is not mentioned
anywhere. ER 233-236 (BS 6819-6822).

Zinnel's only Washington Mutual personal checking account was disclosed
on his bankruptcy schedules with the correct ending balance and the
prosecutor knew Zinnel made a minor typo with the account numbers and
did not willfully conceal the account. In agravation, not only was
Zinnel not charged with concealing his Washington Mutual personal
checking account resulting in surprise at trial, but the government
lawyers knew full well that Zinnel simply made a minor typo in two
digits of the account number.

On Schedule B of his bankruptcy schedules, Zinnel listed his only
Washington Mutual personal checking account with the account number
ending in "9842." SER 189 (BS 6817). Further, Zinnel listed the
current market value of $250 rounded to an even number. SER 189 (BS 6817).
It is true that in discovery, the government provided Zinnel with several
years of his Washington Mutual personal bank statements that Zinnel had
previously given bankruptcy trustee Steven Reynolds in 2005. (BS 6823).
government also produced the Washington Mutual personal Master Account
Agreement that became government Exhibit 30. SER 47 (BS 6824).
However, the government produced tens of thousands of pages of irrelevant
documents in this case during discovery. The appellate record reveals
the government produced at least 40,180 pages of documents in discovery.
SER 2 (BS 6825).

As the indictment and the government's trial brief made no mention of
Zinnel's personal Washington Mutual checking account, let alone any
allegation of criminal concealment of his only Washington Mutual personal
checking account, Zinnel was not provided with fair notice that he had
to defend at trial on this matter. Therefore, Zinnel was completely
surprised at trial and sand bagged by the government lawyers, when
appellate counsel AUSA Hemesath led off with an alleged concealment
of Zinnel's Washington Mutual checking account at the start of her direct
examination of bankrutpcy trustee Stephen Reynolds. SER 549 & 550
(BS 6826 & 6827). This is one of the significant reasons Zinnel objected
to the government's proposed jury instructions becasue of the Washington
Mutual account. ER 976.

Therefore, both of appellate counsel AUSA Segal and Hemesath hammered
hard at closing that Zinnel should be convicted based on the Washington
Mutual personal checking account, thus striking foul blows.

In their closing arguments at trial, both appellate counsel Segal and
Hemesath utilized the persuasiveness of "primacy" on Count 2 as
appellate counsel AUSA Hemesath led off with "Zinnel's personal account.
This is Exhibit 30." ER 1333, ER 1053. In Zinnel's closing argument

BS 5816

Zinnel's trial attorney did inform the jury and the judge of the mistake
in the Washington Mutual account number on Zinnel's bankruptcy schedules
by stating: "[Concerning] the WAMU [checking account]. Ms. Hemesath is right.
It's a different account [number]. Is it possible that he made a mistake
in the account [number]?" Certainly. If he's going to hide WAMU, why put
WAMU on the form at all? But she's right. That [checking account] doesn't
match that account number. Is it possible that was a mistake? ER 1081:23-
1092:4"

Utilizing the same playbook as his co-counsel, when it was appellate counsel
AUSA Matthew Segal's turn to lead the team, he began with what he haracter-
ized the "center piece of this case." "The [WAMU] checking account...Zinnel's
personal account is not disclosed." ER 1116. Then trial/appellate counsel
AUSA Matthew Segal chastised Zinnel's attorney when he knew the real truth:
Zinnel had listed his one and only WAMU personal account on his bankruptcy
schedules. AUSA Matthew Segal tells the jury "and the big defense here is,
well, he put one account at Washington Mutual down on his schedule...that's
silly." ER 1116:25-1117:4.

However, the truth is Zinnel somehow made a typo OR mistake and got two
numbers off in the account number on his bankruptcy schedules and neither
the bankrutpcy trustee or Zinnel discovered it in eight (8) years.
However, after the indictment and trial brief were filed, government
trial/appellate lawyers discovered it and decided to cheat and win at all
costs and use the low hanging fruit as the "center-piece" of their case
against Zinnel and inflame the jury and judge at the same time.

Zinnel's Washington Mutual bank statement, for his one and only WAMU
account, for the period ending 6/13/05 was the bank statment Zinnel used
to fill out his bankruptcy Schedule B. Compare BS 6823 to BS 6817 (SER 189).
The government bates number on the WAMU bank statement ending 6/13/05 is
"ZBK 002318." Thus, the government had the relevant bank statement in its
possesion prior to trial. The account number of 0490-00004975442 on
bates number ZBK 002318 is identical to government Exhibit 30. Compare
BS 6823 to BS 6824 (SER 47).

The account balance of $256.71 on the 6/13/05 statement is a .$6.41
difference from Zinnel's bankruptcy schedules due to rounding. Compare
BS 6823 to BS 6817 (SER 189). In continued underhandedness, government
appellate counsel never solicited testimony of the value of the WAMU
personal checking account nor did they move to admit the 6/13/05 bank
statement they produced early on in discovery as bates number ZBK 002318.
The government lawyers wanted to win at all costs by striking foul blows
and have the jury and the judge think an extremely valuable uncharged asset
was concealed by Zinnel. It would have hurt the government's case because
the amount is a non-material $256.41.

The last four digits of the personal WAMU checking account number on Zinnel's
bankruptcy schedules is "9842." SER 189 (BS 6817), Item #2. The last
four digits of Zinnel's one and only actual personal WAMU checking account
is "5442" as evidenced by government Exhibit 30.SER 47 (BS 6824). Thus,
Zinnel got the last two digits of "42" correct, but somehow put "98"
instead of "54." To this day, Zinnel has no idea how that happened, but
neither Zinnel nor the bankruptcy trustee discovered the typo and it lay
dormant until the government capitalized on it at trial.          BS 5817

CLAIM # 4 (cont.)

Nevertheless, contrary to Justice Sutherland's eloquent words over eighty years ago regarding prosecutors not striking foul blows and his duty to refrain from improper methods, in his zeal to win at all costs, appellate counsel AUSA Matthew Segal used the WAMU account typographical error, that went unnoticed for eight years, to convict Zinnel on bankruptcy fraud concealment and then use the alleged concealment of a $256.41 asset to persuade the new district court judge that the loss enhancement value in this case was the disputed "amount scheduled for dicharge" amount of $3.6 million and there were eleven victims resulting in twenty (20) Offense Levels of enhacements which added 188 months, 15.66 years, of prison time in this case. (difference between O.L. 16 with a mid-range of 24 months and O.L. 36 with a mid-range of 212 monhts in prison.) (BS 6904).

Zinnel has never had a personal WAMU checking account ending in "9842." In discovery, the government produced bank account records for many different bank accounts comprising of thousands of pages of discovery. However, the government DID NOT provide a single bank record for a bank account ending in "9842."

Zinnel requests that the Ninth Circuit and State Bar of California issue an Order to Show Cause to government appellate counsel AUSA Hemesath, AUSA Matthew Segal, and U.S. Attorney for the Eastern District of California Phillip Talbert ordering them to file with the court forthwith any bank records that show Zinnel has ever had a Washingtone Mutual personal checking account ending in "9842."

CLAIM # 5

## DESCRIPTION

Engaging in conduct involving dishonesty, fraud, deceit, and misrepresentation. Making false representations to a federal court, by certifying a fact known to be false, designed to mislead and prejudice the honor and reputation of a party. Fraud on the court. Failure to make a proper inquiry into relevant facts before putting government attorneys' names on, or signing, pleadings, papers, motions, oppositions, or replies filed with the court. Government attorneys making factual contentions in court filings that did not have evidentiary support. Abuse of the legal system. Government lawyers doing everything they could to win at all costs. Conduct unbecoming a member of the court's bar. Conduct contrary to professional standards.

## CRIME, STATUTE, RULE AND/OR LAW VIOLATED

18 U.S.C. §1001 (BS 2001-2002), 18 U.S.C. §1018 (BS 2003), 18 U.S.C. §371 (BS 2010-2012), 14th Amendment (BS 2020),18 U.S.C.§242 (BS 2030), 18 U.S.C. §241 (BS 2040), 18 U.S.C. §2 (2050), 28 U.S.C. §530(B)(a)(BS 3002), U.S.D.C. ED CA Local Rule 180(e) (BS 3002), B&P §6068 (d), (f), (g) (BS 3003-3004) B&P §6067 (BS 3003), B&P §6128(a) (BS 3003), ABA Model Rules 3.3(a), 4.1(a), 8.4(c) (BS 3005), BAR RULES 5-200(B) & (E) (BS 3007), Rule 11(b)(3) (BS 3008-3010), SNYDER (BS 3013), BERGER (BS 3014, 3011, 3012), AUSHERMAN (BS 3016-3020), GLASS (BS 3021-3023), KOJAYAN (BS 3024-3026), KATTAR (BS 3011), GIRARDI (BS 3027), BOWEN (BS 3028-3029), SCHWARE (BS 3030), PUMPHREY, TOSCANO, Robert Jackson. U.S. Attorney General in 1940 (BS 3015), Judge Nunley on 3/4/14 during Zinnel's sentencing (BS 3031), David Ogden, Assistant Attorney General on 1/4/10 (BS 3040), Larry Thompson, Deputy Attorney General on 3/7/02 (BS 3040), Attorneys and Authors Sidney Powell and Gene Neill (BS 3040), OLMSTEAD (BS 3040), Conduct unbecoming a member of the court's bar and contrary to professional standards. (BS 3027)

## WHO VIOLATED THE LAW, STATUTE, AND/OR RULE

AUSA SEGAL, HEMESATH, KHASIGIAN, SKIPPER, U.S. ATTORNEY TALBERT

## UNLAWFUL CONDUCT

Falsely represented to the COURT OF APPEALS:
    "Per the terms of the Business Formation Agreement, Zinnel was paid $3,333 per month for these services."

This representation to the COURT OF APPEALS by AUSA SEGAL, HEMESATH, KHASIGIAN, SKIPPER, U.S. ATTORNEY TALBERT is a bald-faced lie.

## WHEN/WHERE

2/23/17 COURT OF APPEALS filing in APPEAL, Answering Brief of the United States, DktEntry: 69 (BS 6801), Pg. 41 (BS 6828)

## WHY CRIME/VIOLATION OF STATUTE, RULE, AND/OR LAW

Not a term of the Business Formation Agreement. Not a single reference to compensation to Zinnel contained in the Business Formation Agreement. SER 53-56, GEX 105, (BS 6829-6832).

<u>CLAIM #</u> 6

<u>DESCRIPTION</u>

Engaging in conduct involving dishonesty, fraud, deceit, and misrepresentation. Making false representations to a federal court, by certifying a fact known to be false, designed to mislead and prejudice the honor and reputation of a party. Fraud on the court. Failure to make a proper inquiry into relevant facts before putting government attorneys' names on, or signing, pleadings, papers, motions, oppositions, or replies filed with the court. Government attorneys making factual contentions in court filings that did not have evidentiary support. Abuse of the legal system. Government lawyers doing everything they could to win at all costs. Conduct unbecoming a member of the court's bar. Conduct contrary to professional standards.

<u>CRIME, STATUTE, RULE AND/OR LAW VIOLATED</u>

18 U.S.C. §1001 (BS 2001-2002), 18 U.S.C. §1018 (BS 2003), 18 U.S.C. §371 (BS 2010-2012), 14th Amendment (BS 2020),18 U.S.C.§242 (BS 2030), 18 U.S.C. §241 (BS 2040), 18 U.S.C. §2 (2050), 28 U.S.C. §530(B)(a)(BS 3002), U.S.D.C. ED CA Local Rule 180(e) (BS 3002), B&P §6068 (d), (f), (g) (BS 3003-3004) B&P §6067 (BS 3003), B&P §6128(a) (BS 3003), ABA Model Rules 3.3(a), 4.1(a), 8.4(c) (BS 3005), BAR RULES 5-200(B) & (E) (BS 3007), Rule 11(b)(3) (BS 3008-3010), SNYDER (BS 3013), BERGER (BS 3014, 3011, 3012), AUSHERMAN (BS 3016-3020), GLASS (BS 3021-3023), KOJAYAN (BS 3024-3026), KATTAR (BS 3011), GIRARDI (BS 3027), BOWEN (BS 3028-3029), SCHWARE (BS 3030), PUMPHREY, TOSCANO, Robert Jackson. U.S. Attorney General in 1940 (BS 3015), Judge Nunley on 3/4/14 during Zinnel's sentencing (BS 3031), David Ogden, Assistant Attorney General on 1/4/10 (BS 3040), Larry Thompson, Deputy Attorney General on 3/7/02 (BS 3040), Attorneys and Authors Sidney Powell and Gene Neill (BS 3040), OLMSTEAD (BS 3040),Conduct unbecoming a member of the court's bar and contrary to professional standards. (BS 3027)

<u>WHO VIOLATED THE LAW, STATUTE, AND/OR RULE</u>

AUSA SEGAL, HEMESATH, KHASIGIAN, SKIPPER, U.S. ATTORNEY TALBERT

<u>UNLAWFUL CONDUCT</u>

Falsely represented to the COURT OF APPEAL:
    "Zinnel created 4 Results to hide his ownership of Luyung Drive."
    [No cite to the record. No cite possible because not true]

This representation to the COURT OF APPEALS by AUSA SEGAL, HEMESATH, KHASIGIAN, SKIPPER, U.S. ATTORNEY TALBERT is a bald-faced-lie.

<u>WHEN/WHERE</u>

2/23/17 COURT OF APPEALS filing in APPEAL, Answering Brief of the United States, DktEntry: 69 (BS 6801), Pg. 32 (BS 6833)

<u>WHY CRIME/VIOLATION OF STATUTE, RULE, AND/OR LAW</u>

4 Results was actually created as a "telecommunications business" and "training and personnel." SER 753-754 (BS 6834-6835) SER 10&13 (BS 6836-6837). Michael Gravely, not Zinnel, created 4 Results. SER 10 & 13, (BS 6836-6837).

CLAIM # 7

## DESCRIPTION

Engaging in conduct involving dishonesty, fraud, deceit, and misrepresentation. Making false representations to a federal court, by certifying a fact known to be false, designed to mislead and prejudice the honor and reputation of a party. Fraud on the court. Failure to make a proper inquiry into relevant facts before putting government attorneys' names on, or signing, pleadings, papers, motions, oppositions, or replies filed with the court. Government attorneys making factual contentions in court filings that did not have evidentiary support. Abuse of the legal system. Government lawyers doing everything they could to win at all costs. Conduct unbecoming a member of the court's bar. Conduct contrary to professional standards.

## CRIME, STATUTE, RULE AND/OR LAW VIOLATED

18 U.S.C. §1001 (BS 2001-2002), 18 U.S.C. §1018 (BS 2003), 18 U.S.C. §371 (BS 2010-2012), 14th Amendment (BS 2020),18 U.S.C.§242 (BS 2030), 18 U.S.C. §241 (BS 2040), 18 U.S.C. §2 (2050), 28 U.S.C. §530(B)(a)(BS 3002), U.S.D.C. ED CA Local Rule 180(e) (BS 3002), B&P §6068 (d), (f), (g) (BS 3003-3004) B&P §6067 (BS 3003), B&P §6128(a) (BS 3003), ABA Model Rules 3.3(a), 4.1(a), 8.4(c) (BS 3005), BAR RULES 5-200(B) & (E) (BS 3007), Rule 11(b)(3) (BS 3008-3010), SNYDER (BS 3013), BERGER (BS 3014, 3011, 3012), AUSHERMAN (BS 3016-3020), GLASS (BS 3021-3023), KOJAYAN (BS 3024-3026), KATTAR (BS 3011), GIRARDI (BS 3027), BOWEN (BS 3028-3029), SCHWARE (BS 3030), PUMPHREY, TOSCANO, Robert Jackson. U.S. Attorney General in 1940 (BS 3015), Judge Nunley on 3/4/14 during Zinnel's sentencing (BS 3031), David Ogden, Assistant Attorney General on 1/4/10 (BS 3040), Larry Thompson, Deputy Attorney General on 3/7/02 (BS 3040), Attorneys and Authors Sidney Powell and Gene Neill (BS 3040), OLMSTEAD (BS 3040), Conduct unbecoming a member of the court's bar and contrary to professional standards. (BS 3027)

## WHO VIOLATED THE LAW, STATUTE, AND/OR RULE

AUSA SEGAL, HEMESATH, KHASIGIAN, SKIPPER, U.S. ATTORNEY TALBERT

## UNLAWFUL CONDUCT

Falsely represented to the COURT OF APPEAL:
"Another concealed asset, Done Deal"

This representation to the COURT OF APPEALS by AUSA SEGAL, HEMESATH, KHASIGIAN, SKIPPER, U.S. ATTORNEY TALBERT is a bald-faced lie.

## WHEN/WHERE

2/23/17 COURT OF APPEALS filing in APPEAL, Answering Brief of the United States, DktEntry: 69 (BS 6801), Pg. 35 (BS 6803)

## WHY CRIME/VIOLATION OF STATUTE, RULE, AND/OR LAW

Zinnel not charged with concealing Done Deal and there was no evidence that Zinnel ever owned any part of Done Deal. In fact there was evidence at trial that "[Zinnel] had no ownership interest in Done Deal...and was only an employee of Done Deal." ER 1461 (BS 6838). Further, there was trial evidence that Derian Eidson was "the sole shareholder of Done Deal." ER 1462 (BS 6839).

The indictment did not charge Zinnel with concealing Done Deal in his bankruptcy. ER 179-201 (BS 6044-6048).

In fact, during the 64 months after the indictment that Zinnel's bankruptcy remained re-opened, the bankruptcy trusteee never made a claim that Done Deal was part of Zinnel's bankruptcy estate.

BS 5830

**CLAIM #** 8

## DESCRIPTION

Engaging in conduct involving dishonesty, fraud, deceit, and misrepresentation. Making false representations to a federal court, by certifying a fact known to be false, designed to mislead and prejudice the honor and reputation of a party. Fraud on the court. Failure to make a proper inquiry into relevant facts before putting government attorneys' names on, or signing, pleadings, papers, motions, oppositions, or replies filed with the court. Government attorneys making factual contentions in court filings that did not have evidentiary support. Abuse of the legal system. Government lawyers doing everything they could to win at all costs. Conduct unbecoming a member of the court's bar. Conduct contrary to professional standards.

## CRIME, STATUTE, RULE AND/OR LAW VIOLATED

18 U.S.C. §1001 (BS 2001-2002), 18 U.S.C. §1018 (BS 2003), 18 U.S.C. §371 (BS 2010-2012), 14th Amendment (BS 2020), 18 U.S.C.§242 (BS 2030), 18 U.S.C. §241 (BS 2040), 18 U.S.C. §2 (2050), 28 U.S.C. §530(B)(a)(BS 3002), U.S.D.C. ED CA Local Rule 180(e) (BS 3002), B&P §6068 (d), (f), (g) (BS 3003-3004) B&P §6067 (BS 3003), B&P §6128(a) (BS 3003), ABA Model Rules 3.3(a), 4.1(a), 8.4(c) (BS 3005), BAR RULES 5-200(B) & (E) (BS 3007), Rule 11(b)(3) (BS 3008-3010), SNYDER (BS 3013), BERGER (BS 3014, 3011, 3012), AUSHERMAN (BS 3016-3020), GLASS (BS 3021-3023), KOJAYAN (BS 3024-3026), KATTAR (BS 3011), GIRARDI (BS 3027), BOWEN (BS 3028-3029), SCHWARE (BS 3030), PUMPHREY, TOSCANO, Robert Jackson. U.S. Attorney General in 1940 (BS 3015), Judge Nunley on 3/4/14 during Zinnel's sentencing (BS 3031), David Ogden, Assistant Attorney General on 1/4/10 (BS 3040), Larry Thompson, Deputy Attorney General on 3/7/02 (BS 3040), Attorneys and Authors Sidney Powell and Gene Neill (BS 3040), OLMSTEAD (BS 3040), Conduct unbecoming a member of the court's bar and contrary to professional standards. (BS 3027)

## WHO VIOLATED THE LAW, STATUTE, AND/OR RULE

AUSA SEGAL, HEMESATH, KHASIGIAN, SKIPPER, U.S. ATTORNEY TALBERT

## UNLAWFUL CONDUCT

Falsely represented to the COURT OF APPEAL:
  "The paid undertaking meant that Zinnel could continue with an appeal in his child support litigation."

This representation to the COURT OF APPEALS by AUSA SEGAL, HEMESATH, KHASIGIAN, SKIPPER, U.S. ATTORNEY TALBET is a bald-faced lie.

## WHEN/WHERE

2/23/17 COURT OF APPEALS filing in APPEAL, Answering Brief of the United States, DktEntry: 69 (BS 6801), Pg. 52 ·(BS 6840)

## WHY CRIME/VIOLATION OF STATUTE, RULE, AND/OR LAW

Government cite to trial testimony concerns a time period of "May 2008" and the government exhibit referenced was filed in state court in Zinnel's family law case on June 26, 2008. However, the family law appeal referenced was decided by the Court of Appeal four (4) months earlier on February 28, 2008. GEX 20 (BS 6841). No undertaking was required to prosecute Zinnel's family law appeal. (BS 6844). An undertaking is required to stay enforcement of a money judgment during the pendency of an appeal as the witness testified. (BS 6842)(BS 6844). Thus, Zinnel's lawyer confirmed the undertaking had nothing to do with whether Zinnel could prosecute the appeal. The child support witness also testified that no court had ordred or found that Mr. Zinnel had failed to pay child support. (BS 6843).

BS 5835

**CLAIM #** 9

## DESCRIPTION

Engaging in conduct involving dishonesty, fraud, deceit, and misrepresentation. Making false representations to a federal court, by certifying a fact known to be false, designed to mislead and prejudice the honor and reputation of a party. Fraud on the court. Failure to make a proper inquiry into relevant facts before putting government attorneys' names on, or signing, pleadings, papers, motions, oppositions, or replies filed with the court. Government attorneys making factual contentions in court filings that did not have evidentiary support. Abuse of the legal system. Government lawyers doing everything they could to win at all costs. Conduct unbecoming a member of the court's bar. Conduct contrary to professional standards.

## CRIME, STATUTE, RULE AND/OR LAW VIOLATED

18 U.S.C. §1001 (BS 2001-2002), 18 U.S.C. §1018 (BS 2003), 18 U.S.C. §371 (BS 2010-2012), 14th Amendment (BS 2020), 18 U.S.C. §242 (BS 2030), 18 U.S.C. §241 (BS 2040), 18 U.S.C. §2 (2050), 28 U.S.C. §530(B)(a)(BS 3002), U.S.D.C. ED CA Local Rule 180(e) (BS 3002), B&P §6068 (d), (f), (g) (BS 3003-3004) B&P §6067 (BS 3003), B&P §6128(a) (BS 3003), ABA Model Rules 3.3(a), 4.1(a), 8.4(c) (BS 3005), BAR RULES 5-200(B) & (E) (BS 3007), Rule 11(b)(3) (BS 3008-3010), SNYDER (BS 3013), BERGER (BS 3014, 3011, 3012), AUSHERMAN (BS 3016-3020), GLASS (BS 3021-3023), KOJAYAN (BS 3024-3026), KATTAR (BS 3011), GIRARDI (BS 3027), BOWEN (BS 3028-3029), SCHWARE (BS 3030), PUMPHREY, TOSCANO, Robert Jackson. U.S. Attorney General in 1940 (BS 3015), Judge Nunley on 3/4/14 during Zinnel's sentencing (BS 3031), David Ogden, Assistant Attorney General on 1/4/10 (BS 3040), Larry Thompson, Deputy Attorney General on 3/7/02 (BS 3040), Attorneys and Authors Sidney Powell and Gene Neill (BS 3040), OLMSTEAD (BS 3040), Conduct unbecoming a member of the court's bar and contrary to professional standards. (BS 3027)

## WHO VIOLATED THE LAW, STATUTE, AND/OR RULE

AUSA SEGAL, HEMESATH, KHASIGIAN, SKIPPER, U.S. ATTORNEY TALBERT

## UNLAWFUL CONDUCT

Falsely represented to the COURT OF APPEAL:
    "The defendants' motion for a bill of particulars was filed over a year too late and before the wrong judge."

This representation to the COURT OF APPEALS by AUSA SEGAL, HEMESATH, KHASIGIAN, SKIPPER, U.S. ATTORNEY TALBERT is a bald-faced lie.

## WHEN/WHERE

2/23/17 COURT OF APPEALS filing in APPEAL, Answering Brief of the United States, DktEntry: 69 (BS 6801), Pg. 89 (BS 6845)

## WHY CRIME/VIOLATION OF STATUTE, RULE, AND/OR LAW

The superseding indictment in this case was unsealed on December 8, 2011. (BS 6044, 6846) ER 1638. The same day, the court set all pre-trial motions in this case, including a motion for a Bill of Particulars, to be heard on March 15, 2012 before the presiding district court judge and not a magistrate judge. ER 1638 (BS 6846). On January 24, 2012, the district court continued the pre-trial motions hearing to March 29, 2012 and ordered all pre-trial motions filed by February 10, 2012. ER 1639 (BS 6847).

CLAIM # 9 (cont.)
Both defendants complied with the court's pre-trial motions order and both Zinnel and Eidson filed all their pre-trial motions on February 10, 2012. ER 1639-1640. To allow them to prepare for trial and to prevent surprise at trial, Zinnel and Eidson filed a motion for a Bill of Particulars to compel identification of the precise property interest alleged in Counts 1 and 2. ER 205, (BS 6849), CR 83 & 77 ER 1639 & 1640 (BS 6847 & 6848). Zinnel also joined Eidson's Motion for a Bill of Particulars CR 90, ER 1640 (BS 6848).

As the government's trial court opposition correctly states, "Fed. R. Criminal P. 7(f) requires that absent 'good cause,' bill of particular motions SHOULD be filed within 14 days of arraignment." ER 209 (BS 6850). In the same opposition, AUSA SEGAL & HEMESATH correctly wrote below: "Zinnel was arraigned on December 15, 2011 and Eidson on January 11, 2012." ER 210 (BS 6851). The court docket reflects this as well. CR 71 & 74 ER 1639 (BS 6847). Both defendants filed their motions for a bill of particulars on February 10, 2012 as directed by the COURT. CR 83 & 77 ER 1639 & 1640 (BS 6847 & 6848).

Therefore, contrary to the government lawyers' blatant misrepresentations to this court, less than TWO months elapsed from the filing of the indictment and the date the motions for a bill of particulars were filed; "NOT over a year." BS 6845. Further, defendants had good cause to set the hearing before the district court judge instead of a magistrate judge and to file their motions on February 10, 2012, because the government attorneys stipulated to it and a district court judge ordered it. ER 1638 & 1639, CR 65, 75, & 76.

In ruling on both defendants' motion for a bill of particulars at the court-ordered hearing, evidently based on the first paragraph of the government's opposition writing "presented to a magistrate" ER 209 (BS 6850), the district court judge mistakenly stated in ruling:

> "This has already been RESOLVED previoulsy by the magistrate judge. I don't see that there's any reason to go into that again. There's been no justification cited by the defendant. Motion denied." ER 13 (BS 6853)

Rather than seeking justice and correcting the judge, both AUSA Segal and Hemesath remained silent knowing full well that they did not have to then "strictly adhere to answers filed in response," and they would have "no strict limits to proof within the area of the bill." ER 211 (BS 6852).

Therefore, below, there was never any ruling on either of defendants' motion for a bill of particulars on timeliness or the merits. ER 1633-1673 (BS 6846-6848).

CLAIM # 10

## DESCRIPTION

Engaging in conduct involving dishonesty, fraud, deceit, and misrepresentation. Making false representations to a federal court, by certifying a fact known to be false, designed to mislead and prejudice the honor and reputation of a party. Fraud on the court. Failure to make a proper inquiry into relevant facts before putting government attorneys' names on, or signing, pleadings, papers, motions, oppositions, or replies filed with the court. Government attorneys making factual contentions in court filings that did not have evidentiary support. Abuse of the legal system. Government lawyers doing everything they could to win at all costs. Conduct unbecoming a member of the court's bar. Conduct contrary to professional standards.

## CRIME, STATUTE, RULE AND/OR LAW VIOLATED

18 U.S.C. §1001 (BS 2001-2002), 18 U.S.C. §1018 (BS 2003), 18 U.S.C. §371 (BS 2010-2012), 14th Amendment (BS 2020), 18 U.S.C.§242 (BS 2030), 18 U.S.C. §241 (BS 2040), 18 U.S.C. §2 (2050), 28 U.S.C. §530(B)(a)(BS 3002), U.S.D.C. ED CA Local Rule 180(e) (BS 3002), B&P §6068 (d), (f), (g) (BS 3003-3004) B&P §6067 (BS 3003), B&P §6128(a) (BS 3003), ABA Model Rules 3.3(a), 4.1(a), 8.4(c) (BS 3005), BAR RULES 5-200(B) & (E) (BS 3007), Rule 11(b)(3) (BS 3008-3010), SNYDER (BS 3013), BERGER (BS 3014, 3011, 3012), AUSHERMAN (BS 3016-3020), GLASS (BS 3021-3023), KOJAYAN (BS 3024-3026), KATTAR (BS 3011), GIRARDI (BS 3027), BOWEN (BS 3028-3029), SCHWARE (BS 3030), PUMPHREY, TOSCANO, Robert Jackson. U.S. Attorney General in 1940 (BS 3015), Judge Nunley on 3/4/14 during Zinnel's sentencing (BS 3031), David Ogden, Assistant Attorney General on 1/4/10 (BS 3040), Larry Thompson, Deputy Attorney General on 3/7/02 (BS 3040), Attorneys and Authors Sidney Powell and Gene Neill (BS 3040), OLMSTEAD (BS 3040), Conduct unbecoming a member of the court's bar and contrary to professional standards. (BS 3027)

## WHO VIOLATED THE LAW, STATUTE, AND/OR RULE

AUSA SEGAL, HEMESATH, KHASIGIAN, SKIPPER, U.S. ATTORNEY TALBERT

## UNLAWFUL CONDUCT

Falsely represented to the COURT OF APPEALS:
"The district court considered ALL of the 3553(a) factors in sentencing Zinnel."

This representation to the COURT OF APPEALS by AUSA SEGAL, HEMESATH, KHASIGIAN, SKIPPER, U.S. TALBERT is a bald-faced lie.

## WHEN/WHERE

2/23/17 COURT OF APPEALS filing in APPEAL, Answering Brief of the United States, DktEntry: 69 (BS 6801), Pg. 171 (BS 6854)

## WHY CRIME/VIOLATION OF STATUTE, RULE, AND/OR LAW

The COURT at best considered two out of seven required 3553(a) factors and utterly failed to consider the 800 pound gorilla in this case which is 3553(a)(6) avoiding unwarranted disparity. The government's own brief contradicts the violating lawyers' heading as it only lists two factors: 18 U.S.C. 3553(a)(1) & (2). (BS 6855). However, there are seven 3553(a) factors that Congress mandates that the COURT shall consider at sentencing. Thus, by the violating lawyers' own admissions, the COURT failed to consider five out of the seven including the big one in this case 18 U.S.C. 3553(a)(6) avoiding unwarranted disparity. The government's Table of Authorities also only lists two of the seven 3553(a) factors. (BS 6856 & 6857)

BS 5845

CLAIM # 10 (cont.)

In another part of the brief, the government lawyers again contradict themselves and concede the COURT did not consider disparity. (BS 6858). In fact, the violating lawyers admit, if only by omission, that the COURT did not consider 3553(a)(3) through 3553(a)(7) which includes the 800 pound gorilla in this case 3553(a)(6) avoiding unwarranted disparity.

<u>CLAIM #</u> 11

<u>DESCRIPTION</u>

Engaging in conduct involving dishonesty, fraud, deceit, and misrepresentation. Making false representations to a federal court, by certifying a fact known to be false, designed to mislead and prejudice the honor and reputation of a party. Fraud on the court. Failure to make a proper inquiry into relevant facts before putting government attorneys' names on, or signing, pleadings, papers, motions, oppositions, or replies filed with the court. Government attorneys making factual contentions in court filings that did not have evidentiary support. Abuse of the legal system. Government lawyers doing everything they could to win at all costs. Conduct unbecoming a member of the court's bar. Conduct contrary to professional standards.

<u>CRIME, STATUTE, RULE AND/OR LAW VIOLATED</u>

18 U.S.C. §1001 (BS 2001-2002), 18 U.S.C. §1018 (BS 2003), 18 U.S.C. §371 (BS 2010-2012), 14th Amendment (BS 2020), 18 U.S.C.§242 (BS 2030), 18 U.S.C. §241 (BS 2040), 18 U.S.C. §2 (2050), 28 U.S.C. §530(B)(a)(BS 3002), U.S.D.C. ED CA Local Rule 180(e) (BS 3002), B&P §6068 (d), (f), (g) (BS 3003-3004) B&P §6067 (BS 3003), B&P §6128(a) (BS 3003), ABA Model Rules 3.3(a), 4.1(a), 8.4(c) (BS 3005), BAR RULES 5-200(B) & (E) (BS 3007), Rule 11(b)(3) (BS 3008-3010), SNYDER (BS 3013), BERGER (BS 3014, 3011, 3012), AUSHERMAN (BS 3016-3020), GLASS (BS 3021-3023), KOJAYAN (BS 3024-3026), KATTAR (BS 3011), GIRARDI (BS 3027), BOWEN (BS 3028-3029), SCHWARE (BS 3030), PUMPHREY, TOSCANO, Robert Jackson. U.S. Attorney General in 1940 (BS 3015), Judge Nunley on 3/4/14 during Zinnel's sentencing (BS 3031), David Ogden, Assistant Attorney General on 1/4/10 (BS 3040), Larry Thompson, Deputy Attorney General on 3/7/02 (BS 3040), Attorneys and Authors Sidney Powell and Gene Neill (BS 3040), OLMSTEAD (BS 3040), Conduct unbecoming a member of the court's bar and contrary to professional standards. (BS 3027)

<u>WHO VIOLATED THE LAW, STATUTE, AND/OR RULE</u>

AUSA SEGAL, HEMESATH, KHASIGIAN, SKIPPER, U.S. ATTORNEY TALBERT

<u>UNLAWFUL CONDUCT</u>

Falsely represented to the COURT OF APPEALS:
   "From 2001 through 2009, Zinnel received these payments from
   System 3."

This representation to the COURT OF APPEALS by AUSA SEGAL, HEMESATH, KHASIGIAN, SKIPPER, U.S. ATTORNEY TALBERT is a bald-faced lie.

<u>WHEN/WHERE</u>

2/23/17 COURT OF APPEALS filing in APPEAL, Answering Brief of the United States, DktEntry: 69 (BS 6801), Pg. 49 (BS 6859).

<u>WHY CRIME/VIOLATION OF STATUTE, RULE, AND/OR LAW</u>

The first alleged payment was at the very end of 2006 on 12/27/06 as the indictment alleges (BS 6048) and the payment was not to Zinnel. (BS 6861).

<u>CLAIM #</u> 12

<u>DESCRIPTION</u>

Engaging in conduct involving dishonesty, fraud, deceit, and misrepresentation. Making false representations to a federal court, by certifying a fact known to be false, designed to mislead and prejudice the honor and reputation of a party. Fraud on the court. Failure to make a proper inquiry into relevant facts before putting government attorneys' names on, or signing, pleadings, papers, motions, oppositions, or replies filed with the court. Government attorneys making factual contentions in court filings that did not have evidentiary support. Abuse of the legal system. Government lawyers doing everything they could to win at all costs. Conduct unbecoming a member of the court's bar. Conduct contrary to professional standards.

<u>CRIME, STATUTE, RULE AND/OR LAW VIOLATED</u>

18 U.S.C. §1001 (BS 2001-2002), 18 U.S.C. §1018 (BS 2003), 18 U.S.C. §371 (BS 2010-2012), 14th Amendment (BS 2020), 18 U.S.C. §242 (BS 2030), 18 U.S.C. §241 (BS 2040), 18 U.S.C. §2 (2050), 28 U.S.C. §530(B)(a)(BS 3002), U.S.D.C. ED CA Local Rule 180(e) (BS 3002), B&P §6068 (d), (f), (g) (BS 3003-3004) B&P §6067 (BS 3003), B&P §6128(a) (BS 3003), ABA Model Rules 3.3(a), 4.1(a), 8.4(c) (BS 3005), BAR RULES 5-200(B) & (E) (BS 3007), Rule 11(b)(3) (BS 3008-3010), SNYDER (BS 3013), BERGER (BS 3014, 3011, 3012), AUSHERMAN (BS 3016-3020), GLASS (BS 3021-3023), KOJAYAN (BS 3024-3026), KATTAR (BS 3011), GIRARDI (BS 3027), BOWEN (BS 3028-3029), SCHWARE (BS 3030), PUMPHREY, TOSCANO, Robert Jackson. U.S. Attorney General in 1940 (BS 3015), Judge Nunley on 3/4/14 during Zinnel's sentencing (BS 3031), David Ogden, Assistant Attorney General on 1/4/10 (BS 3040), Larry Thompson, Deputy Attorney General on 3/7/02 (BS 3040), Attorneys and Authors Sidney Powell and Gene Neill (BS 3040), OLMSTEAD (BS 3040), Conduct unbecoming a member of the court's bar and contrary to professional standards. (BS 3027)

<u>WHO VIOLATED THE LAW, STATUTE, AND/OR RULE</u>

AUSA SEGAL, HEMESATH, KHASIGIAN, SKIPPER, U.S. ATTORNEY TALBERT

<u>UNLAWFUL CONDUCT</u>

Falsely represented to the COURT OF APPEALS:
"Eidson appeared before the Grand Jury as custodian of records and produced a document purporting to be the assignment. The document was manufactured."

This representation to the COURT OF APPEALS by AUSA SEGAL, HEMESATH, KHASIGIAN, SKIPPER, U.S. ATTORNEY TALBERT is a bald-faced lie.

<u>WHEN/WHERE</u>

2/23/17 COURT OF APPEALS filing in APPEAL, Answering Brief of the United States, DktEntry: 69 (BS 6801), Pg. 62 (BS 6862)

<u>WHY CRIME/VIOLATION OF STATUTE, RULE, AND/OR LAW</u>

The assignment was created and entered into on July 13, 2004. (BS 6863). In response to the grand jury subpoena, Steven Zinnel was helping Derian Eidson assemble responsive documents. Zinnel had a digital copy of the assignment on his laptop computer. Zinnel and Eidson were both at Eidson's law office in Santa Ana, CA at Kinkle Rodiger and Spriggs and his laptop computer would not print to the law firm's computer so Zinnel transfered the digital copy of the assignment file to a USB thumb drive and printed from attorney Krista Dawkins computer at Kinkle Rodiger and Spriggs. (BS 6864 & 6865).

When government agents executed a search warrant at Zinnel's mom's house

<u>CLAIM #</u> 12 (cont.)

on 10/29/13, the government agents found the USB thumb drive with the digital copy of the assignment on it and seized the USB thumb drive. Thus, that is the source of the assignment file and not Zinnel's laptop computer. It is a lie that the assignment was created and signed in April or May 2009. In aggravation, Eidson wrongly received a two-level sentencing enhancement for Obstruction of Justice resulting in an additional two (2) more years in federal prison because she received a Guideline sentence of 121 months. (BS 6904, compare mid-range Guideline sentence for Offense Level 31 at 121 months to Offense Level 29 at 97 months which is a difference of 24 months)

**CLAIM #** 13

## DESCRIPTION

Engaging in conduct involving dishonesty, fraud, deceit, and misrepresentation. Making false representations to a federal court, by certifying a fact known to be false, designed to mislead and prejudice the honor and reputation of a party. Fraud on the court. Failure to make a proper inquiry into relevant facts before putting government attorneys' names on, or signing, pleadings, papers, motions, oppositions, or replies filed with the court. Government attorneys making factual contentions in court filings that did not have evidentiary support. Abuse of the legal system. Government lawyers doing everything they could to win at all costs. Conduct unbecoming a member of the court's bar. Conduct contrary to professional standards.

## CRIME, STATUTE, RULE AND/OR LAW VIOLATED

18 U.S.C. §1001 (BS 2001-2002), 18 U.S.C. §1018 (BS 2003), 18 U.S.C. §371 (BS 2010-2012), 14th Amendment (BS 2020), 18 U.S.C. §242 (BS 2030), 18 U.S.C. §241 (BS 2040), 18 U.S.C. §2 (2050), 28 U.S.C. §530(B)(a)(BS 3002), U.S.D.C. ED CA Local Rule 180(e) (BS 3002), B&P §6068 (d), (f), (g) (BS 3003-3004) B&P §6067 (BS 3003), B&P §6128(a) (BS 3003), ABA Model Rules 3.3(a), 4.1(a), 8.4(c) (BS 3005), BAR RULES 5-200(B) & (E) (BS 3007), Rule 11(b)(3) (BS 3008-3010), SNYDER (BS 3013), BERGER (BS 3014, 3011, 3012), AUSHERMAN (BS 3016-3020), GLASS (BS 3021-3023), KOJAYAN (BS 3024-3026), KATTAR (BS 3011), GIRARDI (BS 3027), BOWEN (BS 3028-3029), SCHWARE (BS 3030), PUMPHREY, TOSCANO, Robert Jackson. U.S. Attorney General in 1940 (BS 3015), Judge Nunley on 3/4/14 during Zinnel's sentencing (BS 3031), David Ogden, Assistant Attorney General on 1/4/10 (BS 3040), Larry Thompson, Deputy Attorney General on 3/7/02 (BS 3040), Attorneys and Authors Sidney Powell and Gene Neill (BS 3040), OLMSTEAD (BS 3040), Conduct unbecoming a member of the court's bar and contrary to professional standards. (BS 3027)

## WHO VIOLATED THE LAW, STATUTE, AND/OR RULE

AUSA SEGAL, HEMESATH, KHASIGIAN, SKIPPER, U.S. ATTORNEY TALBERT

## UNLAWFUL CONDUCT

Falsely represented to the COURT OF APPEALS:
"The fourth and final phase of the crime was an attempt to obtain a $4 million buyout of Zinnel's ownership interest in System 3. ZINNEL MADE THE INITIAL REQUEST FOR THE BUYOUT...threatened to retaliate if the $4 million was not paid under the terms ZINNEL demanded...EIDSON demand for the $4 million payout...ZINNEL instead approached his largest concealed asset and through EIDSON demanded a payout."

This representation to the COURT OF APPEALS by AUSA SEGAL, HEMESATH, KHASIGIAN, SKIPPER, U.S. ATTORNEY TALBERT is a bald-faced lie.

## WHEN/WHERE

2/23/17 COURT OF APPEALS filing in APPEAL, Answering Brief of the United States, DktEntry: 69 (BS 6801), Pgs. 54, 56, 101, & 109 (BS 6866-6869)

## WHY CRIME/VIOLATION OF STATUTE, RULE AND/OR LAW

Contrary to what the government lawyers represented to the COURT OF APPEALS, neither Zinnel or Eidson demanded a $4 million payout. The government's agents Tom Wilbert and attorney Frank Radoslovich, offered an amount to garner a mega sentencing enhancement, that ultimately resulted in Zinnel receiving an additional 15 years 8 months in prison. (BS 6904. compare Offense Level 36 mid-range at 212 months in prison & Offense Level 16 mid-range at 24 months.)

BS 5860

Neither Zinnel or Eidson accepted the $4,000,000 offered by any of
the government agents as a result of the government's sting operation.
The evidence should be undisputed that Wilbert approached Zinnel,
(BS 6870-6880), as an employee of Done Deal, Inc. which actually had
an ownership in System 3 as a result of an assignment. (Zinnel as an
employee of Done Deal (BS 6881-6884), (Derian Eidson as the sole
shareholder of Done Deal, Inc. (BS 6885), (Assignment of Interest in
System 3, Inc. to Done Deal (BS 6863, 6885, 6886, 6887, 6888). The
record on appeal is clear that Done Deal, not Zinnel, was the true owner
of a 46% ownership interest in System 3 as Zinnel had assigned any
interest in System 3 to Done Deal on July 13, 2004. (BS 6863, 6885,6886,
6887, 6888),

As AUSA Segal and hemesath did below, on appeal, all five government
lawyers (BS 6801) conveniently omit that the GOVERNMENT INVESTIGATORS
AND THEIR AGENTS WILBERT AND ATTORNEY RADOSLOVICH, not Zinnel or Eidson,
initiated the settlement discussions and buyout offer resulting in the
Zinnel/Wilbert settlement meeting on December 3, 2008 and the two attorney
to attorney settlement meetings in a law office conference room in :
February and March 2009.

Contrary to the government lawyers assertions (BS 6866--6869), Zinnel
did not approach Tom Wilbert (BS6870-6880), nor were the actual owners
of System 3 entitled to a payout on any specified date. Prior to the
$3,944,799 initial UNSOLICITED OR EXPECTED offer (BS 6870, 6875, 6876),
Wilbert became a "member of the U.S. DOJ Team" (BS 6889) and the consider-
ation for joining Team USA DOJ was not to be prosecuted for his crimes.
(BS 6889).

It was Tom Wilbert, as a government agent of Team USA DOJ, that came up
with the $3,944,799 mega sentencing enhancement figure. (BS 6875-6876).
The settlement offer was drafted by his co-agent attorney Frank Radoslovich
who was also part of Team USA DOJ (BS 6884),because Tom Wilbert wanted
to "terminate the relationship." (BS 6879, 6873, 6974).

The five government lawyers (BS 6801) also contradict themselves on the same
page of the government's Answering Brief:

    "In the summer of 2008, Tom Wilbert made the decision to buy the
    Zinnel brothers out." (BS 6866).

Further, Tom Wilbert's unsolicited offer WAS NOT in the "summer of 2008,"
but on May 12, 2008. (BS 6870).

**CLAIM #** 14

**DESCRIPTION**

Engaging in conduct involving dishonesty, fraud, deceit, and misrepresentation. Making false representations to a federal court, by certifying a fact known to be false, designed to mislead and prejudice the honor and reputation of a party. Fraud on the court. Failure to make a proper inquiry into relevant facts before putting government attorneys' names on, or signing, pleadings, papers, motions, oppositions, or replies filed with the court. Government attorneys making factual contentions in court filings that did not have evidentiary support. Abuse of the legal system. Government lawyers doing everything they could to win at all costs. Conduct unbecoming a member of the court's bar. Conduct contrary to professional standards.

**CRIME, STATUTE, RULE AND/OR LAW VIOLATED**

18 U.S.C. §1001 (BS 2001-2002), 18 U.S.C. §1018 (BS 2003), 18 U.S.C. §371 (BS 2010-2012), 14th Amendment (BS 2020), 18 U.S.C. §242 (BS 2030), 18 U.S.C. §241 (BS 2040), 18 U.S.C. §2 (2050), 28 U.S.C. §530(B)(a)(BS 3002), U.S.D.C. ED CA Local Rule 180(e) (BS 3002), B&P §6068 (d), (f), (g) (BS 3003-3004) B&P §6067 (BS 3003), B&P §6128(a) (BS 3003), ABA Model Rules 3.3(a), 4.1(a), 8.4(c) (BS 3005), BAR RULES 5-200(B) & (E) (BS 3007), Rule 11(b)(3) (BS 3008-3010), SNYDER (BS 3013), BERGER (BS 3014, 3011, 3012), AUSHERMAN (BS 3016-3020), GLASS (BS 3021-3023), KOJAYAN (BS 3024-3026), KATTAR (BS 3011), GIRARDI (BS 3027), BOWEN (BS 3028-3029), SCHWARE (BS 3030), PUMPHREY, TOSCANO, Robert Jackson. U.S. Attorney General in 1940 (BS 3015), Judge Nunley on 3/4/14 during Zinnel's sentencing (BS 3031), David Ogden, Assistant Attorney General on 1/4/10 (BS 3040), Larry Thompson, Deputy Attorney General on 3/7/02 (BS 3040), Attorneys and Authors Sidney Powell and Gene Neill (BS 3040), OLMSTEAD (BS 3040), Conduct unbecoming a member of the court's bar and contrary to professional standards. (BS 3027)

**WHO VIOLATED THE LAW, STATUTE, AND/OR RULE**

AUSA SEGAL, HEMESATH, KHASIGIAN, SKIPPER, U.S. ATTORNEY TALBERT

**UNLAWFUL CONDUCT**

Falsely represented to the COURT OF APPEALS:
   "Without support in the record, Zinnel points to the government's plea offer to claim that his post-trial sentence is unreasonable. ZAOB at 84."

This representation to the COURT OF APPEALS by AUSA SEGAL, HEMESATH, KHASIGIAN, SKIPPER, U.S. ATTORNEY TALBERT is a bald-faced lie.

**WHEN/WHERE**

2/23/17 COURT OF APPEALS filing in APPEAL, Answering Brief of the United States, DktEntry: 69 (BS 6801), Pg. 182 (BS 6890)

**WHY CRIME/VIOLATION OF STATUTE, RULE AND/OR LAW**

Contrary to what the government lawyers represented to the COURT OF APPEALS, Zinnel in fact cited the record in his Appellant Opening Brief where he informed the COURT during his sentencing hearing of the "two five-year plea offers." (BS 6891). In agravation, the cite to the record of "ER 1240-1242" was on page 83 of the ZAOB which is the page before the government's claim of page 84. Compare BS 6890 to BS 6891. In further agravation, during Zinnel's sentencing, he informed the COURT three (3) times of the government's two five-year plea offers, that the government lawyers stated in writing that Zinnel was guideline 26, and that he was receiving a trial tax for exercising his right to go to trial. (ER 1241, 1242, & 1243), (BS 6892, 6893, & 6894).

## CLAIM # 15

### DESCRIPTION

Engaging in conduct involving dishonesty, fraud, deceit, and misrepresentation. Making false representations to a federal court, by certifying a fact known to be false, designed to mislead and prejudice the honor and reputation of a party. Fraud on the court. Failure to make a proper inquiry into relevant facts before putting government attorneys' names on, or signing, pleadings, papers, motions, oppositions, or replies filed with the court. Government attorneys making factual contentions in court filings that did not have evidentiary support. Abuse of the legal system. Government lawyers doing everything they could to win at all costs. Conduct unbecoming a member of the court's bar. Conduct contrary to professional standards.

### CRIME, STATUTE, RULE AND/OR LAW VIOLATED

18 U.S.C. §1001 (BS 2001-2002), 18 U.S.C. §1018 (BS 2003), 18 U.S.C. §371 (BS 2010-2012), 14th Amendment (BS 2020), 18 U.S.C.§242 (BS 2030), 18 U.S.C. §241 (BS 2040), 18 U.S.C. §2 (2050), 28 U.S.C. §530(B)(a)(BS 3002), U.S.D.C. ED CA Local Rule 180(e) (BS 3002), B&P §6068 (d), (f), (g) (BS 3003-3004) B&P §6067 (BS 3003), B&P §6128(a) (BS 3003), ABA Model Rules 3.3(a), 4.1(a), 8.4(c) (BS 3005), BAR RULES 5-200(B) & (E) (BS 3007), Rule 11(b)(3) (BS 3008-3010), SNYDER (BS 3013), BERGER (BS 3014, 3011, 3012), AUSHERMAN (BS 3016-3020), GLASS (BS 3021-3023), KOJAYAN (BS 3024-3026), KATTAR (BS 3011), GIRARDI (BS 3027), BOWEN (BS 3028-3029), SCHWARE (BS 3030), PUMPHREY, TOSCANO, Robert Jackson. U.S. Attorney General in 1940 (BS 3015), Judge Nunley on 3/4/14 during Zinnel's sentencing (BS 3031), David Ogden, Assistant Attorney General on 1/4/10 (BS 3040), Larry Thompson, Deputy Attorney General on 3/7/02 (BS 3040), Attorneys and Authors Sidney Powell and Gene Neill (BS 3040), OLMSTEAD (BS 3040), Conduct unbecoming a member of the court's bar and contrary to professional standards. (BS 3027)

### WHO VIOLATED THE LAW, STATUTE, AND/OR RULE

AUSA SEGAL, HEMESATH, KHASIGIAN, SKIPPER, U.S. ATTORNEY TALBERT

### UNLAWFUL CONDUCT

Falsely represented to the COURT OF APPEALS:
   "The bankruptcy trustee testified that if he had been aware of this account, he would have investigated. SER 550."

This is lying by ommision, as the government lawyers do not provide full disclosure to the COURT OF APPEALS.

### WHEN/WHERE

2/23/17 COURT OF APPEALS filing in APPEAL, Answering Brief of the United States, DktEntry: 69 (BS 6801), Pg. 44 (BS 6816)

### WHY CRIME/VIOLATION OF STATUTE, RULE AND/OR LAW

In order to mislead the COURT OF APPEALS, the government lawyers selectively quoted part of the bankruptcy trustee's answer: "I would have investigated it." citing SER 550. (BS 6895). However, this was only part of the trustee's answer. The trustee's next sentence was: "I would have wanted to know what the balance was. I might have asked for bank records. But if it had simply been disclosed he had two accounts, I would have looked at the balances and seen if they were exempt or worthwhile administering." (BS 6895, lines 2-6).

BS 5870

<u>CLAIM #</u>  15 (cont.)

The bank account the government lawyers were asking about and the trustee
was answering, is the same personal Washington Mutual Checking account
discussed in Claim #4 herein.  (see BS 5815-5818).  This is the WAMU
checking account that Zinnel got the last two digits of "42" correct
on his bankruptcy schedules, but somehow put "98" instead of "54".
(see BS 5817, last para.)  The account balance of $256.71 on the
6/13/05 statement is a $6.41 difference from Zinnel's bankruptcy schedules
due to rounding.  Compare BS 6823 to BS 6817 (SER 189).

As Claim #4 details, Zinnel only had one Washington Mutal personal bank
account that he listed on his bankruptcy schedules and the indictment
did not charge him with concealing.  (see BS 5815- 5818).  Further,
based on the bankruptcy trustee's COMPLETE answer at trial, it is doubtful
the trustee would have found a bank account with $256.41 worth administrating
thus immaterial.

The government lawyers attempt to mislead the COURT OF APPEALS with their
incomplete citation of the trustee's full answer to their question.

**CLAIM #** 16

## DESCRIPTION

Engaging in conduct involving dishonesty, fraud, deceit, and misrepresentation. Making false representations to a federal court, by certifying a fact known to be false, designed to mislead and prejudice the honor and reputation of a party. Fraud on the court. Failure to make a proper inquiry into relevant facts before putting government attorneys' names on, or signing, pleadings, papers, motions, oppositions, or replies filed with the court. Government attorneys making factual contentions in court filings that did not have evidentiary support. Abuse of the legal system. Government lawyers doing everything they could to win at all costs. Conduct unbecoming a member of the court's bar. Conduct contrary to professional standards.

## CRIME, STATUTE, RULE AND/OR LAW VIOLATED

18 U.S.C. §1001 (BS 2001-2002), 18 U.S.C. §1018 (BS 2003), 18 U.S.C. §371 (BS 2010-2012), 14th Amendment (BS 2020), 18 U.S.C. §242 (BS 2030), 18 U.S.C. §241 (BS 2040), 18 U.S.C. §2 (2050), 28 U.S.C. §530(B)(a)(BS 3002), U.S.D.C. ED CA Local Rule 180(e) (BS 3002), B&P §6068 (d), (f), (g) (BS 3003-3004) B&P §6067 (BS 3003), B&P §6128(a) (BS 3003), ABA Model Rules 3.3(a), 4.1(a), 8.4(c) (BS 3005), BAR RULES 5-200(B) & (E) (BS 3007), Rule 11(b)(3) (BS 3008-3010), SNYDER (BS 3013), BERGER (BS 3014, 3011, 3012), AUSHERMAN (BS 3016-3020), GLASS (BS 3021-3023), KOJAYAN (BS 3024-3026), KATTAR (BS 3011), GIRARDI (BS 3027), BOWEN (BS 3028-3029), SCHWARE (BS 3030), PUMPHREY, TOSCANO, Robert Jackson. U.S. Attorney General in 1940 (BS 3015), Judge Nunley on 3/4/14 during Zinnel's sentencing (BS 3031), David Ogden, Assistant Attorney General on 1/4/10 (BS 3040), Larry Thompson, Deputy Attorney General on 3/7/02 (BS 3040), Attorneys and Authors Sidney Powell and Gene Neill (BS 3040), OLMSTEAD (BS 3040), Conduct unbecoming a member of the court's bar and contrary to professional standards. (BS 3027)

## WHO VIOLATED THE LAW, STATUTE, AND/OR RULE

AUSA SEGAL, HEMESATH, KHASIGIAN, SKIPPER, U.S. ATTORNEY TALBERT

## UNLAWFUL CONDUCT

Falsely represented to the COURT OF APPEALS:
  "From there, Eidson transferred $80,000 into her personal bank
  account.  SER 265."

This representation to the COURT OF APPEALS by AUSA SEGAL, HEMESATH, KHASIGIAN, SKIPPER, U.S. ATTORNEY TALBERT is a bald-faced lie.

## WHEN/WHERE

2/23/17 COURT OF APPEALS filing in APPEAL, Answering Brief of the United States, DktEntry: 69 (BS 6801), Pg. 52 (BS 6840)

## WHY CRIME/VIOLATION OF STATUTE, RULE AND/OR LAW

The government lawyers' citation to the record is to government trial exhibit 1401. (SER 265), (BS 6896). Government Exhibit 1401 is a Washington Mutual bank statement for Derian Eidson's Attorney Client Trust Account and not alleged "personal bank account." Further, the bank statement does not reflect a "transferred $80,000."

## DESCRIPTION

Engaging in conduct involving dishonesty, fraud, deceit, and misrepresentation. Making false representations to a federal court, by certifying a fact known to be false, designed to mislead and prejudice the honor and reputation of a party. Fraud on the court. Failure to make a proper inquiry into relevant facts before putting government attorneys' names on, or signing, pleadings, papers, motions, oppositions, or replies filed with the court. Government attorneys making factual contentions in court filings that did not have evidentiary support. Abuse of the legal system. Government lawyers doing everything they could to win at all costs. Conduct unbecoming a member of the court's bar. Conduct contrary to professional standards.

## CRIME, STATUTE, RULE AND/OR LAW VIOLATED

18 U.S.C. §1001 (BS 2001-2002), 18 U.S.C. §1018 (BS 2003), 18 U.S.C. §371 (BS 2010-2012), 14th Amendment (BS 2020), 18 U.S.C. §242 (BS 2030), 18 U.S.C. §241 (BS 2040), 18 U.S.C. §2 (2050), 28 U.S.C. §530(B)(a)(BS 3002), U.S.D.C. ED CA Local Rule 180(e) (BS 3002), B&P §6068 (d), (f), (g) (BS 3003-3004) B&P §6067 (BS 3003), B&P §6128(a) (BS 3003), ABA Model Rules 3.3(a), 4.1(a), 8.4(c) (BS 3005), BAR RULES 5-200(B) & (E) (BS 3007), Rule 11(b)(3) (BS 3008-3010), SNYDER (BS 3013), BERGER (BS 3014, 3011, 3012), AUSHERMAN (BS 3016-3020), GLASS (BS 3021-3023), KOJAYAN (BS 3024-3026), KATTAR (BS 3011), GIRARDI (BS 3027), BOWEN (BS 3028-3029), SCHWARE (BS 3030), PUMPHREY, TOSCANO, Robert Jackson. U.S. Attorney General in 1940 (BS 3015), Judge Nunley on 3/4/14 during Zinnel's sentencing (BS 3031), David Ogden, Assistant Attorney General on 1/4/10 (BS 3040), Larry Thompson, Deputy Attorney General on 3/7/02 (BS 3040), Attorneys and Authors Sidney Powell and Gene Neill (BS 3040), OLMSTEAD (BS 3040), Conduct unbecoming a member of the court's bar and contrary to professional standards. (BS 3027)

## WHO VIOLATED THE LAW, STATUTE, AND/OR RULE

AUSA SEGAL, HEMESATH, KHASIGIAN, SKIPPER, U.S. ATTORNEY TALBERT

## UNLAWFUL CONDUCT

Falsely represented to the COURT OF APPEALS:
  "System 3 paid nearly $300,000 into Eidson's client trust account. SER 232."

This representation to the COURT OF APPEALS by AUSA SEGAL, HEMESATH, KHASIGIAN, SKIPPER, U.S. ATTORNEY TALBERT is a bald-faced lie.

## WHEN/WHERE

2/23/17 COURT OF APPEALS filing in APPEAL, Answering Brief of the United States, Dkt.#69 (BS 6801), Pgs. 52 & 53 (BS 6840 & 6840A)

## WHY CRIME/VIOLATION OF STATUTE, RULE AND/OR LAW

The government lawyers' citation to the record is to government trial exhibit 304. (SER 232), (BS 6897). Government Exhibit 304 is a copy of a Cashier's Check payable to "Derian Eidson, Attorney Trust Account" in the amount of $125,869. (BS 6897). First, a check in the amount of $125,969 is nowhere near "$300,000" and second, the check does not evidence that "System 3" was the source of funds.

**CLAIM #** 18

**DESCRIPTION**

Engaging in conduct involving dishonesty, fraud, deceit, and misrepresentation. Making false representations to a federal court, by certifying a fact known to be false, designed to mislead and prejudice the honor and reputation of a party. Fraud on the court. Failure to make a proper inquiry into relevant facts before putting government attorneys' names on, or signing, pleadings, papers, motions, oppositions, or replies filed with the court. Government attorneys making factual contentions in court filings that did not have evidentiary support. Abuse of the legal system. Government lawyers doing everything they could to win at all costs. Conduct unbecoming a member of the court's bar. Conduct contrary to professional standards.

**CRIME, STATUTE, RULE AND/OR LAW VIOLATED**

18 U.S.C. §1001 (BS 2001-2002), 18 U.S.C. §1018 (BS 2003), 18 U.S.C. §371 (BS 2010-2012), 14th Amendment (BS 2020), 18 U.S.C. §242 (BS 2030), 18 U.S.C. §241 (BS 2040), 18 U.S.C. §2 (2050), 28 U.S.C. §530(B)(a)(BS 3002), U.S.D.C. ED CA Local Rule 180(e) (BS 3002), B&P §6068 (d), (f), (g) (BS 3003-3004) B&P §6067 (BS 3003), B&P §6128(a) (BS 3003), ABA Model Rules 3.3(a), 4.1(a), 8.4(c) (BS 3005), BAR RULES 5-200(B) & (E) (BS 3007), Rule 11(b)(3) (BS 3008-3010), SNYDER (BS 3013), BERGER (BS 3014, 3011, 3012), AUSHERMAN (BS 3016-3020), GLASS (BS 3021-3023), KOJAYAN (BS 3024-3026), KATTAR (BS 3011), GIRARDI (BS 3027), BOWEN (BS 3028-3029), SCHWARE (BS 3030), PUMPHREY, TOSCANO, Robert Jackson. U.S. Attorney General in 1940 (BS 3015), Judge Nunley on 3/4/14 during Zinnel's sentencing (BS 3031), David Ogden, Assistant Attorney General on 1/4/10 (BS 3040), Larry Thompson, Deputy Attorney General on 3/7/02 (BS 3040), Attorneys and Authors Sidney Powell and Gene Neill (BS 3040), OLMSTEAD (BS 3040), Conduct unbecoming a member of the court's bar and contrary to professional standards. (BS 3027)

**WHO VIOLATED THE LAW, STATUTE, AND/OR RULE**

AUSA SEGAL, HEMESATH, KHASIGIAN, SKIPPER, U.S. ATTORNEY TALBERT

**UNLAWFUL CONDUCT**

Falsely represented to the COURT OF APPEALS:
"Zinnel did not disclose that he was receiving rental income from System 3 for that company's use of the Luyung Drive Property."

This representation to the COURT OF APPEALS by AUSA SEGAL, HEMESATH, KHASIGIAN, SKIPPER, U.S. ATTORNEY TALBERT is a bald-faced lie.

**WHEN/WHERE**

2/23/17 COURT OF APPEALS filing in APPEAL, Answering Brief of the United States, DktEntry: 69 (BS 6801)P.43 (BS 6898)

**WHY CRIME/VIOLATION OF STATUTE, RULE AND/OR LAW**

Zinnel did not receive the money, Done Deal did. (BS 6899). Further, Zinnel filed bankruptcy on 7/20/05. However, the "rent" was for the period from 8/1/07 to 11/30/07; over two years later. (BS 6899). Therefore, Zinnel could not have disclosed on his bankruptcy schedules filed in July and August of 2005, "rent" paid by one corporation to another two years into the future.

BS 5885

<u>CLAIM #</u> 19

<u>DESCRIPTION</u>

Engaging in conduct involving dishonesty, fraud, deceit, and misrepresentation. Making false representations to a federal court, by certifying a fact known to be false, designed to mislead and prejudice the honor and reputation of a party. Fraud on the court. Failure to make a proper inquiry into relevant facts before putting government attorneys' names on, or signing, pleadings, papers, motions, oppositions, or replies filed with the court. Government attorneys making factual contentions in court filings that did not have evidentiary support. Abuse of the legal system. Government lawyers doing everything they could to win at all costs. Conduct unbecoming a member of the court's bar. Conduct contrary to professional standards.

<u>CRIME, STATUTE, RULE AND/OR LAW VIOLATED</u>

18 U.S.C. §1001 (BS 2001-2002), 18 U.S.C. §1018 (BS 2003), 18 U.S.C. §371 (BS 2010-2012), 14th Amendment (BS 2020), 18 U.S.C.§242 (BS 2030), 18 U.S.C. §241 (BS 2040), 18 U.S.C. §2 (2050), 28 U.S.C. §530(B)(a)(BS 3002), U.S.D.C. ED CA Local Rule 180(e) (BS 3002), B&P §6068 (d), (f), (g) (BS 3003-3004) B&P §6067 (BS 3003), B&P §6128(a) (BS 3003), ABA Model Rules 3.3(a), 4.1(a), 8.4(c) (BS 3005), BAR RULES 5-200(B) & (E) (BS 3007), Rule 11(b)(3) (BS 3008-3010), SNYDER (BS 3013), BERGER (BS 3014, 3011, 3012), AUSHERMAN (BS 3016-3020), GLASS (BS 3021-3023), KOJAYAN (BS 3024-3026), KATTAR (BS 3011), GIRARDI (BS 3027), BOWEN (BS 3028-3029), SCHWARE (BS 3030), PUMPHREY, TOSCANO, Robert Jackson. U.S. Attorney General in 1940 (BS 3015), Judge Nunley on 3/4/14 during Zinnel's sentencing (BS 3031), David Ogden, Assistant Attorney General on 1/4/10 (BS 3040), Larry Thompson, Deputy Attorney General on 3/7/02 (BS 3040), Attorneys and Authors Sidney Powell and Gene Neill (BS 3040), OLMSTEAD (BS 3040), Conduct unbecoming a member of the court's bar and contrary to professional standards. (BS 3027)

<u>WHO VIOLATED THE LAW, STATUTE, AND/OR RULE</u>

AUSA SEGAL, HEMESATH, KHASIGIAN, SKIPPER, U.S. ATTORNEY TALBERT

<u>UNLAWFUL CONDUCT</u>

Falsely represented to the COURT OF APPEALS:
    "The court found that the amount Zinnel scheduled for discharge
    was $3.6 million. Fn 21...Fn21 The trial evidence actually a[sic]
    supported a discharge amount of $6 million. SER 351. The evidence
    was based on the bankruptcy schedules Zinnel prepared, which listed
    over $6 million in debt. SER 187-214. The $3.6 million figure
    was derived from the claims register in the reopening of Zinnel's
    bankruptcy, after the fraud scheme was uncovered. <u>'The court relied
    on the lower figure to Zinnel's benefit.'</u>"
    ***
    "<u>The alternative would have been worse for Zinnel. The court could
    have used the $4 million loss amount from the attempted money
    laundering count</u>; the same loss figure the court used for Eidson. Fn 22
    ***
    FN 22"<u>Another worse alternative for Zinnel would have been the total
    value of Zinnel's concealed assets, whcih the PSR estimated at
    $5,466,158.20.</u>"

This representation to the COURT OF APPEALS by AUSA SEGAL, HEMESATH, KHASIGIAN, SKIPPER, U.S. ATTORNEY TALBERT are bald-faced lies.


<u>WHEN/WHERE</u>
2/23/17 COURT OF APPEALS filing in APPEAL, Answering Brief of the United States, Dkt.Entry: 69 (BS 6801) Pgs. 146,147,150. (BS 6900, 6901, 6902)
                                                                    BS 5890

## WHY CRIME/VIOLATION OF STATUTE, RULE, AND/OR LAW

Contrary to what the government lawyers represented to the COURT OF APPEALS and the opposing attorneys, Zinnel DID NOT receive any "benefit" because the COURT used $3.6 million for loss instead of $4 million or $5,466,158.20.

The fraud Loss Tables codified under U.S.S.G. sec. 2B1.1 specifies for loss more than $2,500,000 but under $7,000,000 there is an 18 level (BS 6903) sentencing enhancement which Zinnel received. This 18 level mega enhancement added 15 years 2 months of prison time to Zinnel's sentence. (BS 6904).

Therefore, Zinnel received no "benefit" with the "lower figure" nor would Zinnel have been worse off if the COURT would have used $4 million or $5,466,158.20 for loss. All three figures result in an 18 level mega enhancement. (BS 6903)

CLAIM # 20

## DESCRIPTION

Engaging in conduct involving dishonesty, fraud, deceit, and misrepresentation. Making false representations to a federal court, by certifying a fact known to be false, designed to mislead and prejudice the honor and reputation of a party. Fraud on the court. Failure to make a proper inquiry into relevant facts before putting government attorneys' names on, or signing, pleadings, papers, motions, oppositions, or replies filed with the court. Government attorneys making factual contentions in court filings that did not have evidentiary support. Abuse of the legal system. Government lawyers doing everything they could to win at all costs. Conduct unbecoming a member of the court's bar. Conduct contrary to professional standards.

## CRIME, STATUTE, RULE AND/OR LAW VIOLATED

18 U.S.C. §1001 (BS 2001-2002), 18 U.S.C. §1018 (BS 2003), 18 U.S.C. §371 (BS 2010-2012), 14th Amendment (BS 2020), 18 U.S.C.§242 (BS 2030), 18 U.S.C. §241 (BS 2040), 18 U.S.C. §2 (2050), 28 U.S.C. §530(B)(a)(BS 3002), U.S.D.C. ED CA Local Rule 180(e) (BS 3002), B&P §6068 (d), (f), (g) (BS 3003-3004) B&P §6067 (BS 3003), B&P §6128(a) (BS 3003), ABA Model Rules 3.3(a), 4.1(a), 8.4(c) (BS 3005), BAR RULES 5-200(B) & (E) (BS 3007), Rule 11(b)(3) (BS 3008-3010), SNYDER (BS 3013), BERGER (BS 3014, 3011, 3012), AUSHERMAN (BS 3016-3020), GLASS (BS 3021-3023), KOJAYAN (BS 3024-3026), KATTAR (BS 3011), GIRARDI (BS 3027), BOWEN (BS 3028-3029), SCHWARE (BS 3030), PUMPHREY, TOSCANO, Robert Jackson. U.S. Attorney General in 1940 (BS 3015), Judge Nunley on 3/4/14 during Zinnel's sentencing (BS 3031), David Ogden, Assistant Attorney General on 1/4/10 (BS 3040), Larry Thompson, Deputy Attorney General on 3/7/02 (BS 3040), Attorneys and Authors Sidney Powell and Gene Neill (BS 3040), OLMSTEAD (BS 3040), Conduct unbecoming a member of the court's bar and contrary to professional standards. (BS 3027)

## WHO VIOLATED THE LAW, STATUTE, AND/OR RULE

AUSA SEGAL, HEMESATH, KHASIGIAN, SKIPPER, U.S. ATTORNEY TALBERT

## UNLAWFUL CONDUCT

Falsely represented to the COURT OF APPEALS:
  "Zinnel did not object when the court imposed time limits after
  Zinnel's allocution meandered into topics not relevant to mitigation.
  The standard of review is plain error."

This representation to the COURT OF APPEALS by AUSA SEGAL, HEMESATH, KHASIGIAN, SKIPPER, U.S. ATTORNEY TALBERT is a bald-faced lie.

## WHEN/WHERE
2/23/17 COURT OF APPEALS filing in APPEAL, Answering Brief of the United States, DktEntry: 69 (BS 6801), Pg. 168 (BS 6905)

## WHY CRIME/VIOLATION OF STATUTE, RULE, AND/OR LAW

Contrary to what the government lawyers represented to the COURT OF APPEALS, Zinnel objected twice when the court stated it was going to cut Zinnel off. After the COURT stated it was going to give Zinnel three more minutes, Zinnel stated: "Your Honor, I need a little bit longer than three minutes." (BS 6906). Again Zinnel stated: "And to be cut off in three minutes, I just do not believe that is fair." (BS 6907). Further, the government lawyer AUSA SEGAL objected as well. (BS 6908), and the COURT overruled his objection as well. (BS 6908).

<u>CLAIM #</u>  21

## DESCRIPTION

Engaging in conduct involving dishonesty, fraud, deceit, and misrepresentation. Making false representations to a federal court, by certifying a fact known to be false, designed to mislead and prejudice the honor and reputation of a party. Fraud on the court. Failure to make a proper inquiry into relevant facts before putting government attorneys' names on, or signing, pleadings, papers, motions, oppositions, or replies filed with the court. Government attorneys making factual contentions in court filings that did not have evidentiary support. Abuse of the legal system. Government lawyers doing everything they could to win at all costs. Conduct unbecoming a member of the court's bar. Conduct contrary to professional standards.

## CRIME, STATUTE, RULE AND/OR LAW VIOLATED

18 U.S.C. §1001 (BS 2001-2002), 18 U.S.C. §1018 (BS 2003), 18 U.S.C. §371 (BS 2010-2012), 14th Amendment (BS 2020), 18 U.S.C. §242 (BS 2030), 18 U.S.C. §241 (BS 2040), 18 U.S.C. §2 (2050), 28 U.S.C. §530(B)(a)(BS 3002), U.S.D.C. ED CA Local Rule 180(e) (BS 3002), B&P §6068 (d), (f), (g) (BS 3003-3004) B&P §6067 (BS 3003), B&P §6128(a) (BS 3003), ABA Model Rules 3.3(a), 4.1(a), 8.4(c) (BS 3005), BAR RULES 5-200(B) & (E) (BS 3007), Rule 11(b)(3) (BS 3008-3010), SNYDER (BS 3013), BERGER (BS 3014, 3011, 3012), AUSHERMAN (BS 3016-3020), GLASS (BS 3021-3023), KOJAYAN (BS 3024-3026), KATTAR (BS 3011), GIRARDI (BS 3027), BOWEN (BS 3028-3029), SCHWARE (BS 3030), PUMPHREY, TOSCANO, Robert Jackson. U.S. Attorney General in 1940 (BS 3015), Judge Nunley on 3/4/14 during Zinnel's sentencing (BS 3031), David Ogden, Assistant Attorney General on 1/4/10 (BS 3040), Larry Thompson, Deputy Attorney General on 3/7/02 (BS 3040), Attorneys and Authors Sidney Powell and Gene Neill (BS 3040), OLMSTEAD (BS 3040), Conduct unbecoming a member of the court's bar and contrary to professional standards. (BS 3027)

## WHO VIOLATED THE LAW, STATUTE, AND/OR RULE

AUSA SEGAL, HEMESATH, KHASIGIAN, SKIPPER, U.S. ATTORNEY TALBERT

## UNLAWFUL CONDUCT

Falsely represented to the COURT OF APPEALS:
Double jeopardy is not a concern because "Zinnel could not be indicted separately for any additional item of property he concealed from the bankruptcy court" falsely claiming "bankruptcy fraud is a single offense."

This representation to the COURT OF APPEALS is blatant misstatement of well-settled law and <u>United States v. Bussell</u>, a case the government cites thirteen (13) times in their Answering Brief.(BS 6910)

## WHEN/WHERE

2/23/17 COURT OF APPEALS filing in APPEAL, Answering Brief of the United States, DktEntry: 69 (BS 6801), Pg. 67 (BS 6909)

## WHY CRIME/VIOLATION OF STATUTE, RULE, AND/OR LAW

The government lawyers misstate the law when in their Answering Brief the government lawyers rely on and cite <u>Bisno v. United States</u>, 299 F.2d 711 (9th Cir. 1961) and <u>Edwards v. United States</u>, 265 F.2d 302 (9th Cir. 1959). (BS 6909). Ten (10) years after <u>Edwards</u> and <u>Bisno</u> were decided on different issues, the COURT OF APPEALS held in <u>United States v. Kaldenberg</u>, 429 F.2d 161 (9th Cir. 1970) that "where a person makes successive decisions to transfer or conceal, and each involves a different set of facts, that person may be convicted of a separate count for violating 18 U.S.C. 152(1) and 152(7) for each such transfer or concealment.

BS 5900

CLAIM # 21 (cont.)

In Kaldenberg, a debtor in bankruptcy retained at least seven rental payments from tenants instead of turning them over to the receiver, and was convicted of seven (7) counts of post-petition concealment. The defendant, in his direct appeal, challenged the multiple charges under Edwards and Bisno, but the COURT OF APPEALS distinguished those cases as involving a single act of concealing multiple assets. Kaldenberg concluded that separate counts were proper because there were separate concealments, each involving a new set of facts and "a new decision on whether to transfer the new assets to the receiver or to conceal them." Kaldenberg at 162.

In aggravation, the five government lawyers cited United States v. Bussell, 504 F.3d 956 (9th Cir. 2007) thirteen (13) times in their Answering Brief over four pages. (BS 6910). Letantia Bussell was charged in a 17-count indictment for concealment of assets in her bankruptcy. (BS 6911). Dr. Bussell was convicted of three separate counts of concealment of assets. (BS 6911). Similarly, in United States v. Vandevort, 2013 U.S. App. LEXIS 18095 (Aug. 29, 2013), Milton Vandevort was convicted of two counts of cencealing assets in a bankruptcy case. (BS 6912). Therefore, at least three other cases have multiple count convictions of concealment of assets in a bankruptcy including a case the five government lawyers cite thirteen (13) times in their filed Answering Brief.

As in Kaldenberg, Bussell, and Vandevort, the government alleged that Zinnel made successive decisions and took separate courses of action to conceal or transfer certain assets, as detailed in the indictment. Therefore, contrary to what the government lawyers represent to the COURT OF APPEALS in their Answering Brief (BS 6909) there IS a double jeopardy concern at play in Zinnel's case. Zinnel COULD be indicted separately for an additional item of property the government lawyers manufacturer.

**CLAIM #** 22

<u>DESCRIPTION</u>

Engaging in conduct involving dishonesty, fraud, deceit, and misrepresentation. Making false representations to a federal court, by certifying a fact known to be false, designed to mislead and prejudice the honor and reputation of a party. Fraud on the court. Failure to make a proper inquiry into relevant facts before putting government attorneys' names on, or signing, pleadings, papers, motions, oppositions, or replies filed with the court. Government attorneys making factual contentions in court filings that did not have evidentiary support. Abuse of the legal system. Government lawyers doing everything they could to win at all costs. Conduct unbecoming a member of the court's bar. Conduct contrary to professional standards.

<u>CRIME, STATUTE, RULE AND/OR LAW VIOLATED</u>

18 U.S.C. §1001 (BS 2001-2002), 18 U.S.C. §1018 (BS 2003), 18 U.S.C. §371 (BS 2010-2012), 14th Amendment (BS 2020), 18 U.S.C. §242 (BS 2030), 18 U.S.C. §241 (BS 2040), 18 U.S.C. §2 (2050), 28 U.S.C. §530(B)(a)(BS 3002), U.S.D.C. ED CA Local Rule 180(e) (BS 3002), B&P §6068 (d), (f), (g) (BS 3003-3004) B&P §6067 (BS 3003), B&P §6128(a) (BS 3003), ABA Model Rules 3.3(a), 4.1(a), 8.4(c) (BS 3005), BAR RULES 5-200(B) & (E) (BS 3007), Rule 11(b)(3) (BS 3008-3010), SNYDER (BS 3013), BERGER (BS 3014, 3011, 3012), AUSHERMAN (BS 3016-3020), GLASS (BS 3021-3023), KOJAYAN (BS 3024-3026), KATTAR (BS 3011), GIRARDI (BS 3027), BOWEN (BS 3028-3029), SCHWARE (BS 3030), PUMPHREY, TOSCANO, Robert Jackson. U.S. Attorney General in 1940 (BS 3015), Judge Nunley on 3/4/14 during Zinnel's sentencing (BS 3031), David Ogden, Assistant Attorney General on 1/4/10 (BS 3040), Larry Thompson, Deputy Attorney General on 3/7/02 (BS 3040), Attorneys and Authors Sidney Powell and Gene Neill (BS 3040), OLMSTEAD (BS 3040), **9th Cir. Rule 28-2.8** Conduct unbecoming a member of the court's bar.(BS3027)(BS 3040 A)

<u>WHO VIOLATED THE LAW, STATUTE, AND/OR RULE</u>

AUSA SEGAL, HEMESATH, KHASIGIAN, SKIPPER, U.S. ATTORNEY TALBERT

<u>UNLAWFUL CONDUCT</u>

Violated the COURT OF APPEALS' 9th Cir. Rule 28-2.8 which requires
    "Every assertion in briefs regarding matters in the record
    shall be supported by a reference to the location in the
    excerpts of record where the matter is to be found." (BS 3040 A)

The five government lawyers attempt to defend their convictions by pointing to supposed "evidence" in the record that does not exist. Throughout their Answering Brief, the government lawyers repeatedly cite to "facts" with no citation to the record, in violation of the COURT OF APPEALS' rule 28-2.8. (BS 3040 A)

Besides being improper and aggravating, the government lawyers' lack of record citations tellingly reflects the lack of sufficient evidence to support Zinnel's and Eidson's convictions. This practice is telling, as it reflects that the government lawyers' theory of guilt is mere speculation and conjecture unsupported by evidence in the record.

<u>WHEN/WHERE</u>

2/23/17 COURT OF APPEALS filing in APPEAL, Answering Brief of the United States, DktEntry: 69 (BS 6801), Pgs. 138-143 (BS 6913-6923)

## WHY CRIME/VIOLATION OF STATUTE  RULE, AND/OR LAW

In violation of BERGER, in an attempt to protect their unlawful
convictions by winning at all costs, in their Answering Brief (BS 6801),
the government lawyers again provide the COURT OF APPEALS what they call
corroborating "evidence" with no citations to the record. i.e.
> "She padded her legal invoices to System 3 to hide the distribution
> payments to Zinnel.  Eidson laundered additional concealed Zinnel
> funds through her client trust account." (BS 6913).

The government lawyers describe the above as "plenty of evidence."
(BS 6913).  The government lawyers brazenly make similar statements,
presented to the COURT OF APPEALS as facts, with no citations to the
record or evidence, knowing Ms. Eidson was convicted of crimes only
related to her participation in the sting attorney settlement negotiations.
(BS 6914).

The government lawyers points include assertions that "Eidson added
Zinnel to the Done Deal bank account and permitted him to spend out
of it freely." (BS 6915).  However, the five government lawyers point
to no evidence to support their wild assertion that Zinnel "spent
freely" from this account. (BS 6915).

In support of their heading "There was plenty of proof of the conspiracy
between Zinnel and Eidson," the government lawyers list four bullet points
of "evidence" with no citation to the record that the government lawyers
boldly claim "There was sufficient evidence to support the jury's verdict
that Zinnel and Eidson conspired to launder the proceeds of Zinnel's
bankruptcy fraud." (BS 6915 & 6916).

Thereafter, in support of their heading "The government proved that
Eidson took a substantial step toward the end of receiving the
$4 million," the government lawyers again resort to bullet points of
"evidence" with no citation to the record.  (BS 6916 & 6917).

Sanctions may be imposed for failure to comply with 9th Cir. Rule 28-2.8,
particularly with respect to record references.  Mitchel v. General Electric,
689 F.2d 877, 879 (9th Cir., 1982).  Further, "A court of appeals may
discipline an attorney who practices before it for conduct unbecoming
a member of the bar for failure to comply with any court rule."
See Fed.R.App.P.46(c).  (BS 3027).  Likewise, the State Bar of California
can also discipline an attorney for misleading a judge.  (BS 3003-3007).
Moreover, within the Department of Justice, the Office of Professional
Responsibility ("OPR") is required to "receive, review, investigate, and
refer for appropriate action allegations of misconduct involving Department
attorneys that relate to the exercise of their authority to...litigate."
28 C.F.R. sec. 0.39a(a)(1).  When a complaint is filed, OPR would
therefore be required to review the conduct of the five government lawyers.

**"It is a cardinal rule of appellate practice that the facts are those
found in the record and not those found in the minds of the attorneys."**
United States v. Sigal, 341 F.2d 837, 850 (3rd Cir. 1965).

**CLAIM #** 23

## DESCRIPTION

Engaging in conduct involving dishonesty, fraud, deceit, and misrepresentation. Making false representations to a federal court, by certifying a fact known to be false, designed to mislead and prejudice the honor and reputation of a party. Fraud on the court. Failure to make a proper inquiry into relevant facts before putting government attorneys' names on, or signing, pleadings, papers, motions, oppositions, or replies filed with the court. Government attorneys making factual contentions in court filings that did not have evidentiary support. Abuse of the legal system. Government lawyers doing everything they could to win at all costs. Conduct unbecoming a member of the court's bar. Conduct contrary to professional standards.

## CRIME, STATUTE, RULE AND/OR LAW VIOLATED

18 U.S.C. §1001 (BS 2001-2002), 18 U.S.C. §1018 (BS 2003), 18 U.S.C. §371 (BS 2010-2012), 14th Amendment (BS 2020), 18 U.S.C. §242 (BS 2030), 18 U.S.C. §241 (BS 2040), 18 U.S.C. §2 (2050), 28 U.S.C. §530(B)(a)(BS 3002), U.S.D.C. ED CA Local Rule 180(e) (BS 3002), B&P §6068 (d), (f), (g) (BS 3003-3004) B&P §6067 (BS 3003), B&P §6128(a) (BS 3003), ABA Model Rules 3.3(a), 4.1(a), 8.4(c) (BS 3005), BAR RULES 5-200(B) & (E) (BS 3007), Rule 11(b)(3) (BS 3008-3010), SNYDER (BS 3013), BERGER (BS 3014, 3011, 3012), AUSHERMAN (BS 3016-3020), GLASS (BS 3021-3023), KOJAYAN (BS 3024-3026), KATTAR (BS 3011), GIRARDI (BS 3027), BOWEN (BS 3028-3029), SCHWARE (BS 3030), PUMPHREY, TOSCANO, Robert Jackson. U.S. Attorney General in 1940 (BS 3015), Judge Nunley on 3/4/14 during Zinnel's sentencing (BS 3031), David Ogden, Assistant Attorney General on 1/4/10 (BS 3040), Larry Thompson, Deputy Attorney General on 3/7/02 (BS 3040), Attorneys and Authors Sidney Powell and Gene Neill (BS 3040), OLMSTEAD (BS 3040), **9th Cir. Rule 28-2.8** Conduct unbecoming a member of the court's bar.(BS3027)**(BS·3040 A)**

## WHO VIOLATED THE LAW, STATUTE, AND/OR RULE

AUSA SEGAL, HEMESATH, KHASIGIAN, SKIPPER, U.S. ATTORNEY TALBERT

## UNLAWFUL CONDUCT

Violated the COURT OF APPEALS' 9th Cir. Rule 28-2.8 which requires "Every assertion in briefs regarding matters in the record shall be supported by a reference to the location in the excerpts of record where the matter is to be found." (BS 3040 A)

The five government lawyers attempt to defend their convictions by pointing to supposed "evidence" in the record that does not exist. Throughout their Answering Brief, the government lawyers repeatedly cite to "facts" with no citation to the record, in violation of the COURT OF APPEALS' rule 28-2.8. (BS 3040 A)

Besides being improper and aggravating, the government lawyers' lack of record citations tellingly reflects the lack of sufficient evidence to support Zinnel's and Eidson's convictions. This practice is telling, as it reflects that the government lawyers' theory of guilt is mere speculation and conjecture unsupported by evidence in the record.

## WHEN/WHERE

2/23/17 COURT OF APPEALS filing in APPEAL, Answering Brief of the United States, DktEntry: 69 (BS 6801), Pgs. 27, 47, 157, 159, 160 & 161 (BS 6918-6923)

## WHY CRIME/VIOLATION OF STATUTE RULE, AND/OR LAW

In violation of BERGER, in an attempt to protect their unlawful convictions by winning at all costs, in their Answering Brief (BS 6801), the government lawyers claim, at least ten (10) times, that Zinnel created and used "**shell companies**" without once pointing to any evidence or citation to the record. (BS 6918-6923), (BS 6803).

"A shell corporation is a company that is incorporated, but has no significant assets or operations." Nautilus Ins. Co. v. Reuter, 537 F.3d 733, 737 (7th Cir. 2008). Shell corporations "typically have no physical presence (other than a mailing address) and generate little or no independent economic value." Guidance Memo., Dept. of the Treasury, Financial Crimes Enforcement Network 1 (Nov. 9, 2006) (quoted in Nautilus at 737). In reviewing the Answering Brief the five (5) government lawyers all put their names on and AUSA Hemesath signed, the government lawyers do not cite to the record a single time that the "shell companies" lacked independent operations or assets. (BS 6918-6923). Instead, trial evidence showed for example that Done Deal provided legal and financial consulting services, and had earnings and a physical address. (ER 578-581, 669, 732, 742, 1409).

The five government lawyers' unsupported and untrue claims without a single citation to the record, repeated ad nauseam, does not magically make an untrue "fact" true. "Painting black lines on the sides of a horse and calling it a zebra does not make it one." United States v. Vazquez-Rivera, 135 F.3d 172, 177 (1st Cir. 1998).

Sanctions may be imposed for failure to comply with 9th Cir. Rule 28-2.8, particularly with respect to record references. Mitchel v. General Electric, 689 F.2d 877, 879 (9th Cir. 1982). Further, "A court of appeals may discipline an attorney who practices before it for conduct unbecoming a member of the bar for failure to comply with any court rule." See Fed.R.App.P.46(c). (BS 3027). Likewise, the State Bar of California can also discipline an attorney for misleading a judge. (BS 3003-3007). Moreover, within the Department of Justice, the Office of Professional Responsibility ("OPR") is required to "receive, review, investigate, and refer for appropriate action allegations of misconduct involving Department attorneys that related to the exercise of their authority to...litigate." 28 C.F.R. sec. 0.39a(a)(1). When a complaint is filed, OPR would therefore, be required to review the conduct of the five government lawyers.

**"It is a cardinal rule of appellate practice that the facts are those found in the record and not those found in the minds of the attorneys."** United States v. Sigal, 341 F.2d 837, 850 (3rd Cir. 1965).

**CLAIM #** 24

**DESCRIPTION**

Engaging in conduct involving dishonesty, fraud, deceit, and misrepresentation. Making false representations to a federal court, by certifying a fact known to be false, designed to mislead and prejudice the honor and reputation of a party. Fraud on the court. Failure to make a proper inquiry into relevant facts before putting government attorneys' names on, or signing, pleadings, papers, motions, oppositions, or replies filed with the court. Government attorneys making factual contentions in court filings that did not have evidentiary support. Abuse of the legal system. Government lawyers doing everything they could to win at all costs. Conduct unbecoming a member of the court's bar. Conduct contrary to professional standards.

**CRIME, STATUTE, RULE AND/OR LAW VIOLATED**

18 U.S.C. §1001 (BS 2001-2002), 18 U.S.C. §1018 (BS 2003), 18 U.S.C. §371 (BS 2010-2012), 14th Amendment (BS 2020), 18 U.S.C. §242 (BS 2030), 18 U.S.C. §241 (BS 2040), 18 U.S.C. §2 (2050), 28 U.S.C. §530(B)(a)(BS 3002), U.S.D.C. ED CA Local Rule 180(e) (BS 3002), B&P §6068 (d), (f), (g) (BS 3003-3004) B&P §6067 (BS 3003), B&P §6128(a) (BS 3003), ABA Model Rules 3.3(a), 4.1(a), 8.4(c) (BS 3005), BAR RULES 5-200(B) & (E) (BS 3007), Rule 11(b)(3) (BS 3008-3010), SNYDER (BS 3013), BERGER (BS 3014, 3011, 3012), AUSHERMAN (BS 3016-3020), GLASS (BS 3021-3023), KOJAYAN (BS 3024-3026), KATTAR (BS 3011), GIRARDI (BS 3027), BOWEN (BS 3028-3029), SCHWARE (BS 3030), PUMPHREY, TOSCANO, Robert Jackson. U.S. Attorney General in 1940 (BS 3015), Judge Nunley on 3/4/14 during Zinnel's sentencing (BS 3031), David Ogden, Assistant Attorney General on 1/4/10 (BS 3040), Larry Thompson, Deputy Attorney General on 3/7/02 (BS 3040), Attorneys and Authors Sidney Powell and Gene Neill (BS 3040), OLMSTEAD (BS 3040), Conduct unbecoming a member of the court's bar and contrary to professional standards. (BS 3027)

**WHO VIOLATED THE LAW, STATUTE, AND/OR RULE**

AUSA SEGAL, HEMESATH, KHASIGIAN, SKIPPER, U.S. ATTORNEY TALBERT

**UNLAWFUL CONDUCT**

Falsely represented to the COURT OF APPEALS:
   "Done Deal was not doing any consulting for System 3." No cite to record.

This representation to the COURT OF APPEALS by AUSA SEGAL, HEMESATH, KHASIGIAN, SKIPPER, U.S. ATTORNEY TALBERT is a bald-faced lie.

**WHEN/WHERE**

2/23/17 COURT OF APPEALS filing in APPEAL, Answering Brief of the United States, DktEntry: 69 (BS 6801), Pg. 140 (BS 6914)

**WHY CRIME/VIOLATION OF STATUTE, RULE, AND/OR LAW**

The government lawyers boldly claim "Done Deal was not doing any consulting for System 3." (BS 6914). Again, the government lawyers provide no evidence to support their claim that Done Deal was not consulting for System 3. In fact, the evidence at trial supports the opposite, that Mr. Zinnel did "consulting," "reviewed financials," and "look at different ways to make [System 3] more profitable." (BS 6924).

CLAIM # 25

## DESCRIPTION

Engaging in conduct involving dishonesty, fraud, deceit, and misrepresentation. Making false representations to a federal court, by certifying a fact known to be false, designed to mislead and prejudice the honor and reputation of a party. Fraud on the court. Failure to make a proper inquiry into relevant facts before putting government attorneys' names on, or signing, pleadings, papers, motions, oppositions, or replies filed with the court. Government attorneys making factual contentions in court filings that did not have evidentiary support. Abuse of the legal system. Government lawyers doing everything they could to win at all costs. Conduct unbecoming a member of the court's bar. Conduct contrary to professional standards.

## CRIME, STATUTE, RULE AND/OR LAW VIOLATED

18 U.S.C. §1001 (BS 2001-2002), 18 U.S.C. §1018 (BS 2003), 18 U.S.C. §371 (BS 2010-2012), 14th Amendment (BS 2020), 18 U.S.C.§242 (BS 2030), 18 U.S.C. §241 (BS 2040), 18 U.S.C. §2 (2050), 28 U.S.C. §530(B)(a)(BS 3002), U.S.D.C. ED CA Local Rule 180(e) (BS 3002), B&P §6068 (d), (f), (g) (BS 3003-3004) B&P §6067 (BS 3003), B&P §6128(a) (BS 3003), ABA Model Rules 3.3(a), 4.1(a), 8.4(c) (BS 3005), BAR RULES 5-200(B) & (E) (BS 3007), Rule 11(b)(3) (BS 3008-3010), SNYDER (BS 3013), BERGER (BS 3014, 3011, 3012), AUSHERMAN (BS 3016-3020), GLASS (BS 3021-3023), KOJAYAN (BS 3024-3026), KATTAR (BS 3011), GIRARDI (BS 3027), BOWEN (BS 3028-3029), SCHWARE (BS 3030), PUMPHREY, TOSCANO, Robert Jackson. U.S. Attorney General in 1940 (BS 3015), Judge Nunley on 3/4/14 during Zinnel's sentencing (BS 3031), David Ogden, Assistant Attorney General on 1/4/10 (BS 3040), Larry Thompson, Deputy Attorney General on 3/7/02 (BS 3040), Attorneys and Authors Sidney Powell and Gene Neill (BS 3040), OLMSTEAD (BS 3040), Conduct unbecoming a member of the court's bar and contrary to professional standards. (BS 3027)

## WHO VIOLATED THE LAW, STATUTE, AND/OR RULE

AUSA SEGAL, HEMESATH, KHASIGIAN, SKIPPER, U.S. ATTORNEY TALBERT

## UNLAWFUL CONDUCT

The three cases the government lawyers cite for the proposition that the testimony of Mr. Gee was permissible to "provide background testimony to the jury's understanding of the mechanics of bankruptcy" are inapposite. The government lawyers omited the key fact that the witness in each of those cases was qualified as an expert.

## WHEN/WHERE

2/23/17 COURT OF APPEALS filing in APPEAL, Answering Brief of the United States, DktEntry: 69 (BS 6801), Pgs.116-118 (BS 6925-6927)

## WHY CRIME/VIOLATION OF STATUTE, RULE, AND/OR LAW

The three cases the government lawyers cited for the proposition that the testimony of Mr. Gee was permissible to "provide background testimony important to the jury's understanding of the mechanics of bankruptcy" were United states v. Sobin, 56 F.3d 1423, 1427 (D.C. Cir. 1995), United States v. Nguyen, 2012 U.S. App. LEXIS 22501 (9th Cir. 2012), and United States v. Arutunoff, 1 F.3d 1112 (10th Cir. 1993). (BS 6925-6926). However, the government lawyers mislead the COURT OF APPEALS because they omit the key fact that the witness in each of those cases was qualified as an expert. As the government lawyers admit, Mr. Gee was not established as a bankruptcy expert. (BS 6926).

BS 5920

**CLAIM #** 26

## DESCRIPTION

Engaging in conduct involving dishonesty, fraud, deceit, and misrepresentation. Making false representations to a federal court, by certifying a fact known to be false, designed to mislead and prejudice the honor and reputation of a party. Fraud on the court. Failure to make a proper inquiry into relevant facts before putting government attorneys' names on, or signing, pleadings, papers, motions, oppositions, or replies filed with the court. Government attorneys making factual contentions in court filings that did not have evidentiary support. Abuse of the legal system. Government lawyers doing everything they could to win at all costs. Conduct unbecoming a member of the court's bar. Conduct contrary to professional standards.

## CRIME, STATUTE, RULE AND/OR LAW VIOLATED

18 U.S.C. §1001 (BS 2001-2002), 18 U.S.C. §1018 (BS 2003), 18 U.S.C. §371 (BS 2010-2012), 14th Amendment (BS 2020), 18 U.S.C. §242 (BS 2030), 18 U.S.C. §241 (BS 2040), 18 U.S.C. §2 (2050), 28 U.S.C. §530(B)(a)(BS 3002), U.S.D.C. ED CA Local Rule 180(e) (BS 3002), B&P §6068 (d), (f), (g) (BS 3003-3004) B&P §6067 (BS 3003), B&P §6128(a) (BS 3003), ABA Model Rules 3.3(a), 4.1(a), 8.4(c) (BS 3005), BAR RULES 5-200(B) & (E) (BS 3007), Rule 11(b)(3) (BS 3008-3010), SNYDER (BS 3013), BERGER (BS 3014, 3011, 3012), AUSHERMAN (BS 3016-3020), GLASS (BS 3021-3023), KOJAYAN (BS 3024-3026), KATTAR (BS 3011), GIRARDI (BS 3027), BOWEN (BS 3028-3029), SCHWARE (BS 3030), PUMPHREY, TOSCANO, Robert Jackson. U.S. Attorney General in 1940 (BS 3015), Judge Nunley on 3/4/14 during Zinnel's sentencing (BS 3031), David Ogden, Assistant Attorney General on 1/4/10 (BS 3040), Larry Thompson, Deputy Attorney General on 3/7/02 (BS 3040), Attorneys and Authors Sidney Powell and Gene Neill (BS 3040), OLMSTEAD (BS 3040), Conduct unbecoming a member of the court's bar and contrary to professional standards. (BS 3027)

## WHO VIOLATED THE LAW, STATUTE, AND/OR RULE

AUSA SEGAL, HEMESATH, KHASIGIAN, SKIPPER, U.S. ATTORNEY TALBERT

## UNLAWFUL CONDUCT

The government mis-cites Marx & Co. v. Diners' Club, Inc., 550 F.2d 505, 512 (2d Cir. 1977)-the quote attributed to that case does not appear there.

## WHEN/WHERE

2/23/17 COURT OF APPEALS filing in APPEAL, Answering Brief of the United States, DktEntry: 69 (BS 6801), Pg. 117 (BS 6926)

## WHY CRIME/VIOLATION OF STATUTE, RULE, AND/OR LAW

The government lawyers represent to the COURT OF APPEALS that the following quote is in Marx & Co. v. Diners' Club, Inc., 550 F.2d 505 (2d Cir. 1977) at page 512: "the attorney-witness, who is presented to them imbued with the mystique inherent in the title 'expert'". However, that quote does not appear anywhere in Marx. Id.

**CLAIM #** 27

**DESCRIPTION**

Engaging in conduct involving dishonesty, fraud, deceit, and misrepresentation. Making false representations to a federal court, by certifying a fact known to be false, designed to mislead and prejudice the honor and reputation of a party. Fraud on the court. Failure to make a proper inquiry into relevant facts before putting government attorneys' names on, or signing, pleadings, papers, motions, oppositions, or replies filed with the court. Government attorneys making factual contentions in court filings that did not have evidentiary support. Abuse of the legal system. Government lawyers doing everything they could to win at all costs. Conduct unbecoming a member of the court's bar. Conduct contrary to professional standards.

**CRIME, STATUTE, RULE AND/OR LAW VIOLATED**

18 U.S.C. §1001 (BS 2001-2002), 18 U.S.C. §1018 (BS 2003), 18 U.S.C. §371 (BS 2010-2012), 14th Amendment (BS 2020), 18 U.S.C.§242 (BS 2030), 18 U.S.C. §241 (BS 2040), 18 U.S.C. §2 (2050), 28 U.S.C. §530(B)(a)(BS 3002), U.S.D.C. ED CA Local Rule 180(e) (BS 3002), B&P §6068 (d), (f), (g) (BS 3003-3004) B&P §6067 (BS 3003), B&P §6128(a) (BS 3003), ABA Model Rules 3.3(a), 4.1(a), 8.4(c) (BS 3005), BAR RULES 5-200(B) & (E) (BS 3007), Rule 11(b)(3) (BS 3008-3010), SNYDER (BS 3013), BERGER (BS 3014, 3011, 3012), AUSHERMAN (BS 3016-3020), GLASS (BS 3021-3023), KOJAYAN (BS 3024-3026), KATTAR (BS 3011), GIRARDI (BS 3027), BOWEN (BS 3028-3029), SCHWARE (BS 3030), PUMPHREY, TOSCANO, Robert Jackson. U.S. Attorney General in 1940 (BS 3015), Judge Nunley on 3/4/14 during Zinnel's sentencing (BS 3031), David Ogden, Assistant Attorney General on 1/4/10 (BS 3040), Larry Thompson, Deputy Attorney General on 3/7/02 (BS 3040), Attorneys and Authors Sidney Powell and Gene Neill (BS 3040), OLMSTEAD (BS 3040), Conduct unbecoming a member of the court's bar and contrary to professional standards. (BS 3027)

**WHO VIOLATED THE LAW, STATUTE, AND/OR RULE**

AUSA SEGAL, HEMESATH, KHASIGIAN, SKIPPER, U.S. ATTORNEY TALBERT

**UNLAWFUL CONDUCT**

Falsely represented to the COURT OF APPEALS:
    "Zinnel plotted to fake his financial death...Zinnel was a wealthy
    ...businessman." No cite to the record.

This representation to the COURT OF APPEALS by AUSA SEGAL, HEMESATH, KHASIGIAN, SKIPPER, U.S. ATTORNEY TALBERT is a bald-faced lie.

Violated the COURT OF APPEALS' 9th Cir. Rule 28-2.8 which requires
    "Every assertion in briefs regarding matters in the record
    shall be supported by a reference to the location in the excerpts
    of record where the matter is to be found." (BS 3040 A)

Besides being improper and aggravating, the government lawyers' lack of record citations tellingly reflects the lack of sufficient evidence to support Zinnel's and Eidson's convictions. This practice is telling, as it reflects that the government lawyers' theory of guilt is mere speculation and conjecture unsupported by evidence in the record.

The government lawyers' wild imagination would be more at home in a fantasy novel than a serious legal brief regarding 28 years in prison. **"It is a cardinal rule of appellate practice that the facts are those found in the record and not those found in the minds of the attorneys."** United States v. Sigal, 341 F.2d 837, 850 (3rd Cir. 1965)

<u>CLAIM # 27</u> (cont.)

**WHEN/WHERE**
2/23/17 COURT OF APPEALS filing in APPEAL, Answering Brief of the United
States, DktEntry: 69 (BS 6801), Pg. 27 (BS 6918)

**WHY CRIME/VIOLATION OF STATUTE RULE, AND/OR LAW**
No evidence was presented a trial that "Zinnel plotted to fake his
financial death or that Zinnel was a wealthy businessman." Thus,
it is not surprising that the government lawyers did not cite to
the record to support their wild assertion. Therefore, the fantasy
resides "in the minds of the attorneys" and not in the record. In
aggravation, the government lawyers simply lifted from their Opening
Statement and Closing Argument at trial. The government lawyers used
the exact same language in the first sentence of their opening and
closing. (BS 6928-6929). "Painting black lines on the side of a horse
and calling it a zebra does not make it one." <u>United States v. Vazquez-
Rivera</u>, 135 F.3d 172 (1st Cir. 1998) Because the government lawyers'
statements regarding Zinnel's "plotting, faking his financial death,
and status as a wealthy businessman" are untrue and without support
in the record, the government lawyers not only misrepresented to the
COURT OF APPEALS, but the District Court judge and jury as well.

Sanctions may be imposed for failure to comply with 9th Cir. Rule 28-2.8,
particularly with respect to record references. <u>Mitchel v. General Electric</u>,
689 F.2d 877, 879 (9th Cir. 1982). Further, "A court of appeals may
discipline an attorney who practices before it for conduct unbecoming
a member of the bar for failure to comply with any court rule."
See Fed.R.App.P. 46(c). (BS 3027). Likewise, the State Bar of California
can also discipline an attorney for misleading a judge. (BS 3003-3007).
Moreover, within the Department of Justice, the Office of Professional
Responsibility ("OPR") is required to "receive, review, investigate, and
refer for appropriate action allegations of misconduct involving Department
attorneys that related to the exercise of their authority to...litigate."
28 C.F.R. sec. 0.39a(a)(1). When a complaint is filed, OPR would
therefore, be required to review the conduct of the five government lawyers.

<u>CLAIM #</u> 28

<u>DESCRIPTION</u>

Engaging in conduct involving dishonesty, fraud, deceit, and misrepresentation. Making false representations to a federal court, by certifying a fact known to be false, designed to mislead and prejudice the honor and reputation of a party. Fraud on the court. Failure to make a proper inquiry into relevant facts before putting government attorneys' names on, or signing, pleadings, papers, motions, oppositions, or replies filed with the court. Government attorneys making factual contentions in court filings that did not have evidentiary support. Abuse of the legal system. Government lawyers doing everything they could to win at all costs. Conduct unbecoming a member of the court's bar. Conduct contrary to professional standards.

<u>CRIME, STATUTE, RULE AND/OR LAW VIOLATED</u>

18 U.S.C. §1001 (BS 2001-2002), 18 U.S.C. §1018 (BS 2003), 18 U.S.C. §371 (BS 2010-2012), 14th Amendment (BS 2020), 18 U.S.C.§242 (BS 2030), 18 U.S.C. §241 (BS 2040), 18 U.S.C. §2 (2050), 28 U.S.C. §530(B)(a)(BS 3002), U.S.D.C. ED CA Local Rule 180(e) (BS 3002), B&P §6068 (d), (f), (g) (BS 3003-3004) B&P §6067 (BS 3003), B&P §6128(a) (BS 3003), ABA Model Rules 3.3(a), 4.1(a), 8.4(c) (BS 3005), BAR RULES 5-200(B) & (E) (BS 3007), Rule 11(b)(3) (BS 3008-3010), SNYDER (BS 3013), BERGER (BS 3014, 3011, 3012), AUSHERMAN (BS 3016-3020), GLASS (BS 3021-3023), KOJAYAN (BS 3024-3026), KATTAR (BS 3011), GIRARDI (BS 3027), BOWEN (BS 3028-3029), SCHWARE (BS 3030), PUMPHREY, TOSCANO, Robert Jackson. U.S. Attorney General in 1940 (BS 3015), Judge Nunley on 3/4/14 during Zinnel's sentencing (BS 3031), David Ogden, Assistant Attorney General on 1/4/10 (BS 3040), Larry Thompson, Deputy Attorney General on 3/7/02 (BS 3040), Attorneys and Authors Sidney Powell and Gene Neill (BS 3040), OLMSTEAD (BS 3040), Conduct unbecoming a member of the court's bar and contrary to professional standards. (BS 3027)

<u>WHO VIOLATED THE LAW, STATUTE, AND/OR RULE</u>

AUSA Matthew D. Segal.

<u>UNLAWFUL CONDUCT</u>

Falsely represented to the COURT OF APPEALS at oral argument on 11/16/17:

" They say we hammered these uncharged properties, but that's just not consistent with my recollection of the trial and closing arguments."

This representation to the COURT OF APPEALS by AUSA Matthew D. Segal is a bald-faced lie.

<u>**WHEN/WHERE**</u>
11/16/17 COURT OF APPEALS oral argument in APPEAL, Time-stamp 17:20

<u>**WHY CRIME/VIOLATION OF STATUTE, RULE, AND/OR LAW**</u>

At trial, the government lawyer in fact hammered uncharged properties including Zinnel's one and only personal checking account at Washington Mutual ("WAMU"). AUSA Hemesath started her direct examination with Zinnel's bankruptcy trustee by asking the following questions:
"Government moves to admit Exhibit 30." (BS 6930) (BS 6824)
"This is a signature card for a Washington Mutual Bank account. Whose bank account is it?" (BS 6930) (BS 6824)
A. "It appears to be Steven Zinnel's." (BS 6930) (BS 6824)

CLAIM # 28 (cont.)
        "And put side by side with Exhibit 202 [BS 6817], page 3." (BS 6930)
        "Were you aware that STEVEN ZINNEL had another personal bank
         account not listed on Schedule B?" (BS 6930) (BS 6817)
        A. "NO." (BS 6930)
***  It is noteworthy, that AUSA Hemesath did not show the bankruptcy
     trustee the actual bank statement of the referenced WAMU account
     which had the same balance as Zinnel's bankruptcy schedules.
     (compare BS 6817 to BS 6823 and BS 6824).
The prosecutor then moved on to the next uncharged property Done Deal:
        "May we please see Exhibit 202, page 4 [BS 6932]." (BS 6895)
        "Do you see any reference here to a company called Done Deal?" (BS 6895)
        A. "No." (BS 6895) [referring to Sch. B, item 12] (BS 6932)
        "And let's look at page 3 again. 202, page 3. [BS 6817]. This
         is back to personal property. Do you see any reference here
         to a Done Deal bank account?" (BS 6895)
        A. "No." (BS 6895)
        "Move to admit what has been marked as Government's Exhibit 140 [BS 6931]
         a certified business record." (BS 6895)
        [GEX 140 is actually Done Deal, Inc.'s WAMU checking account]

On Redirect examination of Zinnel's bankruptcy trustee, AUSA Hemesath
started off with and hammered Zinnel's personal WAMU checking account:
        "Please put up side by side Exhibit 202, page 3 (BS 6817) and
         30 (BS 6824)." (BS 6933)
        "Schedule B [BS 6817] is the personal property where the bank
         accounts are to be listed; correct?" (BS 6933)
        A. "Correct." (BS 6933)
        "Can you box on the second exhibit. Are those the same bank
         account numbers?" (BS 6933)
        A. "No." (BS 6933)
        "So this second bank account on the right-hand side, Government's
         Exhibit 30 [BS 6824], is not listed on Schedule B [BS 6817] correct?"
         (BS 6933)
        A. "That's correct." (BS 6933)
        "Can we see just Exhibit 30. [BS 6824]. Whose bank account is
         this?" (BS 6933)
        A. "Mr. Zinnel's." (BS 6933)
AUSA Hemesath does not ask anything related to Done Deal's bank accout
actually being Steven Zinnel's. AUSA Hemesath just hammers to the jury
and the judge the uncharged concealment of Zinnel's personal WAMU
checking account that he actually listed on his bankruptcy schedules,
but simply got two digits of the account number wrong. (BS 6817, 6823,
6824). There is no mention of System 3 which the grand jury actually
charged Zinnel in concealing and thus he received actual notice that
he would have to defend at trial against charges of concealing System 3.

Therefore, AUSA Hemesath started her presentation of evidence with
the bankruptcy trustee by soliciting evidence that Zinnel concealed
his personal WAMU checking account and the entire company of Done Deal,
which are both uncharged concealment by the grand jury, and did not
stress System 3 which the grand jury actually charged concealed.


                                                        BS 5936

CLOSING ARGUMENT

AUSA Hemesath and AUSA Segal also started off each of their closing
arguments hammering the uncharged property of concealments of
Zinnel's personal WAMU checking account and the company Done Deal:

AUSA Hemesath led off with the government's closing argument by
hammering the uncharged property when she began talking about Count 2
which is the bankruptcy fraud concealment count:
> "All legal interests. That's something with your name is on.
> For example, a bank account. This is Government Exhibit 30.
> "Steven Zinnel's personal bank account." (BS 6934)

AUSA Hemesath actually waived Exhbit 30 in front of the jury.
AUSA Hemesath then told the jury they should convict on the next
uncharged property; Done Deal when she argued:
> "Equitable interests. That's the big bag in this case of
> hidden property. Done Deal." (BS 6934)

AUSA Hemesath again hammered uncharged concealment in concluding her
Count 2, Element 2 argument:
> "Equitable control of Done Deal. And listed personal bank
> account. Just as in Count 1, any one item of concealed
> property is sufficient." (BS 6935).

AUSA Matthew Segal during his rebuttal closing argument picked up
right where his co-counsel started and ended by hammering to the
jury that Zinnel should be convicted on uncharged concealment of
property:
> "Now, so what's really the centerpiece of this case? Let's
> put up Government Exhibit 202, the bankruptcy schedules,
> [BS 6817] because this is a bankruptcy fraud case. The
> centerpiece of this case is the truth versus the lies.
> Let's look at page 3, please. [BS 6817]. Number 2.
> The checking account. Where is Done Deal? Done Deal is
> nowhere." (BS 6936) **"Zinnel's personal account is not disclosd."** Id.

AUSA Matthew D. Segal does not even mention System 3. But AUSA
Matthew D. Segal is not done hammering uncharged property to the jury:
> "You remember, I think the first or the second Mission Impossible
> movie where they've got these masks and they tear them off
> and there you know it's the real person. That's how Steven
> Zinnel uses corporations. Like he creates Done Deal....
> Corporate Control. Well, those are the big ones in this case."
> ...That's the centerpiece of this case. (BS 6937)

AUSA Matthew D. Segal does not mention System 3 let alone calling
System 3 the centerpiece of the case. No, AUSAs Hemesath and Segal
call Zinnel's WAMU personal checking account and Done Deal "the
big ones" and the "centerpiece of the case."; both uncharged
concealments by the grand jury.

As the Ninth Circuit has made crystal clear, **"Evidence matters,
closing argument matters; statements from the prosecutor matter
a great deal."** United States v. Kojayan, 8 F.3d 1315 (9 CA, 1993)

Here, the district court comitted reversible error when the jury
instructions did not instruct the jury on what Zinnel was actually
charged with concealing. Both at trial and at closing, the
prosecutors actually held in their hand Exhibit 30 and hammered
that the jury should convict on the uncharged WAMU checking account.

CLAIM # 29

## DESCRIPTION

Engaging in conduct involving dishonesty, fraud, deceit, and misrepresentation. Making false representations to a federal court, by certifying a fact known to be false, designed to mislead and prejudice the honor and reputation of a party. Fraud on the court. Failure to make a proper inquiry into relevant facts before putting government attorneys' names on, or signing, pleadings, papers, motions, oppositions, or replies filed with the court. Government attorneys making factual contentions in court filings that did not have evidentiary support. Abuse of the legal system. Government lawyers doing everything they could to win at all costs. Conduct unbecoming a member of the court's bar. Conduct contrary to professional standards.

## CRIME, STATUTE, RULE AND/OR LAW VIOLATED

18 U.S.C. §1001 (BS 2001-2002), 18 U.S.C. §1013 (BS 2003), 18 U.S.C. §371 (BS 2010-2012), 14th Amendment (BS 2020), 18 U.S.C. §242 (BS 2030), 18 U.S.C. §241 (BS 2040), 18 U.S.C. §2 (2050), 28 U.S.C. §530(B)(a)(BS 3002), U.S.D.C. ED CA Local Rule 180(e) (BS 3002), B&P §6068 (d), (f), (g) (BS 3003-3004) B&P §6067 (BS 3003), B&P §6128(a) (BS 3003), ABA Model Rules 3.3(a), 4.1(a), 8.4(c) (BS 3005), BAR RULES 5-200(B) & (E) (BS 3007), Rule 11(b)(3) (BS 3008-3010), SNYDER (BS 3013), BERGER (BS 3014, 3011, 3012), AUSHERMAN (BS 3016-3020), GLASS (BS 3021-3023), KOJAYAN (BS 3024-3026), KATTAR (BS 3011), GIRARDI (BS 3027), BOWEN (BS 3028-3029), SCHWARE (BS 3030), PUMPHREY, TOSCANO, Robert Jackson. U.S. Attorney General in 1940 (BS 3015), Judge Nunley on 3/4/14 during Zinnel's sentencing (BS 3031), David Ogden, Assistant Attorney General on 1/4/10 (BS 3040), Larry Thompson, Deputy Attorney General on 3/7/02 (BS 3040), Attorneys and Authors Sidney Powell and Gene Neill (BS 3040), OLMSTEAD (BS 3040), Conduct unbecoming a member of the court's bar and contrary to professional standards. (BS 3027)

## WHO VIOLATED THE LAW, STATUTE, AND/OR RULE

AUSA Matthew D. Segal.

## UNLAWFUL CONDUCT

Falsely represented to the COURT OF APPEALS at oral argument on 11/16/17:

"This was a System 3 trial and a System 3 closing."

This representation to the COURT OF APPEALS by AUSA Matthew D. Segal is a bald-faced lie.

## WHEN/WHERE
11/16/17 COURT OF APPEALS oral argument in APPEAL, Time-stamp 17:50

## WHY CRIME/VIOLATION OF STATUTE, RULE, AND/OR LAW

At trial, the government lawyer in fact hammered uncharged properties including Zinnel's one and only personal checking account at Washington Mutual ("WAMU"). AUSA Hemesath started her direct examination with Zinnel's bankruptcy trustee by asking the following questions:
"Government moves to admit Exhibit 30." (BS 6930) (BS 6824)
"This is a signature card for a Washington Mutual Bank account. Whose bank account is it?" (BS 6930) (BS 6824)
A. "It appears to be Steven Zinnel's." (BS 6930) (BS 6824)

CLAIM # 29 (cont.)
    "And put side by side with Exhibit 202 [BS 6817], page 3." (BS 6930)
    "Were you aware that STEVEN ZINNEL had another personal bank
    account not listed on Schedule B?" (BS 6930) (BS 6817)
    A. "NO." (BS 6930)
*** It is noteworthy, that AUSA Hemesath did not show the bankruptcy
    trustee the actual bank statement of the referenced WAMU account
    which had the same balance as Zinnel's bankruptcy schedules.
    (compare BS 6817 to BS 6823 and BS 6824).
The prosecutor then moved on to the next uncharged property Done Deal:
    "May we please see Exhibit 202, page 4 [BS 6932]." (BS 6895)
    "Do you see any reference here to a company called Done Deal?" (BS 6895)
    A. "No." (BS 6895) [referring to Sch. B, item 12] (BS 6932)
    "And let's look at page 3 again. 202, page 3. [BS 6817]. This
    is back to personal property. Do you see any reference here
    to a Done Deal bank account?" (BS 6895)
    A. "No." (BS 6895)
    "Move to admit what has been marked as Government's Exhibit 140 [BS 6931]
    a certified business record." (BS 6895)
    [GEX 140 is actually Done Deal, Inc.'s WAMU checking account]

On Redirect examination of Zinnel's bankruptcy trustee, AUSA Hemesath
started off with and hammered Zinnel's personal WAMU checking account:
    "Please put up side by side Exhibit 202, page 3 (BS 6817) and
    30 (BS 6824)." (BS 6933)
    "Schedule B [BS 6817] is the personal property where the bank
    accounts are to be listed; correct?" (BS 6933)
    A. "Correct." (BS 6933)
    "Can you box on the second exhibit. Are those the same bank
    account numbers?" (BS 6933)
    A. "No." (BS 6933)
    "So this second bank account on the right-hand side, Government's
    Exhibit 30 [BS 6824], is not listed on Schedule B [BS 6817] correct?"
    (BS 6933)
    A. "That's correct." (BS 6933)
    "Can we see just Exhibit 30. [BS 6824]. Whose bank account is
    this?" (BS 6933)
    A. "Mr. Zinnel's." (BS 6933)
AUSA Hemesath does not ask anything related to Done Deal's bank accout
actually being Steven Zinnel's. AUSA Hemesath just hammers to the jury
and the judge the uncharged concealment of Zinnel's personal WAMU
checking account that he actually listed on his bankruptcy schedules,
but simply got two digits of the account number wrong. (BS 6817, 6823,
6824). There is no mention of System 3 which the grand jury actually
charged Zinnel in concealing and thus he received actual notice that
he would have to defend at trial against charges of concealing System 3.

Therefore, AUSA Hemesath started her presentation of evidence with
the bankruptcy trustee by soliciting evidence that Zinnel concealed
his personal WAMU checking account and the entire company of Done Deal,
which are both uncharged concealment by the grand jury, and did not
stress System 3 which the grand jury actually charged concealed.


                                                              BS 5941

CLOSING ARGUMENT

AUSA Hemesath and AUSA Segal also started off each of their closing arguments hammering the uncharged property of concealments of Zinnel's personal WAMU checking account and the company Done Deal:

AUSA Hemesath led off with the government's closing argument by hammering the uncharged property when she began talking about Count 2 which is the bankruptcy fraud concealment count:
> "All legal interests. That's something with your name is on.
> For example, a bank account. This is Government Exhibit 30.
> "Steven Zinnel's personal bank account." (BS 6934)

AUSA Hemesath actually waived Exhbit 30 in front of the jury.
AUSA Hemesath then told the jury they should convict on the next uncharged property; Done Deal when she argued:
> "Equitable interests. That's the big bag in this case of
> hidden property. Done Deal." (BS 6934)

AUSA Hemesath again hammered uncharged concealment in concluding her Count 2, Element 2 argument:
> "Equitable control of Done Deal. And listed personal bank
> account. Just as in Count 1, any one item of concealed
> property is sufficient." (BS 6935)

AUSA Matthew Segal during his rebuttal closing argument picked up right where his co-counsel started and ended by hammering to the jury that Zinnel should be convicted on uncharged concealment of property:
> "Now, so what's really the centerpiece of this case? Let's
> put up Government Exhibit 202, the bankruptcy schedules,
> [BS 6817] because this is a bankruptcy fraud case. The
> centerpiece of this case is the truth versus the lies.
> Let's look at page 3, please. [BS 6817]. Number 2.
> The checking account. Where is Done Deal? Done Deal is
> nowhere." (BS 6936) **"Zinnel's <u>personal</u> account is not disclosed."** Id.

AUSA Matthew D. Segal does not even mention System 3. But AUSA Matthew D. Segal is not done hammering uncharged property to the jury:
> "You remember, I think the first or the second Mission Impossible
> movie where they've got these masks and they tear them off
> and there you know it's the real person. That's how Steven
> Zinnel uses corporations. Like he creates Done Deal....
> Corporate Control. Well, those are the big ones in this case."
> ...That's the centerpiece of this case. (BS 6937)

AUSA Matthew D. Segal does not mention System 3 let alone calling System 3 the centerpiece of the case. No, AUSAs Hemesath and Segal call Zinnel's WAMU personal checking account and Done Deal "the big ones" and the "centerpiece of the case."; both uncharged concealments by the grand jury.

As the Ninth Circuit has made crystal clear, **"Evidence matters, closing argument matters; statements from the prosecutor matter a great deal."** <u>United States v. Kojayan</u>, 8 F.3d 1315 (9 CA, 1993)

Here, the district court comitted reversible error when the jury instructions did not instruct the jury on what Zinnel was actually charged with concealing. Both at trial and at closing, the prosecutors actually held in their hand Exhibit 30 and hammered that the jury should convict on the uncharged WAMU checking account.

CLAIM # 30

DESCRIPTION

Engaging in conduct involving dishonesty, fraud, deceit, and misrepresentation. Making false representations to a federal court, by certifying a fact known to be false, designed to mislead and prejudice the honor and reputation of a party. Fraud on the court. Failure to make a proper inquiry into relevant facts before putting government attorneys' names on, or signing, pleadings, papers, motions, oppositions, or replies filed with the court. Government attorneys making factual contentions in court filings that did not have evidentiary support. Abuse of the legal system. Government lawyers doing everything they could to win at all costs. Conduct unbecoming a member of the court's bar. Conduct contrary to professional standards.

CRIME, STATUTE, RULE AND/OR LAW VIOLATED

18 U.S.C. §1001 (BS 2001-2002), 18 U.S.C. §1013 (BS 2003), 18 U.S.C. §371 (BS 2010-2012), 14th Amendment (BS 2020), 18 U.S.C.§242 (BS 2030), 18 U.S.C. §241 (BS 2040), 18 U.S.C. §2 (2050), 28 U.S.C. §530(B)(a)(BS 3002), U.S.D.C. ED CA Local Rule 180(e) (BS 3002), B&P §6068 (d), (f), (g) (BS 3003-3004) B&P §6067 (BS 3003), B&P §6128(a) (BS 3003), ABA Model Rules 3.3(a), 4.1(a), 8.4(c) (BS 3005), BAR RULES 5-200(B) & (E) (BS 3007), Rule 11(b)(3) (BS 3008-3010), SNYDER (BS 3013), BERGER (BS 3014, 3011, 3012), AUSHERMAN (BS 3016-3020), GLASS (BS 3021-3023), KOJAYAN (BS 3024-3026), KATTAR (BS 3011), GIRARDI (BS 3027), BOWEN (BS 3028-3029), SCHWARE (BS 3030), PUMPHREY, TOSCANO, Robert Jackson. U.S. Attorney General in 1940 (BS 3015), Judge Nunley on 3/4/14 during Zinnel's sentencing (BS 3031), David Ogden, Assistant Attorney General on 1/4/10 (BS 3040), Larry Thompson, Deputy Attorney General on 3/7/02 (BS 3040), Attorneys and Authors Sidney Powell and Gene Neill (BS 3040), OLMSTEAD (BS 3040), Conduct unbecoming a member of the court's bar and contrary to professional standards. (BS 3027)

WHO VIOLATED THE LAW, STATUTE, AND/OR RULE

AUSA Matthew D. Segal.

UNLAWFUL CONDUCT

Falsely represented to the COURT OF APPEALS at oral argument on 11/16/17:
"If this was a real variance, the government would have stood up and said Aha!, we've got this personal checking account [AUSA Segal raising his right hand in court like he is holding a piece of paper]. That is not what happened at all."

This representation to the COURT OF APPEALS by AUSA Matthew D. Segal is a bald-faced lie.

WHEN/WHERE
11/16/17 COURT OF APPEALS oral argument in APPEAL, Time-stamp 18:15

WHY CRIME/VIOLATION OF STATUTE, RULE, AND/OR LAW

At trial, the government lawyer in fact hammered uncharged properties including Zinnel's one and only personal checking account at Washington Mutual ("WAMU"). AUSA Hemesath started her direct examination with Zinnel's bankruptcy trustee by asking the following questions:
"Government moves to admit Exhibit 30." (BS 6930) (BS 6824)
"This is a signature card for a Washington Mutual Bank account. Whose bank account is it?" (BS 6930) (BS 6824)
A. "It appears to be Steven Zinnel's." (BS 6930) (BS 6824)

BS 59 45

"And put side by side with Exhibit 202 [BS 6817], page 3." (BS 6930)
"Were you aware that STEVEN ZINNEL had another personal bank
account not listed on Schedule B?" (BS 6930)  (BS 6817)
A. "NO." (BS 6930)
*** It is noteworthy, that AUSA Hemesath did not show the bankruptcy
trustee the actual bank statement of the referenced WAMU account
which had the same balance as Zinnel's bankruptcy schedules.
(compare BS 6817 to BS 6823 and BS 6824).

The prosecutor then moved on to the next uncharged property Done Deal:
"May we please see Exhibit 202, page 4 [BS 6932]." (BS 6895)
"Do you see any reference here to a company called Done Deal?" (BS 6895)
A. "No." (BS 6895) [referring to Sch. B, item 12] (BS 6932)
"And let's look at page 3 again. 202, page 3. [BS 6817]. This
is back to personal property. Do you see any reference here
to a Done Deal bank account?" (BS 6895)
A. "No." (BS 6895)
"Move to admit what has been marked as Government's Exhibit 140 [BS 6931]
a certified business record." (BS 6895)
[GEX 140 is actually Done Deal, Inc.'s WAMU checking account]


On Redirect examination of Zinnel's bankruptcy trustee, AUSA Hemesath
started off with and hammered Zinnel's personal WAMU checking account:
"Please put up side by side Exhibit 202, page 3 (BS 6817) and
30 (BS 6824)." (BS 6933)
"Schedule B [BS 6817] is the personal property where the bank
accounts are to be listed; correct?" (BS 6933)
A. "Correct." (BS 6933)
"Can you box on the second exhibit. Are those the same bank
account numbers?" (BS 6933)
A. "No." (BS 6933)
"So this second bank account on the right-hand side, Government's
Exhibit 30 [BS 6824], is not listed on Schedule B [BS 6817] correct?"
(BS 6933)
A. "That's correct." (BS 6933)
"Can we see just Exhibit 30. [BS 6824]. Whose bank account is
this?" (BS 6933)
A. "Mr. Zinnel's." (BS 6933)

AUSA Hemesath does not ask anything related to Done Deal's bank accout
actually being Steven Zinnel's. AUSA Hemesath just hammers to the jury
and the judge the uncharged concealment of Zinnel's personal WAMU
checking account that he actually listed on his bankruptcy schedules,
but simply got two digits of the account number wrong. (BS 6817, 6823,
6824). There is no mention of System 3 which the grand jury actually
charged Zinnel in concealing and thus he received actual notice that
he would have to defend at trial against charges of concealing System 3.


Therefore, AUSA Hemesath started her presentation of evidence with
the bankruptcy trustee by soliciting evidence that Zinnel concealed
his personal WAMU checking account and the entire company of Done Deal,
which are both uncharged concealment by the grand jury, and did not
stress System 3 which the grand jury actually charged concealed.

## CLOSING ARGUMENT

AUSA Hemesath and AUSA Segal also started off each of their closing arguments hammering the uncharged property of concealments of Zinnel's personal WAMU checking account and the company Done Deal:

AUSA Hemesath led off with the government's closing argument by hammering the uncharged property when she began talking about Count 2 which is the bankruptcy fraud concealment count:
     "All legal interests. That's something with your name is on.
     For example, a bank account. This is Government Exhibit 30.
     "Steven Zinnel's personal bank account." (BS 6934)
AUSA Hemesath actually waived Exhbit 30 in front of the jury.
AUSA Hemesath then told the jury they should convict on the next uncharged property; Done Deal when she argued:
     "Equitable interests. That's the big bag in this case of
     hidden property. Done Deal." (BS 6934)
AUSA Hemesath again hammered uncharged concealment in concluding her Count 2, Element 2 argument:
     "Equitable control of Done Deal. And listed personal bank
     account. Just as in Count 1, any one item of concealed
     property is sufficient." (BS 6935).

AUSA Matthew Segal during his rebuttal closing argument picked up right where his co-counsel started and ended by hammering to the jury that Zinnel should be convicted on uncharged concealment of property:
     "Now, so what's really the centerpiece of this case? Let's
     put up Government Exhibit 202, the bankruptcy schedules,
     [BS 6817] because this is a bankruptcy fraud case. The
     centerpiece of this case is the truth versus the lies.
     Let's look at page 3, please. [BS 6817]. Number 2.
     The checking account. Where is Done Deal? Done Deal is
     nowhere." (BS 6936) **"Zinnel's _personal_ account is not disclosed."** Id.
AUSA Matthew D. Segal does not even mention System 3. But AUSA Matthew D. Segal is not done hammering uncharged property to the jury:
     "You remember, I think the first or the second Mission Impossible
     movie where they've got these masks and they tear them off
     and there you know it's the real person. That's how Steven
     Zinnel uses corporations. Like he creates Done Deal....
     Corporate Control. Well, those are the big ones in this case."
     ...That's the centerpiece of this case. (BS 6937)
AUSA Matthew D. Segal does not mention System 3 let alone calling System 3 the centerpiece of the case. No, AUSAs Hemesath and Segal call Zinnel's WAMU personal checking account and Done Deal "the big ones" and the "centerpiece of the case."; both uncharged concealments by the grand jury.

As the Ninth Circuit has made crystal clear, **"Evidence matters, closing argument matters; statements from the prosecutor matter a great deal."** United States v. Kojayan, 8 F.3d 1315 (9 CA, 1993)

Here, the district court comitted reversible error when the jury instructions did not instruct the jury on what Zinnel was actually charged with concealing. Both at trial and at closing, the prosecutors actually held in their hand Exhibit 30 and hammered that the jury should convict on the uncharged WAMU checking account.

CLAIM # 31

## DESCRIPTION

Engaging in conduct involving dishonesty, fraud, deceit, and misrepresentation. Making false representations to a federal court, by certifying a fact known to be false, designed to mislead and prejudice the honor and reputation of a party. Fraud on the court. Failure to make a proper inquiry into relevant facts before putting government attorneys' names on, or signing, pleadings, papers, motions, oppositions, or replies filed with the court. Government attorneys making factual contentions in court filings that did not have evidentiary support. Abuse of the legal system. Government lawyers doing everything they could to win at all costs. Conduct unbecoming a member of the court's bar. Conduct contrary to professional standards.

## CRIME, STATUTE, RULE AND/OR LAW VIOLATED

18 U.S.C. §1001 (BS 2001-2002), 18 U.S.C. §1018 (BS 2003), 18 U.S.C. §371 (BS 2010-2012), 14th Amendment (BS 2020), 18 U.S.C. §242 (BS 2030), 18 U.S.C. §241 (BS 2040), 18 U.S.C. §2 (2050), 28 U.S.C. §530(B)(a)(BS 3002), U.S.D.C. ED CA Local Rule 180(e) (BS 3002), B&P §6068 (d), (f), (g) (BS 3003-3004) B&P §6067 (BS 3003), B&P §6128(a) (BS 3003), ABA Model Rules 3.3(a), 4.1(a), 8.4(c) (BS 3005), BAR RULES 5-200(B) & (E) (BS 3007), Rule 11(b)(3) (BS 3008-3010), SNYDER (BS 3013), BERGER (BS 3014, 3011, 3012), AUSHERMAN (BS 3016-3020), GLASS (BS 3021-3023), KOJAYAN (BS 3024-3026), KATTAR (BS 3011), GIRARDI (BS 3027), BOWEN (BS 3028-3029), SCHWARE (BS 3030), PUMPHREY, TOSCANO, Robert Jackson. U.S. Attorney General in 1940 (BS 3015), Judge Nunley on 3/4/14 during Zinnel's sentencing (BS 3031), David Ogden, Assistant Attorney General on 1/4/10 (BS 3040), Larry Thompson, Deputy Attorney General on 3/7/02 (BS 3040), Attorneys and Authors Sidney Powell and Gene Neill (BS 3040), OLMSTEAD (BS 3040), Conduct unbecoming a member of the court's bar and contrary to professional standards. (BS 3027)

## WHO VIOLATED THE LAW, STATUTE, AND/OR RULE

AUSA Matthew D. Segal

## UNLAWFUL CONDUCT

Falsely represented to the COURT OF APPEALS at oral argument on 11/16/17:
Judge Wilken asked the following question:
Q. "The complaint seems to be this WAMU personal checking account. Which I guess is not the Done Deal WAMU checking account that had a couple of hundred dollars in it [BS 6823, 6824], Was that emphasized in any way?" Time-stamp 19:03

A. "No. And I think that is the source of the confusion. As both of those accounts were at WAMU. And we spent just a ton of time with witness Kimberly Barr showing that the Done Deal account was Zinnel's personal account. That was his personal account." Time-stamp 19:13

"And if you look at excerpts of records 1116-17 [BS 6936], I'm holding up the bankruptcy schedule and saying personal account. Where is Done Deal. Look at all the money he spent out of it. This is his personal account." Time-stamp 19:31

"It's not referring to this nothing." [Judge Wilken nodding her head.] Time-stamp 19:50

**"You need to look at the exhibits that are actually being referred to during the closing."** [Judge Wilken again nodded her head] Time-stamp 19:51

BS 5950

**CLAIM # 31** (cont.)

**WHY CRIME/VIOLATION OF STATUTE, RULE, AND/OR LAW**

At trial and in closing arguments, both AUSA Segal and AUSA Hemesath in fact hammered the uncharged property of Zinnel's personal WAMU checking account. Please see Claim #28, BS 5935 to 5937 for how hard and how many times AUSAs Segal and Hemesath hit.

The Exhibit the prosecutors "actually referred to during the closing" was **Exhibit 30; Zinnel's <u>personal</u> checking account."** (BS 6934:5-10, BS 6824.) **"Zinnel's <u>personal</u> account is not disclosed."** (BS 6936:25).

The government prosecutors DO NOT one time refer to Exhibit 140 which is Done Deal, Inc.'s WAMU account. (ER 1352, BS 6931). See AUSA Hemesath's closing argument. (BS 6934 & 6935, ER 1043-1068). See AUSA Segal's closing argument. (BS 6936 & 6937, ER 1114-1136).

AUSAs Hemesath and Segal tell the jury and the judge that Zinnel's WAMU personal checking account is "the big one" and the "centerpiece of the case."; an uncharged concealment by the grand jury.

As the ninth Circuit has made crystal clear, **"Evidence matters, closing argument matters; statements from the prosecutor matter a great deal."** <u>United States v. Kojayan</u>, 8 F.3d 1315 (9 CA, 1993)


Here the district court comitted reversible error when the jury instructions did not instruct the jury on what property Zinnel was actually charged with concealing. Both at trial and at closing argument, the prosecutors actually held in their hand Exhibit 30 and hammered that the jury should convict Zinnel on his uncharged <u>personal</u> WAMU checking account.

CLAIM # 32

## DESCRIPTION

Engaging in conduct involving dishonesty, fraud, deceit, and misrepresentation. Making false representations to a federal court, by certifying a fact known to be false, designed to mislead and prejudice the honor and reputation of a party. Fraud on the court. Failure to make a proper inquiry into relevant facts before putting government attorneys' names on, or signing, pleadings, papers, motions, oppositions, or replies filed with the court. Government attorneys making factual contentions in court filings that did not have evidentiary support. Abuse of the legal system. Government lawyers doing everything they could to win at all costs. Conduct unbecoming a member of the court's bar. Conduct contrary to professional standards.

## CRIME, STATUTE, RULE AND/OR LAW VIOLATED

18 U.S.C. §1001 (BS 2001-2002), 18 U.S.C. §1018 (BS 2003), 18 U.S.C. §371 (BS 2010-2012), 14th Amendment (BS 2020), 18 U.S.C.§242 (BS 2030), 18 U.S.C. §241 (BS 2040), 18 U.S.C. §2 (2050), 28 U.S.C. §530(B)(a)(BS 3002), U.S.D.C. ED CA Local Rule 180(e) (BS 3002), B&P §6068 (d), (f), (g) (BS 3003-3004) B&P §6067 (BS 3003), B&P §6128(a) (BS 3003), ABA Model Rules 3.3(a), 4.1(a), 8.4(c) (BS 3005), BAR RULES 5-200(B) & (E) (BS 3007), Rule 11(b)(3) (BS 3008-3010), SNYDER (BS 3013), BERGER (BS 3014, 3011, 3012), AUSHERMAN (BS 3016-3020), GLASS (BS 3021-3023), KOJAYAN (BS 3024-3026), KATTAR (BS 3011), GIRARDI (BS 3027), BOWEN (BS 3028-3029), SCHWARE (BS 3030), PUMPHREY, TOSCANO, Robert Jackson. U.S. Attorney General in 1940 (BS 3015), Judge Nunley on 3/4/14 during Zinnel's sentencing (BS 3031), David Ogden, Assistant Attorney General on 1/4/10 (BS 3040), Larry Thompson, Deputy Attorney General on 3/7/02 (BS 3040), Attorneys and Authors Sidney Powell and Gene Neill (BS 3040), OLMSTEAD (BS 3040), Conduct unbecoming a member of the court's bar and contrary to professional standards. (BS 3027)

## WHO VIOLATED THE LAW, STATUTE, AND/OR RULE

AUSA Matthew D. Segal.

## UNLAWFUL CONDUCT

Withheld information from the COURT OF APPEALS at oral argument on 11/16/17:
Judge Paez asked the following question:
Q. "Does the record reflect when Radoslovich and Wilbert became cooperating witnesses?" Time-stamp 21:07

A. "I don't think so. I'm not sure. It was before the Starbucks meeting for sure. But it was after David Zinnel did his agreement with System 3. So that exhibit where David Zinnel was getting cashed out of his interest was something we were not around for." Time-stamp 21:20

Judge Wilken followed up and asked the following question:
Q. "But the point which Wilbert says 'I'd like to buy you out, how about $4 million.' Was he cooperating at that point?" Time-stamp 21:50

A. "Wilbert was trying to get the Zinnels out before he met the government." The reason I am hesitating is I don't know exactly when they arrived at the $4 million number." Time-stamp 22:00

Judge Wilken followed up and asked the following question:

Q.  "When the document was written that said $4 million."
    Time-stamp 22:15

A.  "If that is important to the court, I have heard people
    get the opportunity to send something.  I really don't
    know if it is in trial evidence and I don't want to
    make it up.  **It depends what you mean by cooperator.
    He was told he was not a target.  He was asked to
    wear a wire.  He did that.**"  Time-stamp 22:39

Judge Wilken said "That's pretty cooperative."  Time-stamp 22:44

**WHEN/WHERE**
11/16/17 COURT OF APPEALS oral argument in APPEAL, Time-stamp 21:07

**WHY CRIME/VIOLATION OF STATUTE, RULE, AND/OR LAW**

It is obvious by the two judges' questions, the court was trying to
find out from AUSA Matthew Segal when Tom Wilbert became a cooperating
witness.  AUSA Matthew Segal was the ONLY person in that courtroom
that knew exactly when Tom Wilbert became a cooperating witness for
the government willing to not only sing, but compose as well.

Contrary to AUSA Segal's claimed ignorace, the record reflects
that AUSA Matthew Segal has been involved in this criminal case
as far back as 2006.  (see AUSA Segal filed document CR #310,
p. 18 filed on 2/26/14, BS 6094).

Rather than simply providing the court with the answer it sought,
AUSA Matthew Segal waffled and carefully danced around the direct
questions of two judges.  AUSA Matthew Segal's hesitation and
evasiveness is similar to AUSA Sinek's evasiveness before the
Court of Appeals regarding a cooperation agreement almost twenty-
five years earlier in United States v. Kojayan, 8 F.3d 1315
(9 CA, 1993).  (BS 6938).  Exactly when Tom Wilbert became a
government cooperating witness is a verifiable fact that AUSA
Matthew Segal knew when he stood before the Court of Appeals.
One thing's for sure; Tom Wilbert became AUSA Matthew Segal's
puppet, willing to do and say anything, before the morning of
December 3, 2008 which was the day Tom Wilbert was "pretty
cooperative" and wore a wire to record protected settlement
discussions.

## DESCRIPTION

Engaging in conduct involving dishonesty, fraud, deceit, and misrepresentation. Making false representations to a federal court, by certifying a fact known to be false, designed to mislead and prejudice the honor and reputation of a party. Fraud on the court. Failure to make a proper inquiry into relevant facts before putting government attorneys' names on, or signing, pleadings, papers, motions, oppositions, or replies filed with the court. Government attorneys making factual contentions in court filings that did not have evidentiary support. Abuse of the legal system. Government lawyers doing everything they could to win at all costs. Conduct unbecoming a member of the court's bar. Conduct contrary to professional standards.

## CRIME, STATUTE, RULE AND/OR LAW VIOLATED

18 U.S.C. §1001 (BS 2001-2002), 18 U.S.C. §1018 (BS 2003), 18 U.S.C. §371 (BS 2010-2012), 14th Amendment (BS 2020), 18 U.S.C. §242 (BS 2030), 18 U.S.C. §241 (BS 2040), 18 U.S.C. §2 (2050), 28 U.S.C. §530(B)(a)(BS 3002), U.S.D.C. ED CA Local Rule 180(e) (BS 3002), B&P §6068 (d), (f), (g) (BS 3003-3004) B&P §6067 (BS 3003), B&P §6128(a) (BS 3003), ABA Model Rules 3.3(a), 4.1(a), 8.4(c) (BS 3005), BAR RULES 5-200(B) & (E) (BS 3007), Rule 11(b)(3) (BS 3008-3010), SNYDER (BS 3013), BERGER (BS 3014, 3011, 3012), AUSHERMAN (BS 3016-3020), GLASS (BS 3021-3023), KOJAYAN (BS 3024-3026), KATTAR (BS 3011), GIRARDI (BS 3027), BOWEN (BS 3028-3029), SCHWARE (BS 3030), PUMPHREY, TOSCANO, Robert Jackson. U.S. Attorney General in 1940 (BS 3015), Judge Nunley on 3/4/14 during Zinnel's sentencing (BS 3031), David Ogden, Assistant Attorney General on 1/4/10 (BS 3040), Larry Thompson, Deputy Attorney General on 3/7/02 (BS 3040), Attorneys and Authors Sidney Powell and Gene Neill (BS 3040), OLMSTEAD (BS 3040), Conduct unbecoming a member of the court's bar and contrary to professional standards. (BS 3027)

## WHO VIOLATED THE LAW, STATUTE, AND/OR RULE

AUSA Audrey B. Hemesath

## UNLAWFUL CONDUCT

Falsely represented to the COURT OF APPEALS at oral argument on 11/16/17:
"Number of victims came from the PSR. And the PSR got it
from the bankruptcy claims register and from Zinnel's
own admissions in his bankruptcy schedules. In 2011 the
bankruptcy had been reopened. So the 2011 claims register
is what the PSR drew that number from."

## WHEN/WHERE

11/16/17 COURT OF APPEALS oral argument in APPEAL, Time-stamp 26:20

## WHY CRIME/VIOLATION OF STATUTE, RULE, AND/OR LAW

The PSR did not get number of victims or loss from Zinnel's bankruptcy schedules because all the listings on Zinnel's bankruptcy schedules were disputed. (BS 6975). That is what Zinnel admitted under penalty of perjury eight years before sentencing. Zinnel agrees his bankruptcy schedules admissions are reliable evidence to the court that Zinnel disputed the loss and number of victims both in 2005 and at sentencing. (BS 6975 & 6976).

In Zinnel's bankruptcy, there is only one "Claims Register." (BS 6939-6944). The Claims Register was printed on 10/12/16, but reflects that the claims were filed in 2005. Therefore, contrary to what AUSA Hemesath represented to the court, there IS NOT a 2005 and a 2011 Claims Register. All the creditors listed on the Claims Register are disputed on Zinnel's bankruptcy schedules and no determination was made by any court that a single claim was valid.

BS 5960

## CLAIM # 34

### DESCRIPTION

Engaging in conduct involving dishonesty, fraud, deceit, and misrepresentation. Making false representations to a federal court, by certifying a fact known to be false, designed to mislead and prejudice the honor and reputation of a party. Fraud on the court. Failure to make a proper inquiry into relevant facts before putting government attorneys' names on, or signing, pleadings, papers, motions, oppositions, or replies filed with the court. Government attorneys making factual contentions in court filings that did not have evidentiary support. Abuse of the legal system. Government lawyers doing everything they could to win at all costs. Conduct unbecoming a member of the court's bar. Conduct contrary to professional standards.

### CRIME, STATUTE, RULE AND/OR LAW VIOLATED

18 U.S.C. §1001 (BS 2001-2002), 18 U.S.C. §1018 (BS 2003), 18 U.S.C. §371 (BS 2010-2012), 14th Amendment (BS 2020), 18 U.S.C.§242 (BS 2030), 18 U.S.C. §241 (BS 2040), 18 U.S.C. §2 (2050), 28 U.S.C. §530(B)(a)(BS 3002), U.S.D.C. ED CA Local Rule 180(e) (BS 3002), B&P §6068 (d), (f), (g) (BS 3003-3004), B&P §6067 (BS 3002), DOJ §0120(a) (BS 3005), ABA Model Rules 3.3(a), 4.1(a), 8.4(c) (BS 3005), BAR RULES 5-200(B) & (E) (BS 3007), Rule 11(b)(3) (BS 3008-3010), SNYDER (BS 3013), BERGER (BS 3014, 3011, 3012), AUSHERMAN (BS 3016-3020), GLASS (BS 3021-3023), KOJAYAN (BS 3024-3026), KATTAR (BS 3011), GIRARDI (BS 3027), BOWEN (BS 3028-3029), SCHWARE (BS 3030), PUMPHREY, TOSCANO, Robert Jackson. U.S. Attorney General in 1940 (BS 3015), Judge Nunley on 3/4/14 during Zinnel's sentencing (BS 3031), David Ogden, Assistant Attorney General on 1/4/10 (BS 3040), Larry Thompson, Deputy Attorney General on 3/7/02 (BS 3040), Attorneys and Authors Sidney Powell and Gene Neill (BS 3040), OLMSTEAD (BS 3040), Conduct unbecoming a member of the court's bar and contrary to professional standards. (BS 3027)

### WHO VIOLATED THE LAW, STATUTE, AND/OR RULE

AUSA Matthew D. Segal,  AUSA Audrey B. Hemesath

### UNLAWFUL CONDUCT

Pre-trial, AUSA Segal made a one year in prison plea offer to EIDSON if she would plead guilty to misdemeanor extortion. After exercising her right to a jury trial, at EIDSON'S sentencing, AUSA Segal and AUSA Hemesath sought to impose an unconstitutional Trial Tax of 12.5 times by asking the COURT to sentence EIDSON to 12.5 years in prison for her attempted money laundering convictions. (CR 305, 5:1-2, BS 6065:1-2). Thereafter, AUSAs Hemesath and Segal lied to Judge Nunley when AUSA Hemesath stated:  "Even to the extent that this is a disparate sentence--and my co-counsel [AUSA Segal] points out to me that in the Luong case, Judge Shubb give [sic] a near life sentence for money laundering.  So this is relatively short."  (CR 389, 58:18-21, BS 6081:18-21). This representation to the COURT is a bald-faced lie as John That Luong was not found guilty of the same conduct as EIDSON, Luong did not have the same criminal history as EIDSON, and Luong WAS NOT even convicted of Money Laundering.

### WHEN/WHERE

4/2/14  COURT proceeding in the CRIMINAL CASE (CR 389, 58:18-21, BS 6081)

ER 1319

## WHY CRIME/VIOLATION OF STATUTE, RULE, AND/OR LAW

John That Luong was a member of an organized syndicate that robbed and attempted to rob computer chip companies at gunpoint. Luong also distributed heroin.

In a trial before Judge William B. Shubb in the Eastern District of California, Sacramento, a jury convicted Luong of nine (9) counts including DEATH Caused by use of a Firearm During a Crime of Violence, two counts of Conspiracy to Commit a Robbery Affecting Interstate Commerce, and four counts of Use of a Firearm During a Crime of Violence (BS 6082). Contrary to AUSAs Hemesath's and Segal's lies to Judge Nunley, Luong WAS NOT convicted of Money Laundering (BS 6082). Further, contrary to AUSAs Hemesath's and Segal's lie to Judge Nunley, Luong did not receive a "near life sentence" from Judge Shubb for money laundering, as on March 1, 2010, Luong in fact received Life in prison plus 960 months (80 years) (BS 6083).

In a trial before Chief Judge Marilyn Hall Patel in the Northern District of California, a jury convicted Luong of eleven (11) counts including Racketeer Influence and Corrupt Organization (RICO), Use of a Firearm to Commit a Violent Felony, Distribution of Heroin, and Conspiracy to Distribute Heroin (BS 6084). Contrary to AUSAs Hemesath's and Segal's lie to Judge nunley, Luong WAS NOT convicted of Money Laundering in that case either (BS 6084). After initially being sentenced in 2001 to 88 years in prison, on February 18, 2011, Luong was sentenced to 65 years in prison by the District Court for the Northern District of California (BS 6085).

Thus, as a result of Luong causing DEATH, using firearms in a Crime of Violence multiple times and being a heroin distributor, he was sentenced to prison by two different federal judges to Life in prison plus 145 years. Thus, contrary to AUSAs Hemesath's and Segal's specious win-at-all-costs attempt to defeat EIDSON'S 18 U.S.C. 3553(a)(6) disparity arguments, by comparing EIDSON, who had no criminal history and was being sentenced for a two-count conviction for a non-violent attempted economic crime manufacured by the government, she IS NOT similarly situated to John That Luong.

Apparently the COURT relied on the bald-faced lies to prove an issue before the COURT in the CRIMINAL CASE because Judge Nunley gave first-time offender EIDSON a mid-range Guideline sentence of 10 years 1 month.

# SECTION #9

EXHIBITS

BS 6001 - 6999

#9

#9

#9

1  BENJAMIN B. WAGNER
   United States Attorney
2  MATTHEW D. SEGAL
   Assistant U.S. Attorney
3  501 I Street, Suite 10-100
   Sacramento, California 95814
4  Telephone: (916) 554-2708

5

6

7

8

9

10                IN THE UNITED STATES DISTRICT COURT

11            FOR THE EASTERN DISTRICT OF CALIFORNIA

12  UNITED STATES OF AMERICA,

13              Plaintiff,          CASE NO. 2:11-cr-234 MCE

14       v.                         VIOLATIONS: 18 U.S.C. § 152(7) -
                                    Bankruptcy Fraud; 18 U.S.C. §
15  STEVEN ZINNEL, and              152(1) - Bankruptcy Fraud; 18
    DERIAN EIDSON,                  U.S.C. § 1956(h) - Money
16                                  Laundering Conspiracy (2
                Defendants.         Counts); 18 U.S.C. § 1956 -
17                                  Money Laundering (10 Counts);
                                    18 U.S.C. § 1957 - Transactions
18                                  in Criminally Derived Property
                                    (5 Counts); 18 U.S.C. §
19                                  982(a)(1), 18 U.S.C. §
                                    981(a)(1)(C) & 28 U.S.C. §
20                                  2461(c) - Criminal Forfeiture

21

22  COUNT ONE:    [18 U.S.C. § 152(7): Bankruptcy Fraud]

23       The Grand Jury charges:

24  STEVEN ZINNEL, and
    DERIAN EIDSON,
25
    Defendants herein, as follows:
26
                I.  DEFINITIONS
27
28  1.   At all times material herein.

                                    1

---

1       a.   Defendant STEVEN KEITH ZINNEL, ("STEVEN ZINNEL,") was an

2  individual residing in Gold River in Sacramento County in the State

3  and Eastern District of California.

4       b.   Defendant DERIAN EIDSON was an individual residing in Yorba

5  Linda, Orange County, California.  Defendant EIDSON was a member of

6  the bar of the State of California and maintained a client trust

7  account and a personal bank account at Washington Mutual Bank.

8       c.   Corporate Control, Inc. was a California corporation owned

9  and controlled by defendant STEVEN ZINNEL.

10      d.   Done Deal was a California corporation whose titular owner

11 and president was defendant DERIAN EIDSON.

12      e.   Company 1, a company known to the Grand Jury, was a

13 California corporation engaged in the business of electrical utility

14 infrastructure contracting and whose titular owner was Nominee 1, a

15 person known to the Grand Jury.

16      f.   4Results, LLC was a California Limited Liability

17 corporation that was actually controlled by defendant STEVEN ZINNEL.

18      g.   Auto and Boat Store, Inc. was a California corporation that

19 was actually controlled by defendant STEVEN ZINNEL.

20      h.   "The Layung Property," Sacramento County Parcel No.

21 072-0450-015-0000 was real estate in Rancho Cordova, California.

22      i.   "The Old Eureka Way Property," Sacramento County Parcel No.

23 069-0620-051-0000 was real estate in Gold River, California.  At all

24 times material, defendant STEVEN ZINNEL used the Old Eureka Way

25 Property as his residence.

26                II.  BACKGROUND

27 2.   Defendant STEVEN ZINNEL, separated from his then-wife in 1999 and

28 began what became a contentious divorce proceeding.  In April and

                                    2

BS 6044

1  July of 2001, defendant STEVEN ZINNEL emailed her and told her that
2  he had retained counsel for bankruptcy and that his company
3  was going to file for bankruptcy. On July 15, 2001, defendant STEVEN
4  ZINNEL emailed her that, when his company went into bankruptcy, he
5  would draw a smaller salary and her support would "almost go to
6  zero". He went on, "[h]is soon as the bank and the bonding company
7  sue me for my personal obligation. I will file personal bankruptcy as
8  well."
9     III. PRE-FILING FRAUDULENT TRANSFERS AND CONCEALMENT
10    Defendant STEVEN ZINNEL, aided and abetted by defendant DERIAN
11 EIDSON, between in or about October 2001 and on or about July 20,
12 2005, in a personal capacity and as an officer and agent of at least
13 one corporation, in contemplation of a case under title 11, United
14 States Code, by himself, and with intent to defeat the provisions of
15 title 11, did knowingly and fraudulently transfer and conceal some of
16 his property and the property of said corporation.
17    IV. WAYS AND MEANS
18    4.  In knowingly and fraudulently transferring and concealing
19 property in contemplation of his bankruptcy, defendant STEVEN ZINNEL
20 employed, among others, the following ways and means:
21    a.  In or about October 2001, defendant STEVEN ZINNEL and
22 Nominee 1 formed Company 1. They agreed that defendant STEVEN ZINNEL
23 would be a "silent partner." According to the agreement, defendant
24 STEVEN ZINNEL "or his designated entity or individual," would own
25 shares of common stock in Company 1. According to the agreement,
26 defendant STEVEN ZINNEL "or his designated entity or individual"
27 would put up all the initial startup capital. Also, according to the

3

1  agreement, once certain conditions were satisfied, defendant ZINNEL
2  would get back his initial capital contribution of $600,000 with 10%
3  interest per annum with the remaining equity distributed in
4  proportion to ownership at the time. Nominee 1 was to be the
5  President, Chief Financial Officer, and Corporate Secretary.
6  Defendant STEVEN ZINNEL created and filed Company 1's articles of
7  incorporation with the California Secretary of State. Nominee 1
8  opened a bank account for Company 1 by placing $1,500 of his own
9  money into the account. Defendant STEVEN ZINNEL contributed
10 approximately $300,000 worth of funds to start Company 1. Defendant
11 STEVEN ZINNEL's name appeared nowhere in this or any public filings
12 of Company 1.
13    b.  On or about March 20, 2002, 4Results was formed as a
14 California LLC.
15    c.  On or about June 20, 2002, defendant STEVEN ZINNEL obtained
16 a loan from First Bank (No. 417023002514) secured by a deed of trust
17 against the Old Eureka Way Property.
18    d.  On or about January 26, 2004, Corporate Control, Inc. sent
19 a wire transfer in the amount of $169,804.27 to a bank account in the
20 name of 4Results. The true controllers of this bank account were
21 persons associated with defendant STEVEN ZINNEL, known to the Grand
22 Jury.
23    e.  On or about January 27, 2004, 4Results purchased a
24 cashier's check for $169,804.27 addressed to the then-titular owner
25 of the Layuug Property.
26    f.  On or about February 17, 2004, defendant STEVEN ZINNEL
27 convinced another person, known to the Grand Jury, to serve as
28 4Results's agent for service of process. Defendant ZINNEL told that

4

BJ 6045

person that his purpose was to control 4Results without using
defendant ZINNEL's name because defendant ZINNEL's ex-wife had taken
his money from his other businesses, and defendant ZINNEL wanted to
keep one separated.

    9.  On or about February 18, 2004, 4Results acquired title to
the Luyung Property.

    h.  On or about June 7, 2004, Auto and Boat Store, Inc. was
formed as a California Corporation held in title by Nominee 2, a
person known the the Grand Jury, but the Corporation was actually
controlled by defendant STEVEN ZINNEL.

    i.  On or about June 10, 2004, Auto and Boat Store, Inc. took
title to the Luyung Property from 4Results, LLC.

    j.  On or about July 5, 2004, defendant DERIAN EIDSON formed
Done Deal as a California corporation.

    k.  On or about July 13, 2004, defendants STEVEN ZINNEL and
DERIAN EIDSON created a document purporting to assign defendant
STEVEN ZINNEL's interest in Company 1 to Done Deal.

    l.  On or about October 4, 2004, defendant DERIAN EIDSON opened
a bank account in the name of Done Deal.

    m.  On or about October 22, 2004, defendant STEVEN ZINNEL
obtained a loan from First Bank (No. 417051025814) secured by a deed
of trust against the Old Eureka Way Property.

    n.  On or about February 22, 2005, defendant DERIAN EIDSON
added defendant STEVEN ZINNEL as a signatory on Done Deal's account.
Defendant STEVEN ZINNEL proceeded to use the funds in the Done Deal
account for his personal expenses.

---

## V. BANKRUPTCY FILING

5.  On or about July 20, 2005, in the State and Eastern District of
California, defendant STEVEN ZINNEL filed and caused to be filed a
voluntary bankruptcy petition in his name, case number 05-28800-C7,
under Chapter 7 of Title 11 of the United States Code, in the United
States Bankruptcy Court for the Eastern District of California. On
the schedule of assets and liabilities filed in his bankruptcy case
defendant STEVEN ZINNEL disclosed $842,620.00 in assets, excluding
interests in assets transferred and concealed as alleged in
paragraphs 4(a) through 4(n) above, $2,013,896.29 in secured debt,
and $4,036,466.25 in unsecured debt.

    All in violation of Title 18, United States Code, Sections 2 and
152(7).

COUNT TWO:

[18 U.S.C. § 152(1) - Bankruptcy Fraud]

    The Grand Jury further charges:

    STEVEN ZINNEL, and
    DERIAN EIDSON,

defendants herein, as follows:

1.  The allegations set forth in Paragraphs 1, 2, 4, and 5 of Count
1 are realleged as if fully set forth herein.

2.  Between on or about July 20, 2005, and on or about September 6,
2006, in the State and Eastern District of California, defendants
STEVEN ZINNEL and DERIAN EIDSON did knowingly and fraudulently
conceal from a custodian, trustee, and other officer of the court
charged with the control and custody of property, and from creditors
in the bankruptcy case captioned "In re Steven Zinnel," Bankruptcy
Case Number 05-28800-C7, the property set forth below belonging to
the estate of the debtor, defendant STEVEN ZINNEL.

B560646

1   a.   defendant STEVEN ZINNEL's interest in Company 1;

2   b.   payments defendant STEVEN ZINNEL was receiving from Company

3        1 through Done Deal;

4   c.   defendant STEVEN ZINNEL's interest in Done Deal's bank

5        account;

6   d.   defendant STEVEN ZINNEL's interest in 4Results;

7   e.   defendant STEVEN ZINNEL's interest in Auto and Boat Store;

8   f.   defendant STEVEN ZINNEL's interest in the Luyung Property.

9   3.   To further the concealment of assets, defendant STEVEN ZINNEL

10  made the following false statements, among others:

11       a.   On or about August 18, 2005, defendant STEVEN ZINNEL signed

12  and filed with the Bankruptcy Court a "Summary of Schedules" with

13  attached schedules of his assets and liabilities, declaring under

14  penalty of perjury therein that all of the information contained in

15  them was true and correct. The Summary of Schedules and attached

16  schedules omitted any mention of defendant STEVEN ZINNEL interest in

17  Auto and Boat Store, 4Results, Done Deal, the Luyung Property, and

18  Company 1.

19       b.   On or about August 18, 2005, defendant STEVEN ZINNEL signed

20  and filed with the Bankruptcy Court a "Statement of Financial

21  Affairs," declaring under penalty of perjury therein that all of the

22  information contained in it was true and correct. Question 18 of the

23  Statement of Financial Affairs concerned "Nature, location, and name

24  of business." It stated,

25       If the debtor is an individual, list the names, taxpayer
         identification numbers, nature of businesses, and beginning and

26       ending dates of all businesses in which the debtor was an
         officer, director, partner, or managing executive of a

27       corporation, partnership, sole proprietorship, or was a self-
         employed professional within the six years immediately preceding

28       the commencement of this case, or in which the debtor owned 5

7

1   percent or more of the voting or equity securities within six

2   years immediately preceding the commencement of this case.

3   Defendant STEVEN ZINNEL omitted any mention of Auto and Boat Store,

4   4Results, Done Deal, and Company 1 from his answer to Question 18.

5        c.   On or about August 24, 2005, defendant STEVEN ZINNEL

6   testified under oath in a hearing of creditors called a "341

7   Hearing."

8        i.   In the 341 Hearing, defendant STEVEN ZINNEL falsely

9   stated under oath that he had no property that was not listed on his

10  schedules; and

11       ii.   In the 341 Hearing, defendant STEVEN ZINNEL falsely

12  stated under oath that all of Corporate Control's assets had gone to

13  First Bank and Trust in 2002.

14  4.   To further the concealment of assets, defendants STEVEN ZINNEL

15  and DERIAN EIDSON employed the following ways and means, among

16  others:

17       a.   Defendant STEVEN ZINNEL used Auto and Boat Store to

18  disguise defendant STEVEN ZINNEL's control over the Luyung Property;

19       b.   Company 1 made payments to defendant STEVEN ZINNEL through

20  checks to Done Deal;

21       c.   The checks to Done Deal were deposited into the Done Deal

22  bank account; and

23       d.   defendant STEVEN ZINNEL used the Done Deal bank account to

24  pay for his own wine, travel, groceries, restaurant meals, and other

25  personal expenses.

26  5.   On or about September 6, 2006, defendant STEVEN ZINNEL'S Chapter

27  7 Bankruptcy was discharged.

28  / / /

8

BS 6047

| COUNT | DEFENDANT(S) | DATE OF CHECK | FALSE PURPOSE | AMOUNT |
|---|---|---|---|---|
| 4 | ZINNEL and EIDSON | Dec. 27, 2006 | Substation equipment | $139,524.00 |
| 5 | ZINNEL and EIDSON | Oct. 4, 2007 | Legal work | $3,333.00 |
| 6 | ZINNEL and EIDSON | Oct. 4, 2007 | Legal work | $4,826.20 |
| 7 | ZINNEL | Oct. 9, 2007 | Safety training | $42,348.00 |
| 8 | ZINNEL | Dec. 28, 2007 | Safety training, legal work, and management consulting | $146,752.00 |
| 9 | ZINNEL | Feb. 14, 2008 | Safety training and other purposes | $42,534.00 |
| 10 | ZINNEL | Apr. 1, 2008 | Management consulting and yard rent | $111,341.00 |
| 11 | ZINNEL | June 12, 2008 | Consulting "Payout" | $162,171.00 |
| 12 | ZINNEL | July 7, 2008 | Consulting "Payout" | $162,171.00 |

All in violation of Title 18, United States Code, Sections 2 and 1956(a)(1)(B)(i).

COUNT THIRTEEN:     [18 U.S.C. § 1957 - Transactions in Criminally Derived Property]

The Grand Jury further charges: T H A T

DERIAN EIDSON

defendant herein, on or about June 8, 2006, in the State and Eastern District of California and elsewhere, did knowingly engage and attempt to engage in a monetary transaction by, through, and to a financial institution, affecting interstate and foreign commerce, in criminally derived property of a value greater than $10,000, that is

13

---

deposit $171,200.43 in U.S. funds, such property having been derived from a specified unlawful activity, that is, a violation of Title 18, United States Code, Section 152, all in violation of Title 18, United States Codes, Sections 2 and 1957.

COUNT FOURTEEN:     [18 U.S.C. § 1957 - Transactions in Criminally Derived Property]

The Grand Jury further charges: T H A T

DERIAN EIDSON

defendant herein, on or about December 19, 2006, in the State and Eastern District of California and elsewhere, did knowingly engage and attempt to engage in a monetary transaction by, through, and to a financial institution, affecting interstate and foreign commerce, in criminally derived property of a value greater than $10,000, that is

transfer $82,511.25 from her client trust account at Washington Mutual Bank to her personal account at Washington Mutual Bank, such property having been derived from a specified unlawful activity, that is, a violation of Title 18, United States Code, Section 152, all in violation of Title 18, United States Codes, Sections 2 and 1957.

COUNT FIFTEEN:     [18 U.S.C. § 1957 - Transactions in Criminally Derived Property]

The Grand Jury further charges: T H A T

STEVEN ZINNEL, and DERIAN EIDSON

defendants herein, on or about January 10, 2007, in the State and Eastern District of California and elsewhere, did knowingly engage and attempt to engage in a monetary transaction by, through, and to a financial institution, affecting interstate and foreign commerce, in criminally derived property of a value greater than $10,000, that is

14

BS 6048

1    before, this began in 2)01, so that's over a decade that this

2    has been going on. That's a huge chunk of time. So a one-time

3    lapse in judgment doesn't last 10 years.

4    This has been going on through Your Honor's

5    supervised release order, which she violated just last year.

6    She made contact with Zinnel. She accepted his money that he

7    sent her from jail under disguised terms.

8    So, you know, the idea that there's going to be

9    rehabilitation and reform, when is that going to kick in? It

10    didn't kick in when she was served with the Grand Jury

11    subpoena. It didn't kick in when she was convicted.

12    And those same friends, we would assume, have been

13    there all along. And some of them even testified here in

14    trial. So I don't doubt that she has loyal friends. I do

15    doubt that they are going to be the force that turns her

16    around. So that's on rehabilitation.

17    I also want to speak about the sentencing disparity

18    that opposing counsel touched on. Even to the extent that this

19    is a disparate sentence -- and my co-counsel points out to me

20    that in the Luong case Judge Shubb give a near life sentence

21    for money laundering. So this is relatively short.

22    But even if there's a disparity, and under Treadwell

23    even if this Court wants to consider that, a high sentence

24    would be appropriate in this case given all the factors at play

25    here.

# United States District Court
## Eastern District of California

| | |
|---|---|
| UNITED STATES OF AMERICA | JUDGMENT IN A CRIMINAL CASE |
| v. | (For Offenses Committed On or After November 1, 1987) |
| JOHN THAT LUONG, AKA AH SING | Case Number: 2:90CR00433-01 |
| | Richard Mazer, Appointed |
| | *Defendant's Attorney* |

**THE DEFENDANT:**

[ ] pleaded guilty to count(s): ___

[ ] pleaded nolo contendere to count(s) ___ which was accepted by the court.

[✓] was found guilty on count(s) 1, 2, 3, 4, 5, 6, 7, 8, 9 of the Indictment after a plea of not guilty.

ACCORDINGLY, the court has adjudicated that the defendant is guilty of the following offense(s):

| Title & Section | Nature of Offense | Date Offense Concluded | Count Number(s) |
|---|---|---|---|
| See Page 2 | | | |

The defendant is sentenced as provided in pages 2 through 6 of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

[ ] The defendant has been found not guilty on count(s) ___ and is discharged as to such count(s).

[ ] Count(s) ___ (is)(are) dismissed on the motion of the United States.

[✓] Indictment is to be dismissed by District Court on motion of the United States.

[ ] Appeal rights given.    [ ] Appeal rights waived.

IT IS FURTHER ORDERED that the defendant shall notify the United States Attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

| | |
|---|---|
| March 1, 2010 | |
| Date of Imposition of Judgment | |
| | *[signature]* |
| | Signature of Judicial Officer |
| | WILLIAM B. SHUBB, United States District Judge |
| | Name & Title of Judicial Officer |
| | March 8, 2010 |
| | Date |

---

CASE NUMBER: 2:90CR00433-01                                   Judgment - Page 2 of 6
DEFENDANT: JOHN THAT LUONG, AKA AH SING

| Title & Section | Nature of Offense | Date Offense Concluded | Count Number(s) |
|---|---|---|---|
| 18 USC 1951(a) | Conspiracy to Commit a Robbery Affecting Interstate Commerce | 1/25/1995 | 1 |
| 18 USC 924(c)(1) | Use of a Firearm During a Crime of Violence | 1/25/1995 | 2 |
| 18 USC 924(j)(1) and 2 | Death Caused by Use of a Firearm During a Crime of Violence and Aiding and Abetting | 1/25/1995 | 3 |
| 18 USC 1951(a) | Conspiracy to Commit a Robbery Affecting Interstate Commerce | 12/22/1995 | 4 |
| 18 USC 924(c)(1) | Use of a Firearm During a Crime of Violence | 12/22/1995 | 5 |
| 18 USC 1951(a) | Conspiracy to Commit a Robbery Affecting Interstate Commerce | 11/17/1996 | 6 |
| 18 USC 924(c)(1) | Use of a Firearm During a Crime of Violence | 11/17/1996 | 7 |
| 18 USC 1951(a) | Conspiracy to Commit a Robbery Affecting Interstate Commerce | 1/20/1996 | 8 |
| 18 USC 924(c)(1) | Use of a Firearm During a Crime of Violence | 1/20/1996 | 9 |

R < 6087

AO 245B-CAED (Rev 9/98) Sheet 2 - Imprisonment
Case 2:99-cr-00433-WBS   Document 1411   Filed 03/08/10   Page 3 of 6
CASE NUMBER:    2:99CR00433-01
DEFENDANT:    JOHN THAT LUONG, AKA AH SING

Judgment - Page 3 of 6

## IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a total term of 240 months as to each of Counts 1, 4, 6, 8 to be served concurrently to each other and concurrently to Counts 2, 5, 7 and 8; Life as to Count 3 to be served concurrently to Counts 1, 4, 6, 8 and consecutively to Counts 2, 5, 7 and 9; 240 months as to each of Counts 2, 5, 7, and 9 to be served consecutively to each other consecutively to Count 3, and consecutively to Counts 1, 4, 6 and 8; all such terms imposed to be served for a total term of life plus 960 months.

☐ The court makes the following recommendations to the Bureau of Prisons:

☑ The defendant is remanded to the custody of the United States Marshal.

☐ The defendant shall surrender to the custody of the United States Marshal.
   [ ] at _____ on _____.
   [ ] as notified by the United States Marshal.

☐ The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:
   [ ] before _____ on _____.
   [ ] as notified by the United States Marshal.
   [ ] as notified by the Probation or Pretrial Services Officer.
   If no such institution has been designated, to the United States Marshal for this district.

## RETURN

I have executed this judgment as follows:

Defendant delivered on _____ to _____
at _____, with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
        Deputy U.S. Marshal

---

AO 245B-CAED (Rev 9/98) Sheet 3 - Supervised Release
Case 2:99-cr-00433-WBS   Document 1411   Filed 03/08/10   Page 4 of 6
CASE NUMBER:    2:99CR00433-01
DEFENDANT:    JOHN THAT LUONG, AKA AH SING

Judgment - Page 4 of 6

## SUPERVISED RELEASE

Supervised release: No terms or conditions of supervised release are imposed as ordered by the Court unless defendant's sentence is overturned and defendant is sentenced to a term of less than Life, at which time the court will then reconsider said sentence as is appropriate.

BS 6083

AO 245B (Rev. 9/00) Judgment in a Criminal Case

**Date of Original Judgment: August 9, 2001**
(or Date of Last Amended Judgment)

**Reason for Amendment:**

[X] Correction of Sentence on Remand (Fed.R.Crim.P.35(a))
[ ] Reduction of Sentence for Changed Circumstances
       (Fed. R.Crim.P.35(b))
[ ] Correction of Sentence by Sentencing Court (Fed.R.Crim.P.35(c))
[ ] Correction of Sentence for Clerical Mistake (Fed.R.Crim.P.36)

[ ] Modification of Supervision Conditions (18 U.S.C. §§ 3563(c) or 3583(e))
[ ] Modification of Imposed Term of Imprisonment for Extraordinary and
       Compelling Reasons (18 U.S.C. § 3582(c)(1))
[ ] Modification of Imposed Term of Imprisonment for Retroactive
       Amendment(s) to the Sentencing Guidelines (18 U.S.C. § 3582(c)(2))
[ ] Direct Motion to District Court Pursuant to [ ] 28 U.S.C. § 2255 or
       [ ] 18 U.S.C. § 3559(c)(7) or [ ] Modification of Restitution Order
       (18 U.S.C. § 3664)

# United States District Court

## Northern District of California

UNITED STATES OF AMERICA
v.
JOHN THAT LUONG

**AMENDED JUDGMENT IN A CRIMINAL CASE**
(For Offenses Committed On or After November 1, 1987)

Case Number:      CR 96-0094-01 MHP

Richard Mazer, appointed
Defendant's Attorney

**THE DEFENDANT:**

[ ] pleaded guilty to count(s) ___
[ ] pleaded nolo contendere to count(s) ___ which was accepted by the court.
[X] was found guilty on count(s) 1, 2, 10, 11, 12, 13, 14, 15, 16, 17 and 19 of this Indictment after a plea of not guilty.

THE DEFENDANT:

See next page.

| Title & Section | Nature of Offense | Date Offense Concluded | Count Number(s) |
|---|---|---|---|

     The defendant is sentenced as provided in pages 2 through 10  of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984. This court's bench order, made at the time of sentencing, is hereby deemed incorporated.

[ ] .  The defendant has been found not guilty on count(s) 18 and #14 of racketeering act of the Indictment.

     IT IS FURTHER ORDERED that the defendant shall notify the United States Attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant shall notify the court and United States attorney of any material change in the defendant's economic circumstances.

|  |  |
|---|---|
| | June 12, 2009 |
| | Date of Imposition of Amended Judgment |

Defendant's Soc. Sec. No.:     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

Defendant's Date of Birth:     12/16/71          _signature_

Defendant's USM No.:     08838-097          Signature of Judicial Officer

Defendant's Residence Address:     Honorable Marilyn Hall Patel, Chief U.S. District Judge
In Federal Custody                                   Name & Title of Judicial Officer

Defendant's Mailing Address:     February 18, 2011
In Federal Custody                             Date

---

AO 245B (Rev. 9/00) - Judgment in a Criminal Case

DEFENDANT:     JOHN THAT LUONG
CASE NUMBER:     CR 96-0094-01 MHP

Judgment - Page 2 of 10

**ADDITIONAL COUNTS OF CONVICTION**

| Title & Section | Nature of Offense | Date Offense Concluded | Count Number(s) |
|---|---|---|---|
| 18 USC § 1962(c) | Racketeer Influence and Corrupt Organization | | 1 |
| 18 USC § 1962(d) | Racketeer Influence and Corrupt Organization | | 2 |
| 18 USC § 1951(a) | Conspiracy to Commit a Robbery Affecting Interstate Commerce | | 10, 11,13 |
| 18 USC § 924(c)(1) | Use of a Firearm to Commit a Violent Felony | | 12, 15 |
| 21 USC § 846 | Conspiracy to Distribute Heroin | | 16 |
| 21 USC § 841(a)(1) | Distribution of Heroin | | 17 |
| 21 USC § 843(b) | Unlawful Use of a Telecommunications Facility | | 19 |

BS 6084

AO 245B (Rev. 9/00) - Imprisonment

DEFENDANT: JOHN THAI LUONG
CASE NUMBER: CR 96-0094-01 MHP

Judgment - Page 3 of 10

## IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned as follows:

Count 1: 20 years;
Count 2: 20 years, to be served consecutively to the sentence imposed on count 1;

Counts 10, 11, 13, 14, 16, and 17: 10 years as to each count, to be served concurrently to the sentence imposed on count 1, and concurrently to each other;

Count 12: 5 years, to be served consecutively to the sentence imposed on count 1;

Count 15: 20 years, to be served consecutively to the sentence imposed on count 2;

Count 19: 4 years, to be served concurrently to the sentence imposed on count 2;

for a total term of 65 years.

[x] The defendant is remanded to the custody of the United States Marshal.

Defendant delivered on _____ to _____

at _____

## RETURN

I have executed this judgment as follows:

_____ with a certified copy of this judgment.

UNITED STATES MARSHAL

By _____
Deputy U.S. Marshal

---

AO 245B (Rev. 9/00) - Sheet 3 - Supervised Release

DEFENDANT: JOHN THAI LUONG
CASE NUMBER: CR 96-0094-01 MHP

Judgment - Page 4 of 10

## SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of 4 years as to each of counts 1, 2, 10, 11, 12, 13, 14, 17, and 19, to be served concurrently;

While on Supervised Release you shall not commit another federal, state or local crime and shall not illegally possess a controlled substance. Revocation of supervised release is mandatory for possession of a controlled substance.

The defendant shall refrain from any unlawful use of a controlled substance. The defendant shall submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter.

[ ] The above drug testing condition is suspended based on the court's determination that the defendant poses a low risk of future substance abuse. (Check if applicable)

[x] The defendant shall not possess a firearm, destructive device, or any other dangerous weapon.

[x] Revocation of supervised release is mandatory for refusal to comply with drug testing imposed as a condition of supervision. 18 U.S.C. Sections 3565(b)(3) and 3583 (g)(3)

The defendant shall pay the assessment imposed in accordance with 18 U.S.C. Section 3013, and shall immediately notify the probation officer of any change ... that might affect his ability to pay a special assessment, fine, restitution, or co-payments imposed in accordance ...

If the judgment imposed a fine or a restitution obligation, it shall be a condition of supervision that defendant pay any such fine or restitution that remains unpaid at the commencement of the term of supervision in accordance with any Schedule of Payments set forth in the Criminal Monetary Penalties sheet of the judgment. In any case, the defendant shall cooperate with the probation officer in meeting any financial obligations.

BS 6085



U.S. Department of Justice

Federal Bureau of Investigation

In Reply, Please Refer to
File No.

209A-SC-40611 ~6

Sacramento, California
November 20, 2006

MICHELLE ZINNEL
6█████████████████
ROSEVILLE, CA 95678
HCF - HIPAA VIOLATION

This case was initiated by the Sacramento Division on July 7, 2006 in reference to an HHS/OIG referral, set out in electronic communication 209-HQ-r517272-HIPAA serial 78, regarding a Health Insurance Portability and Accountability Act (HIPAA) violation.

Captioned matter was being investigated under case file 209A-SC-40611 and assigned to Special Agent Laura Jones.

The captioned subject was currently cooperating with the government and has faxed over a written and signed confession.

AUSA Matthew Segal/Eastern District of California, has declined prosecution of the HIPAA violation, but has agreed to work with SA Jones to determine if other offenses exist that can be prosecuted.

Please direct any questions to SA Laura Jones at (916) 977-2289.

Michelle Zinnel is described as follows:

Sex: Female
Hair: Brown
Eyes: Green
Height: 5 feet, 8 inches
Weight: 140 lbs
CA DL#: ████████████
SSN: ████████████
DOB: 10/21/1964

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

BS 6094    ZBK037053

Despite the general belief that no corporate executives go to prison, the feds have gotten quite aggressive in pursuing white-collar cases. Recent cases have shown the government s willingness to use wiretaps, hidden microphones, informants and undercover sting operations to nail white-collar suspects. In the past, these methods were traditionally used to bust drug runners and organized crime figures. But have some of the tactics gone too far to prove investigators' theories of the criminal activity? One case in the Eastern District of California shows just how far the government will go.

Federal authorities believed that Steven Zinnel had not disclosed all of his assets in a bankruptcy filing that had been discharged in 2008. He listed $842,000 in assets and over $6,000,000 in various debts. Acting on some information from an interested party, an ex-wife, Zinnel became a target of a federal investigation to determine if and how much he had fudged those figures. During the investigation the FBI had a theory that Zinnel s girlfriend, an attorney in Orange County California, was helping him hide assets.

Derian Eidson had practiced law in civil defense cases in Southern California. She began dating Zinnel after his contentious divorce in 2001 and also represented him in some business issues. Zinnel was an entrepreneur who had his hands in a myriad of businesses, but the financial downfall that landed him in bankruptcy was mostly due to a series of business mishaps, including a default on a large electrical contract worth over $700,000 that came as a result of Enron's collapse. According to a

federal indictment in June 2011, Zinnel's divorce, coupled with the bankruptcy, led him to be less than forthcoming with information related to his assets. One of those assets was in a company called System 3.

According to the indictment, Zinnel set up an outside-electrical contracting company, System 3, with an investment of $170,000 in October 2001. However, his name did not appear on any of the documentation of the company but each month, beginning in 2007 (two years after his bankruptcy) System 3 would pay a consulting fee that the government alleged was meant for Zinnel. The arrangement seemed dubious to investigators. Further, those fees for consulting and other legal work were being sent to a company owned by Eidson, Done Deal, and where Zinnel was listed as an employee. While Done Deal generated other, and significantly more income from Eidson's legal work and real estate activities, the government alleged that its sole purpose was to hide Zinnel's assets, something Eidson has always denied.

By 2008, System 3 had become more successful, the consulting payments to Done Deal continued to flow, but the relationship between Zinnel and company management was deteriorating. System 3's sole owner, Tom Wilbert, arranged a meeting with Zinnel for a one-time buyout for the consulting.

In late 2008, Wilbert offered Zinnel $4 million to sever all ties with System 3.. It was a generous offer and Zinnel accepted. However, the offer was part of an elaborate set-up by federal investigators who were working with System 3 to build a case that the payment offered was in exchange for Zinnel's undisclosed ownership in the company, not a settlement for future consulting fees. The System 3 settlement would be a perfect opportunity to prove their case but they needed more evidence on Eidson. Wilbert, who was cooperating with the FBI, suggested that Eidson travel to Sacramento to put together the final agreement with the attorney representing System 3.

Eidson, acting more as a friend [girlfriend] doing Zinnel a favor, would attend two meetings in Sacramento in February and March 2009 with a lawyer representing System 3 and a legal assistant. The initial terms of the contract concerned her as it made reference to Zinnel's undisclosed ownership in the company and no mention of the termination of a consulting agreement. Eidson insisted that the agreement be changed based on information she had from her client, Zinnel. What Eidson did not know was that the legal assistant was an undercover FBI agent and the System 3 attorney was cooperating with the federal government. Zinnel would never sign the $4 million agreement to terminate his consulting nor would he ever see any of the money. He and Eidson would be indicted on charges that they conspired to hide assets for Zinnel.

"What is interesting about this case," said David Benowitz of Price Benowitz LLP, whose firm represents white collar clients in federal court but is not representing any of the clients in this case, "is that you have an attorney who, while working undercover for the government is very much still representing the interests of his client [System 3].. So this is not a normal undercover operation based on what I know about the case and my experience."

As with most all federal criminal cases, both Eidson and Zinnel were offered plea agreements by the federal government. In a letter dated April 27, 2010, Assistant U.S. Attorney Matthew Segal (Eastern District of California) offered Eidson a deal that would put her in prison for a year and Zinnel for five. Segal noted in the letter that this was a "generous offer" and that Eidson "...will never again be offered a misdemeanor." Both she and Zinnel rejected the offer and took their case to trial. In Eidson's case, she believed in her innocence and was confident in victory. Pleading guilty would mean the certainty of losing her law license and destroying her career. Not pleading guilty makes for a lot more work for prosecutors and usually results in a much harsher punishment when the defendant is found guilty.

BS 6127

In July 2013, Zinnel would be found guilty on multiple counts of fraud, including bankruptcy fraud. Eidson on the other hand was cleared of any charges associated with bankruptcy fraud and the jury failed to reach a verdict on a number of other charges ... except for those related to the undercover settlement meeting in Sacramento (money laundering conspiracy and attempted money laundering). So the only charges she faced were related to a staged settlement meeting where she was working on behalf of Zinnel to draft an agreement .... no negotiation of any money related to the settlement ... no contract ever executed ... no exchange of money.

Prosecutors had asked for tough sentences and they used the $4 million settlement offer to push for higher sentences. , the same prosecutors that had offered those generous plea deals long before the trial. Eidson's sentence should have been based on her sole actions during those settlement meetings in Sacramento. The offer of $4 million was not her offer, according to Eidson's pretrial motion, but instead was offered by System 3's owner, with encouragement from federal agents, and accepted by Zinnel.

That System 3 offer to Zinnel was used in calculating the prison sentence for Eidson under the Federal Sentencing Guidelines (the points associated with a table to recommend a prison term). The dollar amount, $4 million, added 18 points to Eidson's calculation .... sophisticated means added another 2 points .. sophisticated money laundering added another 2 points ...

obstruction (related to invoices the government claims Eidson did not provide) ... she also got another 2 points for being in a position of trust (a lawyer). Thirty-one points later and Eidson's guidelines were 108-135 months ... 9 years to over 11 years. This for a "crime" that was all fabricated by the government. U.S. District Judge Troy L.. Nunley, who had been newly appointed by President Obama at the time of the trial, came down hard on Eidson, sentencing her to 121 months. Zinnel was sentenced to 18 years.

For Eidson, it was an incredibly long sentence for a first time, non-violent offender who was involved in an alleged crime that had no real money exchanged. In the end, System 3 agreed o pay $2.8 million to the government that would have otherwise gone to Zinnel. (Note the government's payout was far less that the dollar settlement offer used in the sting operation and to determine Eidson's sentence.. Of that amount, Zinnel's ex-wife received $305,000 and his children received $300,000. In addition, System 3 paid $350,000 to the bankruptcy court.

Eidson is now appealing her conviction based on the evidence that was submitted as a result of the Sacramento settlement meeting. Her position is that the Federal Rules of Evidence 408 prohibits the government from using information obtained during settlement discussions between parties. It is also against the California State Bar rules and National Canons of Ethics for a lawyer to lie in a settlement meeting.

After numerous delays, Eidson's opening brief for her appeal is expected to be filed later this summer. She has been incarcerated for nearly two years already and been transported to over seven different prison facilities in that time, A decision on her case may not come until late 2016.

BS 6128

FROM: Pavlo, Walt

DATE: 06/27/2016 07:06:08 AM

DealBook's Peter Henning recently wrote about lawyers who testify against their own clients. It is an odd situation where a client had assumed some expectation of confidentiality with their attorney then he/she turned around and shared that information with authorities. As Henning wrote, " There may be no more fertile ground for obtaining damaging information in an investigation than from a lawyer about a client." That exception may be a lawyer wearing a wire for the feds.

Derian Eidson. a former attorney, is serving a 10 year prison term for negotiating a business transaction on behalf of her client, and boyfriend, Steven Zinnel. Zinnel was convicted of 15 counts of bankruptcy fraud and money laundering in an 11-day trial in July 2013. Eidson was cleared of the charges related to the bankruptcy fraud (she played no part in Zinnel's bankruptcy filing), however she was convicted on money laundering charges for her role in a government-staged business transaction. Zinnel would be sentenced to one of the longest prison terms for a bankruptcy fraud case in U.S. history.

Eidson, who was involved in two negotiation meetings in early 2009 on behalf of Zinnel, would end with no agreement for Zinnel to be bought out of his business interests he had with System 3. System 3, a commercial electrical contractor, was started with seed money from Zinnel but over the years he had become an unwelcome consultant by the company's owner Tom Wilbert.

The FBI believed that Zinnel was hiding his interests in System 3 in order to avoid paying money in his contentious divorce. They also believed that Eidson was assisting him. Wilbert was approached by the FBI to set up a negotiation to offer Zinnel a deal he could not refuse, $4 million to walk away from System 3. Wilbert arranged for Eidson to meet with his attorney, Frank Radoslovich, in early 2009 to negotiate the deal. Radoslovich, Eidson and an FBI agent posing as a paralegal representing System 3, entered discussions on the settlement but no settlement ever came out of the discussions. No money was transferred and no deal was ever signed, however, in June 2011 Eidson and Zinnel were indicted.

Eidson argued that, "the government cannot create a false conspiracy to just try to produce admissions." Evidently they can, because Eidson was convicted in July 2013 and sentenced to 121 months in prison. She is currently incarcerated in the women's federal prison in Victorville, CA with a release date of August 10, 2022.

She has now filed an appeal to have her conviction overturned for the aggressive tactics used in the sting, the amount of money calculated as a "loss" and faulty jury instructions. As to the aggressive nature of the sting, even the cooperating attorney, Radoslovich, testified that he had not entered into this arrangement without some pressure, saying, "So that s why I did it [wear wire], because he [Wilbert] wanted me to cooperate and I was his lawyer." Eidson contends that the jury only heard portions of the taped settlement talks and did not hear portions where she was relying on Radoslovich's opinion as a lawyer representing System 3.

As to the money laundering instructions to the jury, Eidson states that there was no settlement and no money was ever exchanged ... nor did the perceived settlement have anything to do with Zinnel's bankruptcy fraud charges. A more general money laundering instruction was allowed to be considered by the jury. On the loss amount used to sentence Eidson, $4 million, it triggered additional points (more months in prison) under the Federal Sentencing Guidelines, when there was no real loss because there was no settlement ... there was no money. In the end, System 3 would end up paying a much lesser amount on behalf of a real settlement with Zinnel that was paid to the Bankruptcy Court ... $2.8 Million.

Zinnel has also filed an appeal as well, noting that his sentence is longer than any other bankruptcy criminal case in the history of the U.S.

Now, both Zinnel and Eidson will have an even longer wait. The government recently filed for and received an extension to reply to their appeal ... 9 months. The 9th Circuit of Appeals has granted the government until February 23, 2017 to give their position on the appeals of Zinnel and Eidson. It appears the right to a Speedy Appeal are as likely as a Speedy Trial. If their convictions are overturned, it may not be decided until early 2018 when both have already served four years in prison.

By any measure, Eidson's and Zinnel's prison terms rank as some of the longest for white collar-type crimes. In comparison, of all those pleading guilty or convicted in the Bernie Madoff scandal, only Bernie is serving a longer prison term than either Eidson or Zinnel.

The tactic of using a lawyer for settlement negotiations in a sting is good one when looking to nail someone. There is an environment of trust, where discussions can be candid so that a deal can be struck. In fact, confidential settlements are just as important to commerce as they are to justice ... and in this case it appears both have been compromised by an aggressive prosecution.

BS 6129

LONGEST BANKRUPTCY FRAUD SENTENCES IN THE HISTORY OF THE UNITED STATES BY CIRCUIT
Last Updated: 8/5/15

Steven Zinnel's exhaustive and thorough research is that Zinnel's almost 18 year prison sentence is the longest sentence in United States history for Bankruptcy Fraud, by DOUBLE. Noteworthy, the second longest prison sentence for bankruptcy fraud is out of the Eastern District of California - Sacramento as well.

Excludes all cases that were primarily a Ponzi scheme, bank fraud, wire fraud, mail fraud, securities fraud, tax fraud, violent crime... with a Bankruptcy Fraud kicker at the end. The cases below are listed by length of sentence.

Search Terms: "Bankruptcy Fraud" and "sentence" and "months" and "money laundering"

|  | SENTENCE BEFORE APPEAL |
| --- | --- |
| NINTH CIRCUIT longest sentence (previous U.S. record) | |

U.S. v. Klassy, 409 Fed. Appx. 169 (9th, 2011), 487 Fed. Appx. 363 (9th, 2012)          121 MONTHS
2nd longest in the history of the United States - E.D. CA - Sacramento
Trial
Convictions: Bankruptcy fraud 18 USC 152(1), 152(3), money laundering 18 USC 1956(a)(1)(B)(i), transactions involving
            criminally derived property 18 USC 1957
Key facts:
No fine imposed
Now 2nd longest sentence in the history of the United States for bankruptcy fraud because it is less than half of Zinnel's
Even though similarly situated defendants found guilty received significantly less prison time, Klassy did not raise on appeal
   the sentencing factor of disparity (18 USC 3553(a)(6)) for the then record sentence nor did he raise on appeal that the
   sentence was substantively unreasonable, thus the Court of Appeal never considered the draconian sentence of 121 months
Eastern District of California - Sacramento case; Judge Morrison England was the trial judge
Found guilty of 28 counts
Government sought guideline sentence of 168-210 months; 14 years to 17.5 years


EIGHTH CIRCUIT longest sentence

U.S. v. Hecker, D. Minn. 10-cr-32 JNT                                          120 MONTHS
Plea
Convictions: Bankruptcy fraud
Key facts:
No fine imposed
Largest Auto Dealer in Minnesota - owned dozens of auto dealerships
Loss $31 million
Bankruptcy schedules listed:
   Assets of    $ 18,508,972
   Liabilities of $766,754,240 (3/4 of a billion dollars)
PSR found O.L. of 40 and recommended between 292-365 months in prison
Plea Agreement was for 151-188 months in prison
This case was listed on Zinnel's Table of Cases attached to his Sentencing Memorandum (see ECF#307-1, pg 53)

BS 6131

FIFTH CIRCUIT longest sentences

U.S. v. Rosbottom, 763 F.3d 408 (5th, 2014)                                          120 MONTHS
Trial                                                            Employee girlfriend Co-D  60 MONTHS
Convictions: Bankruptcy fraud 18 USC 152(1), 152(7), Money laundering 18 USC 1956(a)(1)(A)(i) & (B)(i)
            Conspiracy to commit at least one offense against United States 18 USC 371
Key facts:
No fine imposed
Restitution $5,353,102

Forfeiture $1,677,506
Rosbottom was an entrepreneur
Self-made multi-millionaire who owned over a 100 businesses
Bitter divorce
Boyfriend and girlfriend both convicted
Hid cashiers' checks, boat, plane
Rosbottom received a below guideline sentence
Rosbottom argued on appeal that his sentence of 120 months was substantively unreasonable in a bankruptcy fraud case were
the concealed assets were recovered and creditors will be paid in full. Relying on Fifth Circuit precedent, the Court of Appeals
held that Rosbottom's sentence is presumed reasonable because it falls within the properly calculated guideline range.
However, that is not the law in the Ninth Circuit as it is well-settled that "although a court may presume on appeal that a
sentence within the Guidelines range is reasonable, we decline to adopt such a presumption in this circuit." U.S. v. Carty, 520
F.3d 984, 993 (9th, 2008). Carty holds that the Guidelines are just one factor to be considered by the court, unwarranted
disparity, 18 USC 3553(a)(6), must figure more heavily in the balance, the district court must have a significant explanation in a
complex case, and when a party raises a specific nonfrivolous argument tethered to a relevant 3553(a) factor in support of a
requested sentence, the the judge should normally explain why he accepts or rejects the party's position.

U.S. v. Willey, 57 F.3d 1374 (5th, 1995)                                              97 MONTHS
Trial
Convictions: Bankruptcy fraud 18 USC 152(1), 152(2), Money laundering 18 USC 1956,
            False statement on loan application 18 USC 1014
Key facts:
Fine imposed: $15,000
$46,000,000 in creditor claims
32 count indictment

THIRD CIRCUIT longest sentence

U.S. v. Brennan, 326 F.3d 176 (3rd, 2003), 395 F.3d 59 (2nd., 2005)                   110 MONTHS
Trial
Convictions: Bankruptcy fraud 18 USC 152(1), (3), Money laundering 18 USC 1956(a)(1)(B)(i), 18 USC 1956
            Criminal Contempt of Court 18 USC 401(3)
Key facts:
No fine imposed
Criminal history II
$75,000,000 creditor claim in the form of a SEC judgment
Created off shore trusts funded with $4,000,000
Concealed $4,000,000 and $500,000 in casino chips
Off shore trusts grew to $22,000,000
Criminal contempt conviction resulted from violating court issued Freeze Order

SECOND CIRCUIT longest sentence

U.S. v. Sabbeth, 262 F.3d 207 (2nd, 2001)                                             97 MONTHS
Trial
Convictions: Bankruptcy fraud 18 USC 151(2), (7), Money laundering 18 USC 1956(a)(1)(A)(i), 18 USC 371
Key facts:
No fine imposed
Businessman who owned a lumber yard and personally guaranteed his corporation's $18,000,000 bank line of credit
On appeal, did not claim sentence was substantively unreasonable or disparity

BS 6132

ELEVENTH CIRCUIT longest sentences

U.S. v. Travers, 233 F.3d 1327 (11th, 2000)                                      78 MONTHS
Trial
Convictions: Bankruptcy fraud, Money laundering, Mail fraud, Equity skimming
Key facts:
No fine imposed
Did not appeal sentence

Between 1991 and 1995, Joseph Travers obtained title to more than 97 houses by assuming Veterans Administration (VA) and Federal Housing Association (FHA) guaranteed home loans. He did so under a variety of false names and aliases. Travers collected the rents on these properties, but never paid on any of the mortgages. Travers filed multiple fraudulent bankruptcy proceedings.

U.S. v. Hyatt, 369 Fed Appx. 48 (11th, 2010)                                     60 MONTHS
Trial                                                                    Wife Co-D  12 MONTHS
Convictions: Bankruptcy fraud 18 USC 152 (1), (2), (3), 1519,  Conspiracy to commit at least one offense against
          United States 18 USC 371
Key facts:
No fine imposed
Filed bankruptcy 6 different times and made false statements in 6 different bankruptcies
BK lawyer warned of perjury
19 count indictment
Restitution amount is $4,020,243

FIRST CIRCUIT longest sentence

U.S. v. Ledee, 772 F.3d 21 (1st, 2014)                                            72 MONTHS
Trial                                               Co-D is sister who is a bankruptcy attorney 36 MONTHS
Convictions: Bankruptcy Fraud 18 USC 152(1), 152(7), Money Laundering 18 USC 1956(a)(1)(B)(i), conspiracy
Key facts:
No fine imposed
Defendants are brother (Edgardo, a plastic surgeon with a JD) and sister (Astrid, a bankruptcy attorney)
Brother filed personal bankruptcy.
Sister also filed bankruptcy, but was not charged criminally in her own case; only her brother's
Brother blamed his troubles on his sister. i.e. brother threw sister under the bus.
7 day trial
Brother lied at meeting of creditors
The District Court stated at sentencing "it cannot overlook the serious of the offense, the actions of this defendant, and the apparent absence of clear repentance or remorse for criminal conduct that defendant Edgardo undertook knowingly and with deliberation."
Edgardo attacked his sentence as being substantively unreasonable arguing that his circumstances justified a downward departure to a sentence of probation with home confinement. However the Court of Appeal opined that "the district court took a measured approach to the pertinent sentencing factors."
Significantly, the court sided with Astrid in assessing the siblings' efforts to lay primary blame on the other.
The reviewing court further opined that "the linchpin of a reasonable sentence is a plausible sentencing rationale and a DEFENSIBLE result" citing U.S. v. Ramos, 763 F.3d 45, 58 (1st Cir, 2014) emphasis added. "The district court provided both here. We therefore reject Edgardo's claim that his sentence was substantively unreasonable."

TENTH CIRCUIT longest sentence

U.S. v. McAllister, 2015 U.S. App. Lexis 7375 (10th, 2015)                        78 MONTHS
Plea
Convictions: Bankruptcy fraud, wire fraud
Key facts:
No fine imposed
Attorney
Government characterized 78 months in prison as a "stiff sentence"
Engaged in a crime spree - for five years he embezzled funds
Violated court orders of 3 different judges

BS 6133

U.S. v. McIntosh, 124 f.3d 1330 (10th, 1997)                                    63 MONTHS
Trial
Convictions: Bankruptcy fraud 18 USC 152(1), money laundering 18 USC 1956(a)(1)(A)(i), 1956(a)(1)(B)(i),
          Transactions involving criminally derived property 18 USC 1957
Key facts:
No fine imposed
Attorney

Convicted on all 13 counts
On appeal, all 9 money laundering counts were reversed and one bankruptcy fraud count. Therefore, the Court of Appeal did
not reach substantive reasonableness of the sentence.

FOURTH CIRCUIT longest sentence

U.S. v. Lineberger, 1999 U.S. Lexis 11137 (4th, 1999)                           60 MONTHS
Trial
Convictions: Bankruptcy fraud, Wire fraud 18 USC 1343, False statements 18 USC 1001, 1010
          Money laundering 18 USC 1956(a)(1)(B)(i) Transactions involving criminally derived property 18 U.S.C. 1957
Key facts:
No fine imposed
Convicted on 13 counts
On appeal did not claim sentence was substantively unreasonable or unwarranted disparity

SEVENTH CIRCUIT longest sentence

U.S. v. Arthur, 582 F.3d 713 (7th, 2009), 2006 U.S. Dist. Lexis 92661, U.S. Dist. Lexis 93819        54 MONTHS
Trial                                                                 Co-D wife 12 MONTHS
Convictions: Bankruptcy fraud 18 USC 152(4), (5), Money laundering 18 USC 1856(a)(1)(B)(i), conspiracy
Key facts:
No fine imposed
Husband and wife and both were attorneys
Used shell corporations
District court ruled that cannot have sophisticated means and sophisticated money laundering (must be one or the other)
Failed to disclose that the was earning substantial income as a lawyer and real estate consultant
Found guilty of 23 of 26 counts
PSR determined O.L. 30 and recommended 97-121 months in prison
Judge considered Sentencing Factors. 3553(a), including disparity, and sentenced to 54 months in prison

SIXTH CIRCUIT longest sentence

U.S. v. Dale, 429 Fed. Appx. 576 (6th, 2011)                                    21 MONTHS
Trial
Convictions: Bankruptcy fraud 18 USC 152(1), (2), (3), 157(1)
Key facts:
No fine imposed
Charged with filing a bankruptcy petition for the purpose of executing or concealing a scheme to defraud the payment of child
support to his child's mother.
Found guilty on 7 counts
Following the jury's guilty verdict on all counts, the district court granted his motion for judgment of acquittal with respect to
Count 1, finding there was insufficient evidence that Dale filed the bankruptcy petition for the purpose of executing or
concealing scheme to defraud his child's mother.

/
CHARLES PONZI

Charles Ponzi's name will forever be associated with the financial fraud scheme he elevated to a way of life. After serving jail
time for minor financial crimes, in early 1920 he began offering investors a 50% return on their money in 45 days and a 100%
return in 90 days. Although it seemed too good to be true, the money poured in. Ponzi used money from new investors to pay
prior investors and fund his lavish lifestyle. By the time his fraud was discovered in August 1920, investors had lost 20 million
dollars and five banks had failed. Ponzi was sentenced to 3 YEARS in prison for his massive fraud.

BS 6134

NOS. 14-10141 & 14-10196

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
PLAINTIFF-APPELLEE,

V.

STEVEN ZINNEL AND DERIAN EIDSON,
DEFENDANTS-APPELLANTS.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF CALIFORNIA
D.C. NO. 2:11-CR-234-TLN

ANSWERING BRIEF OF THE UNITED STATES

PHILLIP A. TALBERT
United States Attorney

CAMIL A. SKIPPER
Assistant U.S. Attorney
Appellate Chief

AUDREY B. HEMESATH
MATTHEW D. SEGAL
KEVIN C. KHASIGIAN
Assistant U.S. Attorneys
Eastern District of California
501 I Street, Suite 10-100
Sacramento, California 95814
Telephone: (916) 554-2700

Attorneys for Appellee

BS 6801

record reflects the court's consideration of and adjudication of each of the objections.

Nothing on this record leads to the conclusion that the district judge would have any difficulty putting out of his mind his previously-expressed views. *Arnett*, 628 F.2d at 1165. Nothing on this record affects the appearance of justice. *Id.* Reassignment would entail waste and duplication out of proportion to preserving the appearance of fairness in this complex, dense fraud trial. *Id.* No factor weighs in favor of remand to a different judge.

## CONCLUSION

The government respectfully requests that this Court affirm both Zinnel and Eidson's convictions and sentences.

Respectfully submitted,

PHILLIP A. TALBERT
United States Attorney

/s/ Audrey B. Hemesath
AUDREY B. HEMESATH
MATTHEW D. SEGAL
KEVIN C. KHASIGIAN
Assistant United States Attorneys

BS 6802

Luyung property taxes using the bank account of another concealed asset, Done Deal. SER 48-52, 241, 776.

Auto & Boat Store and 4 Results were entities used to hold nominal interests in property that Zinnel controlled. Auto & Boat Store did not file any tax returns for the years 2004 through 2009. SER 778. 4 Results did not file any tax returns for any year between 2004 and 2009. SER 778.

The government introduced a summary chart showing the complex nature of the Luyung property transaction. SER 279. The result of the movement of the property was that the property was not in Zinnel's name in the years before he filed for bankruptcy, though it remained within his control. In addition, through the Tom Cologna loan, he was able to access the cash he needed to fund his next, secret business venture.

C. Zinnel launched a new secret business venture, and Eidson created a shell company to hide Zinnel's profits. ⑩ NO CITE TO RECORD

Also during the pre-bankruptcy years, Zinnel created System 3—a new electrical infrastructure business that grew to be very successful. Zinnel's concealment of his interest in System 3 caused

12

BS 6803



**NORTH AMERICAN TITLE COMPANY**

1504 Eureka Road, Suite 110
Roseville, CA 95661

Phone: (916) 783-1130
Fax: (916) 783-3860

## *SELLER'S FINAL SETTLEMENT STATEMENT*

ESCROW NO.: 54806-70001926-JMM
PROPERTY:

    Parcel # 072 0450 015

DATE: May 3, 2002

CLOSING DATE: May 3, 2002

SELLER:
Steve K Zinnell

BUYER:
Thomas A. Cologna and Linda A. Cologna

| | DEBIT $ | CREDIT $ |
|---|---|---|
| **FINANCIAL CONSIDERATION** | | |
| Total Consideration | | 161,000.00 |
| | | |
| **PAYOFF CHARGES** - Louise J. Ferris | | |
| [Total Payoff $153,041.30] | | |
| Principal Balance | 150,015.00 | |
| Interest on Principal Balance to 04/30/2002 | 2,877.00 | |
| Interest on Principal Balance at 10.0000% from 05/01/2002 to 05/04/2002 | 123.30 | |
| Abstract of Judgment issuance Fee | 7.00 | |
| Recording Fee(s) | 19.00 | |
| | | |
| **PRORATIONS/ADJUSTMENTS** | | |
| Taxes at $2230.79/semi-annually from 05/03/2002 to 07/01/2002 | | 718.81 |
| | | |
| **OTHER DEBITS/CREDITS** | | |
| Sacramento County Tax Collector for Property Taxes 2nd install. + penalty | 2,463.87 | |
| **TITLE/TAXES/RECORDING CHARGES** | | |
| Owners Title Policy Fee to North American Title Company | 637.60 | |
| Recording Satisfaction/Release to North American Title Company | 15.00 | |
| Documentary Transfer Tax to North American Title Company | 177.10 | |
| | | |
| **ESCRO '' CHARGES** | | |
| Escrow Fee to North American Title Company | 531.25 | |
| Document Preparation Fee to North American Title Company | 100.00 | |
| Notary Fee to North American Title Company | 10.00 | |
| Net Proceeds | | 4,742.69 |
| | | |
| **TOTAL** | $ 161,718.81 | $ 161,718.81 |

SAVE THIS STATEMENT FOR INCOME TAX PURPOSES

GOVERNMENT
EXHIBIT 117a
2:11-CR-234 TLN

Zinnel Def. - 200725

BS 6804

ER001341

**NORTH AMERICAN TITLE COMPANY**
COMMERCIAL DEPARTMENT
1524 EUREKA ROAD
ROSEVILLE, CA 95661
Net Proceeds1 #548-06

WARNING! · DO NOT CASH THIS CHECK
WITHOUT NOTING WATERMARK ON BOTH SIDES
AND HOLOGRAM ON FRONT SIDE.

Comerica

San Francisco Regional Office
San Francisco, CA 94111-3333

No. 607370

00-37/12/1211

ESCROW NO. 54806-70001926-JMM          May 3, 2002

AMOUNT $*****4,742.69

PAY          FOUR THOUSAND SEVEN HUNDRED FORTY-TWO AND 69/100 DOLLARS

VOID 150 DAYS FROM DATE OF ISSUE
TWO SIGNATURES REQUIRED

TO
THE
ORDER
OF

Steve K. Zinnell

11966 Old Eureka Way
Gold River, CA. 95670

THE FACE OF THIS DOCUMENT HAS A BLUE BACKGROUND • ANY OTHER COLORS MAY BE EVIDENCE OF CHEMICAL ALTERATION OR ERASURE

⑈607370⑈ ⑆121137522⑆ 1891611194⑈

---

APN: 072 0450 015 0000
ESCROW NO. 54806-70001926-JMM          DATE May 3, 2002          CHECK NO.          607370          No.   607370
                                                                                                      AMOUNT $*****4,742.69

Property:
Seller: Steve K. Zinnell

Buyer  Thomas A. Cologna and Linda A. Cologna

Net Proceeds

NORTH AMERICAN TITLE COMPANY

GOVERNMENT
EXHIBIT 1176
2:11-CR-234 TLN

Zinnel Def. - 200726

BS 6805
ER001342

2360455

ARTICLES OF INCORPORATION

OF

SYSTEM 3, INC.

**FILED** W
In the office of the Secretary of State
of the State of California

OCT 03 2001

BILL JONES, Secretary of State

ONE:     The name of this corporation is SYSTEM 3, INC.

TWO:     The purpose of this corporation is to engage in any lawful act or activity for which a corporation may be organized under the General Corporation Law of California other than the banking business, the trust company business or the practice of a profession permitted to be incorporated by the California Corporations Code.

THREE:   The name and address in the State of California of this corporation's initial agent for service of process is:

> Tom Wilbert
> 7010 Los Olivos Way
> Carmichael, CA  95608

FOUR:    The corporation is authorized to issue only one class of shares of stock; and the total number of shares which this corporation is authorized to issue is 1,000,000 common shares.

FIVE:    The liability of the directors of the corporation for monetary damages shall be eliminated to the fullest extent permissible under California Law.

SIX:     The corporation is authorized to provide indemnification of agents (as defined in Section 317 of the Corporations Code) for breach of duty to the corporation and its stockholders through bylaw provision or through agreements with the agents, or both, in excess of the indemnification otherwise permitted by Section 317 of the Corporations Code, subject to the limits on such excess indemnification set forth in Section 204 of the Corporations Code.

Dated:  October 2, 2001

Tom Wilbert, Incorporator

BS 6806
SER 0058

## S3 INITIAL CASH INVESTMENTS

| DATE | DEPOSIT AMOUNT | BANK | NOTES |
|---|---|---|---|
| 10/31/2001 | 1,500.00 | WFB | Deposited by Wilbert's |
| 11/30/2001 | 42,132.00 | WFB | Deposited by SKZ |
| 12/19/2001 | 210,069.00 | WFB | Deposited by SKZ |
| 5/28/2002 | 148,005.00 | E'Trade | Deposited by Wilbert's to E'Trade; Check written from Heritage CrU to System 3; Remitter, Chris Lagerstrom, Cashier's check |
| | 401,736.00 | TOTAL | |
| ?? | 100,000.00 | REPAYMENT | |
| | 301,736.00 | BALANCE | As of 1/15/05 |
| 4/11/2006 | 125,969.00 | PAYMENT | From E'Trade Account |
| | 175,767.00 | BALANCE | As of 4/12/06 |
| 7/15/2005 | 171,200.43 | PAYMENT | Wilbert's loan to S3 for DP on Property |
| | 4,566.57 | | Difference Owed To Clear |

DEFENDANT'S EXHIBIT

CASE NO. 11-234

EXHIBIT NO. N-21

BS 6807

SZ034770

THIS CHECK HAS A TRUE DOCUCHECK™ WATERMARK AND VISIBLE FIBERS DISCERNIBLE FROM BOTH SIDES



**HERITAGE**
COMMUNITY CREDIT UNION
P.O. BOX 790, RANCHO CORDOVA, CA 95741-0790 (916) 364-1700

90-7084
3211

VOID AFTER 6 MONTHS  **TC 243593**

DATE          AMOUNT
28MAR02     $ **148000.00

ONE HUNDRED FORTY EIGHT THOUSAND AND 00/100 DOLLARS

SYSTEM 3 INC. ***

CASHIER'S CHECK Remitter: CHRIS LAGERSTROM

AUTHORIZED SIGNATURE

THIS CHECK IS ALTERATION PROTECTED AND REFLECTS FLUORESCENT FIBERS UNDER UV LIGHT

FOR DEPOSIT ONLY
PAY TO THE ORDER OF:
E*TRADE

GOVERNMENT
EXHIBIT 104g
2:11-CR-234 TLN

BS 6808

ER001336

1          THE COURT:  ·Any opposition?

2          MS. HEMESATH:  No objection.

3          MS. DALY:  No, Your Honor.

4          THE COURT:  All right. [Defendant Zinnel's N21 will be

5     moved into evidence at this time. ]

6                        (DEFENDANT'S EXHIBIT N21 ADMITTED INTO

7                         EVIDENCE.)

8     Q.      BY MR. JOHNSON:  What's the document titled, ma'am?

9     A.      [S3 Initial Cash Investments. ]

10    Q.      [In talking about the initial cash investments, coming

11    down to the first line, how much did you and your husband put

12    in?

13    A.      $1500.

14    Q.      So, you and your husband put in 1500 bucks. ]

15    Mr. Zinnel puts in 42 on 11/30, correct?

16    A.      Correct.

17    Q.      210 on 12/19, correct?

18    A.      Correct.

19    Q.      [And 148 in -- on May 20, 2002, correct?

20    A.      Correct. ]

21    Q.      [So, his total capital investment is approximately

22    $400,000, correct? '

23    A.      Correct. ]

24    Q.      [Out of that 400,000, you and your husband put in 1500

25    bucks, right? ]

Zinnel also requested distribution payments by falsifying Eidson's bills to System 3 for legal work. Although Eidson did work on two litigation matters as an attorney for System 3, the invoice she and Zinnel sent included a bill for "corporate legal work" and "corporate strategy" that Eidson never performed. SER 258, 473-77.

System 3 wrote checks to Done Deal in the amount of each requested invoice. Zinnel kept track of the distributions, including how the payments were disguised, on a spreadsheet. SER 268.

Zinnel and Eidson alternated endorsing the checks for deposit. SER 259-62. The checks were deposited into the Done Deal bank account. Although the checks were not made out to Zinnel directly, the money was intended to pay Zinnel the distributions for his ownership interest in System 3. SER 454. In total, over $1.2 million flowed from System 3 to the Done Deal bank account. SER 282.

> **B. Eidson passed System 3 money through her client trust account, then through her personal bank account, and then paid part of Zinnel's child support undertaking.**

In addition to his distribution payments, Zinnel also had to launder System 3's return of his initial capitalization of $150,000. Zinnel once again turned to Eidson to help him. Zinnel had System 3

28

BS 6810

1        THE COURT:  Let me stop you for a moment.  Has that

2    been offered in evidence?

3        MR. SEGAL:  I'm doing it now, your Honor.

4        THE COURT:  Go ahead.  Proceed.

5        MR. SEGAL:  Offer Government's Exhibit 104-G into

6    evidence, your Honor.

7        THE COURT:  Any opposition?

8        MR. JOHNSON:  No.

9        MS. DALY:  No, your Honor.

10        THE COURT:  All right.  It will be received.

11                    (GOVERNMENT'S EXHIBIT 104-G, Heritage

12                    Community Credit Union check dated

13                    3/28/2002 written to System 3, Inc.,

14                    in the amount of $148,000, ADMITTED

15                    INTO EVIDENCE.)

16    Q.    BY MR. SEGAL:  How much is that cashier's correct for?

17    A.    148,000.

18    Q.    Where did you get the money for this check?

19    A.    From a check from Corporate Control.

20    Q.    Who gave you that check?

21    A.    Mr. Zinnel.

22    Q.    How much time prior to -- well, was it for the exact

23    same amount?

24    A.    I believe so.

25    Q.    Okay.  So when Mr. Zinnel gave you a Corporate Control

defendants spent freely out of that account during the years of the bankruptcy. SER 280-81.

### E. Eidson buys Zinnel's house out of the bankruptcy for him.

Zinnel sought to keep his house even after he declared bankruptcy. SER 580-81. Eidson helped him accomplish this by paying various checks out of the Done Deal bank account totaling $60,000 to buy Zinnel's house out of the bankruptcy estate. SER 225-229, 584.

### F. Zinnel's debts are discharged based on his false representations to the bankruptcy court.

Zinnel succeeded in obtaining an initial bankruptcy discharge in 2006 and a final decree in 2008. SER 564-65. The result was a $3.6 million loss to his eleven creditors. ZPSR ¶ 8.

### IV. Zinnel and Eidson then conspired to launder the money they had hidden from the bankruptcy court.

Zinnel and Eidson then began the next phase of their conspiracy, which was to launder the hidden assets through Done Deal, through Eidson's client trust account, through Eidson's personal account, and through an E*TRADE account.

25

BS 6812



## JPMORGAN CHASE BANK, N.A.
Bankruptcy Management Services

**ACCOUNT DEPOSIT TICKET**

Deposit Date: 08/30/2006
Account Number: 31206804565
Deposit Number: 100002

Trustee Number: 007890
Trustee Name: STEPHEN M. REYNOLDS
424 SECOND STREET, SUITE C, DAVIS CA 95616

Case (Estate of): ZINNEL, STEVEN KEITH
Case Number: 05-28800

Printed: Wednesday, August 30, 2006

Checks and other items are received for deposit subject the provisions of the uniform commercial code.

1358 103 08-21-06    433
0100000011108489

$30,000.00

Check #
956529131    10,000.00

EXC ROSA FACHER

$    10,000.00

---

**Washington Mutual Bank**

OFFICIAL CHECK

956529131

16-371/1220    1358 103

MATCH THE AMOUNT IN WORDS WITH THE AMOUNT IN NUMBERS

WASHINGTON
MUTUAL

*****10*THOUSAND*DOLLARS*AND*00*CENTS*****

Aug 21, 2006   $**10,000.00**

PAY
TO THE
ORDER
OF    STEPHEN REYNOLDS

DRAWER: Washington Mutual Bank

Thomas M. Berry
AUTHORIZED SIGNATURE
REMITTER

Issued by Integrated Payment Systems Inc., Englewood, Colorado Wells Fargo Bank Ltd., N.A., Los Angeles, CA

⑈054086⑈ ⑆122037171⑆ ⑈800009565529131⑈

GOVERNMENT
EXHIBIT    228
2:11-CR-234 TLN    SER 0226

BS 6813





GOVERNMENT
EXHIBIT 229
2:11-CR-234 TLN
BS 6814



ACCOUNT DEPOSIT TICKET

**JPMORGAN CHASE BANK, N.A.**
Bankruptcy Management Services

| | Check # |
| --- | --- |
| | 956529133 |

Deposit Date: 08/30/2006
Account Number: 3120680453565
Deposit Number: 100003

Trustee Number: 007890
Trustee Name: STEPHEN M. REYNOLDS
424 SECOND STREET, SUITE C, DAVIS CA 95616

Case (Estate of): ZINNEL, STEVEN KEITH
Case Number: 05-28800

Printed: Wednesday, August 30, 2006

Checks and other items are received for deposit subject to the provisions of the uniform commercial code.

$ 5,000.00

5,000.00

GOVERNMENT
EXHIBIT 230
SER 0228
2:11-CR-234 TLN

BS 6814A

---

OFFICIAL CHECK

**Washington Mutual Bank**

956529133

1358 103

MATCH THE AMOUNT IN WORDS WITH THE AMOUNT IN NUMBERS

\*\*\*\*\*\*\*\*\*5,000.00

WASHINGTON MUTUAL
*****FIVE THOUSAND DOLLARS AND 00 CENTS

DRAWER: Washington Mutual Bank

Aug 21, 2006 FIVE THOUSAND DOLLARS AND 00 CENTS

AUTHORIZED SIGNATURE
REMITTER

PAY TO THE ORDER OF: STEPHAN REYNOLDS

Issued by Integrated Payment Systems Inc., Englewood, Colorado Wells Fargo Bank Ltd., N.A., Los Angeles, CA

4556 (10/99)



JPMORGAN CHASE BANK, N.A.
Bankruptcy Management Services

ACCOUN(...) (...)OSIT TICKET

Deposit Date: 08/30/2006
Account Number: 312068045565
Deposit Number: 100001

Trustee Number: 007890
Trustee Name: STEPHEN M. REYNOLDS
424 SECOND STREET, SUITE C, DAVIS CA 95616

Case (Estate of): ZINNEL, STEVEN KEITH
Case Number: 05-28800

Printed: Wednesday, August 30, 2006
Checks and other items are received for deposit subject the provisions of the uniform commercial code.

Check #
956529134

5,000.00

$ 5,000.00

WASHINGTON MUTUAL

OFFICIAL CHECK

956529134

16-37/1211220

MATCH THE AMOUNT IN WORDS WITH THE AMOUNT IN NUMBERS

*****FIVE THOUSAND DOLLARS AND 00 CENTS*****

$ ****5,000.00

Aug 29, 2006

DRAWER: Washington Mutual Bank

AUTHORIZED SIGNATURE
REMITTER

1358 103

PAY
TO
THE
ORDER
OF

STEPHAN REYNOLDS

Issued by Integrated Payment Systems Inc., Englewood, Colorado Wells Fargo Bank Ltd., N.A., Los Angeles, CA

Washington Mutual Bank

4556 (10/99)

BS 6815

GOVERNMENT
EXHIBIT
SER 0229
2:11-CR-234 TLN

BS 68(...)


555. If Zinnel had revealed an interest in another property, the bankruptcy trustee "would have investigated the value – the nature of the ownership interest, the value of the property, and the liens or other claims against the properties." SER 559.

### 5. Zinnel omitted disclosure of both 4 Results and Auto & Boat Store.

Zinnel failed to disclose his interest in either 4 Results or the Auto & Boat Store. SER 187-214. Yet the evidence at trial revealed that Zinnel used 4 Results to purchase the Luyung property back from Tom Cologna, to his own benefit. SER 33, 37. 4 Results later transferred Luyung to Auto & Boat Store. SER 714. The bankruptcy trustee indicated that he "would have been very interested. It all raises questions as to what the debtor owns." SER 563.

### 6. Zinnel omitted a personal bank account.

Finally, Zinnel omitted a personal bank account Zinnel held at Washington Mutual. SER 47, 187-214. The bankruptcy trustee testified that if he had been aware of this account, he would have investigated. SER 550.

21

BJ 6816

Case 05-28800    Filed 08/18/05    Doc 17

In re    Steven Keith Zinnel                                          Case No. _____
                              Debtor

## SCHEDULE B. PERSONAL PROPERTY

Except as directed below, list all personal property of the debtor of whatever kind. If the debtor has no property in one or more of the categories, place an "x" in the appropriate position in the column labeled "None." If additional space is needed in any category, attach a separate sheet properly identified with the case name, case number, and the number of the category. If the debtor is married, state whether husband, wife, or both own the property by placing an "H," "W," "J," or "C" in the column labeled "Husband, Wife, Joint, or Community." If the debtor is an individual or a joint petition is filed, state the amount of any exemptions claimed only in Schedule C - Property Claimed as Exempt.

Do not list interests in executory contracts and unexpired leases on this schedule. List them in Schedule G - Executory Contracts and Unexpired Leases.

If the property is being held for the debtor by someone else, state that person's name and address under "Description and Location of Property."

| | Type of Property | N O N E | Description and Location of Property | Husband, Wife, Joint, or Community | Current Market Value of Debtor's Interest in Property, without Deducting any Secured Claim or Exemption |
|---|---|---|---|---|---|
| 1. | Cash on hand | | Cash on hand for emergency | - | 200.00 |
| 2. | Checking, savings or other financial accounts, certificates of deposit, or shares in banks, savings and loan, thrift, building and loan, and homestead associations, or credit unions, brokerage houses, or cooperatives. | | Checking account #....9842 Washington Mutual 11200 Gold Express Dr. Gold River, CA 95670 | - | 250.00 |
| 3. | Security deposits with public utilities, telephone companies, landlords, and others. | X | | | |
| 4. | Household goods and furnishings, including audio, video, and computer equipment. | | Normal household goods and furnishings located at residence | - | 15,000.00 |
| 5. | Books, pictures and other art objects, antiques, stamp, coin, record, tape, compact disc, and other collections or collectibles. | | Mass market published books, pictures, and art | - | 2,000.00 |
| 6. | Wearing apparel. | | Normal clothing | - | 1,500.00 |
| 7. | Furs and jewelry. | | Watch, ring, and cuff links | - | 1,000.00 |
| 8. | Firearms and sports, photographic, and other hobby equipment. | X | | | |
| 9. | Interests in insurance policies. Name insurance company of each policy and itemize surrender or refund value of each. | X | | | |

                                                         Sub-Total >        19,950.00
                                                         (Total of this page)

  3    continuation sheets attached to the Schedule of Personal Property

Copyright (c) 1996-2005 - Best Case Solutions, Inc. - Evanston, IL - (800) 492-8037                    Best Case Bankruptcy

SER 0489
BS 6817

simply a misreading of the plain text of the indictment to claim that

Zinnel's concealment of his interest in these companies was

uncharged conduct. The fact that the indictment includes some very

specific allegations regarding these two companies does not erase the

broader allegations also set forth in the indictment that Zinnel's

interest in both of these companies ought to have been disclosed in

bankruptcy.

> **b. There was no variance with respect to the Washington Mutual personal bank account because the account was an example of an item of property Zinnel omitted from his bankruptcy schedules.**

Zinnel is correct that the Washington Mutual personal bank

account was not specifically listed in the indictment as an item of the

bankruptcy estate in count two, paragraph two, nor anywhere else in

the indictment. ER 184-85. The account was introduced as evidence

at trial and argued at closing as proof of count two. SER 549-50, 671-

72. But the superseding indictment specifically put Zinnel on notice

that his statements about the truth of his bankruptcy schedules

would be in issue. ER 186 ¶ 3(c)(i). This was exactly how the

Washington Mutual account was presented at trial. For that reason,

BS 6818

1   BENJAMIN B. WAGNER
    United States Attorney
2   MATTHEW D. SEGAL
    AUDREY B. HEMESATH
3   Assistant United States Attorneys
    501 I Street, Suite 10-100
4   Sacramento, CA 95814
    Telephone: (916) 554-2700
5   Facsimile:  (916) 554-2900

6
    Attorneys for Plaintiff
7   United States of America

8                    IN THE UNITED STATES DISTRICT COURT

9                    EASTERN DISTRICT OF CALIFORNIA

10

11
    UNITED STATES OF AMERICA,              CASE NO.  2:11-CR-234 TLN
12
                     Plaintiff,
13
              v.
14                                         TRIAL BRIEF OF THE UNITED STATES
    STEVEN K. ZINNEL & DERIAN EIDSON
15
                     Defendants.
16

17

18

19

20

21

22

23

24

25

26

27

28

    Trial Brief of the United States

ER000233
BS6819

1  Wilbert worked together post-bankruptcy to pay Zinnel for the substantial investment Zinnel had made

2  in System 3.  Money for Zinnel was paid out of System 3 through Eidson's shell company Done Deal,

3  Inc., and through Eidson's client trust account, ultimately to Zinnel's benefit.  They used System 3

4  distributions to pay things like Zinnel's mortgages, his routine living expenses, and costs related to

5  Zinnel's child support.  Based on Phase Three, Counts 3-17 charge conspiracy to commit money

6  laundering, "disguise/conceal" money laundering, and transactions in criminally derived property.  18

7  U.S.C. §§ 1956(h), 1956(a)(1)(B)(i), 1957.

8      In Phase Four (February – March 2009), Zinnel and Eidson are charged with conspiracy and

9  attempt to extract $4 million in fraud-tainted funds from System 3.  Tom Wilbert stopped cooperating

10  with Defendants in the summer of 2008.  Zinnel and Eidson together agreed to demand that Wilbert pay,

11  through their shell company Done Deal, $4 million to terminate Zinnel's partnership investment in

12  System 3.  But they wanted it falsely characterized as a $4 million payment to Done Deal to terminate a

13  consulting agreement, which agreement Eidson admitted did not exist in writing.  To this end, Zinnel

14  met with Wilbert and then Eidson had two meetings with Wilbert's attorney.  Those meetings were

15  recorded by law enforcement.  Based on Phase Four, Counts 18-19 charge money laundering conspiracy

16  and attempted money laundering.  18 U.S.C. §§ 1956(h), 1956(a)(1)(B)(i).

17          **II.    STATEMENT OF FACTS**

18      **A.    Pre-Petition Transfers (July 2001 to July 20, 2005)**

19      Until this case, Zinnel was, as far as the Government can tell, a successful self-made

20  entrepreneur with no real criminal history.  But then his marriage dissolved.  It was in this context that

21  Zinnel conceived of a years-long scheme to avoid paying child support.  On July 15, 2001, he sent an

22  email to his ex-wife:

23          [T]o give you a heads up, the company is filing for bankruptcy protection.
            Federal law will now have jurisdiction over the company and not family
24          law court.  Under Federal law, I am aloud (sic) to only take $3,500 per
            month in salary, (instead of $10,000) for the first two months.  After that,
25          it takes federal court approval to even take a dollar in salary.  Therefore,
            by the August 21, 2001 hearing, there will be no subjectivity of what my
26          compensation will be.  Your support will go almost to zero and you will
            have to go to work.  You may even have to pay to support me.
27
            Additionally, as soon as the bank and the bonding company sue me for my
28          personal obligation, I will file personal bankruptcy as well.  In this event,
            the federal court will take jurisdiction over our estate and the property

Trial Brief of the United States                    2

ER000234
BS 6820

1    settlement will be on hold until my personal bankruptcy is done.

2    It is sad that you have caused all the pain and financial loss because you
     had an affair and could not keep your marriage vows.  And that you have
3    your three attorneys continue to delay and delay and run up the legal bills.

4    I expect all the money to be gone in less than two months.  The property
     settlement will then be very easy.
5

6    Zinnel also complained to a number of his male associates that his ex-wife was taking money from him

7    and indicated that he wanted to keep things for himself.  A few of these people helped him by holding

8    property in their names.

9        In the pre-petition phase, Zinnel and Eidson transferred assets, created corporations, and opened

10   accounts that figure prominently in later events:

11       • *System 3, Inc.*  In October 2001, Zinnel agreed with his brother and Tom Wilbert to

12            create System 3, Inc. with Zinnel as a "silent partner" whose name would appear in

13            no public filings.  Initially, System 3's board of directors was comprised of Zinnel,

14            his brother, and Wilbert.  Zinnel poured into System 3 money and equipment from

15            his other companies.  $148,000 of these funds came through Chris Lagerstrom,

16            Zinnel's childhood friend who had been holding the money for Zinnel up to that

17            point.  System 3, Inc. became a real company with real employees, assets, work, and

18            revenue.

19       • *4Results, LLC.*  In June 2002, Zinnel formed 4Results, LLC with a man named

20            Michael Gravely.  Zinnel funded the company with money from supposed "investors"

21            that he would not disclose to Gravely.  The business never went anywhere and shut

22            down operations.  Zinnel then turned to Chris Garrison to be the public face of this

23            corporate shell.  At the time Zinnel asked Garrison to be the public face of 4Results,

24            Zinnel told Garrison that Zinnel's purpose was to have a company to keep from his

25            ex-wife.  Garrison did not do anything for the business.  The signors on the corporate

26            bank account were Zinnel's mother and brother.  4Results, LLC was a shell

27            corporation that never filed a tax return.

28       • *Auto and Boat Store, Inc.*  On June 7, 2004, Zinnel formed Auto and Boat Store, Inc.,

Trial Brief of the United States                    3

1    also with Chris Garrison as its public face.  But Garrison never had any involvement

2    in the company.  Auto and Boat Store, Inc. was a shell that never even filed a tax

3    return.

4       • *Derian Eidson Client Trust Account.*  Also on June 7, 2004, attorney Eidson opened a

5       client trust account.  Eidson later used this account to receive money from System 3

6       and send it to Zinnel or, alternatively, first to Eidson's own personal bank account

7       and then to Zinnel's purposes.

8       • *Done Deal, Inc.*  On July 5, 2004, Derian Eidson formed Done Deal, Inc..  On

9       February 22, 2005, she added Zinnel as a signatory on the Done Deal bank account

10      and he used it for various personal expenses.  Done Deal's "revenue" was almost

11      exclusively made up of payments that System 3 sent pursuant to Zinnel's instructions.

12   Zinnel used these shells to transfer the Luyung Property, a commercial lot near System 3's

13   primary place of business.  In 2002, Zinnel told real estate investor Tom Cologna that he was having

14   personal difficulties related to a divorce.  Zinnel transferred to Cologna the Luyung Property as security

15   for an informal loan of $161,000.  The loan was paid back when, on February 18, 2004, 4Results

16   acquired the Luyung Property back from Cologna for about $165,000.  On June 10, 2004, Auto and Boat

17   Store, Inc. took title to the Luyung Property.  During this period, Done Deal paid the real estate taxes for

18   this parcel.  Zinnel paid interest to Cologna before the loan was repaid.

19   There is a document dated July 13, 2004 in which Zinnel purported to assign his interest in

20   Wilbert's company System 3 to Defendant Eidson's shell corporation Done Deal.  This document was

21   produced by Eidson to the Grand Jury.[1]

22   On July 20, 2005, just over one year later, Zinnel filed for bankruptcy.  The significance of the

23   one-year delay is that *most* of the questions on the bankruptcy "Statement of Financial Affairs" call only

24   for transactions that occurred within the preceding year.  Zinnel could thus maintain secret interests in

25   these entities and properties and reduce the risk of exposure because he did not have to disclose many of

26   the pre-petition transactions on his Statement of Financial Affairs.  Zinnel was simultaneously making

27

28   ---

   [1] It is believed that Defendants cannot authenticate this document without one of them testifying.

ER000236
BS 6822

P.O. BOX 1098
NORTHRIDGE, CA 91328-1098

**This Statement Covers**
From: 05/13/05
Through: 06/13/05

**Need assistance?**
To reach us anytime,
call 1-800-788-7000
or visit us at wamu.com

STEVEN K ZINNEL
11966 OLD EUREKA WAY
RANCHO CORDOVA CA 95670-8376

---

# Your Free Checking Detail Information

**STEVEN K ZINNEL**     **Account Number: 490-497544-2**
**Washington Mutual Bank, FA**

---

## Your Account at a Glance

| | | | |
|---|---|---|---|
| Beginning Balance | $354.87 | Your Overdraft Limit as of the statement end date: | $1,000.00 |
| Checks Paid | -$710.48 | Please note that this may be changed at any time without notice. (See | |
| Other Withdrawals | -$87.98 | reverse for more information). As of the statement end date, the fee for | |
| Deposits | +$700.00 | any Non-Sufficient Funds transaction, whether paid or returned, was | |
| **Ending Balance** | **$256.41** | $23.00. | |

| Date | Description | Withdrawals (-) | Deposits (+) |
|---|---|---|---|
| 05/20 | Customer Deposit | | $500.00 |
| 05/23 | ATM-NCHG S1C08115 11200 GOLD EXPRESS DR GOLD RIVER CA | $20.00 | |
| 05/27 | ATM-NCHG S1A07580 20385 YORBA LINDA BLVDYORBA LINDA CA | | $200.00 |
| 06/13 | VISA TEXTILESHOP.COM IN 201-332-0072 NJ | $67.98 | |

## Checks Paid
*Indicates check out of sequence

| Check Number | Date | Amount Paid | Check Number | Date | Amount Paid |
|---|---|---|---|---|---|
| 1335 | 05/17 | $91.49 | 1337 | 05/25 | $170.00 |
| 1336 | 05/24 | $422.64 | 1338 | 06/01 | $26.35 |

BS 6823
ZJN000180
ZBK002318
GOVERNMENT PRODUCED
IN DISCOVERY AS

| | | | | | | INDIVIDUAL/JOINT |

**Washington Mutual Bank,** FA

(the "Bank")

| | 1 OF 1 | BANK COPY | MASTER ACCOUNT AGREEMENT |

| COMP NO 02 | OWN CODE 7 | PRODUCT DDA | FC NUMBER 1488 | ACCOUNT NUMBER 0490-0000497544-2 | | |

| 1. CUSTOMER NAME STEVEN K ZINNEL | | | DATE OF BIRTH 12/31/1963 | TAX ID 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 | SEX M | PERSONAL PHONE (916) 402-2640 | BUSINESS PHONE (916) 402-2640 |

ADDRESS (CITY, STATE, ZIP CODE - GIVE PROVINCE AND COUNTRY, IF NOT IN U.S.A.)    11966 OLD EUREKA WAY    RANCHO CORDOVA, CA 95670

| EMPLOYER SELF EMPLOYED | MOTHER'S MAIDEN NAME | BIRTHPLACE | IDENTIFICATION DRIVERS LICENSE C0204057 CA 06/12/2003 VISA WELLS FARGO 03/05 06/12/2003 | | | APPROVAL CODE 1977CA |

| 2. CUSTOMER NAME | | | DATE OF BIRTH | TAX ID | SEX | PERSONAL PHONE | BUSINESS PHONE |

| EMPLOYER | MOTHER'S MAIDEN NAME | BIRTHPLACE | IDENTIFICATION | | | APPROVAL CODE |

| 3. CUSTOMER NAME | | | DATE OF BIRTH | TAX ID | SEX | PERSONAL PHONE | BUSINESS PHONE |

| EMPLOYER | MOTHER'S MAIDEN NAME | BIRTHPLACE | IDENTIFICATION | | | APPROVAL CODE |

| DATE OPENED 06/12/2003 | BY FGS | TAX LINK 1 | DATE CHANGED |

The account opened under this Master Account Agreement shall be of the following type:    A SINGLE ACCOUNT IN MY NAME.    01 / 01

This type of account is described in detail in the Account Disclosures and Regulations

Number of signatures required (see paragraph 3 below):  1

1. The Depositor shall be bound by the Bank's Account Disclosures and Regulations, and all amendments thereto, from time to time in effect. Such provisions are by this reference made a part of this Agreement as if set forth herein in full. All accounts, products or services opened shall remain open and in effect until they terminate in accordance with their own terms or until Bank terminates them or receives termination notice from Depositor, owner or signer in form satisfactory to Bank. Not all accounts, products and services offered by Bank may be available to Depositor.

2. This Agreement shall govern all accounts, products and services opened by Depositor in the capacity as indicated at the time of signing this Agreement and all other accounts, products and services that Depositor may from time to time authorize the Bank to open under this Agreement, in that ownership capacity. Depositor may be in writing, in person, by telephone or other means as Bank may accept, as its option, or by Depositor's use of such without specific authorization (except as required by law). Depositor and each owner or signer, if more than one, agrees that any other of them may authorize Bank to open or provide other accounts, products or services from time to time in the same ownership capacity. Further, Depositor and each owner or signer, if more than one, appoints each other his attorney-in-fact to endorse, cash or deposit, any checks or drafts payable to the order of any one or more of them. This power of attorney shall not be affected by the subsequent incapacity of any owner, signer or Depositor.

3. Instructions to permit withdrawal upon more than one signature apply only to checks and in-person transactions taking place in a branch. Other withdrawal or transfer transactions may be paid on the authorization of any one signer notwithstanding any instructions to the contrary, or, at its option, Bank may refuse such transaction and require joint written instructions. Without limiting the foregoing, funds in the account may be paid for accounts authorized for such: (a) upon checks, receipts, orders or drafts signed in Depositor's or agent's name by the prescribed number of authorized persons as set forth above; (b) pursuant to electronic, telephone or automated instructions using a personal identification number or (c) pursuant to telephonic instructions from any agent or person purporting to be an agent of Depositor so long as such funds are transferred to an account in the name of Depositor or check is made payable to the Depositor. Notwithstanding the foregoing, Bank shall not be liable for any refusal or failure to make transfers or withdrawals pursuant to telephonic instructions. Except for Consumer Accounts as defined in the Account Disclosures and Regulations, depositor agrees that so long as a personal identification number is used or the agent or the purported agent identifies him or herself to Bank's satisfaction, every such payment/transfer of funds shall be at the sole risk of Depositor until Bank receives written revocation regarding such authorization applicable to future transactions.

4. Most disputes arising under this Agreement related to accounts or services hereunder are subject to mandatory binding arbitration. Rights to trial by a judge or jury are waived hereby. Bank must be notified by Depositor of claims and proceedings to enforce any such claims must be brought, within the time requirements established in the Account Disclosures and Regulations.

TAX CERTIFICATION - UNDER PENALTIES OF PERJURY I CERTIFY THAT:
1) The Tax ID number shown on this form is my correct Taxpayer Identification Number.
2) I certify that I am not subject to backup withholding because (a) I have not been notified that I am subject to backup withholding as a result of a failure to report all interest or dividends, (b) the Internal Revenue Service has notified me that I am no longer subject to backup withholding, or (c) this account is owned by an entity exempt from backup withholding.
3) Check this box ☐ if you are subject to backup withholding and can not certify the provisions of (2) above.
4) ☐ If this box is checked, the above 1-2) of the Tax Certification do not apply because (a) I am not a United States person or (b) I am an individual and am neither a citizen nor a resident of the United States. I will complete the IRS form W-8BEN. (c) If this box is not checked, I am a U.S. person (including U.S. resident alien).

By signing below, I/we agree to be bound by the terms and conditions of this Master Account Agreement (the "Agreement") as set forth herein, and make the tax certification set forth above. In addition, I/we acknowledge receipt of the Account Disclosure and Regulations Relating to Deposit Accounts and Other Service and Electronic Funds Transfer Agreement and Disclosure ("Account Disclosure and Regulations"). Deposits are insured by the FDIC to the maximum amount permitted by law. THE INTERNAL REVENUE SERVICE DOES NOT REQUIRE YOUR CONSENT TO ANY PROVISION OF THIS DOCUMENT OTHER THAN THE CERTIFICATIONS REQUIRED TO AVOID BACKUP WITHHOLDING.

02        0490-0000497544-2

STEVEN K ZINNEL

| X | | X | |
| Please sign within the box | Thumb Print | Please sign within the box | Thumb Print |

| X | |
| Please sign within the box | Thumb Print |

GOVERNMENT EXHIBIT 30
2:11-CR-234 TLN

574I (11/00)

JER 0047
BS 6824

# 24

**Thursday**
**January 2002**

**STEVE K. ZINNEL**

✓ Task Complete
→ Planned Forward
✗ Task Deleted
◑ Delegated Task
● In Process

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
|   |   | 1 | 2 | 3 | 4 | 5 |
| 6 | 7 | 8 | 9 | 10 | 11 | 12 |
| 13 | 14 | 15 | 16 | 17 | 18 | 19 |
| 20 | 21 | 22 | 23 | 24 | 25 | 26 |
| 27 | 28 | 29 | 30 | 31 |   |   |

December 2001 / February 2002

## 1 ABC Prioritized Daily Task List

| | | |
|---|---|---|
| A1 | PLAN IN SOLITUDE | ✓ |
| A2 | RUN / PU & SU'S | ✓ |
| A3 | PACK FOR TRIP | ✓ |
| A4 | E-MAIL AUTO REPLY | ✗ |
| A5 | CELL PHONE MESSAGE | ✓ |
| A6 | FILES TO LAPTOP | ✓ |
| A7 | AOL RENEWED | ✓ |
| A8 | LISTEN TO TAPE | ✓ |
| A9 | ORDER CORK CLOCK (2) | ✓ |
| A10 | 1999 TAX RETURN TO IRS | ✓ |
| A11 | NOTE TO RICH & KRAFT | ✓ |
| A12 | FERRIS COMPLAINT | ✓ |
| A13 | E-TRADE IRA OPENED | ✓ |
| A14 | E-TRADE TT2 OPENED | ✓ |
| A15 | E-TRADE TT OPENED | ✓ |
| A16 | P/S CASHIER CK TO E-TRADE | ✓ |
| A17 | $31,311.82 P/S TO E-TRADE | ✓ |
| A18 | FRIENDLY BUYER FOR LUYUN | ✓ |
| A19 | P/S STMTS & CKS TO KF | ✓ |
| A20 | TRUST23 TO KF W/ONLY UU | ✓ |
| A21 | LUYUNG LISTING TO LOUI | ✓ |
| A22 | CA STATE BOARD OBJECTION | ✓ |
| A23 | AZ STATE BOARD OBJECTION | ✓ |
| A24 | UU IRS RESPONSE | |
| A25 | UNGER RESPONSE | |
| A26 | OTTO RESPONSE | |
| A27 | BOBO RESPONSE | |
| A28 | CED RESPONSE | |
| A29 | FH RESPONSE | |
| A30 | EC RESPONSE | |
| A31 | CUSHMAN APP RESPONSE | |

**Daily Expenses**

© 1993 Franklin Covey Co.     www.franklincovey.com     Original Classic

### Appointment Schedule

8

9

10

11

12

1

2

3

4

5

6

7

8

GOVERNMENT
EXHIBIT
1-236
BS 6825

SER 2

K0406

GOVERNMENT PRODUCED IN
DISCOVERY AS →  7BK040180
BS 6825

1    A.      Yes.

2    Q.      Let's go back to 202, please, at page 3.

3            This is the bankruptcy schedule looking for disclosure

4    of personal property?

5    A.      Correct.

6            MS. HEMESATH:  Government moves to admit what's been

7    marked as Government's Exhibit 30, a certified business

8    record.

9            THE COURT:  Any opposition?

10           MR. JOHNSON:  No, Your Honor.

11           MS. DALY:  No, Your Honor.

12           THE COURT:  All right.  Exhibit 30 will be received

13   into evidence.

14                        (GOVERNMENT'S EXHIBIT 30 ADMITTED INTO

15                         EVIDENCE.)

16           MS. HEMESATH:  Permission to publish?

17           THE COURT:  Yes, you may.

18   Q.      BY MS. HEMESATH:  This is a signature card for a

19   Washington Mutual Bank account.  Whose bank account is it?

20   A.      It appears to be Steven Zinnel's.

21   Q.      We could go back out, please.  And put it side by side

22   with Exhibit 202, page 3.

23           Were you aware that Steven Zinnel had another personal

24   bank account not listed on Schedule B?

25   A.      No.

1    Q.       If you had been aware, what would you have done?

2    A.       I would have investigated it.  I -- if it -- I would

3    have wanted to know what the balance was.  I might have asked

4    for bank records.  But if it had simply been disclosed he had

5    two bank accounts, I would have looked at the balances and

6    seen if they were exempt or worthwhile administering.

7    Q.       May we please see Exhibit 202, page 4.

8             Do you see any reference here to a company called Done

9    Deal?

10   A.       No.

11   Q.       And let's look at page 3 again.  202, page 3.

12            This is back to personal property.  Do you see any

13   reference here to a Done Deal bank account?

14   A.       No.

15            MS. HEMESATH:  Move to admit what has been marked as

16   Government's Exhibit 140, a certified business record.

17            THE COURT:  Any opposition?

18            MR. JOHNSON:  Can I have a moment, Your Honor?

19            THE COURT:  Yes, you may.

20            MR. JOHNSON:  No objection.

21            THE COURT:  Ms. Daly?

22            MS. DALY:  No objection.

23            THE COURT:  All right.  That will be received.

24                        (GOVERNMENT'S EXHIBIT 140 ADMITTED

25                         INTO EVIDENCE.)

OFFICIAL COURT REPORTERS, USDC -- (916) 448-2712

SER 0550

BS6827

if he had been aware of the business formation agreement for System 3, which preceded the bankruptcy filing by approximately four years, he would have investigated with an eye toward liquidating and distributing proceeds to creditors. SER 555.

## 2. Zinnel omitted his income from System 3.

In addition to his ownership interest, Zinnel concealed his monthly income from System 3. Zinnel was paid monthly for the services (review of financials) he provided to System 3. SER 397. [Per the terms of the business formation agreement, Zinnel was paid $3,333 per month for these services.] SER 397. Zinnel used his mother as the company accountant, and she issued him this monthly salary on System 3 checks made payable to Done Deal. SER 242-252. This salary flowed steadily to Zinnel from April 2005 (before his bankruptcy filing) through August 2006. SER 242-252. Yet, on July 29, 2005, within days of filing his bankruptcy petition, Zinnel represented in family court that his monthly income was $0. SER 67.

Zinnel repeated this misrepresentation on his bankruptcy schedules. He completely zeroed out the "Income" section,

18

BS 6828

BUSINESS FORMATION AGREEMENT

This BUSINESS FORMATION AGREEMENT is entered into with an effective date of October 3, 2001, by and between Tom J. Wilbert (TW), David P. Zinnel (DZ), and Steve K. Zinnel (SKZ).

1.   Background and Purpose

Tom Wilbert (TW), David Zinnel (DZ), and Steve K. Zinnel (SKZ) desire to form a corporation to engage in the business of <u>infrastructure contracting</u>.  This agreement is entered into to define the basic terms of the BUSINESS FORMATION AGREEMENT.

2. Capitalization and stock ownership

The corporation will be authorized to issue 1,000,000 shares of common stock and initially issue 100,000.

TW shall own eventually own 46% of the capital stock.
Initially, TW will own 100% of the capital stock.
(100% on 10/3/01, 49on 12/31/02%, 48% on 12/31/03, 47% on 12/31/04, & 46% on 12/31/05)


DZ shall own eventually own 8% (2% a year for 4 years) of the capital stock.
Initially, DZ will own 0% of the capital stock.
(0% on 10/3/01, 2% on 12/31/02, 4% on 12/31/03, 6% on 12/31/04, & 8% on 12/31/05)

SKZ, or his designated entity cr individual, shall eventually own of the capital stock.
Initially, SKZ will own 0% of the capital stock.
(0% on 10/3/01, 49% on 12/31/02, 48% on 12/31/03, 47% on 12/31/04, & 46% on 12/31/05)

Since the company will be a Sub Chapter S corporation, the corporation pays no Federal Income taxes.  Therefore, all income or losses flow to the individual shareholders via a schedule K-1.  The parties to this Agreement expressly agree that the corporation will always distribute enough money annually to cover the shareholders individual tax liability resulting from this company's pass through income.

TW, DZ, SKZ agree that initially, $600,000 will be needed to capitalize the company.

SKZ, or his designated entity or individual, shall contribute the following:
Cash $250,000
Small tools $50,000
Large capitalized tools $124,700
Rolling stock $234,297
Office furniture & equipment $50,000
Contracts
Business systems

> GOVERNMENT
> EXHIBIT 105
> 2:11-CR-234 TLN

CONFIDENTIAL

Business Formation Agreement

Page 1          Initial

SER 0053

BS 6829

Since Steve K. Zinnel or his designated entity or individual, is putting in all the initial startup capital, the parties agree that once sufficient stockholder equity exists, and the majority of the shareholders agree it is in the best interest of the company to pay back the capital contribution made by Steve K. Zinnel or his designated entity or individual, Steve K. Zinnel shall get back his initial $600,000 with 10% interest per annum. Further, if the company is sold or shut down, Steve K. Zinnel or his designated entity or individual, shall get back his initial $600,000 with 10% interest per annum and the remaining equity shall be distributed in proportion to ownership at the time.

## 3. Stockholder personal guarantees

TW agrees that he will personally guarantee a bonding company indemnity agreement, bank line of credit, and only if absolutely necessary, personally guarantee trade credit. The parties of this agreement agree that as soon as the company is able to get trade credit, or bonding, or bank lines of credit without shareholders' personal guarantee, TW shall be removed as an individual guarantor.

## 4. Board of Directors

Initially, the Board of Directors shall be TW, DZ, & SKZ.

## 5. Officer and Officer Compensation

Initially, the officers of the corporation shall be TW. TW will be the President, Chief Financial Officer, and Corporate Secretary. Officer terms of employment including base salary, performance compensation, benefits and such will be agreed to in separate employment agreements.

## 6. Warranty of Voluntary Signing

TW, DZ, and SKZ warrant and represent that this Agreement is freely and voluntarily executed. TW, DZ, and SKZ further warrant and represent that the parties of this agreement have not relied on any inducements, promises or representations made by either party or its representative, or any other person, except for those expressly set forth herein.

## 7. Warranty of Understanding

TW, DZ, and SKZ warrant and represent that they have read this Agreement and that the have had an opportunity to have the terms used herein and the consequences hereof explained by counsel if needed.

///
///
///
///
///

**CONFIDENTIAL**

Business Formation Agreement

Page 2          Initial

SKZ 0054

BS 6830

## 8. Non-compete

The parties of this agreement expressly and explicitly agree that they will not, at any time while a shareholder of the company, directly or indirectly engage in, or have any interest in any person, firm, corporation, or business (whether as an employee, officer, director, agent, security holder, consultant or otherwise) that engages in infrastructure contracting within the California counties of Alameda, Amador, Butte, Calaveras, Colusa, Contra Costa, El Dorado, Fresno, Glenn, Merced, Napa, Nevada, Placer, Sacramento, San Joaquin, San Mateo, San Francisco, Santa Clara, Solano, Sonoma, Stanislaus, Sutter, Yolo, and Yuba (hereinafter collectively, "Non-Compete Area") which is the same as or competitive with the business being formed by this agreement which is union inside wiring electrical contracting in the Non-Compete Area so long as the Business or any successor shall engage in this activity in the Non-Compete Area without the written approval of the parties of this agreement, which shall not be unreasonably withheld. Should this Agreement or its Term be held unenforceable in whole or in part by a court of competent jurisdiction, then this covenant shall run for the maximum period allowed by law for the maximum geographic area allowed by law. Specifically excluded from this Agreement is any activity related to TW, DZ, and SKZ's role as a property owner, lessor and property manager within the Non-Compete Area.

## 9. Attorneys' Fees

Should any party commence legal action to enforce the terms of this Agreement, the prevailing party shall be entitled to reasonable attorneys' fees and costs.

## 10. Binding Effect

This Agreement shall bind and insure to the benefit of all successors, assigns, and heirs of the parties.

## 11. Modification Must be in Writing

This Agreement may not be altered, amended, or modified, except by written executed by duly authorized representatives of all parties.

## 12. Construction

Should any paragraph, clause or provision of this Agreement be construed to be against public policy or determined by a court of competent jurisdiction to be void, invalid, or unenforceable, such construction and decision shall affect only those paragraphs, clauses, or provisions so construed or interpreted, and shall in no way affect the remaining paragraphs, clauses, or provisions of this Agreement which shall remain in force.

## 13. Entire Agreement

This Agreement states the entire agreement among the parties and supersedes their prior agreements, negotiations, or understandings. Each of these parties acknowledges and agrees that no other party, nor agent, nor attorney of the parties made any promise, representation, or warranty, express or

CONFIDENTIAL

BS 6831

implied, not set forth in this Agreement.  Each party acknowledges that they did not rely on any promise, representation, conduct, or warranty of any basis for executing this Agreement.

## 14. Governing Law

This Agreement shall be construed and governed by the laws of the State of California.

## 15. Counterparts

This Agreement may be signed in counterparts and shall be enforceable if signed in counterparts.

## 16. Fax signature

This Agreement is enforceable with either wet signatures or faxed signatures.

## 17. Confidentiality

The parties of this agreement consider the agreement to be extremely confidential.   Therefore,  this  agreement  may  not  be  copied  and/or distributed, nor any part of this agreement divulged to anyone without written agreement of both parties.

IN WITNESS WHEREOF, the parties have executed this BUSINESS FORMATION AGREEMENT and intend that its effective date be the day and year first above written.

Agreed and Accepted by:

_____
Tom J. Wilbert

Agreed and Accepted by:

_____
David P. Zinnel

Agreed and Accepted by:

_____
Steve K. Zinnel

cc: SERVER1\\C:\EXEC\DATA02\S3AGREEMENT.DOC

**CONFIDENTIAL**

Business Formation Agreement

Page 4                    Initial

SEN        0056

BS 6832

granted the property back to Zinnel when the loan was repaid. SER 737. The property did not go back to Zinnel in his own name, however. Instead, the deed granted the property to 4 Results, attention Chris Garrison. SER 44. Even though the deal featured the involvement of 4 Results and Corporate Control, Cologna testified, "[t]he only person I dealt with in this transaction [was] Mr. Zinnel." SER 739.

### 2. Zinnel created 4 Results to hide his ownership of Luyung Drive

Michael Gravely was an employee of Zinnel's at Zinnel's company Corporate Control. SER 747. In late 2001, Zinnel and Gravely formed a new company, 4 Results. SER 749. Zinnel told Gravely that the 4 Results was being backed by a group of "protected" investors that "didn't have to disclose themselves." SER 749. Zinnel was emotional and adamant on the subject of the confidentiality of the "investors," and Gravely trusted him. SER 750-51, 756.

Gravely accepted a $40,000 cashier's check from Zinnel to start the company. SER 750. Gravely never dealt with the "investors;" only with Zinnel. SER 749-50. By Gravely's understanding, 4

9

BS 6833

1    frame.  I would assume this was a document we received when

2    everything was processed.

3    Q.        And who filed that?

4    A.        I did.

5    Q.        Turn to page 2, please.  What is this?

6    A.        This looks like the paperwork I filled out to file for

7    4 Results.  It looks like my writing, and it looks like my

8    signature.  The date's about the right time frame.  So I'm

9    assuming that's the paperwork I used to actually initiate

10   4 Results, LLC, through the Secretary of State.

11   Q.        What type of business was 4 Results supposed to be?

12   A.        It was a telecommunications business.  The original

13   plan was we had an arrangement with a company called

14   Win First here in town, a large utility that was very

15   well-financed.  And I knew several people there, and they

16   were willing to lease vehicles from us.  I think it was about

17   a dozen vehicles.  We actually signed leases and developed an

18   agreement.  And so we started the business with a business

19   arrangement with Win First.

20   Q.        And was 4 Results a successful business?

21   A.        It started out that way, but Win First, their

22   investors walked away.  They spent about $200 million in

23   Sacramento, and then the word was the investors were dropping

24   out, and my indication was they filed bankruptcy, and so it

25   kind of dried off real fast.  So we probably lasted two

1    or three months, at most.

2    Q.     4 Results lasted two or three months?

3    A.     [My involvement with Win First.  So we leased them the

4    vehicles, we delivered the vehicles over there to the

5    facility, the old McClellan Air Force Base.]  And I believe we

6    probably received one or two monthly leases, but then they

7    quit paying and filed for bankruptcy, so we brought the

8    vehicles back to avoid being caught up in their bankruptcy.

9    Q.     When did you leave 4 Results?

10   A.     When we brought the vehicles back, I would say that's

11   probably March, April time frame, a couple of months into the

12   business.

13   Q.     When you say back, where did you bring the vehicles?

14   A.     I think we brought them to the facility on Luyung.

15   And I recall working with Dave Zinnel to do that, and my wife

16   helped bring the vehicles back.  So we picked them up and

17   drove them back to the facility and parked them.  And then my

18   wife wrapped up all the books and paperwork for transactions

19   we had done, and I recall dropping it off at the facility at

20   Luyung Way, I believe.  I don't know exactly, but I probably

21   give it to Dave Zinnel, his brother.

22   Q.     Who is Dave Zinnel?

23   A.     Dave Zinnel is Steve Zinnel's brother.  So he helped

24   me move the vehicles back and forth.

25   Q.     What did you think happened to the business after you



# State of California
## Bill Jones
## Secretary of State

LIMITED LIABILITY COMPANY – STATEMENT OF INFORMATION

Filing Fee - Please see information section

IMPORTANT – Read Instructions Before Completing This Form

**FILED**
In the Office of the Secretary of State
of the State of California

MAR 2 0 2002

*Bill Jones*
BILL JONES, Secretary of State

This Space For Filing Use Only

1. LIMITED LIABILITY COMPANY NAME

[ 4 RESULTS LLC ]

2. SECRETARY OF STATE FILE NUMBER
200127110101

3. JURISDICTION OF FORMATION
CA

4. STREET ADDRESS OF PRINCIPAL EXECUTIVE OFFICE
8371 BUNCHBERRY COURT
CITY AND STATE: CITRUS HEIGHTS CA
ZIP CODE: 95610

6. STREET ADDRESS IN CALIFORNIA OF OFFICE WHERE RECORDS ARE MAINTAINED (FOR DOMESTIC ONLY)   CITY
8371 BUNCHBERRY COURT
CITRUS HEIGHTS CA 95610

CHECK THE APPROPRIATE PROVISION BELOW AND NAME THE AGENT FOR SERVICE OF PROCESS.
[X] AN INDIVIDUAL RESIDING IN CALIFORNIA.
[ ] A CORPORATION WHICH HAS FILED A CERTIFICATE PURSUANT TO SECTION 1505 OF THE CALIFORNIA CORPORATIONS CODE.

AGENT'S NAME: [ MICHAEL L GRAVELY ]

7. ADDRESS OF THE AGENT FOR SERVICE OF PROCESS IN CALIFORNIA, IF AN INDIVIDUAL   CITY   ZIP CODE
8371 BUNCHBERRY COURT   CITRUS HEIGHTS CA 95610

8. DESCRIBE TYPE OF BUSINESS OF THE LIMITED LIABILITY COMPANY.
[ TRAINING AND PERSONNEL ]

LIST THE NAME AND COMPLETE ADDRESS OF ANY MANAGER OR MANAGERS, OR IF NONE HAVE BEEN APPOINTED OR ELECTED, PROVIDE THE NAME AND ADDRESS OF EACH MEMBER AND CHIEF EXECUTIVE OFFICER (CEO), IF ANY. (CHECK THE APPROPRIATE DESIGNATION). ATTACH ADDITIONAL PAGES IF NECESSARY.

9. NAME   MICHAEL L. GRAVELY
ADDRESS   P. O. BOX 808
CITY   SACRAMENTO   STATE CA   ZIP 95812
[X] MANAGER
[ ] MEMBER
[ ] CEO, IF ANY

10. NAME
ADDRESS
CITY   STATE   ZIP
[ ] MANAGER
[ ] MEMBER
[ ] CEO, IF ANY

11. NUMBER OF PAGES ATTACHED, IF ANY.   NONE

12. I DECLARE THAT THIS STATEMENT IS TRUE, CORRECT, AND COMPLETE.

*Michael L Gravely*
SIGNATURE OF INDIVIDUAL AUTHORIZED TO SIGN   DATE 1/15/02

MICHAEL L. GRAVELY, MANAGER
TYPE OR PRINT NAME AND TITLE OF PERSON SIGNING

DUE DATE:

SEC/STATE FORM LLC-12 (REV. 11/99)   APPROVED BY SECRETARY OF STATE

SEC
BS 6836



# State of California
# Bill Jones
## Secretary of State

Filer **200127110101**

**FILED**
In the Office of the Secretary of State
of the State of California

SEP 2 8 2001

*Bill Jones*
BILL JONES, Secretary of State

This Space For Filing Use Only

## LIMITED LIABILITY COMPANY
## ARTICLES OF ORGANIZATION

A $70.00 filing fee must accompany this form.
IMPORTANT — Read instructions before completing this form.

| | |
|---|---|
| 1. | Name of the limited liability company (end the name with the words "Limited Liability Company," " Ltd. Liability Co.," or the abbreviations "LLC" or "L.L.C.") |

4RESULTS, LLC

| | |
|---|---|
| 2. | The purpose of the limited liability company is to engage in any lawful act or activity for which a limited liability company may be organized under the Beverly-Killea limited liability company act. |
| 3. | Name the agent for service of process and check the appropriate provision below: |

Michael Gravely    which is

[X] an individual residing in California. Proceed to item 4.

[ ] a corporation which has filed a certificate pursuant to section 1505. Proceed to item 5.

| | |
|---|---|
| 4. | If an individual, California address of the agent for service of process: |

Address: 8371 Bunchberry Court

City: Citrus Heights    State: CA    Zip Code: 95610

| | |
|---|---|
| 5. | The limited liability company will be managed by: (check one) |

[X] one manager  [ ] more than one manager  [ ] single member limited liability company  [ ] all limited liability company members

| | |
|---|---|
| 6. | Other matters to be included in this certificate may be set forth on separate attached pages and are made a part of this certificate. Other matters may include the latest date on which the limited liability company is to dissolve. |
| 7. | Number of pages attached, if any: 3 |
| 8. | Type of business of the limited liability company. (For informational purposes only) |

Training and Personnel

| | |
|---|---|
| 9. | DECLARATION: It is hereby declared that I am the person who executed this instrument, which execution is my act and deed. |

*Michael S Gravely*
Signature of Organizer

Michael Gravely
Type or Print Name of Organizer

09/28/01
Date

| | |
|---|---|
| 10. | RETURN TO: |

NAME
FIRM    Michael L. Gravely

ADDRESS
CITY/STATE    8371 Bunchberry Court, Citrus Heights, CA

ZIP CODE    95610

SEC/STATE (REV. 12/99)

FORM LLC-1 – FILING FEE $70.00
Approved by Secretary of State

SER 0013
BS 683.7

FR: Okay.

DE: And Steve doesn't have a share interest? Or does he?

DE: He has no ownership interest in Done Deal. He has been an employee of Done Deal.

FR: Since when? Do you know?

DE: Since – I want to say... he did consulting for Done Deal, but was a true employee on payroll, 2006.

FR: Okay.

DE: So – that brings us to May and Steve said 'Alright.' And then I believe Tom had you prepare an agreement.

FR: Yeah (inaudible).

DE: Right.

FR: (inaudible) before May.

DE: Okay. It's my understanding that your office prepared a settlement agreement and it was not agreeable...

FR: I have a copy of it here. Do you know why it wasn't agreeable?

DE: Uh-huh. And I... in fact... we prepared a (inaudible) response agreement so I'm not sure which one...

FR: I think I have that one. That's this one right? Your response agreement?

DE: Yes. Exactly.

FR: Okay, good.

DE: And so the difference between the two docFRents is really what was acceptable and what wasn't acceptable. And at that point the response was sent to Tom and then Tom refused to communicate any further with Steve and said 'Talk to Frank.'

FR: Okay.

BS 6838

ER 1461

DE: And that's why I wrote you the letter saying... and when really the letter was a follow up to our first conversation where I said 'What is your client's position?' because he would not – he just said 'Talk to Frank.' So –

FR: So are you the sole shareholder in Done Deal?

DE: I am the sole shareholder of Done Deal.

FR: Okay. (pause) And do you know why... well let me just ask you about your agreement. I'll just start there. Because I mean you're saying the difference – I don't want to put words in your mouth. You said the difference between the Done Deal agreement and the one that Tom had proposed to you was just the changes therein?

DE: Correct.

FR: Okay. Well I think one of the major problems with this – and I think this was actually shared with Steve... well let me ask you a question about that. I mean if he assigned his rights over to Done Deal in July of 2004, what is, you know why is there this, always this communication with Steve? This is what I'm missing.

DE: Right. Well...

FR: Why is there – why is there like no communication with you about it?

DE: It's not that there wasn't communication. As you know I represented System Three in a couple of lawsuits.

FR: Right.

DE: So it wasn't that there wasn't any communication but Steve and Tom were friends and went way back and so it didn't change the character of their relationship.

FR: Well I guess I'm trying to figure out like why – why does he care? He sold his - what I'm hearing is he sold his interest in July of 2004 for around $30,000 pursuant to some agreement.

DE: Mm-hmm. Well he signed his interest but... I wouldn't say (inaudible)

FR: Assigned?

DE: Assigned.

FR: Well what is that?

DE: An assignment. It's a legal docFRent where he assigned his rights in the company.

BS 6839
ER001462

repay his initial capitalization via a cashier's check deposited into Eidson's client trust account.  SER 228-29, 409-11.

From there, Eidson transferred $80,000 into her personal bank account.  SER 265. Out of her personal bank account, she then wrote a $75,000 check to the family court to pay off Zinnel's child support arrearage.  SER 266.  The jury learned that the family court does not look particularly hard at the source of money coming in to pay off child support debt: "We don't have the resources to do a lot of investigation.  To be honest with you, we're happy to get payoffs when we get them."  SER 592.  Zinnel and Eidson exploited this reality and Zinnel was able to pay the arrearage without drawing any attention to his hidden wealth. The paid undertaking meant that Zinnel could continue with an appeal in his child support litigation. SER 589-90.

### C. Eidson used funds laundered through her client trust account to pay off Zinnel's mortgage.

Not only did Eidson help Zinnel purchase his house out of the bankruptcy estate, but she also used funds that were rightfully part of the bankruptcy to satisfy Zinnel's mortgage. System 3 paid nearly

BS 6840

$300,000 into Eidson's client trust account.  SER 232.  Eidson then used those funds to pay off the $235,000 remaining on Zinnel's home loan.  SER 267.

**D.    Zinnel laundered System 3 funds by hiding them in a newly-opened Done Deal E-trade account.**

Zinnel moved $172,000 from the Done Deal bank account he and Eidson shared into a newly-opened Done Deal E-trade account. SER 233, 270.  Both Zinnel and Eidson were on the new E-trade account.  SER 234.

Hundreds of thousands of hidden System 3 dollars were laundered out of the Done Deal account and Eidson's client trust account.  SER 280-81.  The money went to Zinnel's child support debt, to pay off Zinnel's house, and to an investment account.  SER 280-81.  Each additional transaction kept the money another step further hidden from the bankruptcy estate and from Zinnel's family court litigation.

BS 6840A

NOT TO BE PUBLISHED

# COPY

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

In re the Marriage of MICHELLE and STEVEN ZINNEL.

MICHELE M. ZINNEL,

      Respondent,

v.

STEVEN K. ZINNEL,

      Appellant.

C052510

(Sup.Ct.No. 99FL07781)

# FILED

FEB 2 8 2008

COURT OF APPEAL · THIRD DISTRICT
DEENA C. FAWCETT, Clerk

BY_____Deputy

GOVERNMENT EXHIBIT 20

2:11-CR-234 TLN

ZBK022824

BS 6841

1    Q.    [ If a trial occurs and if a person is ordered to pay,

2    say, $75,000 -- let's take it one step back -- $69,000 in

3    child support.  Okay.  Then in order for that person to

4    appeal that trial court ruling, they have to deposit that

5    amount with the court; correct?

6    A.    Yes.  If they want to stay enforcement while they are

7    appealing, yes.

8    Q.    Okay.  Let's talk about some of these words.  Stay

9    enforcement.

10   A.    Uh-huh.

11   Q.    Stay enforcement means the respondent has to put that

12   money into an account with the superior court, and the money

13   doesn't go to the petitioner until the appeal is concluded;

14   correct?

15   A.    Correct.

16   Q.    So when you say "stay enforcement," that's really code

17   for don't send the money to respondent yet.  I'm appealing

18   this.  Correct?

19   A.    I think it means don't take any other means that are

20   available to enforce a civil judgment until the appeal has

21   resolved. ]

22   Q.    But what the superior court demands, what the superior

23   court demands, is that a deposit be made into the court;

24   correct?

25   A.    Yes.

BS 6842

1 opinion that in some way, shape, or form Mr. Zinnel was

2 avoiding the paying of child support; correct?

3 A.    I'm trying not to form an opinion.  I'm just reading

4 the excerpts as put forth.

5 Q.    And to your knowledge, no court has ordered or found

6 Mr. Zinnel has failed to pay child support; correct?

7 A.    To my knowledge, that's correct.

8 Q.    And to your knowledge, even if a court had said, even

9 if a court had said he had deliberately failed to pay child

10 support, which you have no information about, that cannot be

11 discharged in bankruptcy regardless; isn't that true?

12 A.    That's true.

13 Q.    So you said something to Ms. Hemesath on direct which

14 seemed to imply that child support in bankruptcy gets

15 complicated when there is child support in bankruptcy.  Do

16 you remember that question and answer?

17 A.    I do.  I believe what I was saying, or at least trying

18 to say, is that certain enforcement methods, certain

19 enforcement actions, are suppressed or suspended during the

20 automatic stay that goes into effect upon the filing of a

21 bankruptcy case.

22 Q.    So when you say "enforcement action," that means you

23 can't take money from them at that time during the pendency

24 of the bankruptcy proceeding; correct?

25 A.    No.  I mean certain actions are still allowed.  If a

1  opinion that in some way, shape, or form Mr. Zinnel was

2  avoiding the paying of child support; correct?

3  A.    I'm trying not to form an opinion.  I'm just reading

4  the excerpts as put forth.

5  Q.    And to your knowledge, no court has ordered or found

6  Mr. Zinnel has failed to pay child support; correct?

7  A.    To my knowledge, that's correct.

8  Q.    And to your knowledge, even if a court had said, even

9  if a court had said he had deliberately failed to pay child

10  support, which you have no information about, that cannot be

11  discharged in bankruptcy regardless; isn't that true?

12  A.    That's true.

13  Q.    So you said something to Ms. Hemesath on direct which

14  seemed to imply that child support in bankruptcy gets

15  complicated when there is child support in bankruptcy.  Do

16  you remember that question and answer?

17  A.    I do.  I believe what I was saying, or at least trying

18  to say, is that certain enforcement methods, certain

19  enforcement actions, are suppressed or suspended during the

20  automatic stay that goes into effect upon the filing of a

21  bankruptcy case.

22  Q.    So when you say "enforcement action," that means you

23  can't take money from them at that time during the pendency

24  of the bankruptcy proceeding; correct?

25  A.    No.  I mean certain actions are still allowed.  If a

OFFICIAL COURT REPORTERS, USDC -- (916) 448-2712

BS 6843

1    A.        A bank levy is where the Department of Child Support

2    Services levies on any account that it finds in any financial

3    institution in the state that has an account holder with a

4    name or social security number matching the list of those who

5    have arrearages -- child support arrearages.

6    Q.        Can child support orders be appealed?

7    A.        Yes.

8    Q.        Is there a requirement that the parent appealing the

9    child support order be current on the payment of child

10   support in order to appeal?

11   A.        No.

12   Q.        What's an undertaking?

13   A.        An undertaking is an amount of money that's put forth

14   as a security or a bond, if you will, in order to stay

15   enforcement of a money judgment that's been rendered in the

16   trial court pending the outcome of an appeal.

17   Q.        What are some of the factors that go into whether an

18   undertaking is ordered?

19   A.        Essentially, it has to be a money judgment, and if the

20   party appealing that judgment wants to stay enforcement of

21   that judgment, then they're required, by statute, to provide

22   an undertaking.

23   Q.        What's the purpose of ordering an undertaking?

24   A.        It's, essentially, a security. Basically, the

25   rationale is that so a person who has just had a money

F. ⌈ **The Defendants' motion for a bill of particulars was filed over a year too late and before the wrong judge.**⌉

Zinnel backstops his variance argument by arguing that the district court abused its discretion in denying a motion for a bill of particulars. ZAOB at 28. However, the motion was filed over a year after arraignment and before the wrong judge—by local rule the motion ought to have been filed before the magistrate judge. Fed. R. Crim. P. 7(f) (absent good cause, a motion for a bill of particulars should be filed within 14 days of arraignment); E.D.C.A. Loc. R. 302(b)(1). In any event, the indictment was more than adequate to advise Zinnel as to the government's theory of the case. *United States v. Yeargain*, 314 F.2d 881, 882 (9th Cir. 1963) ("A defendant is not entitled to know all the evidence the government intends to produce, but only the government's theory of the case."). Discovery was provided at least a year pre-trial and included documents related to each of the concealed properties. The court was well within its discretion in denying the motion.

BS 6845

| | | |
|---|---|---|
| | | Rodriguez)(Segal, Matthew) Modified on 12/1/2011 (Meuleman, A). (Entered: 11/30/2011) |
| 12/02/2011 | 60 | AMENDED NOTICE OF HEARING of 59 Notice of Appeal by USA as to Steven Zinnel, Derian Eidson. Attorney Hemesath, Audrey Benison added. Hearing set for 12/15/11 at 09:00 AM in Courtroom 7 (MCE) before Judge Morrison C. England, Jr. (Hemesath, Audrey) Modified on 12/5/2011 (Benson, A.). (Entered: 12/02/2011) |
| 12/02/2011 | 61 | DESIGNATION of COUNSEL FOR SERVICE. Adding attorney Audrey Hemesath; attorney Michele M. Beckwith, GOVT terminated. (Beckwith, Michele) Modified on 12/5/2011 (Benson, A.). (Entered: 12/02/2011) |
| 12/02/2011 | 62 | STIPULATION and PROPOSED ORDER for Continuance of Status Conference and Motion Hearing by Steven Zinnel. (Johnson, Thomas) (Entered: 12/02/2011) |
| 12/07/2011 | 64 | AO257 (Sealed) as to Steven Zinnel, Derian Eidson (Benson, A.) (Entered: 12/08/2011) |
| 12/08/2011 | 63 | SUPERSEDING INDICTMENT as to Steven Zinnel (1) counts 1s-2s, 3s, 4s-12s, 15s-17s, 18s; Derian Eidson (2) counts 1s-2s, 3s, 4s-6s, 13s-16s, 18s, 19s. (Benson, A.) (Entered: 12/08/2011) |
| 12/08/2011 | 65 | STIPULATION and ORDER signed by Judge Morrison C. England, Jr on 12/8/11 as to Steven Zinnel, Derian Eidson CONTINUING Motion Hearing to 3/15/2012 at 09:00 AM in Courtroom 7 (MCE) before Judge Morrison C. England Jr. Defendants' motion is to be filed by 1/19/12; oppositions due 2/16/12; replies due 2/23/12. Status Conference RESET for 3/15/2012 at 09:00 AM in Courtroom 7 (MCE) before Judge Morrison C. England Jr. Excludable started: XT-4 Start: 10/13/11 Stop: 3/15/12. (Meuleman, A) (Entered: 12/08/2011) |
| 12/08/2011 | 66 | MEMORANDUM placing Arraignment of Steven Zinnel on Superseding Indictment before Mag. Judge Kenneth J. Newman on December 15, 2011, at 11:00 a.m. by USA. (Segal, Matthew) (Entered: 12/08/2011) |
| 12/13/2011 | 67 | OPPOSITION by Steven Zinnel *to the Government's Appeal from Magistrate's Decision.* (Johnson, Thomas) Modified on 12/15/2011 (Kastilahn, A). (Entered: 12/13/2011) |
| 12/14/2011 | 68 | JOINDER in. *Defendant Steven Zinnel's Opposition to Government's Request for Reconsideration of Magistrate's Ruling* (Segal, Malcolm) (Entered: 12/14/2011) |
| 12/14/2011 | 69 | NOTICE *of Arraignment of Derian Eidson on Superseding Indictment before Mag. Judge Carolyn K. Delaney on December 27, 2011, at 2:00 p.m..* (Segal, Malcolm) (Entered: 12/14/2011) |
| 12/15/2011 | 70 | MINUTES (Text Only) for proceedings held before Judge Morrison C. England, Jr.:MOTION HEARING as to Steven Zinnel, Derian Eidson held on 12/15/2011.After hearing argument from counsel, the Court submitted the Government's Motion for Appeal from Magistrate Judge Decision 59 . A formal order will issue shortly. Government Counsel Matthew Segal and Audrey Hemesath present. Defense Counsel Thomas Johson and James Mayo, both retained present. Custody Status: Steven Zinnell present and out of custody; Derian Eidason not present with waiver on file. Court Reporter/CD Number: |

ER001638

BS 6846

| | | |
|---|---|---|
| | | Diane Shepard. Interpreter None present. (Deutsch, S) (Entered: 12/15/2011) |
| 12/15/2011 | 71 | MINUTES for ARRAIGNMENT proceedings as to Steven Zinnel held before Magistrate Judge Kendall J. Newman on 12/15/2011: Rights given. Defendant waived a formal reading of the Indictment. Charges reviewed. Defendant entered a not guilty plea and demanded a jury trial. Government Counsel Audrey Hemesath and Matthew Segal present. Defense Counsel Tom Johnson present. Custody Status: Defendant present, out of custody. ECRO/CD Number: 1 of 1. (Text Only) (Caspar, M) (Entered: 12/15/2011) |
| 12/16/2011 | 72 | NOTICE *of Arraignment of Derian Eidson on Superseding Indictment before Magistrate Judge Brennan on January 11, 2012, at 2:00 p.m.* by USA. Attorney Segal, Matthew Dean added. (Segal, Matthew) (Entered: 12/16/2011) |
| 12/28/2011 | 73 | ORDER signed by Judge Morrison C. England, Jr on 12/28/11 as to Steven Zinnel, Derian Eidson GRANTING 59 Appeal of Magistrate Judge Decision to District Court - ATY, filed by USA. With respect to the defenses additional request that certain signed tax returns be provided, the government represented on 12/15/11 that those materials would in fact be provided. Consequently, that request is also GRANTED. (Meuleman, A) (Entered: 12/28/2011) |
| 01/11/2012 | 74 | MINUTES (Text Only) for ARRAIGNMENT as to Derian Eidson (2) Count 1-2,1s-2s,3,3s,4-12,4s-6s,13,13s-16s,15,16,18s,19s held on 1/11/2012 before Magistrate Judge Edmund F. Brennan:All parties present. The Court advised the deft of her rights and the pending charges. A not guilty plea was entered with a jury trial demand. The parties confirmed the previously set status conference date of 03/15/12. Government Counsel Matthew Segal present. Defense Counsel Malcolm Segal present. Custody Status: out of custody. Court Reporter/CD Number: Jonathan Anderson, ECRO. (Cannarozzi, N) (Entered: 01/11/2012) |
| 01/20/2012 | 75 | STIPULATION and PROPOSED ORDER for Continuance of Status Conference and Motion Hearing by Steven Zinnel. (Johnson, Thomas) (Entered: 01/20/2012) |
| 01/24/2012 | 76 | STIPULATION and ORDER signed by Judge Morrison C. England, Jr. on 01/23/12 ORDERING that defendants' motion is to be filed by 02/10/12, oppositions by 03/01/12 and a reply, if any, by 03/15/12. The hearing on said motion shall be 03/29/12 at 9:00 a.m. The Status Conference for both defendants is CONTINUED to 03/29/12 at 09:00 AM in Courtroom 7 (MCE) before Judge Morrison C. England, Jr. TIME EXCLUDED: 10/13/11-03/29/12 under the Speedy Trial Act, pursuant to 18 U.S.C. § 3161(h)(7)(A), (h)(7)(B)(iv) and Local T4 (reasonable time for preparation of counsel). (Benson, A.) Modified on 1/24/2012 (Deutsch, S). (Entered: 01/24/2012) |
| 02/10/2012 | 77 | MOTION to DISMISS Counts 18 and 19 by Derian Eidson. Motion Hearing set for 3/29/2012 at 9:00 AM in Courtroom 7 (MCE) before Judge Morrison C. England Jr.. (Attachments: # 1 Motion)(Segal, Malcolm) [Memorandum attached as main document] Modified on 2/14/2012 (Donati, J). (Entered: 02/10/2012) |
| 02/10/2012 | 78 | MOTION for DISCLOSURE and Identification of Informants by Derian Eidson. Motion Hearing set for 03/29/12 at 09:00 AM in Courtroom 7 (MCE) before Judge Morrison C. England, Jr. (Attachments: # 1 Exhibit A-N, # 2 Motion) (Segal, Malcolm) [Memorandum attached as main document] Modified on 2/14/2012 (Donati, J). (Entered: 02/10/2012) |

ER001639

BS 6847

| 02/10/2012 | 79 | MOTION to SUPPRESS by Derian Eidson and Steven Zinnel. Motion Hearing set for 3/29/2012 at 09:00 AM in Courtroom 7 (MCE) before Judge Morrison C. England Jr. (Attachments: # 1 Exhibit A-O, # 2 Motion)(Segal, Malcolm) [Memorandum attached as main document] Modified on 2/14/2012 (Donati, J). (Entered: 02/10/2012) |
| 02/10/2012 | 80 | MOTION to DISMISS Counts 18 and 19 of the Superseding Indictment and MOTION to SEVER by Steven Zinnel. Motion Hearing set for 03/29/12 at 09:00 AM in Courtroom 7 (MCE) before Judge Morrison C. England, Jr. (Attachments: # 1 Exhibit (A-E))(Johnson, Thomas) [No Electronic signature on document] Modified on 2/14/2012 (Donati, J). (Entered: 02/10/2012) |
| 02/10/2012 | 81 | JOINDER by Derian Eidson to 80 Motion to Dismiss and Motion to Sever. (Segal, Malcolm) Modified on 2/14/2012 (Donati, J). (Entered: 02/10/2012) |
| 02/10/2012 | 82 | MOTION TO RETURN PROPERTY by Steven Zinnel. Motion Hearing set for 3/29/2012 at 09:00 AM before Judge Morrison C. England Jr. (Attachments: # 1 Exhibit A)(Johnson, Thomas) [No Electronic signature on document] Modified on 2/14/2012 (Donati, J). (Entered: 02/10/2012) |
| 02/10/2012 | 83 | MOTION for BILL of PARTICULARS by Steven Zinnel. Motion Hearing set for 3/29/2012 at 09:00 AM before Judge Morrison C. England Jr. (Johnson, Thomas) [No Electronic signature on document] Modified on 2/14/2012 (Donati, J). (Entered: 02/10/2012) |
| 02/10/2012 | 84 | JOINDER by Derian Eidson in re 82 MOTION Return of Property Pursuant to FRCrP 41(g) filed by Steven Zinnel. (Segal, Malcolm) (Entered: 02/10/2012) |
| 02/10/2012 | 85 | JOINDER by Derian Eidson in re 83 Motion for Bill of Particulars filed by Steven Zinnel. (Segal, Malcolm) (Entered: 02/10/2012) |
| 02/10/2012 | 86 | MOTION for DISCLOSURE of *Grand Jury Transcripts* by Steven Zinnel. Motion Hearing set for 3/29/2012 at 09:00 AM in Courtroom 7 (MCE) before Judge Morrison C. England Jr. (Johnson, Thomas) Modified on 2/14/2012 (Donati, J). (Entered: 02/10/2012) |
| 02/10/2012 | 87 | JOINDER by Derian Eidson in re 86 Motion for Disclosure of Grand Jury Transcripts filed by Steven Zinnel. (Segal, Malcolm) (Entered: 02/10/2012) |
| 02/10/2012 | 88 | MOTION to SUPPRESS evidence seized pursuant to Search Warrant by Steven Zinnel. Motion Hearing set for 3/29/2012 at 9:00 AM in Courtroom 7 (MCE) before Judge Morrison C. England Jr.. (Attachments: # 1 Exhibit A) (Johnson, Thomas) [No electronic signature on document] Modified on 2/14/2012 (Donati, J). (Entered: 02/10/2012) |
| 02/13/2012 | 89 | JOINDER by Derian Eidson in 88 Motion to Suppress evidence seized pursuant to Search Warrant filed by Steven Zinnel. (Segal, Malcolm) Modified on 2/14/2012 (Marciel, M). (Entered: 02/13/2012) |
| 02/13/2012 | 90 | JOINDER by Steven Zinnel in 77 Motion to Dismiss. (Johnson, Thomas) [No electronic signature on document] Modified on 2/14/2012 (Donati, J). Modified on 4/11/2012 (Deutsch, S). (Entered: 02/13/2012) |
| 02/13/2012 | 91 | JOINDER by Steven Zinnel to 78 Motion for Disclosure. (Johnson, Thomas) [No electronic signature on document] Modified on 2/14/2012 (Donati, J). (Entered: |

ERD 01640

B S 6848

Thomas A. Johnson, SBN 119203
400 Capitol Mall, Suite 1620
Sacramento, CA 95814
Telephone (916) 442-4022
Attorney for Defendant Steven Zinnel

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, .<br><br>Plaintiff,<br><br>v.<br><br>STEVEN ZINNEL, and,<br>DERIAN EIDSON<br><br>Defendants. | CASE NO. 2:11-CR-0234-MCE<br><br>DEFENDANT'S REQUEST FOR<br>BILL OF PARTICULARS<br><br>Date: March 29, 2012<br>Time: 9:00 a.m.<br>Judge: Morrison C. England |

TO THE UNITED STATES ATTORNEY:

PLEASE TAKE NOTICE that on March 29, 2012, or as soon thereafter, Defendant, Steven Zinnel, will request a Bill of Particulars.

## I – INTRODUCTION

A superseding indictment was filed in this case on December 7, 2011. The superseding indictment is replete with allegations that refer to unnamed nominees, corporations, persons associated with Defendant, Steve Zinnel, and various companies. Therefore, Defendant, Steven Zinnel, respectfully requests that the Court order the Government to file a Bill of Particulars pursuant to Federal Rules of Criminal Procedure, Rule 7(f).

## II – REQUEST FOR BILL OF PARTICULARS

A Bill of Particulars requires the government to particularize the matters charged so the government's theory becomes clear and can be defended against. <u>Yeargain v.</u>

U.S. v. Zinnel: Defendant's Request for Bill of Particulars
Case No. 2:11-CR-0234-MCE

1

BS 6849
ER000205

1   BENJAMIN B. WAGNER
    United States Attorney
2   MATTHEW D. SEGAL
    AUDREY B. HEMESATH
3   Assistant U.S. Attorneys
    501 I Street, Suite 10-100
4   Sacramento, CA 95814
    Telephone: (916) 554-2700
5

6

7

8

9                    UNITED STATES DISTRICT COURT

10            FOR THE EASTERN DISTRICT OF CALIFORNIA

11

12   UNITED STATES OF AMERICA,          Case No.  2:11-CR-234 MCE

13          Plaintiff,                   **GOVERNMENT'S OPPOSITION TO
                                         DEFENDANTS' MOTION FOR A BILL OF
14       v.                              PARTICULARS**

15   STEVEN ZINNEL and DERIAN
     EIDSON,
16
           Defendants.
17

18

19                        **INTRODUCTION**

20        Defendants Steven Zinnel ("Zinnel") and Derian Eidson ("Eidson") have moved for a

21   bill of particulars at the wrong time and in the wrong court. Fed. R. Crim. P. 7(f) requires that

22   absent "good cause," such motions should be filed within fourteen days of arraignment. Loc. R.

23   302(b)(1) requires motions for a bill of particulars be filed with a magistrate. It is likely that if

24   this motion had been timely presented to a magistrate, it would have been denied. The

25   superseding indictment is highly detailed and information requested by the defendants is

26   answered by the discovery already provided.

27

28

                                        1

BS 6850

ER000209

1              **ARGUMENT**

2          Rule 7(f) authorizes the court to direct the filing of a bill of particulars  Fed. R. Crim. P.

3     7(f).  However, if the request is made more than fourteen days after arraignment, the Court need

4     not even reach its merits absent a showing of good cause for the delay. Fed. R. Crim. P. 7(f);

5     *United States v. McKay*, 70 F.Supp.2d 208, 211 (E.D.N.Y. 1999); *United States v. Chan*, 2008

6     WL 5233585, *1 (E.D. Cal. 2008). In this case, the arraignment for Steven Zinnel occurred on

7     December 15, 2011 (docket entry 71), and arraignment for Derian Eidson on the superseding

8     indictment occurred on January 11, 2012 (docket entry 74).  Defendants have not even attempted

9     to meet the good cause standard. *See Chan*, 2008 WL 5233585 at *1 ("The Court was expecting

10    to find out in the moving papers whether or not there was some valid reason for the extraordinary

11    delay in filing this instant motion [for a bill of particulars].  No explanation accompanied the

12    motion.").[1]

13         Even if the defendants were able to make a showing to excuse their delay in filing, the

14    court need only grant a request for a bill of particulars where necessary to provide sufficient

15    information to the defense.  The decision whether to grant a request for a bill of particulars is

16    directed to the trial court's discretion.  *United States v. Long*, 706 F.2d 1044, 1054 (9th Cir. 1983).

17         If this motion had been timely presented to the right court, it probably would have been

18    denied because the Superseding Indictment is detailed and the discovery is similarly thorough.

19    There is no ambiguity as to what the defendants are charged with. A bill of particulars is

20    designed only to apprize the defendant of the specific charges being presented to minimize the

21    danger of surprise at trial, to aid in preparation, and to protect against double jeopardy. *Long*, 706

22    F.2d at 1054.  In determining whether to grant a motion for a bill of particulars, therefore, a court

23    should consider whether the defendants has been adequately advised of the charges "through the

24    indictment and all of the disclosures made by the government." *Id.*  Full discovery will "obviate

25    the need for a bill of particulars." *Id.*; *United States v. Giese*, 597 F.2d 1170, 1180 (9th Cir. 1979).

26         A bill of particulars is not meant to serve as a discovery tool:

27          [1] Obviously, a reply brief is no place to make that preliminary showing. *See, e.g., United
28    States v. Bohn*, 956 F.2d 208, 209 (9th Cir. 1992) (courts generally decline to consider arguments
      raised for the first time in a reply brief).

BS 6851

ER000210

> A bill of particulars is not meant to provide the defendant with all
> of the evidence that the government will introduce at trial. Instead,
> the goal of a bill of particulars is satisfied if the defendant is aware
> of "the theory of the government's case."

*United States v. Middleton*, 35 F.Supp.2d 1189, 1192-93 (N.D. Cal. 1999) (*quoting United States v. Ryland*, 806 F.2d 941, 942 99th Cir. 1986)); *Giese*, 597 F.2d at 1181. Accordingly, requests for specifics regarding the beginning or end points of conspiracies, or concerning overt acts therein, are **not** proper grounds for a bill of particulars. *Giese*, 597 F.2d at 1181 ("Appellant's request for the 'when, where, and how' of every act in furtherance of the conspiracy was equivalent to a request for complete discovery of the government's evidence, which is not a purpose of the bill of particulars."); *United States v. DiCesare*, 765 F.2d 890, 897 (9th Cir.), *amended on other grounds*, 777 F.2d 543 (1985) ("DiCesare and Flannery requested a bill for three reasons: (1) to obtain the names of any unknown coconspirators; (2) to determine the exact date on which the conspiracy allegedly began; and (3) to delineate all other overt acts that comprised the charged activity. These reasons, however, do not warrant a bill of particulars.").

One reason why a bill of particulars is disfavored is because the government must strictly adhere to answers filed in response. *United States v. Haskins*, 345 F.2d 111, 114 (6th Cir. 1965); *United States v. Murray*, 297 F.2d 812, 819 (2d Cir. 1962); *United States v. Neff* 212 F.2d 297, 309 (3d Cir. 1954). As the court in *Neff* wrote,

> He who has furnished the bill of particulars . . . must be confined to
> the particulars he has specified, as closely and effectually as if they
> constituted essential allegations in a special declaration. Otherwise
> states, a bill of particulars strictly limits the prosecution to proof
> within the area of the bill.

This prevents the orderly and proper development of the government's evidence during trial. As the court said in *United States v. Mannino*, 480 F.Supp. 1182, 1185 (S.D.N.Y. 1979), "A bill of particulars should not be used to . . . force detailed disclosure of acts underlying a charge, or to restrict the Government's proof at trial."

Defendants in their motion request particulars relating to Counts 1 and 2 of the Indictment, including identification of the concealed corporate property and the defendants'

3

BS 6852

ER000211

1    determined, motion is denied as well.

2         Let's see.  The next is the motion for return of

3    property.

4         MR. JOHNSON:  Submitted.

5         MS. HEMESATH:  Submitted.

6         THE COURT:  The court has reviewed the information

7    contained in the search warrant, what the categories of

8    documents that could be seized, and the court finds that the

9    seizing of the documents was based upon the probable cause as

10   set forth in the search warrant.

11        Motion is denied.

12        Request for bill of particulars.

13        MR. JOHNSON:  Nothing further, Your Honor.

14        MS. HEMESATH:  We submit.

15        THE COURT:  This has already been resolved previously

16   by the Magistrate Judge.  I don't see that there's any reason

17   to go into that again.  There's been no justification cited

18   by the defendants.

19        Motion is denied.

20        Motion for disclosure of Grand Jury transcripts.

21        MR. JOHNSON:  Just in addition to what we've briefed,

22   Your Honor, we don't think there's anything -- that there is

23   a good reason not to disclose the Grand Jury transcript of

24   what we think is the testifying agent, Ms. Plato, from the

25   Grand Jury testimony.

ER000013

BS 6853

end of the sentencing hearing but after the court indicated its views regarding the appropriate sentence).

### G. The district court considered all of the § 3553(a) factors in sentencing Zinnel.

The court correctly calculated the guideline range, heard argument from the parties, heard allocution, and then considered the 18 U.S.C. § 3553(a) factors to arrive at the mid-range Guidelines sentence for Zinnel. The court did not abuse its discretion in declining to vary downward on this record.

### 1. The district court gave the reasons for Zinnel's sentence.

The record makes clear that the court considered the sentencing factors under § 3553(a). ER 1255 ("[T]he court has also considered the factors set forth in 18 U.S.C. § 3553 and finds that this sentence is sufficient, but not greater than necessary to afford deterrence and protect the public from future crimes of the defendant."). The court specifically addressed many of the § 3553(a) factors in the context of the facts of this case in explaining the reasons for the 212 month sentence. ER 1249-55. The district court mentioned:

148

BS 6854

- the letters sent in Zinnel's support (history and characteristics of the defendant)[24] (ER 1251; 18 U.S.C. § 3553(a)(1));

- the lies Zinnel told the bankruptcy trustee and the bankruptcy court (need to promote respect for the law) (ER 1252; 18 U.S.C. § 3553(a)(2)(A));

- the blame Zinnel placed on others (lack of acceptance of responsibility) (ER 1252; 18 U.S.C § 3553(a)(2));

- the elaborateness of the System 3 silent partner scheme (seriousness of the offense) (ER 1253; 18 U.S.C. § 3553(a)(2)(A));

The court held that "there are no aggravating or mitigating circumstances of a kind or to a degree that have not been taken into consideration by the Sentencing Commission in sentencing the defendant here today." ER 1255-56. This explanation indicates that the court considered and rejected the possibility of a non-Guidelines sentence.

---

[24] The letters sent in support of Zinnel, while favorable to him, also helped establish that this was not a crime of desperation.

BS 6855

*Winchester Packaging, Inc. v. Mobil Chemical Co.,*
   14 F.3d 316 (7th Cir. 1994) ................................................................. 83

*Zurich Am. Ins. Co. v. Watts Ind.,*
   417 F.3d 682 (7th Cir. 2005) ........................................................... 89, 91

## STATUTES

11 U.S.C. § 541(a)(6) ............................................................................. 73

18 U.S.C. § 152 ....................................................................................... 62

18 U.S.C. § 152(1) ..................................................................... 55, 57, 60

18 U.S.C. § 152(7) ............................................................................. 3, 91

18 U.S.C. § 981(a)(1)(C) ............................................................ 164, 165

18 U.S.C. § 982(a)(1) ......................................................................... 165

18 U.S.C. § 1956 ........................................................................... 82, 134

18 U.S.C. § 1956(a)(1)(B) ........................................... 110, 115, 118

18 U.S.C. § 1956(a)(1)(B)(i) ............................................................ 69, 71

18 U.S.C. § 1956(a)(3) ........................................................................ 70

18 U.S.C. § 1956(c)(4) ...................................................................... 110

18 U.S.C. § 1956(h) ........................................................................ 3, 68

18 U.S.C. § 1957 ............................................................................... 3, 82

18 U.S.C. § 3231 ...................................................................................... 1

18 U.S.C. § 3553 ................................................................................ 148

18 U.S.C. § 3553(a) ............................................... 148, 150, 156, 160

18 U.S.C. § 3553(a)(1) .............................................. 149, 150, 160, 161

18 U.S.C. § 3553(a)(2) .............................................................. 149, 150

BS 6856

18 U.S.C. § 3553(a)(2)(A) ........................................ 149, 153, 160, 161

18 U.S.C. § 3553(c) ................................................................ 150

28 U.S.C. § 1291 ...................................................................... 1

## RULES

EDCA Local Rule 302(b)(1) ..................................................... 66

Fed. R. App. P. 4(b) ................................................................. 1

Fed. R. Crim. P. 32(i)(4)(A)(ii) ........................................... 145

Fed. R. Crim. P. 7(f) .............................................................. 62

Fed. R. Evid. 408 ............................................... 2, 80, 82, 83, 89

Fed. R. Evid. 408(b) .............................................................. 89

Fed. R. Evid. 701 ................................................................... 99

Fed. R. Evid. 801(d)(2)(A) ................................................... 107

## SENTENCING GUIDELINES

U.S.S.G. § 2B1.1 ........................................................... 124, 132

U.S.S.G. § 2B1.1(b)(2)(A) .................................................... 130

U.S.S.G. § 2S1.1 .......................................................... 135, 140, 141

U.S.S.G. § 2S1.1(b)(10) ....................................................... 134

U.S.S.G. § 2S1.1(b)(2) ......................................................... 139

U.S.S.G. § 3C1.1 ................................................................... 40

U.S.S.G. § 3B1.1 .................................................................. 141

U.S.S.G. § 2S1.1(a)(2) .......................................................... 129

U.S.S.G. § 3B1.3 ................................................................... 140

xxi

BS 6857

mentioned the need for deterrence and to protect the public. ER 1255. Finally, the court rejected the idea that there were any other factors in aggravation or mitigation. ER 1255-56. The court fulfilled its obligation to consider the § 3553(a) factors.

> ### 2. The disparity argument was frivolous, and the district court did not err by not specifically addressing it.

Most of Zinnel's sentencing argument hangs on his claim that his Guidelines sentence resulted in an unwarranted disparity. ZAOB at 76-84. But the court did not abuse its discretion in failing to apply a downward variance. Nor was the court required to specifically address Zinnel's disparity argument where, in the context of this case, that argument was frivolous. *Carty*, 520 F.3d at 992.

Zinnel's comparison of his frauds to other cases did not require a downward variance. In *Treadwell*, this Court recognized that "[a] district court need not, and as a practical matter, cannot compare a proposed sentence to the sentence of every criminal defendant who has ever been sentenced before." *United States v. Treadwell*, 593 F.3d 990, 1010 (9th Cir. 2010). It does not create an unwarranted sentencing disparity to show that different defendants may have

151

BS 6858

## A. They created fake invoices from Done Deal to extract disguised distribution payments from System 3.

Zinnel and his business partners grew System 3 into a very successful company, even while Zinnel publicly declared he had nothing in bankruptcy and before the family court. SER 494. Zinnel was entitled to hundreds of thousands of dollars in ownership distributions per the terms of the business formation agreement. SER 493. From 2001 through 2009, Zinnel received these payments from System 3 because he was a silent partner in the corporation. SER 493. To receive payment without breaking the confidentiality he demanded, Zinnel and Eidson concocted a scheme of fake invoices and payments to Done Deal that were really ownership distributions to Zinnel. SER 415-31.

Zinnel was still receiving System 3's financials. SER 413. All Zinnel had to do to initiate a distribution payment was send an email to System 3 requesting it. SER 452.

26

BS 6859

INTENTIONALLY BLANK

Amount:          $139,524.00                    Sequence Number: 5660277468
Account:         ████████                        Capture Date:    01/05/2007
Bank Number: 12100035                            Check Number:    15719

                                                                                15719

SYSTEM 3, INC.                          BANK OF AMERICA
6830 FAIR OAKS BLVD.
CARMICHAEL, CA 95608                         11-35/1210                      15719
(916) 979-0550

                    5427██████ 01-04-07  4078  07

                                                    DATE              AMOUNT
                                                  12/27/06          $139,524.00

         One Hundred Thirty-Nine Thousand Five Hundred Twenty-Four and 00/100

PAY
TO THE
ORDER
OF       DONE DEAL, INC.

                                          _Gulis Wilit_
                                          AUTHORIZED SIGNATURE

_____ ████████████████████████████████████████████

                                                                    Marian Eubank
                                                                    for Done Deal, Inc.

EL SEGUNDO CA
MCBANK████████ 173  4078 02 60  0000135800211716  01/04/07
12/27██ 1800 ██ ██
01/05/██
5660277468

WASHINGTON MUTUAL CA 3222716270      >3222716270<
5427755995 01-04-07                   01-04-07
                                      542756995

GOVERNMENT
EXHIBIT
403
2:11-CR-234 TLN          BS 6861

ER001399

secret shareholder all these years. SER 542-45. Eidson indicated

that her "greatest fear" was if System 3 did not get the deal done,

then Zinnel would go to the banks, bonding companies, or the IRS.

ER 1519. She added, "That's the only reason I'm involved in this is

to try to get the deal done without it getting uglier." ER 1519. When

Radoslovich ended the meeting by saying that he would talk to his

client about this "threat and see how he responds to it," Eidson

replied "Okay. Thanks." ER 1519.

### VI. Eidson responded to a grand jury subpoena and produced a back-dated document as the custodian of records for Done Deal.

As part of its investigation, the government subpoenaed Done

Deal for the alleged assignment Eidson referenced in her meetings

with Radoslovich. Eidson appeared before the grand jury as

custodian of records and produced a document purporting to be the

assignment. SER 315.

The document was manufactured. It had been typed up to look

as though the assignment occurred on July 13, 2004 (one year before

Zinnel filed his bankruptcy petition), but the file create-date was

April 30, 2009—well after the audio-recorded meetings with

BS 6862

## ASSIGNMENT OF INTEREST IN SYSTEM 3, INC.

THIS ASSIGNMENT is made on July 13, 2004 by STEVE K. ZINNEL, (hereinafter "Assignor") to DONE DEAL, INC., a California Corporation (hereinafter "Assignee").

WHEREAS, as of July 13, 2004, Assignor has an interest in SYSTEM 3, INC., a California Corporation (hereinafter "System 3").

WHEREAS, Assignor desires to assign, transfer, sell and convey to Assignee all of Assignor's right, title, interest, and/or ownership in System 3,

WHEREAS, Assignee is desirous of receiving all of Assignor's right, title, interest, and/or ownership in System 3;

NOW, THEREFORE, for valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Assignor has assigned, transferred, sold and conveyed and by these presents does hereby assign, transfer, sell and convey unto Assignee all of Assignor's right, title, interest, and/or ownership in System 3. Assignee hereby assumes all of Assignor's duties and obligations. This Assignment shall be binding upon Assignor and shall inure to the benefit of Assignee and its successors, heirs and assigns.

NOW, THEREFORE, Assignor and Assignee agree that this Assignment is confidential. Further, Assignor and Assignee agree to use all reasonable efforts to preserve the confidentiality of this Assignment, including without limitation, implementing reasonable physical security measures and operating procedures, and shall not disclose this Assignment to any third party without express written agreement of both Assignor and Assignee. In the event disclosure of this Assignment is required by law, regulation, or court order, each party to this Assignment shall be promptly notified so that party may seek a protective order or other appropriate remedy.

NOW, THEREFORE, the parties to this Assignment agree that this Assignment shall be construed under California law. The parties to this Assignment further agree that photocopies or facsimile copies of the original signature pages shall be deemed to have the same force and effect as the original.

IN WITNESS WHEREOF this Assignment has been signed, sealed, and delivered by Assignor and Assignee as of the day and year first above written.

Agreed and accepted by:

_____
Steve K. Zinnel (Assignor)

Agreed and accepted by:

_____
Done Deal, Inc. (Assignee)
by its President, Derian Eidson

GOVERNMENT EXHIBIT 138
2:11-CR-234 TLN

DD 00508

ZBK006940
JER_0315
BS 6863

1    Q.        And does your report contain further detail on some

2    of those factors you just mentioned?

3    A.        Yes, it does.

4    Q.        Where do we see that?

5    A.        If you turn to attachment 4, page 3 of 11, I

6    identified some of those items that were in the document itself

7    including the title, which was "Assignment," the author, Krista

8    Dawkins; template last saved by Steve K. Zinnel, revision

9    number - six; the creating application Microsoft Office Word;

10   total editing time ten minutes; and the last printed date and

11   time May 5, 2009; create time April 30th, 2009; and the last

12   saved time of May 6th, 2009 and an associated time.

13   Q.        Let's go through each of those.  When it says "title,

14   Assignment," what does that factor mean?

15   A.        When you have a Microsoft Word document, you're

16   essentially buying a program that does typing for you, and you

17   can edit it.  And when you first create a document, you're able

18   to give certain characters to the document so you can find it

19   later or classify it in some way.

20            And one of the titles -- or one of the labels that

21   you're able to give the document is title.  And you would open

22   a document, if you're creating a new document, and you can type

23   in what am I going to call this document.  And it gives you a

24   little label there.  Says "title."  And in this case, the

25   person who did that called this document "Assignment."

1   version of Microsoft Office Word, is that correct?

2   A.        I don't recall the exact dates, but I would -- I

3   believe you're right.

4   Q.        Okay.  If you created a document in 2004 and then

5   burned it to a disc in 2009, would that change the created

6   date?

7              MS. HEMESATH:  Outside the scope of direct.

8              THE COURT:  Overruled.  You can answer the question.

9              THE WITNESS:  Yeah.  You know, it's going to depend,

10  I think, on the way you're going to burn it to a disc.  But,

11  essentially, what you're doing is copying a file.

12              And when you copy a file, you're just making an

13  identical copy, and it's going to retain the old metadata, the

14  old created date.  So it would have the -- whatever date you

15  created it on on the date that you burn it.

16              Now having said that, there is a huge variety of

17  burning software programs.  And I can only speak to the theory

18  of how date and time stamps work.  Each one would be different,

19  obviously, and I haven't tested all those.

20              MR. WARRINER:  No other questions.

21              THE COURT:  Anything further?

22              MS. HEMESATH:  Nothing further, Your Honor.

23              THE COURT:  All right.  Thank you very much.

24  Mr. Cauthen, you are excused.

25              THE WITNESS:  Thank you, sir.

## V. Zinnel and Eidson conspired to extract a final, $4 million payout from System 3, disguised as a consulting agreement with Done Deal.

The fourth and final phase of the crime was an attempt to obtain a $4 million buyout of Zinnel's ownership interest in System 3. Zinnel made the initial request for the buyout, and then Eidson attempted to paper it over as a "payment" for a "consulting agreement" to conceal the true nature of the buyout. The government audio-recorded each meeting, and Zinnel and Eidson's own words proved the nature of the demand.

### A. Tom Wilbert decides to buy out the Zinnel brothers, pays David Zinnel $1.5 million, and sets aside funds to pay Steven Zinnel.

In the summer of 2008, Tom Wilbert made the decision to buy the Zinnel brothers out of System 3. SER 431. In July 2008, Wilbert concluded an agreement with David Zinnel and used two cashier's checks to pay him $1,524,000. SER 432-35. Wilbert also set aside enough money to cover Steven Zinnel's ownership interest, and System 3 had these funds in its bank ready to go. SER 271, 449-50.

31

BS 6866

company.  Government's Exhibit 2101.  Zinnel urged Wilbert to trust

him and not linger on the terms of their written contract:

> So Tom, I tell you.  The bottom line is we've
> known each other for a long time.  It's between
> you and I — you say you want out of this
> business relationship — I don't need a piece of
> paper — you know, I want to get some money —
> I think, uh, it's been a long time and you know,
> I wish you and System 3 much success.  I've
> got some things I wanna do so, I can tell you
> right now, paper is really . . . You and I can
> make a deal, we have a deal.  If this is the
> terms we agree to then . . . as far as I'm
> concerned, it is done.

Government's Exhibit 2101.

It was clear to both Wilbert and Zinnel that while on paper the

agreement would appear to be between Done Deal and System 3, in

reality the deal was with Zinnel.  SER 445.

> ### C. Eidson appeared as an attorney representing both Zinnel and Done Deal and threatened to retaliate if the $4 million was not paid under the terms Zinnel demanded.

Wilbert passed the Zinnel draft of the buyout agreement to his

attorney Frank Radoslovich, as part of a months-long process of

Zinnel trying to obtain his payment without giving up any of his

BS 6867

### III. The district court correctly admitted the evidence of the Eidson-Radoslovich meetings as proof of a criminal conspiracy, correctly clarified that the attorney witnesses testimony should not be given special weight, and correctly admitted the agreed-upon clips of the audio recordings.

The district court correctly admitted the evidence of Eidson's attempt to secure a $4 million concealed payment to Zinnel; correctly admitted background testimony about bankruptcy, and correctly admitted excerpts of the audio-recorded conversations.

### A. Rule 408 does not shield the admissible evidence of the $4 million payout demand or Zinnel's email to his ex-wife.

Both defendants argue that the evidence of Eidson's demand for the $4 million payout should have been excluded because the demand was a "settlement negotiation" under Federal Rule of Evidence 408. ZAOB at 34-35; EAOB at 55-61. Zinnel also invokes Rule 408 to challenge the admission of the email he sent to his ex-wife. ZAOB at 35-36.

### 1. Standard of Review

Both of the Rule 408 arguments were raised in pretrial motions before the district court. The court's decision to admit the evidence is reviewed for abuse of discretion. *Cassino v. Reichhold Chems., Inc.*,

BS 6868

intends to offer settlement evidence to prove liability (guilt),

impermissible under Rule 408. *Davis* is not factually analogous. The

defendant in *Davis* made his offer of compromise (to split $29,000 he

stole from the fraternity for which he was treasurer) directly to the

aggrieved party (the new treasurer for the fraternity). *Davis*, 596

F.3d at 859. The new treasurer was in the position to have accepted

the offer and settle the claim, reject the offer and counter-offer, or

refuse to negotiate. *Id.* at 859 (indicating that the new treasurer

"understood this give and take as compromise negotiations"). Here,

the "settlement negotiations" are not between defendants and the

aggrieved, but rather between defendants and would-be co-

conspirators. To resemble *Davis*, Zinnel would have had to approach

the bankruptcy trustee and offer something of value.

But Zinnel instead approached his partner in his largest

concealed asset and, through Eidson, demanded a payout in

exchange for keeping quiet and standing down on threatened

litigation. While *Davis* therefore had the hallmarks of classic civil

negotiation, protected under Rule 408, this case does not.

BS 6869

**Steve K. Zinnel**

| | |
|---|---|
| From: | Tom Wilbert [twilbert@system3inc.com] |
| Sent: | Monday, May 12, 2008 6:05 AM |
| To: | szinnel@covad.net |

Subject: Hello

Steve,

The reason I want to meet with you this week Wednesday is that I want to discuss our business relationship and my desire to terminate this relationship. I didn't want to go over that with you on the phone that is why I wanted to meet with you. I don't want to discuss the deposition, in fact any thing we discuss about that I will be obligated to convey my attorney. Tuesday afternoon is better for me than Wednesday, can we meet Tuesday at 1:00 PM at the Starbucks in Gold River?

Tom Wilbert
President
Phone 916-979-0550
Fax 916-979-0551
Cell 916-825-6079

5/12/2008

3



DEFENDANT'S
EXHIBIT

CASE
NO. *11-231-TLN*

EXHIBIT
NO. *B11*

BS 6870   ER001564

350

1   Q.      Okay.  And how does Steven Zinnel know your cost

2   codes?

3   A.      He provided them at the start-up of the company.

4   Q.      And he's providing them now?

5   A.      Correct.

6   Q.      All right.  So in the summer of 2008, what did you

7   decide to do about the Zinnel brothers and their relationship

8   with System 3?

9   A.      I wanted to terminate it and purchase out their

10  interest.

11  Q.      What was the problem with David Zinnel?  Purchase out

12  their interest.  What interest?

13  A.      Their owner interest.

14  Q.      What was the problem with David Zinnel?

15  A.      He was struggling as an employee, and we wound up

16  terminating him.

17  Q.      Were there two incidents in particular that concerned

18  you?

19  A.      Yes.

20  Q.      What were they?

21  A.      Failure to attend a mandatory bid walk.

22  Q.      What's a bid walk?

23  A.      It's an opportunity to go bid on a project.  And if

24  you fail to attend, then you are excluded from bidding on the

25  project.

KELLY O'HALLORAN, OFFICIAL COURT REPORTER, USDC -- (916) 448-2712

SER 0431

RS 687.1

1    name on the agreement with David Zinnel because he wasn't an

2    owner when the agreement was executed?

3    A.     The original agreement that was drafted by my legal

4    counsel listed both David and Steve.  Steve requested to have

5    his name removed and that I deal with David separately.

6    Q.     Because he wasn't an owner.

7    A.     That wasn't the reason.

8    Q.     Well, he said I'm not --

9          MR. SEGAL:  Objection, hearsay.

10         THE COURT:  Sustained.

11    Q.     BY MR. JOHNSON:  You testified earlier that it was

12    Mr. Zinnel that was kind of pushing in '08.  It wasn't

13    Mr. Zinnel that was pushing in '08.  It was you that was

14    pushing Mr. Zinnel to take some money and go away; correct?

15    A.     No.

16    Q.     It was you that initiated contact with him in May or

17    June of '08; correct?

18    A.     That is correct.

19    Q.     And so it wasn't like Mr. Zinnel and Ms. Eidson said

20    to you in May or June of '08 hey, we want out.  It was you

21    saying I want to remove any thought that anybody has an

22    interest in this besides me; correct?

23    A.     Correct.

24    Q.     You wanted to formalize what you had set in motion

25    years before.

ER672   BS6872 ER0006

1   A.      I'm reading it.  It's an email I sent to Steve on

2   May 12, 2008.

3   Q.      Telling him I want to terminate --

4           THE COURT:  Just a moment.  Is that in evidence?

5           MR. JOHNSON:  Sorry, Judge.  I'm trying to get it in

6   under the ten-minute mark.  I'm going too fast.

7           THE COURT:  All right.  Slow down.  Have you seen

8   that?

9           MR. SEGAL:  I'm sure it's been made available to me.

10          THE COURT:  Any objection?

11          MR. SEGAL:  No.

12          THE COURT:  Any objection?

13          MS. DALY:  No.

14          THE COURT:  All right.  It will be introduced.  You

15  may proceed.

16                          (DEFENDANT'S EXHIBIT B-11, Email from

17                          Tom to Steve re to terminate

18                          relationship dated 5/12/08,

19                          ADMITTED INTO EVIDENCE.)

20  Q.      BY MR. JOHNSON:  Could you read the letter for the

21  jury?

22  A.      Sure.  "Steve, the reason I want to meet with you this

23  week, Wednesday, is that I want to discuss our business

24  relationship and my desire to terminate this relationship.  I

25  didn't want to go over that with you on the phone.  That is

1    why I wanted to meet with you. I don't want to discuss the

2    deposition.  And, in fact, anything we discuss about that, I

3    will be obligated to convey to my attorney.  Tuesday

4    afternoon is better for me than Wednesday.  Can we meet

5    Tuesday at 1:00 p.m. at Starbucks in Gold River?"

6    Q.     That's as early as May of '08?

7    A.     Correct.

8    Q.     So it's not Ms. Eidson and Mr. Zinnel shaking you

9    down, or whatever the phrase was that we've heard, it's you

10   saying I really want to finish this business relationship;

11   isn't that true?

12   A.     It is me wanting to terminate the relationship.

13   Correct.

14   Q.     And then taking a look at C-11.  Mr. Segal, this is an

15   email from Mr. Wilbert that you provided in discovery.

16          I'd like to move C-11 in, your Honor.

17          THE COURT:  Any objection?

18          MR. SEGAL:  No, your Honor.  Thank you.

19          THE COURT:  Objection?

20          MS. DALY:  No, your Honor.

21          THE COURT:  All right.

22                       (DEFENDANT'S EXHIBIT C-11, Email from

23                       Tom to Steve re proposed Settlement

24                       Agreement along with Settlement

25                       Agreement dated 5/22/08,

Steve K. Zinnel

| | |
|---|---|
| **From:** | Tom Wilbert [twilbert@system3inc.com] |
| **Sent:** | Thursday, May 22, 2008 11:16 AM |
| **To:** | szinnel@covad.net |
| **Cc:** | Julia Wilbert |
| **Subject:** | Misc |
| **Importance:** | High |

Steve,

Attached is the settlement offer, including the breakdown for the dollar figure. I would like to get this resolved sooner than later, once this is executed it has a confidentiality provision which means we can't discuss its details. This helps everyone out.

The reason David is listed is that no one will believe you are not part of this if David is.

Cheers



Tom Wilbert
President
Phone 916-979-0550
Fax 916-979-0551
Cell 916-825-6079

DEFENDANT'S
EXHIBIT

CASE
NO. 11-234-JLR

EXHIBIT
NO. C11

BS 6875  ER00156
ER1564

# SETTLEMENT AGREEMENT AND MUTUAL RELEASE

This Agreement is made between STEVE K. ZINNEL and DAVID ZINNEL (individually referred to herein as "Seller" and collectively referred to herein as "Sellers") and TOM J. WILBERT (referred to herein as "Buyer").

## RECITALS

A.     WHEREAS, Buyer and Sellers entered into a Business Formation Agreement, dated October 3, 2001, causing Sellers to believe Sellers have an undetermined interest in the Corporation; and

B.     WHEREAS, Buyer has always been the sole record owner and holder of all of the outstanding stock of System 3, Inc. (referred to herein as "Corporation"); and

C.     WHEREAS, Buyer has always been the sole director and officer of the Corporation; and

D.     WHEREAS, Sellers have never been a director or officer of the Corporation; and

E.     WHEREAS, Buyer does not acknowledge or admit, by entering into this Agreement, that Sellers have or ever had a lawful interest in the Corporation; and

F.     WHEREAS, Seller DAVID ZINNEL is currently an at-will employee of the Corporation, meaning either the Corporation or DAVID ZINNEL can terminate his employment at any time, with or without cause, by notice to the other party; and

G.     WHEREAS, Buyer and Sellers now desire to resolve any uncertainty as to their respective rights to the shares of the Corporation; and

H.     WHEREAS, Sellers desire to sell any and all interest in the Corporation that Sellers may have to Buyer and Buyer desires to purchase any and all interest in the Corporation that Sellers may have;

NOW, THEREFORE, in consideration of the mutual covenants contained in this Agreement, the parties agree as follows:

1.     SALE OF INTEREST. For the Purchase Price, and on the terms and subject to the conditions set forth in this Agreement, Sellers hereby sell, assign, transfer, and deliver to Buyer, and Buyer hereby purchases from Sellers, all of Sellers' rights, titles, and interests in the Corporation. Immediately upon execution of this Agreement, all of Sellers' rights, titles and interests in the Corporation shall be transferred to Buyer.

2.     STEVE K. ZINNEL'S PURCHASE PRICE AND PAYMENT. The Purchase Price to be paid by Buyer to Seller STEVE K. ZINNEL is $3,944,799.00 (individiually referred to as "SKZ's Purchase Price"). On or before December 31, 2008, Buyer shall pay Seller STEVE K. ZINNEL at

BS 6876
ER001566

```
 1                       ADMITTED INTO EVIDENCE.)

 2   Q.     BY MR. JOHNSON:  This is you in May of '08 telling

 3   Mr. Zinnel let's get with it, here's the settlement

 4   agreement; correct?

 5   A.     The email is from me to Steven?

 6   Q.     Yeah.

 7   A.     It says, "Attached is a settlement offer, including a

 8   breakdown figure."

 9          MR. SEGAL:  May I just ask is that exhibit going in

10   with the attachment?

11          MR. JOHNSON:  Yes.

12          MR. SEGAL:  Okay.

13   Q.     BY MR. JOHNSON:  Showing you what's marked as D-11.

14   This is another -- I move D-11 into evidence, your Honor.

15          THE COURT:  Any objection?

16          MR. SEGAL:  No, your Honor.

17          MS. DALY:  No, your Honor.

18          THE COURT:  All right.  Just a minute.  It will be

19   received in evidence.

20                            (DEFENDANT'S EXHIBIT D-11, Email from

21                            Tom to Steve re proposed Settlement

22                            Agreement along with Settlement

23                            Agreement dated 6/13/08,

24                            ADMITTED INTO EVIDENCE.)

25   Q.     BY MR. JOHNSON:  This is another request by you with
```

## Steve K. Zinnel

| | |
|---|---|
| **From:** | Tom Wilbert [twilbert@system3inc.com] |
| **Sent:** | Friday, June 13, 2008 10:50 AM |
| **To:** | szinnel@covad.net; David Zinnel |
| **Subject:** | Settlement Agreement and Mutual Release_06 12 08 revised_clean.doc |
| **Importance:** | High |

Gents,

Attached is the revised agreement, please print out in triplicate and sing each copy and send back. David we will pay out your full amount by June 30th 2008.

Steve- Frank strongly advised me not to pay out any more amounts until this is signed, I am taking his recommendation, no further payments will be made until this document or something very close is executed.

Best regards,

Tom Wilbert

**DEFENDANT'S EXHIBIT**

CASE
NO. *11-23471k*

EXHIBIT
NO. *D11*

Zinnel Def. - 201163

ER 1571    BS 6878 ER00

1  Q.     But it was your client, Mr. Wilbert, that actually

2  wanted to pursue a settlement of the issues as early as May

3  of '08; isn't that true?

4  A.     Yes.

5  Q.     So are you telling us, Mr. Radoslovich, that you could

6  have come -- it was a real discussion because you could have

7  come to an agreement in 2009 with Ms. Eidson which would

8  constitute a final agreement?  Is that true?

9  A.     It was a real discussion, but that's not the reason.

10 The reason is -- and the FBI wasn't too pleased, I think,

11 about this, but I gave them a way out.

12 Q.     Who did you give a way out to?

13 A.     Well, I mean it seemed to me that if they were to

14 reopen the bankruptcy, we might not all be here today.

15 Q.     Where would we be?

16 A.     I don't know.  Not here.  I mean it seemed that's --

17 the way out was hey, we're taking steps to probably reopen

18 this and handle it right, and then we'll see how the

19 creditors shake out, and then we could pay Steve after that,

20 and then that would have been maybe done in a year and a

21 half, two years, who knows, but it didn't get done.

22 Q.     Mr. Radoslovich, if that was the way out, you could

23 have taken it; correct?

24 A.     I don't know how I would have taken it.

25 Q.     Well, it's simply communication with the trustee.

1                              (DEFENDANT'S EXHIBIT E-11, Email from

2                              Tom to Steve re the December 3, 2008

3                              meeting dated 11/15/08,

4                              ADMITTED INTO EVIDENCE.)

5     Q.      BY MR. JOHNSON:  What's the date of your email?

6     A.      November 19, 2008.

7     Q.      November 19, 2008; is that correct?

8     A.      Correct.

9     Q.      And that's you emailing Mr. Zinnel?

10    A.      Sorry.  The date that I emailed Steve?

11    Q.      Yes.

12    A.      Okay.  That was on the bottom.  I was reading the top.

13    November 15, 2008, I emailed Steve Zinnel.

14    Q.      What did you say?

15    A.      "Steve, I have not heard back from you this week.  I

16    now have Tuesday and Wednesday open if you want to get

17    together to review the letter you are drafting."

18    Q.      But now at this time, by November -- and how does he

19    respond to that?  Excuse me.

20    A.      "Tom, I can't meet this week.  How about next Tuesday

21    at 9:30 at the normal Starbucks?"

22    Q.      So Mr. Zinnel can't.  You want to meet.  Mr. Zinnel

23    can't meet; correct?

24    A.      Correct.

25    Q.      But by the time you send this email, by the time you



BS 6881    ER001535

0080 0080-4092 Done Deal Inc.

# EMPLOYEE EARNINGS RECORD
(Check Dates 01/15/2008 - 12/31/2008)

**Zhinek Steve**
Gold River, CA 95670

| | |
|---|---|
| ID | 2 |
| Home Dept | 100 Office |
| Gender | Male |
| Birthdate | 12/22/2006 |
| Hire Date | |
| Inactive Date | |
| Rehire Date | 12/19/2007 |

| | |
|---|---|
| Term Date: | |
| Pay Frequency | Semi-monthly |
| Standard Hrs | |
| Salary | 2,500.00/Pay period |
| Last Raise Date | |

Withholding Method: Federal Single, 2 / CA Single, 2.0

Earnings:   Deductions:

## HOURS, EARNINGS, AND REIMBURSEMENTS & OTHER PAYMENTS / WITHHOLDINGS

| CHECK DATE | DESCR | REGULAR HOURS | OVERTIME HOURS | REGULAR AMOUNT | OVERTIME AMOUNT | TOTAL EARNINGS | FRINGE & OTHER PAYMENTS | SOC SEC + MED | FEDERAL TAX | STATE TAX | LOCAL TAX | OTHER | NET PAY |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 01/15 | Regular | | | 2500.00 | | 2500.00 | | 191.25 | 378.08 | 119.60 | | 20.00 | 1791.07 |
| 01/31 | Regular | | | 2500.00 | | 2500.00 | | 191.25 | 378.08 | 119.60 | | 20.00 | 1791.07 |
| 02/15 | Regular | | | 2500.00 | | 2500.00 | | 191.25 | 378.08 | 119.60 | | 20.00 | 1791.07 |
| 02/29 | Regular | | | 2500.00 | | 2500.00 | | 191.25 | 378.08 | 119.60 | | 20.00 | 1791.07 |
| 03/14 | Regular | | | 2500.00 | | 2500.00 | | 191.25 | 378.08 | 119.60 | | 20.00 | 1791.07 |
| 03/31 | Regular | | | 2500.00 | | 2500.00 | | 191.25 | 378.08 | 119.60 | | 20.00 | 1791.07 |
| QTR 1 | | | | 15000.00 | | 15000.00 | | S 930.00 M 217.50 | 2268.48 CA | 717.60 | | Disability 120.00 | 10746.42 |
| 04/15 | Regular | | | 2500.00 | | 2500.00 | | 191.25 | 378.08 | 119.60 | | 20.00 | 1791.07 |
| 04/30 | Regular | | | 2500.00 | | 2500.00 | | 191.25 | 378.08 | 119.60 | | 20.00 | 1791.07 |
| 05/15 | Regular | | | 2500.00 | | 2500.00 | | 191.25 | 378.08 | 119.60 | | 20.00 | 1791.07 |
| 05/30 | Regular | | | 2500.00 | | 2500.00 | | 191.25 | 378.08 | 119.60 | | 20.00 | 1791.07 |
| 06/13 | Regular | | | 2500.00 | | 2500.00 | | 191.25 | 378.08 | 119.60 | | 20.00 | 1791.07 |
| 06/30 | Regular | | | 2500.00 | | 2500.00 | | 191.25 | 378.08 | 119.60 | | 20.00 | 1791.07 |
| QTR 2 | | | | 15000.00 | | 15000.00 | | S 930.00 M 217.50 | 2268.48 CA | 717.60 | | Disability 120.00 | 10746.42 |
| 07/15 | Regular | | | 2500.00 | | 2500.00 | | 191.25 | 378.08 | 119.60 | | 20.00 | 1791.07 |
| 07/31 | Regular | | | 2500.00 | | 2500.00 | | 191.25 | 378.08 | 119.60 | | 20.00 | 1791.07 |
| 08/15 | Regular | | | 2500.00 | | 2500.00 | | 191.25 | 378.08 | 119.60 | | 20.00 | 1791.07 |
| 08/29 | Regular | | | 2500.00 | | 2500.00 | | 191.25 | 378.08 | 119.60 | | 20.00 | 1791.07 |
| 09/15 | Regular | | | 2500.00 | | 2500.00 | | 191.25 | 378.08 | 119.60 | | 20.00 | 1791.07 |
| 09/30 | Regular | | | 2500.00 | | 2500.00 | | 191.25 | 378.08 | 119.60 | | 20.00 | 1791.07 |
| QTR 3 | | | | 15000.00 | | 15000.00 | | S 930.00 M 217.50 | 2268.48 CA | 717.60 | | Disability 120.00 | 10746.42 |
| 10/15 | Regular | | | 2500.00 | | 2500.00 | | 191.25 | 378.08 | 119.60 | | 20.00 | 1791.07 |
| 10/31 | Regular | | | 2500.00 | | 2500.00 | | 191.25 | 378.08 | 119.60 | | 20.00 | 1791.07 |

# EMPLOYEE EARNINGS RECORD
### (Check Dates 01/15/2009 - 12/31/2009)

0080 0080-4012 Done Deal Inc.

**HOURS, PAYMENTS, AND REIMBURSEMENTS & OTHER PAYMENTS**

| CHECK DATE | QB/QCA | REGULAR HOURS | OVERTIME HOURS | REGULAR AMOUNT | OVERTIME AMOUNT | TOTAL EARNINGS | BONUS & OTHER PAYMENTS | SOC SEC / MED | FEDERAL TAX | STATE TAX | LOCAL TAX | OTHER | NET PAY |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 01/15 | Regular | | | 2500.00 | | 2500.00 | | 191.25 | 366.75 | 113.93 | | 27.50 | 1749.57 |
| 01/30 | Regular | | | 2500.00 | | 2500.00 | | 191.25 | 369.75 | 113.93 | | 27.50 | 1798.57 |
| 02/27 | Regular | | | 3000.00 | | 3000.00 | | 229.50 | 493.75 | 180.43 | | 33.00 | 2083.32 |
| 03/13 | Regular | | | 3000.00 | | 3000.00 | | 229.50 | 471.54 | 160.43 | | 33.00 | 2105.53 |
| 03/31 | Regular | | | 3000.00 | | 3000.00 | | 229.50 | 471.54 | 160.43 | | 33.00 | 2105.53 |
| QTR 1 | | | | 14000.00 | | 14000.00 | | S 868.00 / M 200.00 | 2174.33/CA | 709.15 | | Disability 154.50 | 9881.52 |
| 04/15 | Regular | | | 3000.00 | | 3000.00 | | 229.50 | 471.54 | 160.43 | | 33.00 | 2105.53 |
| 04/30 | Regular | | | 3000.00 | | 3000.00 | | 229.50 | 471.54 | 160.43 | | 33.00 | 2105.53 |
| 05/15 | Regular | | | 3000.00 | | 3000.00 | | 229.50 | 471.54 | 167.55 | | 33.00 | 2098.41 |
| 05/29 | Regular | | | 3000.00 | | 3000.00 | | 229.50 | 471.54 | 167.55 | | 33.00 | 2098.41 |
| 06/15 | Regular | | | 3000.00 | | 3000.00 | | 229.50 | 471.54 | 167.55 | | 33.00 | 2098.41 |
| 06/30 | Regular | | | 3000.00 | | 3000.00 | | 229.50 | 471.54 | 167.55 | | 33.00 | 2098.41 |
| QTR 2 | | | | 18000.00 | | 18000.00 | | S 1116.00 / M 261.00 | 2829.24/CA | 991.06 | | Disability 198.00 | 12604.70 |
| 07/15 | Regular | | | 3000.00 | | 3000.00 | | 229.50 | 471.54 | 167.55 | | 33.00 | 2059.41 |
| 07/31 | Regular | | | 3000.00 | | 3000.00 | | 229.50 | 471.54 | 167.55 | | 33.00 | 2098.41 |
| 08/14 | Regular | | | 3000.00 | | 3000.00 | | 229.50 | 471.54 | 167.55 | | 33.00 | 2098.41 |
| 08/31 | Regular | | | 3000.00 | | 3000.00 | | 229.50 | 471.54 | 167.55 | | 33.00 | 2098.41 |
| 09/15 | Regular | | | 3000.00 | | 3000.00 | | 229.50 | 471.54 | 167.55 | | 33.00 | 2098.41 |
| 09/30 | Regular | | | 3000.00 | | 3000.00 | | 229.50 | 471.54 | 167.55 | | 33.00 | 2098.41 |
| QTR 3 | | | | 18000.00 | | 18000.00 | | S 1116.00 / M 261.00 | 2829.24/CA | 1005.30 | | Disability 198.00 | 12590.46 |
| 10/15 | Regular | | | 3000.00 | | 3000.00 | | 229.50 | 471.54 | 167.55 | | 33.00 | 2098.41 |
| 10/30 | Regular | | | 3000.00 | | 3000.00 | | 229.50 | 471.54 | 167.55 | | 33.00 | 2098.41 |
| QTR 4 | | | | 6000.00 | | 6000.00 | | S 372.00 / M 87.00 | 943.08/CA | 335.10 | | Disability 66.00 | 4196.82 |

Zimmel, Steve
Sec Sec#
Gold River, CA 95670

| ID | 10 | | |
|---|---|---|---|
| Home Dept: | 2 / 100 Office | Term Date: | |
| Gender: | Male | Pay Frequency: | Semi-monthly |
| Birthdate: | 12/22/2006 | Standard Hrs: | |
| Hire Date: | 12/2/2007 | Salary: | 3,000.00/Pay period |
| Inactive Date: | | Withholding Method: | |
| Rehire Date: | 12/19/2007 | Earnings: | |
| Last Raise Date: | 02/19/2009 | Deductions: | |

Federal: Single, 2
CA: Single, 2, 0

ER1545

BS 6883    ER00154

FR: Okay.

DE: And Steve doesn't have a share interest? Or does he?

DE: He has no ownership interest in Done Deal. He has been an employee of Done Deal.

FR: Since when? Do you know?

DE: Since – I want to say... he did consulting for Done Deal, but was a true employee on payroll, 2006.

FR: Okay.

DE: So – that brings us to May and Steve said 'Alright.' And then I believe Tom had you prepare an agreement.

FR: Yeah (inaudible).

DE: Right.

FR: (inaudible) before May.

DE: Okay. It's my understanding that your office prepared a settlement agreement and it was not agreeable...

FR: I have a copy of it here. Do you know why it wasn't agreeable?

DE: Uh-huh. And I... in fact... we prepared a (inaudible) response agreement so I'm not sure which one...

FR: I think I have that one. That's this one right? Your response agreement?

DE: Yes. Exactly.

FR: Okay, good.

DE: And so the difference between the two docFRents is really what was acceptable and what wasn't acceptable. And at that point the response was sent to Tom and then Tom refused to communicate any further with Steve and said 'Talk to Frank.'

FR: Okay.

RS 6684  ER001461

DE: And that's why I wrote you the letter saying... and when really the letter was a follow up to our first conversation where I said 'What is your client's position?' because he would not – he just said 'Talk to Frank.' So –

FR: So are you the sole shareholder in Done Deal?

DE: I am the sole shareholder of Done Deal.

FR: Okay. (pause) And do you know why... well let me just ask you about your agreement. I'll just start there. Because I mean you're saying the difference – I don't want to put words in your mouth. You said the difference between the Done Deal agreement and the one that Tom had proposed to you was just the changes therein?

DE: Correct.

FR: Okay. Well I think one of the major problems with this – and I think this was actually shared with Steve... well let me ask you a question about that. I mean if he assigned his rights over to Done Deal in July of 2004, what is, you know why is there this, always this communication with Steve? This is what I'm missing.

DE: Right. Well...

FR: Why is there – why is there like no communication with you about it?

DE: It's not that there wasn't communication. As you know I represented System Three in a couple of lawsuits.

FR: Right.

DE: So it wasn't that there wasn't any communication but Steve and Tom were friends and went way back and so it didn't change the character of their relationship.

FR: Well I guess I'm trying to figure out like why – why does he care? He sold his – what I'm hearing is he sold his interest in July of 2004 for around $30,000 pursuant to some agreement.

DE: Mm-hmm. Well he signed his interest but... I wouldn't say (inaudible)

FR: Assigned?

DE: Assigned.

FR: Well what is that?

DE: An assignment. It's a legal docFRent where he assigned his rights in the company.

BS 6885    ER001462

1   opinion on that, because I'm not a bankruptcy lawyer.

2          MR. JOHNSON:  Objection, relevance.

3          THE COURT:  Sustained.

4          MR. SEGAL:  Okay.

5   Q.     BY MR. SEGAL:  When the FBI was -- when a federal

6   agent was at the meeting, were you given any instructions on

7   what to say in the meeting?

8   A.     No.

9   Q.     If you could come to a lawful agreement to end the

10  relationship, did you care what effect it might have on any

11  prosecution of anybody?

12  A.     No.

13  Q.     All right.  Now, who did Eidson say was the real owner

14  of Zinnel's interest in System 3?

15  A.     I have the distinct impression it was Steve.

16         MS. DALY:  Objection, non-responsive.

17         THE COURT:  Sustained.

18  Q.     BY MR. SEGAL:  Did she talk about any assignment?

19  A.     Yes.

20  Q.     What did she say?

21  A.     Well, there had been representations to me that Steve

22  had assigned his interest in System 3 to Done Deal.  And I

23  wanted us to have some type of agreement, or some type of

24  evidence of that to tie that into the agreement that we had

25  drafted to show where that trail went.

JEN 0518

BJ 6886

with some recitals that there was a written agreement in October back in 2001, October 3rd 2001, that there was an assignment to Done Deal at or about July 2004? What is the issue? Why can't we say that?

Begin 2210

DE: Well I guess you can but that wasn't the original agreement. The original agreement at the time of the formation was that Tom would represent to the world that it was solely his business and that distributions would be made pursuant to a consulting agreement and distributions were made to Done Deal.

Begin Exh. 2210

FR: I see that. In the business formation agreement there's references that it should be secret.

DE: Well I wouldn't say secret. I would say confidential.

FR: Well extremely confidential, but I mean if he's willing to do it now – what difference does it make to you? I mean if you're willing to... I mean we have other issues I want to talk about on this but I mean why can't we... look I mean there's plenty of other audiences for a document like this. You know? You said it yourself in one of your letters. You're saying 'Well you know, we're going to talk to the bonding company' and blah, blah, blah.

DE: Well here's the deal. I mean this is kind of what our position is is that everything was fine and Tom decided that he wanted to terminate the business relationship. You know, we're fine continuing on the way it was before he decided to, you know before he indicated that he wanted to terminate. So if he doesn't want to terminate the business relationship, you know, then he needs to be providing an equal shareholder with the financial information and distribution information about the company.

FR: Now when you say equal shareholder you're referring to Done Deal Inc?

DE: Correct.

End Exh. 2210

end 2210

FR: Okay. But I mean I think... look, whenever you're talking about giving this kind of money to anybody, when you're talking about a company that does public infrastructure contracting for the western United States and it has bonding companies looking at it and it has, you know, insurance companies looking at it and, you know, to say nothing about, you know, a couple hundred employees that are working around (inaudible). I mean when you have a financial statement... you know our guy doesn't use Artis anymore. He uses, you know, a real live accounting firm, and you know...

DE: Artis just did the bookkeeping. She didn't really do the accounting.

(inaudible)

FR: We can have a whole other conversation about Artis but the point is is when you're throwing this kind of money down on the books you got to make it show that it's real.

BS 6887
ER001464

**Derian Eidson**
Attorney at Law
▮▮▮▮▮▮▮▮
Yorba Linda, CA 92887
T. 714-349-5922
F. 714-779-1977

February 3, 2009

Frank Radoslovich
Radoslovich Law Corporation                    via fax only:  (916) 565-8170
601 University Ave., Suite 250
Sacramento, CA  95825

Re:  System 3, Inc.

Dear Mr. Radoslovich:

Please allow this to respond to the voice mail you left this morning following our telephone discussion.  I have been retained to represent the interests of Steve Zinnel and Done Deal, Inc., Mr. Zinnel's assignee, as it pertains to discontinuing the business relationship with System 3, Inc.  Similarly, would you kindly provide me with a written statement as to whom you represent in this matter.

In your message you stated that you "prefer no dialoguing over the phone" and want everything in writing.  I am perplexed by that statement as your firm and I have worked together smoothly in the past, and telephonic communication is a much more efficient way for us to resolve this situation, both in terms of time and cost to our clients.  I have no problem with written confirmations of our discussions.

As I indicated in our discussion this morning, please advise me of your client's position in this matter.  I am available to meet with you in your office on Friday morning if you are available to expeditiously attempt to resolve this.  Please advise.

I look forward to working with you.  Should you have any questions or comments please feel free to give me a call.

Very truly yours,

*Derian Eidson*
Derian Eidson

GOVERNMENT
EXHIBIT
*1801*
2:11-CR-234 TLN

1    could just bear with me, Mr. Wilbert.  When you amended your

2    returns, were you already working with the U.S. Government?

3    A.      Yes.

4    Q.      So you become a member of the United States Department

5    of Justice team in '08, you don't get prosecuted, you keep

6    the company, and then you amend your returns in '09; correct?

7    A.      Correct.

8    Q.      Did you do that truthfully?

9    A.      To the best of my knowledge.

10   Q.      What's that mean?

11   A.      To the best of my knowledge, that I amended the parts

12   that needed amending.

13   Q.      You must have been very meticulous in '09 to make sure

14   that your amended returns were accurate.

15   A.      Correct.

16   Q.      So you did not lie or cheat the IRS/U.S. Government

17   again; correct?

18   A.      Not to my knowledge.

19   Q.      It sounds like when you say "not to my knowledge,"

20   you're leaving a door open that you may have committed some

21   sort of additional fraud in '09.

22   A.      I'm not a tax advisor, so to the best of my knowledge,

23   we did a job of correcting the taxes.

24   Q.      Let me ask you this.  You must have been on heightened

25   awareness that the distributions that you gave had to be, by

those who elect to stand trial are penalized.") (internal quotation omitted).

Without support in the record, Zinnel points to the government's plea offer to claim that his post-trial sentence is unreasonable. ZAOB at 84. But when a defendant rejects a plea offer and elects to require the government to prove its case, the earlier plea offer is not a basis for evaluating substantive reasonableness. *Ressam*, 679 F.3d at 1095 ("we reject any comparison with the offer made by the government to Ressam before trial"). Many more facts emerge before and during a trial which are fair game for the district court's sentencing consideration. *Gall*, 552 U.S. at 51.

> **3.  Eidson's ten-year sentence is reasonable in light of her status as an attorney, her repeated failure to chose the right path, and her motivation of greed.**

Eidson's ten-year sentence is substantively reasonable. Eidson's arguments hinge on an inaccurate painting of the facts. Critically, (1) the loss amount was $4 million, not $350,000 (EAOB at 76); and (2) Eidson acted as a co-conspirator, not a lawyer zealously advocating for her client (EAOB at 77-78).

BS 6890

received lower sentences. (ER 431, 1224-1228.)

The sentence was driven by the Guidelines and the judge's perception of Mr. Zinnel as "selfish" and "narcissistic" (ER 1250-1253), personal flaws no doubt shared by most fraud defendants, successful business-people, and even presidential candidates -- which do not warrant a double-digit sentence far exceeding the actual sentences imposed on many similar-situated defendants. Zinnel's unexplained mid-range guideline sentence and maximum fine fails properly to reflect § 3553(a)(1), (a)(2) & (a)(6) considerations. *Rita*, 551 U.S. at 351.

> (b) The Sentence Is Substantively Unreasonable Because Zinnel Received A Trial Tax Of 3.5 Times More Prison Time For Exercising His Right To Trial

As Zinnel stated in his truncated allocution, he was unreasonably penalized with a "Trial Tax" or trial penalty of 3.5 times the two five-year plea offers. (ER 1240-1242.) An accused must not be subjected to more severe punishment for exercising his constitutional right to stand trial. *United States v. Stockwell*, 472 F.2d 1186 (9th Cir.), *cert. denied*, 411 U.S. 948 (1973).

As argued in the Disparity section, the median prison sentences for bankruptcy fraud in 2011, 2012, 2013 and 2014 were well under 48 months. This is demonstrated by the many cases described herein and in the attached charts and I.R.S. announcements that similarly situated bankruptcy fraud defendants received prison sentences of around 30 months. At sentencing, the court made a finding

BS 6891

1   minute, she says, oh, Honey, I don't feel like going. Makes

2   my friend and I breakfast and says, I'm not feeling well, why

3   don't you go.

4        So then I come back from New Year's, and the house is

5   half empty, half of everything gone. In Ms. Zinnel's defense,

6   if there was seven forks, she took four. If there was seven

7   spoons, she took three. She split it up. But how she

8   responded is she hired one of Sacramento's most aggressive

9   attorneys, ah, to litigate against me.

10        THE COURT: Mr. Zinnel, I'm going to cut you off right

11   here. Are you almost done? I'm going to give you three more

12   minutes to finish this up. Proceed.

13        DEFENDANT ZINNEL: Your Honor, I need a little bit

14   longer than three minutes.

15        THE COURT: Proceed. You have three minutes.

16        DEFENDANT ZINNEL: Your Honor, I want to talk about

17   the government, ah, offered a plea agreement in this case of

18   five years. They listed the guidelines of what those

19   guidelines were, 26. The government offered a second plea

20   deal of five years. They said -- they cited Bussell in the

21   plea offer, and so I looked at Bussell. As Your Honor said,

22   this case is very similar to Bussell. In Bussell, the

23   defendant got three years.

24        Even though I did go to law school, I did not

25   graduate, but I do know you can't -- you're not supposed to

1    bring up the penalty at trial.  Both time -- twice the

2    government's lawyers with two different witnesses brought up

3    that the penalty for bankruptcy fraud is five years.

4         The government drafted a -- a plea agreement that they

5    drafted saying that five years is the appropriate sentence in

6    this case.  Ah, there's all kinds -- the law is very clear,

7    there is not supposed to be a trial tax for exercising your

8    right to go to trial.  The worst it's supposed to be is three

9    years for acceptance of responsibility -- or not three years,

10   excuse me -- three points, three levels for acceptance of

11   responsibility.  The government has said in two plea offers,

12   ah, five years.

13        I did want to address the Court today of why I didn't

14   plea.  I do want to apologize, but if I'm getting cut off to

15   three minutes, I don't know how I can possibly do this.

16        We're talking about 20 years of my life.  That is

17   twenty -- over 25 percent of my adult life if I leave -- live

18   to be 80.  And to be cut off at three -- in three minutes, I

19   just do not believe is, ah, fair.

20        The other day, the -- it made national headlines that

21   there's -- at Dodger stadium, two Dodger fans beat a San

22   Francisco Giant fan for wearing a T-shirt so bad that a

23   45-year-old man is in diapers and in a wheelchair for the rest

24   of his life.  The one defendant got -- received a four-year

25   prison sentence.  The other defendant received eight years.

BS6893 ER001241

1    Nothing that Derian and I did -- ah, nobody has lost

2    their life savings.  Nobody is killed.  Nobody is life is, ah,

3    physically harmed.  The -- case after case, I should not be

4    punished for my -- exercising my right to go to trial, and

5    that's what I do not understand.

6        In either plea offer that the government made, they

7    have all the same information that they have now.  So what has

8    changed?  If they put in writing that five years -- they would

9    have -- as officers of the court, they would have represented

10   to this court that the guidelines are 26.  They detailed those

11   guidelines out.  Nothing has changed.

12       The Luyung, I wanted to talk about that.  Nobody has

13   ever understood that Luyung -- I sold Luyung -- there was a

14   settlement agreement, and my creditor First Bank got $4,000 in

15   net proceeds.  Two years -- two years later, Tom Palona

16   [phonetic] came to me and said, hey, I'm not going to develop

17   it.  Do you want to buy it?  I am the -- was the trustee at

18   that time of the Corporate Control profit sharing plan, a

19   completely separate and distinct legal entity that had

20   employees' retirement money.  The retirement plan is the

21   source of the $169,000.

22       So if I would have filed bankruptcy the day before,

23   ah, that transaction originally closed, my creditors would

24   have got $4,000.  In this case, one did.  But now, because new

25   money came in, the government has never seen it.  They view it

1    Q.     If you had been aware, what would you have done?

2    A.     I would have investigated it. I -- if it -- I would

3    have wanted to know what the balance was. I might have asked

4    for bank records.  But if it had simply been disclosed he had

5    two bank accounts, I would have looked at the balances and

6    seen if they were exempt or worthwhile administering.

7    Q.     May we please see Exhibit 202, page 4.

8           Do you see any reference here to a company called Done

9    Deal?

10   A.     No.

11   Q.     And let's look at page 3 again.  202, page 3.

12          This is back to personal property.  Do you see any

13   reference here to a Done Deal bank account?

14   A.     No.

15          MS. HEMESATH:  Move to admit what has been marked as

16   Government's Exhibit 140, a certified business record.

17          THE COURT:  Any opposition?

18          MR. JOHNSON:  Can I have a moment, Your Honor?

19          THE COURT:  Yes, you may.

20          MR. JOHNSON:  No objection.

21          THE COURT:  Ms. Daly?

22          MS. DALY:  No objection.

23          THE COURT:  All right.  That will be received.

24                         (GOVERNMENT'S EXHIBIT 140 ADMITTED

25                          INTO EVIDENCE.)

**Washington Mutual**

P.O. BOX 2395
CHATSWORTH, CA 91313-2395

This Statement Covers
From: 12/01/06
Through: 12/31/06

**Need assistance?**
To reach us anytime
call 1-800-788-7000
or visit us at wamu.com

DERIAN EIDSON
ACCOUNT CLIENT TRUST FUND ACCOUNT
20585 EASTHILL DR
YORBA LINDA CA 92887-3227

We know financial information is important to you. Ensuring the privacy of your information is important to us. Please take a moment to look at the enclosed brochure about Washington Mutual's policy on privacy.

## Pooled Client Checking Detail Information

DERIAN EIDSON
ACCOUNT CLIENT TRUST FUND ACCOUNT

Account Number: 094-220606-3
Washington Mutual Bank, FA

### Account Summary

| | | | |
|---|---|---|---|
| Beginning Balance | $330,939.00 | Interest Earned | $163.53 |
| Deposits | 0.00 | Annual Percentage Yield Earned | 0.65% |
| Electronic & Misc. Deposits | +163.53 | YTD Interest Paid | $1,429.54 |
| Card Purchases/ATM Withdrawals | 0.00 | YTD Interest Withheld | $0.00 |
| Electronic & Misc. Withdrawals | -82,688.07 | | |
| Checks Paid | 0.00 | | |
| Service Fees | 0.00 | | |
| Ending Balance | $248,414.46 | | |

### Electronic & Miscellaneous Deposits

| Date | Amount | Description | Card Number |
|---|---|---|---|
| 12/29 | 163.53 | Interest Payment (Eff. Date:12/31/06) | |
| 1 Item | $163.53 | | |

### Electronic & Miscellaneous Withdrawals

| Date | Amount | Description |
|---|---|---|
| 12/12 | 176.82 | STATE BAR INTEREST |
| 12/19 | 82,511.25 | Transfer Withdrawal |
| 2 Items | $82,688.07 | |

**GOVERNMENT
EXHIBIT
1401
2:11-CR-234 TLN**

0 EM-X-B4

Page 1 of 2

Deposits are FDIC insured 

Form CES0004 E 0000025080    X

SER 0265

BS 6896





GOVERNMENT
EXHIBIT
JER 023 304
2:11-CR-234 TLN

BS 6897

FBI forensic accountant Kimberly Barr testified regarding Zinnel's withdrawals from the Done Deal bank account. SER 606-609, 617-629. Zinnel used this account as his personal bank account. He spent $75,526 on home improvement/household/personal expenses; $18,639 on vineyards and wine; $16,388 on travel; $43,100 on retail; and $7,906 on restaurants. SER 280. Zinnel even paid his housekeeper out of the Done Deal bank account. SER 280, 622.

The Done Deal bank account is not listed among Zinnel's assets. SER 187-214. The bankruptcy trustee testified that if he had known that Zinnel had undisclosed income flowing into the Done Deal bank account, he would have investigated Zinnel's relationship with Done Deal. SER 552.

### 4. Zinnel did not list his interest in the Luyung Drive commercial lot.

Zinnel also omitted any reference to his interest in the Luyung property. In the schedule for real property, Zinnel listed only his personal residence. SER 187-214. Zinnel did not disclose that he was receiving rental income from System 3 for that company's use of the Luyung Drive property. SER 354. The bankruptcy trustee "had no idea that [Zinnel] had any other real property interests." SER

20

BS 6898

**Done Deal, Inc.**
20585 Easthill Dr.
Yorba Linda, CA 92887

Bill To:
**System 3, Inc.**
5921 Landis Ave., Ste 5
Carmichael, CA 95608

Re: Yard Rent

## INVOICE #
111207

| CONTRACT # | DATE 11/12/07 | JOB # |
|---|---|---|
| | | |

**CONTRACT SUMMARY**

**Yard rent from 8/1/07 thru 11/30/07**  $   20,940.00

**Billing This Period**
$   20,940.00

**TOTAL AMOUNT DUE THIS PERIOD**  $   20,940.00

TERMS:  Net 10 days.  Past due amounts are subject to a late payment
service charge of 1-1/2% per month (18% per annum) or the
maximum rate allowed by law, whichever is less.

GOVERNMENT
EXHIBIT
361
2:11-CR-234 TLN

BS 6899

**B.    The court got the loss amounts right for each defendant:  the amount of bankruptcy debt Zinnel tried to erase, and the amount of money Eidson attempted to extract from System 3 in the buyout.**

**1.    The court correctly calculated Zinnel in accordance with *Bussell*.**

Zinnel's loss amount arguments are foreclosed by *Bussell*.  504 F.3d at 956.  Just like *Bussell*, the district court used the total amount of debt scheduled for discharge as the intended loss amount. Just like *Bussell*, this was a complex bankruptcy fraud conspiracy case, and

> [i]n light of all the facts and circumstances, it cannot be said that the district court clearly erred in finding that [Zinnel] engaged in the conspiracy for over [several] years with the intent fraudulently to inflict a loss on [his] creditors equal to the debts scheduled for discharge in bankruptcy.

504 F.3d at 963; ER 1182-83.

The court found that the amount Zinnel scheduled for discharge was $3.6 million.[21]  ER 1181.  Zinnel faults the district court and

---

[21]  The trial evidence actually a supported a discharge amount of $6 million.  SER 351.  The trial evidence was based on the bankruptcy schedules Zinnel prepared, which listed over $6 million in debt.  SER 187-214.  The $3.6 million figure was derived from the claims register in the reopening of Zinnel's bankruptcy, after the

123

BS 6900

government for failing to go a step farther and adjudicate the validity of each claim that went into the total discharge figure. ZAOB at 48. For good reason, this is not a requirement in the Sentencing Guidelines, *Bussell*, or any other case. The Guidelines require only a "reasonable estimate of the loss" based on "available information." U.S.S.G. § 2B1.1 cmt. n.3(C). The validity of each creditor's claim in a complex bankruptcy is not "available information:" sussing out the merits of each claim would require the district court to recreate a complex, involved, and disputed aspect of the bankruptcy—a bankruptcy which was still ongoing at the time of sentencing in this case.

The district court here did not clearly err by relying on the available evidence: Zinnel's own bankruptcy schedules and the bankruptcy court claims register. *United States v. Lawrence*, 189 F.3d 838 (9th Cir. 1999) ("Here, the district court used [loss] values from documents prepared by Lawrence himself. This valuation was not clearly erroneous, and it was not an abuse of discretion not to

---

fraud scheme was uncovered.] The court relied on the lower figure to Zinnel's benefit.

124

BS 6901

Zinnel reads into *Bussell* a requirement that the court evaluate whether the creditors were entitled to the amounts listed on the bankruptcy schedules. ZAOB at 49. But *Bussell* neither undertook nor requires any such evaluation. Rather, the court under *Bussell* looks to the totality of the circumstances to determine whether the intent was to inflict a loss on the creditors equal to the debts scheduled for discharge. *Bussell*, 504 F.3d at 963. That is what the court did here. ER 1181-82. The alternative would have been worse for Zinnel. The court could have used the $4 million loss amount from the attempted money laundering count; the same loss figure the court used for Eidson.[22]

--------

[22] Another worse alternative for Zinnel would have been the total value of Zinnel's concealed assets, which the PSR estimated at $5,466,158.20. ZPSR ¶ 21. The court had the option of using either the total discharge amount or the total value of the concealed assets. *Bussell*, 504 F.3d at 962. Zinnel argues that the value of the concealed assets should be far less than the $5.4 million identified in the PSR, arguing that the number should be the value at the time of concealment, i.e., 2005. ZAOB at 52. There does not appear to be Ninth Circuit case law pinpointing the time to measure the value of the concealed asset. But because the court did not base the loss amount on the value of the concealed asset, this Court need reach this issue at this time.

BS 6902

# SENTENCING TABLE
## (in months of imprisonment)

| | | Criminal History Category (Criminal History Points) | | | | |
|---|---|---|---|---|---|---|
| Offense Level | I (0 or 1) | II (2 or 3) | III (4, 5, 6) | IV (7, 8, 9) | V (10, 11, 12) | VI (13 or more) |
| 1 | 0-6 | 0-6 | 0-6 | 0-6 | 0-6 | 0-6 |
| 2 | 0-6 | 0-6 | 0-6 | 0-6 | 0-6 | 1-7 |
| 3 | 0-6 | 0-6 | 0-6 | 0-6 | 2-8 | 3-9 |
| 4 | 0-6 | 0-6 | 0-6 | 2-8 | 4-10 | 6-12 |
| 5 | 0-6 | 0-6 | 1-7 | 4-10 | 6-12 | 9-15 |
| 6 | 0-6 | 1-7 | 2-8 | 6-12 | 9-15 | 12-18 |
| 7 | 0-6 | 2-8 | 4-10 | 8-14 | 12-18 | 15-21 |
| 8 | 0-6 | 4-10 | 6-12 | 10-16 | 15-21 | 18-24 |
| 9 | 4-10 | 6-12 | 8-14 | 12-18 | 18-24 | 21-27 |
| 10 | 6-12 | 8-14 | 10-16 | 15-21 | 21-27 | 24-30 |
| 11 | 8-14 | 10-16 | 12-18 | 18-24 | 24-30 | 27-33 |
| 12 | 10-16 | 12-18 | 15-21 | 21-27 | 27-33 | 30-37 |
| 13 | 12-18 | 15-21 | 18-24 | 24-30 | 30-37 | 33-41 |
| 14 | 15-21 | 18-24 | 21-27 | 27-33 | 33-41 | 37-46 |
| 15 | 18-24 | 21-27 | 24-30 | 30-37 | 37-46 | 41-51 |
| 16 | 21-27 | 24-30 | 27-33 | 33-41 | 41-51 | 46-57 |
| 17 | 24-30 | 27-33 | 30-37 | 37-46 | 46-57 | 51-63 |
| 18 | 27-33 | 30-37 | 33-41 | 41-51 | 51-63 | 57-71 |
| 19 | 30-37 | 33-41 | 37-46 | 46-57 | 57-71 | 63-78 |
| 20 | 33-41 | 37-46 | 41-51 | 51-63 | 63-78 | 70-87 |
| 21 | 37-46 | 41-51 | 46-57 | 57-71 | 70-87 | 77-96 |
| 22 | 41-51 | 46-57 | 51-63 | 63-78 | 77-96 | 84-105 |
| 23 | 46-57 | 51-63 | 57-71 | 70-87 | 84-105 | 92-115 |
| 24 | 51-63 | 57-71 | 63-78 | 77-96 | 92-115 | 100-125 |
| 25 | 57-71 | 63-78 | 70-87 | 84-105 | 100-125 | 110-137 |
| 26 | 63-78 | 70-87 | 78-97 | 92-115 | 110-137 | 120-150 |
| 27 | 70-87 | 78-97 | 87-108 | 100-125 | 120-150 | 130-162 |
| 28 | 78-97 | 87-108 | 97-121 | 110-137 | 130-162 | 140-175 |
| 29 | 87-108 | 97-121 | 108-135 | 121-151 | 140-175 | 151-188 |
| 30 | 97-121 | 108-135 | 121-151 | 135-168 | 151-188 | 168-210 |
| 31 | 108-135 | 121-151 | 135-168 | 151-188 | 168-210 | 188-235 |
| 32 | 121-151 | 135-168 | 151-188 | 168-210 | 188-235 | 210-262 |
| 33 | 135-168 | 151-188 | 168-210 | 188-235 | 210-262 | 235-293 |
| 34 | 151-188 | 168-210 | 188-235 | 210-262 | 235-293 | 262-327 |
| 35 | 168-210 | 188-235 | 210-262 | 235-293 | 262-327 | 292-365 |
| 36 | 188-235 | 210-262 | 235-293 | 262-327 | 292-365 | 324-405 |
| 37 | 210-262 | 235-293 | 262-327 | 292-365 | 324-405 | 360-life |
| 38 | 235-293 | 262-327 | 292-365 | 324-405 | 360-life | 360-life |
| 39 | 262-327 | 292-365 | 324-405 | 360-life | 360-life | 360-life |
| 40 | 292-365 | 324-405 | 360-life | 360-life | 360-life | 360-life |
| 41 | 324-405 | 360-life | 360-life | 360-life | 360-life | 360-life |
| 42 | 360-life | 360-life | 360-life | 360-life | 360-life | 360-life |
| 43 | life | life | life | life | life | life |

Zone A (Levels 1-8)
Zone B (Levels 9-11)
Zone C (Levels 11-12)
Zone D (Levels 13-43)

*Handwritten annotations:*
24 MONTHS — 16 (21-27)
30 MONTHS — 18 (27-33)
212 MONTHS — 36 (188-235)

BS 6904

alone, the court's application of the aggravated role enhancement

was reasonable.

### F. Zinnel spoke enough to fill sixteen pages of transcript; his right to meaningful allocution was not chilled.

Zinnel argues that his right to meaningful allocution was

chilled. ZAOB at 75-77.

#### 1. Standard of Review

Zinnel did not object when the court imposed time limits after

Zinnel's allocution meandered into topics not relevant to mitigation.

The standard of review is plain error.

#### 2. The court did not plainly err in limiting Zinnel's allocution to the presentation of mitigating information.

The right to allocute is not absolute: the purpose of allocution

under Rule 32 is to allow the defendant to present mitigating

information. Fed. R. Crim. P. 32(i)(4)(A)(ii) (district court must

"address the defendant personally in order to permit the defendant to

speak or present any information to mitigate the sentence.").

---

around the summer of 2008. SER 431, 434. The checks in counts
four-12 precede that timeframe, with dates ranging from
December 27, 2006 through July 8, 2008. SER 240, 277.

BS 6905

1    minute, she says, oh, Honey, I don't feel like going. Makes

2    my friend and I breakfast and says, I'm not feeling well, why

3    don't you go.

4        So then I come back from New Year's, and the house is

5    half empty, half of everything gone. In Ms. Zinnel's defense,

6    if there was seven forks, she took four. If there was seven

7    spoons, she took three. She split it up. But how she

8    responded is she hired one of Sacramento's most aggressive

9    attorneys, ah, to litigate against me.

10       THE COURT: Mr. Zinnel, I'm going to cut you off right

11   here. Are you almost done? I'm going to give you three more

12   minutes to finish this up. Proceed.

13       DEFENDANT ZINNEL: Your Honor, I need a little bit

14   longer than three minutes.

15       THE COURT: Proceed. You have three minutes.

16   DEFENDANT ZINNEL: Your Honor, I want to talk about

17   the government, ah, offered a plea agreement in this case of

18   five years. They listed the guidelines of what those

19   guidelines were, 26. The government offered a second plea

20   deal of five years. They said -- they cited Bussell in the

21   plea offer, and so I looked at Bussell. As Your Honor said,

22   this case is very similar to Bussell. In Bussell, the

23   defendant got three years.

24       Even though I did go to law school, I did not

25   graduate, but I do know you can't -- you're not supposed to

1   bring up the penalty at trial.  Both time -- twice the

2   government's lawyers with two different witnesses brought up

3   that the penalty for bankruptcy fraud is five years.

4        The government drafted a -- a plea agreement that they

5   drafted saying that five years is the appropriate sentence in

6   this case.  Ah, there's all kinds -- the law is very clear,

7   there is not supposed to be a trial tax for exercising your

8   right to go to trial.  The worst it's supposed to be is three

9   years for acceptance of responsibility -- or not three years,

10  excuse me -- three points, three levels for acceptance of

11  responsibility.  The government has said in two plea offers,

12  ah, five years.

13       I did want to address the Court today of why I didn't

14  plea.  I do want to apologize, but if I'm getting cut off to

15  three minutes, I don't know how I can possibly do this.

16       We're talking about 20 years of my life.  That is

17  twenty -- over 25 percent of my adult life if I leave -- live

18  to be 80.  And to be cut off at three -- in three minutes, I

19  just do not believe is, ah, fair.

20       The other day, the -- it made national headlines that

21  there's -- at Dodger stadium, two Dodger fans beat a San

22  Francisco Giant fan for wearing a T-shirt so bad that a

23  45-year-old man is in diapers and in a wheelchair for the rest

24  of his life.  The one defendant got -- received a four-year

25  prison sentence.  The other defendant received eight years.

1    as one and the same.

2         The reason why there are seven checks, they were -- it

3    was not a hard money loan.  Those were rent payments because I

4    sold equipment to get First Bank paid back.  I got them paid

5    back 1.8 million on a two million dollar line of credit.  I

6    worked so hard to, ah, sell assets.

7         I want to talk about victims real quick, Your Honor.

8         Your Honor, you look at -- all the victims got

9    notified of this case because Derian is on my bankruptcy

10   schedules, and so she got notified, too.  Nobody has come in

11   and made a claim.  The government does not talk about, does

12   not talk about any other victim.  But, by far, Safeco is the

13   biggest -- would be the biggest potential victim.

14        Please bear with me just for a moment, Your Honor.

15   We're talking 20 years of my life.

16        MR. SEGAL:  Your Honor, while the defendant is looking

17   among his papers, I'd like a chance to say one thing at the

18   end.  But, as I read Rule 32, I just -- I think the safest

19   thing under Rule 32 is to just let him go until his breath

20   runs out.

21        THE COURT:  I'm not going to do that.

22        MR. SEGAL:  Okay.

23        THE COURT:  Because, quite frankly, ordinarily when a

24   defendant speaks before the Court, they seek to mitigate their

25   sentence in some manner, form or fashion, but that's simply

that Zinnel now challenges the failure to use a special verdict form,
the standard of review is plain error. "Plain error is (1) error, (2)
that is plain, and (3) that affects substantial rights." *United States v.
Evans-Martinez*, 530 F.3d 1164, 1167 (9th Cir. 2008).

## B. Bankruptcy fraud is a single offense.

As a starting point, this Court has held that bankruptcy fraud
is a single offense, "no matter how many items of property may have
been concealed." *Bisno*, 299 F.2d at 722; *Edwards v. United States*,
265 F.2d 302, 306 (9th Cir. 1959). Thus, the superseding indictment
in this case contains just one count of pre-petition concealment
(count one), and one count of post-petition concealment (count two),
even though there were multiple items of property that were
concealed. ER 180-87.

This starting point means that there is not a double jeopardy
concern at play in this case. Zinnel could not be indicted separately
for any additional item of property he concealed from the bankruptcy
court. *United States v. Tsinhnahijinnie*, 112 F.3d 988, 991 (9th Cir.

---

government. SER 658-59. The defense did not take the court up on
its invitation to explore the issue further.

BS 6909

*United States v. Arutunoff,*
  1 F.3d 112 (10th Cir. 1993) ............................................................ 94

*United States v. Austin,*
  54 F.3d 394 (7th Cir. 1995) ............................................................ 90

*United States v. Barrier Ind.,*
  1997 WL 97842 (S.D.N.Y. 1997) .................................................... 91

*United States v. Brown,*
  651 Fed. Appx. 653 (9th Cir. June 6, 2016) .................................. 160

*United States v. Brown,*
  771 F.3d 1149 (9th Cir. 2014) ...................................................... 125

*United States v. Bussell,*
  504 F.3d 956 (9th Cir. 2007) ................................. 122, 123, 127, 128

*United States v. Carter,*
  560 F.3d 1107 (9th Cir. 2009) ...................................................... 150

*United States v. Carty,*
  520 F.3d 984 (9th Cir. 2008) ........................................ 150, 151, 155

*United States v. Crawford,*
  239 F.3d 1086 (9th Cir. 2001) ........................................................ 93

*United States v. Crowe,*
  563 F.3d 969 (9th Cir. 2009) ................................................. 155, 157

*United States v. Cummings,*
  281 F.3d 1046 (9th Cir. 2002) ...................................................... 163

*United States v. Davis,*
  596 F.3d 852 (D.C. Cir. 2010) ............................................ 85, 86, 87

*United States v. Doss,*
  630 F.3d 1181 (9th Cir. 2011) ........................................................ 56

*United States v. Doxie,*
  13-cr-101 WSD, 2014 WL 3845699 (N.D. Ga. Aug. 5, 2014) .......... 87

BS 6910

we will only briefly discuss the relevant facts here. *See United States v. Bussell (Bussell I), 414 F.3d 1048 (9th Cir. 2005).*

Upon the advice of their former lawyers, the Bussells organized the dermatology practice into a three-tiered structure in 1992. The new arrangement separated the business and medical aspects of Bussells's practice: BBL Medical Management, Inc. ("BBL") received the practice's gross receipts, paid the expenses and overhead, and retained the profits; Beverly Hills Dermatology Medical Corp. ("Beverly Hills Medical") received 10% to 20% of BBL's profits and employed Letantia through her professional corporation, [**3] L.B. Bussell, MD, Inc. ("L.B. Bussell, Inc."), for an artificially reduced salary. BBL and Beverly Hills Medical were held in the names of nominee owners; Letantia was the sole shareholder and officer of public record of L.B. Bussell, Inc. The Bussells further enlisted the help of their former lawyers in 1993 to set up various corporations to conceal ownership of a four-unit condominium in the Stein-Ericksen Lodge in Park City, Utah (the "Utah condominium"), a San Diego farm, and receipt of disability insurance income. The Bussells also opened an off-shore bank account to receive funds from John Bussell's pension plan.

On March 7, 1995, the Bussells, together with their former lawyers, filed a joint bankruptcy petition. The Bussells reported total assets of $ 1,783,026.30 and total debts of $ 4,677,194.22 on that petition. The amount of debt scheduled for discharge totaled $ 3,057,927.09, but the bankruptcy court only discharged debt of $ 2,293,527.09 because a liability of $ 764,000.00 to Provident was at issue in pending litigation.

Following the bankruptcy discharge, Letantia was charged in a 17-count indictment, along with two co-defendants, with conspiracy, concealment of assets [**4] in contemplation of bankruptcy, making false declarations, perjury, and attempted tax evasion. At trial, the

Bussells argued that they had acted in good faith and relied on the advice of their lawyers. *Bussell I, 414 F.3d at 1052.* After jury deliberations had begun, John Bussell fell to his death from his hotel room. *Id.*

The jury ultimately convicted Letantia of the following counts charged in the indictment: conspiracy to conceal assets in contemplation of bankruptcy and to make false statements in the bankruptcy (count 1); concealing ownership in BBL, including BBL's bank account with a balance of $ 949,048.00 (count 2); concealing ownership in Beverly Hills Medical, including Beverly Hills Medical's bank account with a balance of $ 5,787.00 (count 3); making false statements in the bankruptcy petition (counts 5 and 6); and willfully attempting to evade a substantial portion of income tax owed for tax years 1983, 1984, 1986, and 1987 (count 12). The jury, however, acquitted Letantia of concealing ownership of the Utah condominium (count 4); making a false oath and account that she was not actively involved with any corporations other than L.B. Bussell, Inc. except on a passive investment [**5] basis (count 11); and willfully attempting to evade a substantial portion of income tax owed for 1996 (count 17).

Their former lawyers, Sherman and Beaudry, entered into plea agreements with the government, under which Sherman pleaded guilty to conspiracy and to attempted tax evasion, and Beaudry pleaded guilty to aiding and abetting attempted tax evasion and the filing of false tax returns. *Id.*

Applying the then-mandatory Sentencing Guidelines, the district court sentenced Letantia to a mid-range sentence of 36 months imprisonment. In determining her offense level for purposes of calculating [*960] an appropriate Guidelines range, the district court increased the base offense level by 13 levels, finding that the intended loss equaled $ 3,057,927.09, the amount of debt scheduled for discharge in bankruptcy. The district court also ordered Letantia to pay, in addition to a special



THE UNITED STATES ATTORNEY'S OFFICE
CENTRAL DISTRICT *of* CALIFORNIA

SEARCH THE ARCHIVE
SEARCH

Home » News » Press Release

## NEWS



**Current Site**

Department of Justice

U.S. Attorneys

Central District of California

# Bel-Air Man Convicted of Bankruptcy Fraud and Assault Sentenced to Nearly Six Years in Federal Prison

FOR IMMEDIATE RELEASE                                October 18, 2011



**Archives**

Department of Justice

U.S. Attorneys

Central District of California

*LOS ANGELES* – A Bel-Air man was sentenced this afternoon to 70 months in federal prison for concealing assets in a bankruptcy proceeding and threatening a private investigator with a golf club.

Milton Lee Vandevort, 50, was sentenced by United States District Judge Phillip S. Gutierrez. In addition to the 70-month sentence, Judge Gutierrez ordered Vandevort to pay $12,500 in fines.

Vandevort has been in custody since July 14, 2010, when, after a two-week trial, a federal jury convicted him of seven counts two counts of concealing assets in a bankruptcy case, making a false oath in a bankruptcy case, making a false declaration in a bankruptcy case, assaulting a process server, and two counts of money laundering. The jury determined that Vandevort, who filed chapter 7 bankruptcy in 2005, concealed his interests in his Bel-Air residence, a nursing registry business called Always There Nursing Care, and various pass-through entities that he created for income generated from his business.

Vandevort also was convicted of assaulting a process server for brandishing a golf club at a private investigator the bankruptcy trustee had hired to serve subpoenas on Vandevort's wife. After the assault, Vandevort called 911 and falsely claimed, among other things, that his family was experiencing a home invasion robbery.

The jury also convicted Vandevort of money laundering for using income generated from the nursing registry business to pay his own expenses and using the proceeds of a 2004 refinance of the Bel-Air residence to buy undeveloped land in Wyoming in the name of his mother-in-law.

Vandevort "withdrew the equity in his residence, hid it in an escrow company's bank account, purchased the Wyoming property with the equity money in his mother-in-law's name, opened bank accounts in the name of Always There Nursing Care Associated LLC and diverted the revenue from ATNC to these accounts, used straw persons as signatories to the bank accounts and the officers of his business entities, transferred this interest in ATNC to [his wife], and filed his bankruptcy petition in Wyoming," prosecutors said in summarizing Vandevort's bankruptcy fraud scheme in a sentencing memo to the court.

The jury that returned the guilty verdicts also determined that Vandevort's interest in the properties he had concealed should be forfeited to the government.

The case was investigated by the Federal Bureau of Investigation with assistance from the U.S. Trustee Program.

The U.S. Trustee Program is the component of the Justice Department that protects the integrity of the bankruptcy system by overseeing case administration and litigating to enforce the bankruptcy laws.

Release No. 11-151

Return to Top

BS 6912   ZJN 179

Radoslovich, the jury could infer that she knew Zinnel's bankruptcy concealments were the source of the $4 million payment.

[Plenty of evidence corroborates the statements in the audio recordings. Eidson was a creditor in Zinnel's bankruptcy and she filed pleadings. She and Zinnel shared the Done Deal bank account where System 3 sent Zinnel his distribution payments. [She padded her legal invoices to System 3 to hide the distribution payments to Zinnel.] Eidson laundered additional concealed Zinnel funds through her client trust account. There was layered, strong evidence that Eidson knew that Zinnel had concealed assets from his bankruptcy, and that those assets now formed the basis of the $4 million payout. A rational jury could easily infer that Eidson had the requisite knowledge of Zinnel's bankruptcy to support the money laundering counts.]

*NO CITE TO THE RECORD OR EVIDENCE*

> **d. A rational jury could find that Eidson attempted to fashion the buyout to conceal Zinnel's ownership interest.**

Next, Eidson challenges the sufficiency of the evidence on the concealment prong of the money laundering statute. EAOB at 38; 18 U.S.C. § 1956(a)(1)(B). Eidson analogizes principally to a Third

BS 6913

- In emphasizing the need to maintain secrecy: "I would like to do whatever we can to resolve it and if resolving it in the form of terminating a consulting agreement, I think that would shine as little light on this situation and what transpired." ER 1511.

The very purpose of the Radoslovich meetings was to persuade System 3 to go along with styling the payout as a payment for consulting services, even though that is just a pretext for paying Zinnel his ownership interest. ER 1511 (Eidson tells Radoslovich that "stiffing Steve" is not the solution).

The jury could easily conclude that as president of Done Deal, Eidson well knew that Done Deal was not doing any consulting for System 3, let alone consulting that would be worth $4 million. For years, Eidson had deposited the System 3 checks into the Done Deal bank account. Eidson's actions in attempting to negotiate this fraudulent contract furthered the concealment of Zinnel's ownership interest in System 3.[20] *Ladum*, 141 F.3d at 1340-41 ("The

_[handwritten: NO CITE TO THE RECORD OR EVIDENCE]_

---

[20] In a footnote, Eidson argues that the money laundering jury instruction was incorrect because it did not inform the jury that "design" means "purpose or plan." EAOB at 42 n.9. Eidson did not

_[handwritten: BS 6914]_

transactions with the rent checks were designed to conceal or disguise . . . the ownership, or the control of the proceeds of the specified unlawful activity, 18 U.S.C. § 1956(a)(1)(B), because they prevented the bankruptcy trustee from knowing that Ladum was the legitimate owner of the stores and that the estate was entitled to the profits from those stores.") (internal quotations omitted).

e. **There was plenty of proof of the conspiracy between Zinnel and Eidson.**

Eidson next argues there was insufficient proof of the money laundering conspiracy between Zinnel and Eidson. EAOB at 42. Eidson ignores the long and deep history of Eidson's agreement to further Zinnel's bankruptcy fraud:

- Eidson added Zinnel to the Done Deal bank account and permitted him to spend out of it freely. *NO CITATION TO RECORD OR "PROOF"*

- Eidson used her attorney client trust account to pay Zinnel's child support arrearage with proceeds hidden from the bankruptcy trustee. *NO CITATION TO RECORD OR "PROOF"*

object to this jury instruction, and the district court did not plainly err in giving the model instruction.

118

BS 691.5

- Eidson bought Zinnel's house back out of the bankruptcy *NO CITATION TO RECORD OR "PROOF"* using funds laundered through her client trust account.

- Eidson padded her legal invoices to Done Deal to conceal *"PROOF"* distribution payments.

All of this is in addition to Eidson appearing as Zinnel's lawyer to *NO CITATION TO RECORD OR "PROOF"* negotiate the fraudulent consulting agreement for the $4 million payout. There was sufficient evidence to support the jury's verdict *"PROOF"* that Zinnel and Eidson conspired to launder the proceeds of Zinnel's bankruptcy fraud.

      f.   **The government proved that Eidson took a substantial step toward the end of receiving the $4 million.**

Last, Eidson argues that the government failed to prove that she took a substantial step to advance the attempted money laundering. EAOB at 44 The evidence at trial proved these steps:

- Eidson sent Radoslovich a letter indicating that she would like to meet to "resolve this situation." SER 276.

- Eidson advocated for a buyout disguised as the termination of a consulting agreement, using a paper *NO CITATION TO RECORD OR "PROOF*

119

*BS 6916*

version of the contract styled as a "release for a consulting

agreement." ER 812.

- Eidson attended two meetings to persuade Radoslovich to
  agree to the written contract.

  *NO CITE TO THE RECORD OR EVIDENCE*

The contract was the only sticking point. System 3 had the money in

the bank ready to pay Zinnel, and the buyout price was not at issue.

The contract language was quite detailed about how the $4 million

was to be paid:

> 1. CONSULTANT'S COMPENSATION TO TERMINATE AGREEMENT. The Compensation to be paid by Corporation to Consultant to terminate the consulting agreement is $4,000,000 (referred to as "DD's Compensation"). Compensation to be paid as follows: On or before December 5, 2008. Corporation shall pay Consultant $300,000 plus six percent (6%) simple interest from May 13, 2008 until date of payment. On or before December 15, 2008. Corporation shall pay Consultant $300,000 plus six percent (6%) simple interest from May 13, 2008 until date of payment. On or before March 20, 2009, Corporation shall pay Consultant $1,500,000 plus six percent (6%) simple interest from May 13, 2008 until date of payment. On or before June 1, 2009. Corporation shall pay Consultant $1,900,000 plus six percent (6%) simple interest from May 13, 2008 until date of payment.

SER 273-75. If Radoslovich had accepted the contract advocated for

by Eidson, there would have been nothing more for Eidson to do to

facilitate the $4 million payout beyond signing the contract as the

president of Done Deal. *United States v. Smith*, 962 F.2d 923, 930-31

(9th Cir. 1992) (holding that arriving at the scene of a scheduled

drug deal was a substantial step where defendant did all he could to

120

BS 6917

later dismissed on the government's motion. ER 257, 1329; CR 223, 344.

The court sentenced each defendant at the middle of the Guidelines range: 212 months imprisonment for Zinnel and 121 months imprisonment for Eidson. CR 386, 354.

## II. Zinnel plotted to fake his financial death, and Eidson agreed to help him.

*NO CITE TO RECORD*

Zinnel was a wealthy Sacramento-area businessman and

*NO CITE TO RECORD*

Eidson, an attorney, was his girlfriend. In the middle of contentious family court proceedings, Zinnel planned and executed a fraudulent personal bankruptcy. Proceedings in both family court and bankruptcy court require disclosure of assets and income, and Zinnel told substantially the same lies in these parallel proceedings. Zinnel held assets through nominee individuals and shell companies and

*①*

*NO CITE TO RECORD*

posed as unemployed and destitute in two courts. Eidson held his money and transacted it for the benefit of them both.

The crime unfolded in four stages over a ten-year period. The first stage was the pre-bankruptcy period of concealment. Over a four-year period, Zinnel created shell companies and solicited friends

*②*

*NO CITE TO RECORD*

to hold his real and personal property and still allow him to use it as

4

BS 6918

support, and that in fact his ex-wife should pay child support to him.

SER 298-99, ER 1215.

> ### D. Eidson appeared as a creditor in the bankruptcy, even while she shielded Zinnel's assets in her shell company.

(3) NO CITE TO RECORD

Zinnel represented on his bankruptcy schedules that Eidson held a mortgage on his personal residence. ER 1368. He represented that he owed her $80,000. ER 1368. Eidson filed a pleading during the bankruptcy litigation indicating her opposition to another creditor's motion for relief from the stay. SER 107. Eidson filed a second pleading raising objections to the bankruptcy trustee's attempt to sell estate assets. SER 109, 571. Eidson filed two more pleadings seeking to depose individuals affiliated with another former Zinnel entity. SER 115-128, 576-77.

Eidson appeared at a hearing in the bankruptcy litigation. SER 129, 579. She was there to bid on assets that were part of the Zinnel bankruptcy estate. SER 580.

Never in the bankruptcy litigation did Zinnel or Eidson reveal the existence of the Done Deal bank account, even though both

BS 6919

**D. Zinnel and Eidson engaged in sophisticated money laundering.**

Both defendants challenge the application of the sophisticated money laundering enhancement. ZAOB at 56-58, EAOB at 74-76. The court did not clearly err in applying this enhancement to either defendant. U.S.S.G. § 2S1.1(b)(10); ER 1192-96 (Zinnel); 1307-08 (Eidson).

④ NO CITE TO RECORD

**i. Zinnel used <u>shell</u> companies, concocted a fake invoice system, and coordinated his misrepresentations in state and bankruptcy court.**

Zinnel was convicted of ten offenses under 18 U.S.C. § 1956. The laundering in these convictions was the use of System 3 invoices to Done Deal to conceal the payment System 3 owner distributions to Zinnel (counts four through twelve) and the conspiracy to extract the $4 million payout from System 3 (count eighteen).

The trial evidence established that Zinnel spent years setting up the companies that were used to hold assets: System 3 and Done Deal. He tricked a childhood friend into acting as a corporate officer of another shell company. He hid behind the fake invoice system to conceal what were really ownership payments that flowed into a

134

BS 6920

trial testimony was that System 3 paid rent to Done Deal for the use

of the Luyung Drive property. SER 483. Auto & Boat Store was

(5) NO CITE TO RECORD

another shell company that Zinnel used to conceal his ownership of

Luyung from the bankruptcy estate. Zinnel's laundering of his

Luyung rent payments through Done Deal "involved" the use of Auto

& Boat Store as well because both shell companies hid the true

nature of the ownership of that property. The court did not err in

mentioning Auto & Boat Store in conjunction with the sophisticated

laundering enhancement.

Zinnel also faults the court for mentioning "multiple levels of

transactions," assuming that the court meant the use of Eidson's

client trust account, which was not charged as § 1956 money

laundering. ZAOB at 56. But there were multiple levels of

transactions within the § 1956 money laundering counts as well. For

example, count nine includes invoices for safety training, yard rent,

and consulting. Zinnel stitched together three separate invoices to

request a single $42,534 check from System 3. SER 480-83. The

issuance of this one check is fairly described as a multi-layer

136

BS 6921

transaction because it is explained by the three invoices used to hide the nature of the payment as a distribution payment.

Zinnel also challenges whether Done Deal was a shell company. ⑥ NO CITE TO RECORD The trial testimony was that only two individuals were associated with the Done Deal bank account:  Zinnel and Eidson.  SER 629.  No other individuals associated with Done Deal came up in any other trial testimony.  The Done Deal business address was Eidson's address in Yorba Linda.  SER 355, 570.  The trial testimony was that System 3 was the overwhelming source of funds into the Done Deal bank account.  SER 600.  During the charge period, System 3 exceeded any other source of money to Done Deal by over a million dollars.  SER 283, 600.  The court did not clearly err by finding Done Deal was a shell company. ⑦ NO CITE TO RECORD *United States v. Jennings*, 711 F.3d 1144, 1147 (9th Cir. 2013) (applying the sophisticated means enhancement even when shell company had some legitimate purpose:  "The fact that an account was also used for lawful payments does not immunize its use for improper purposes.").  Likewise, Auto & Boat Store is another Zinnel shell company. ⑧ NO CITE TO RECORD *United States v. Polanco*, 93 F.3d 555, 566 (9th Cir. 1996) (stating that appellate court may

137

BS 6922

"affirm the district court's sentencing decision on any basis supported by the record").

    ii.   **Eidson engaged in sophisticated money laundering when she negotiated for a buyout amount to be disguised as a consulting payment to be paid to her shell company Done Deal.**

⑨ NO CITE TO RECORD

Eidson also challenges the application of the sophisticated laundering enhancement. EAOB at 74-76. The court did not clearly err in finding that Eidson also engaged in sophisticated laundering. ER 1307-11.

The court found that Eidson founded Done Deal for the purpose of laundering money. ER 1309. The record supports that conclusion. She formed Done Deal exactly one year before Zinnel filed for bankruptcy. SER 61-62. Eidson pushed for a counter-proposal to the Zinnel $4 million buyout that would divert the money to Done Deal and disguise the payment as the termination of a consulting agreement. She traveled twice to Sacramento in an attempt to secure the $4 million buyout under the terms she set forth in the draft contract. Counts 18 and 19—her counts of conviction—have every hallmark of sophisticated laundering: the creation of a

138

BS 6923

1  Q.   Well, you talked earlier about <u>consulting</u>. He was, in

2  fact, <u>consulting</u>, correct?

3  A.   Yes.

4  Q.   And so the 3333s, those were <u>consulting</u> fees, true?

5  A.   True.

6  Q.   Because he was <u>reviewing financials</u>, correct?

7  A.   Correct.

8  Q.   So, when you told us earlier that those -- the

9  invoices were, quote, a lie, it's not that all invoices were

10 a lie, it's that some of them, in your opinion, were,

11 correct?

12 A.   That's correct.

13 Q.   But the 3333s were actually <u>consulting</u>, correct?

14 A.   Correct.

15 Q.   And Mr. Zinnel, at least what you knew at the time,

16 had a -- sort of a broad understanding of financial

17 statements, correct?

18 A.   Correct.

19 Q.   And he offered to help your husband <u>review his</u>

20 <u>financials</u>, correct?

21 A.   Correct.

22 Q.   And he could actually tell your husband, listen, you

23 should look at different ratios, you should <u>look at different</u>

24 <u>ways to make your business more profitable</u>, correct?

25 A.   Correct.

timely object and state the specific grounds for his objection. . . .
Thus, a party fails to preserve an evidentiary issue for appeal not
only by failing to make a specific objection, but also by making the
wrong objection.") (internal citations omitted). The vast majority of
Radoslovich's testimony went unobjected to. Zinnel observed in
district court that Radoslovich had not been noticed as an expert, but
did not make a motion to exclude his testimony on this basis. SER
504. Nor did he make a continuing objection on the basis of the
alleged legal-conclusion testimony. *United States v. Crawford*, 239
F.3d 1086, 1091 (9th Cir. 2001) (where the defense did not make a
continuing objection to the legal-conclusion testimony and did not
move to strike, the standard of review is plain error). Almost all of
Radoslovich's testimony should be reviewed under the plain error
standard.

2. **Edmund Gee gave background testimony regarding bankruptcy and did not offer any legal opinions.**

Edmund Gee, an assistant U.S. trustee, provided background
testimony important to the jury's understanding the mechanics of a
bankruptcy. *United States v. Sobin*, 56 F.3d 1423, 1427 (D.C. Cir.

93

BS 6925

1995) (testimony of an assistant U.S. Trustee "helped the jurors understand what information a bankruptcy trustee expects in response to the questions contained in the Financial Statement and why that information is important, matters not within most juror's experience"); *United States v. Nguyen*, 497 Fed. Appx. 722, 724 (9th Cir. 2012) (unpub.) (finding that government program specialist "did not testify to legal conclusions, but instead provided permissible background on the regulatory framework."); *United States v. Arutunoff*, 1 F.3d 112 (10th Cir. 1993) ("The expert discussed several aspects of securities law, but he did not attempt to apply the law to the facts of the case or otherwise tell the jury how the case should be decided.").

Though noticed as an expert, the government did not qualify him as an expert at trial, avoiding the problem of "the attorney-witness, who is presented to them imbued with all the mystique inherent in the title 'expert.'" [14] *Marx & Co. v. Diners' Club, Inc.*, 550

---

[14] Indeed, three attorneys testified about Zinnel's bankruptcy: Gee, Radoslovich, and Steven Reynolds, the bankruptcy trustee. None was offered as an expert at trial.

BS 6926

F.2d 505, 512 (2d Cir. 1977); *see also United States v. Gadson*, 763 F.3d 1189, 1212 (9th Cir. 2014) ("While witnesses who testify as an expert may receive unmerited credibility for their lay testimony, because expert testimony is likely to carry special weight with the jury, the converse is not true: a lay witness's testimony carries no special weight, even if at points the lay witness has recourse to relevant background and training.") (internal quotations omitted).

Zinnel complains that Gee erred in offering legal conclusion testimony, but acknowledges that "Gee omitted Zinnel's name from his opinions." ZAOB at 43. Indeed, Gee's testimony did not venture anywhere near the ultimate issue of Zinnel's mens rea. *United States v. Morales*, 108 F.3d 1031 (9th Cir. 1997) (holding testimony permissible where "jury would still have had to draw its own inference from that predicate testimony to answer the ultimate factual question").

In *United States v. Matsumaru*, the court approved the use of lay government witnesses to explain the mechanics of visa petitions. 244 F.3d 1092, 1101-02 (9th Cir. 2001). Just as here, the witnesses had not worked on the petitions at issue. *Id.* Just as here, the

95

BS 6927

1          SACRAMENTO, CALIFORNIA

2        MONDAY, JULY 1, 2013, 3:55 P.M.

3              ---oOo---

4        THE COURT: At this time is the government prepared to

5    give an opening statement?

6        MR. SEGAL:  Yes, your Honor.

7        THE COURT:  All right.  Counsel, you may proceed.

8        MR. SEGAL:  Thank you, your Honor.

9        THE COURT:  You're welcome.

10       MR. SEGAL:  Your Honor, may I turn the podium towards

11   the jury?

12       THE COURT:  Yes, you may.

13       Just a moment, Mr. Segal.  We'll take care of a

14   housekeeping matter real quick.

15       All right.  Counsel, you may proceed.

16       MR. SEGAL:  Thank you, your Honor.

17       THE COURT:  You're welcome.

18       MR. SEGAL: This case is about a wealthy businessman,

19   Steven Zinnel, who faked his own financial death.  It's also

20   about an attorney, Derian Eidson, who helped Zinnel secretly

21   deceive, conceal, and spend over a million dollars as he

22   pretended to be broke.  This case is about bankruptcy

23   concealment.  This case is about money laundering.

24       In July 2005, Steven Zinnel claimed he was broke, and

25   he filed for bankruptcy.  Bankruptcy, as you'll hear, is

BS6928

SACRAMENTO, CALIFORNIA

THURSDAY, JULY 11, 2012, 1:05 P.M.

---oOo---

1    (Jury present.)

2    THE COURT: All right. We're back on the record. All

3    the parties are present. All the jurors are present and

4    accounted for.

5    Is the government prepared to give your closing

6    argument?

7    MS. HEMESATH: Yes, your Honor.

8    THE COURT: You may proceed.

9    MS. HEMESATH: This case is about a wealthy

10   businessman, Steven Zinnel, who faked his own financial

11   death. And with the help of his girlfriend/attorney,

12   Derian Eidson, he buried the money, declared bankruptcy,

13   discharged his debts. Zinnel and Eidson then spent the next

14   four years digging the dirty money back out of that grave.

15   Through bank accounts with Done Deal, Derian Eidson's client

16   trust account, and personal bank account, they washed the

17   money clean, laundered it, and spent it to their own personal

18   gain.

19   In his meeting with Tom Wilbert in 2008 at Starbucks,

20   Steve Zinnel sums up the case very nicely for us.

21   (Portion of exhibit played.)

22   MS. HEMESATH: "I would like to get some money

KELLY O'HALLORAN, OFFICIAL COURT REPORTER, USDC -- (916) 448-2712

ER001043

BJ6929

1    A.    Yes.

2    Q.    [Let's go back to 202, please, at page 3.

3          This is the bankruptcy schedule looking for disclosure

4    of personal property?

5    A.    Correct.]

6          [MS. HEMESATH:  Government moves to admit what's been

7    marked as Government's Exhibit 30, a certified business

8    record.]

9          THE COURT:  Any opposition?

10         MR. JOHNSON:  No, Your Honor.

11         MS. DALY:  No, Your Honor.

12         THE COURT:  All right.  Exhibit 30 will be received

13   into evidence.

14                        (GOVERNMENT'S EXHIBIT 30 ADMITTED INTO

15                        EVIDENCE.)

16         MS. HEMESATH:  Permission to publish?

17         THE COURT:  Yes, you may.

18   Q.    [BY MS. HEMESATH:  This is a signature card for a

19   Washington Mutual Bank account.  Whose bank account is it?

20   A.    It appears to be Steven Zinnel's.]

21   Q.    [We could go back out, please.  And put it side by side

22   with Exhibit 202, page 3.]

23         [Were you aware that Steven Zinnel had another personal

24   bank account not listed on Schedule B?]

25   A.    [ No.]

**Washington Mutual Bank, FA**
(the "Bank")

BANK COPY

BUSINESS
MASTER ACCOUNT AGREEMENT

| COMP NO | OWN CODE | PRODUCT | | FC NUMBER | ACCOUNT NUMBER |
|---|---|---|---|---|---|
| 02 | 02 | | DDA | 135B | |

| 1. ACCOUNT TITLE | DOME DEAL, INC. |
|---|---|
| 2. ACCOUNT TITLE | |
| 3. ACCOUNT TITLE | |
| 4. ACCOUNT TITLE | |

ADDRESS (CITY, STATE, ZIP CODE - GIVE PROVINCE
AND COUNTRY - IF NOT IN U.S.A.)

YORBA LINDA, CA 92887-3227

IDENTIFICATION

VERIFICATION STATUS
NPC

| TAX ID | CONTACT PERSON | BUSINESS PHONE |
|---|---|---|
| | DERIAN EIDSON | (714) 779-8724 |

| DATE OPENED | BY | TAX LINK | DATE CHANGED | |
|---|---|---|---|---|
| 10/04/2004 | SMW | 1 | 02/22/2005 | |

The account and deposits opened under this Agreement shall be of the following type:

AN ACCOUNT IN THE CORPORATION'S NAME.

02 / 05

This type of account is described in detail in the Account Disclosures and Regulations.

Number of signatures required (see paragraph 3 below): 1

1. The Depositor shall be bound by the Bank's Account Disclosures and Regulations, and all amendments thereto, from time to time in effect. Such provisions are by this reference made a part of this Agreement as if set forth herein in full. All accounts, products or services opened shall remain open and in effect until they terminate in accordance with their own terms or until Bank terminates them at its discretion upon notice to Depositor. [...]

2. This Agreement shall govern all accounts, products and services opened by Depositor in the capacity as indicated at the time of signing this Agreement and all other accounts, products and services that Depositor may from time to time authorize the Bank to open under this Agreement, in that ownership capacity. [...]

3. Instructions to permit withdrawal upon more than one signature apply only to checks and in-person transactions taking place in a branch. [...]

4. Most disputes arising under this Agreement related to accounts or services hereunder are subject to mandatory binding arbitration. Rights to trial by a judge or jury are waived hereby. Bank must be notified by Depositor of claims and proceedings to enforce any such claims must be brought, within the time requirements established in the Account Disclosures and Regulations.

TAX CERTIFICATION - UNDER PENALTIES OF PERJURY I CERTIFY THAT:
1) The Tax ID number shown on this form is my correct Taxpayer Identification Number.
2) I certify that I am not subject to backup withholding because (a) I have not been notified that I am subject to backup withholding as a result of a failure to report all interest or dividends, (b) the Internal Revenue Service has notified me that I am no longer subject to backup withholding, or (c) this account is owned by an entity exempt from backup withholding.
3) Check this box [ ] if you are subject to backup withholding and can not certify the provisions of (2) above.
4) [ ] If this box is checked, the above 1-3 of the Tax Certification do not apply because (a) I am not a United States person or (b) I am an individual and am neither a citizen nor a resident of the United States. I will complete the IRS form W-8BEN, (c) if this box is not checked, I am a U.S. person (including U.S. resident alien).

By signing below, I/we agree to be bound by the terms and conditions of the Master Account Agreement (the "Agreement") as set forth herein, and make the tax certification set forth above. [...] THE INTERNAL REVENUE SERVICE DOES NOT REQUIRE YOUR CONSENT TO ANY PROVISION OF THIS DOCUMENT OTHER THAN THE CERTIFICATIONS REQUIRED TO AVOID BACKUP WITHHOLDING.

02        0100-0000110848-9

**DERIAN EIDSON**

*Derian Eidson*

Please sign within the box          SIGNATOR          Thumb Print

Please sign within the box          Thumb Print

**STEVEN K ZINNEL**

Please sign within the box          SIGNATOR          Thumb Print

Please sign within the box          Thumb Print

GOVERNMENT
EXHIBIT 140
2:11-CR-234 TLN

ZBK001983

BS6931.

ER001352

Case 05-28800    Filed 08/18/05    Doc 17

In re    Steven Keith Zinnel                                          Case No. _____
                                              ───────────────
                                                   Debtor

## SCHEDULE B. PERSONAL PROPERTY
### (Continuation Sheet)

| Type of Property | N O N E | Description and Location of Property | Husband, Wife, Joint, or Community | Current Market Value of Debtor's Interest in Property, without Deducting any Secured Claim or Exemption |
|---|---|---|---|---|
| 10. Annuities. Itemize and name each issuer. | X | | | |
| 11. Interests in IRA, ERISA, Keogh, or other pension or profit sharing plans. Itemize. | | Coporate Control, Inc. Profit Sharing Plan ERISA Covered Plan Debtor claims as exempt, all of his vested balance in the plan | - | Unknown |
| 12. Stock and interests in incorporated and unincorporated businesses. Itemize. | X | | | |
| 13. Interests in partnerships or joint ventures. Itemize. | X | | | |
| 14. Government and corporate bonds and other negotiable and nonnegotiable instruments. | X | | | |
| 15. Accounts receivable. | X | | | |
| 16. Alimony, maintenance, support, and property settlements to which the debtor is or may be entitled. Give particulars. | | Child support arrearages from October 2002 $1,535 for 34 months | - | 52,190.00 |
| 17. Other liquidated debts owing debtor including tax refunds. Give particulars. | X | | | |
| 18. Equitable or future interests, life estates, and rights or powers exercisable for the benefit of the debtor other than those listed in Schedule of Real Property. | X | | | |
| 19. Contingent and noncontingent interests in estate of a decedent, death benefit plan, life insurance policy, or trust. | X | | | |

Sub-Total >          52,190.00
(Total of this page)

Sheet __1__ of __3__ continuation sheets attached
to the Schedule of Personal Property

BS 6932          0190

Copyright (c) 1996-2005 - Best Case Solutions, Inc. - Evanston, IL - (800) 492-8037          Best Case Bankruptcy

1         MS. DALY: Thank you. Nothing further.

2         THE COURT: Anything further on redirect?

3         MS. HEMESATH: Two questions.

4         THE COURT: Sure. Let's proceed.

5         REDIRECT EXAMINATION

           OF BANCRUPTCY TRUSTEE

6  BY MS. HEMESATH:

7  Q.    Please put up side by side Exhibit 202, page 3, and

8  30.

9        Schedule B is the personal property where the bank

10  accounts are to be listed; correct?

11  A.    Correct.

12  Q.    Can you box that on the second exhibit.

13        Are those the same bank account numbers?

14  A.    No.

15  Q.    So this second bank account on the right-hand side,

16  Government's Exhibit 30, is not listed on Schedule B?

17  A.    That's correct.

18  Q.    Can we see just Exhibit 30. Whose bank account is

19  this?

20  A.    Mr. Zinnel's.

21  Q.    What date is it opened?

22  A.    June 12, 2003.

23  Q.    What does he say for employment?

24  A.    Self-employed.

25  Q.    Is Safeco a bonding company?

1  from -- pardon me -- you heard testimony from Mr. Gee who

2  explained the bankruptcy estate to us.  It is all legal

3  interests, all equitable interests, wherever located, by

4  whomever held.  It's broad.  All legal interests.  That's

5  something your name is on.  For example, a bank account.

6      This is Government's Exhibit 30.  Steven Zinnel's

7  personal bank account.  Down there at the bottom, you might

8  see the date opened, June 12, 2003.  That bank account isn't

9  here on Schedule B, personal property, from his bankruptcy

10 schedules.

11     Equitable interests.  That's the big bag in this case

12 of hidden property.  Done Deal, Luyung property, 4 Results,

13 Auto and Boat Store.  His name is not on these properties,

14 but he's using them all to his benefit.  You cannot put a

15 piece of property in someone's else's name and benefit from

16 it, use it like it's yours, without declaring it on your

17 bankruptcy schedules.

18     The bankruptcy estate includes property wherever

19 located, on Luyung Drive in Gold River, in Carmichael, or in

20 Yorba Linda, California, and by whomever held.  So

21 Derian Eidson, Tom Wilbert, Michael Gravely, Chris Garrison

22 all testified that they held property for Mr. Zinnel.  Pardon

23 me.  Ms. Eidson did not testify.  The other three did.

24     Bankruptcy estate includes assets whose status is

25 uncertain because the bankruptcy trustee will investigate any

1    uncertain assets.  And in that case, that was Steven Reynolds

2    who testified.

3         It is up to the bankruptcy court to determine which

4    assets belong to the estate.  Let's go back to the evidence

5    of Count 2, bankruptcy concealment.  An item of property

6    belonged to the bankruptcy estate.  Again, 4 Results, Luyung,

7    Auto and Boat.  An ownership interest in System 3.  Equitable

8    control of Done Deal.  And listed personal bank account.

9    Just as in Count 1, any one item of concealed property is

10   sufficient.

11        Element 3, knowingly and fraudulently concealing.

12   This means that Eidson and Zinnel are aware of the

13   concealment and do not act through ignorance, mistake, or

14   accident.  What you're looking for here is the intent to

15   conceal the item of property.  Here Mr. Zinnel does not

16   disclose Done Deal even though Derian Eidson, the president

17   of Done Deal, is participating in the bankruptcy as a

18   creditor.  And no disclosure of System 3, Luyung, or

19   Done Deal, even though -- and this was something Steve

20   Reynolds mentioned.  You might recall the audio we heard of

21   the 341 hearing where Mr. Zinnel was being very thorough in

22   disclosing other things, for example, lawsuits he hadn't even

23   filed yet.  So he was being very thorough in certain senses

24   on his bankruptcy petitions, but yet these three items are

25   nowhere to be found.

1    silent partner, I don't want my name out there, yeah, he

2    found the right guy, because obviously these were people

3    willing to lie for money.

4        You know, the government didn't pick them.  The

5    government found them.  And yes, one makes decisions about

6    who to charge maybe based on who's willing to make recordings

7    or whose evidence is corroborated and who's more culpable.

8    But look, yeah, it's from Tom Wilbert.  He's saying keep it

9    secret.  And the one person he's not keeping it secret from,

10    the defendant, who's got his finger on the pulse of System 3,

11    who's getting the financials, who knows everything.

12        Now, so what's really the centerpiece of this case?

13    Let's put up Government's Exhibit 202, the bankruptcy

14    schedules, because this is a bankruptcy fraud case. The

15    centerpiece of this case is the truth versus the lies.

16    NO MENTION OF SYSTEM 3
        Let's look at page 3, please.  Number 2.  The checking

17    account.  Where is Done Deal?  Done Deal is nowhere.

18    Done Deal has already at this point received thousands of

19    dollars in checks signed by Zinnel's mother.  That's a lie.

20    You don't need to believe any witness to believe it, for

21    that.  Right?  You saw the checks.  They're in evidence.  I

22    think they're about Number 365-A, B, and C.  These are checks

23    going to Done Deal, signed by Zinnel's mom.  Not only are the

24    checks not disclosed, but the checking account is not

25    disclosed.  Zinnel's personal account is not disclosed.

1    Chris Garrison?  Right?  Why do that?

2         And by the way, you'll also see in the 341 hearing,

3    the debtor's examination -- you have a transcript of that

4    one -- where Zinnel says all the assets of Corporate Control

5    were sold in 2002 and went to First Bank.  He doesn't care in

6    this scheme what the truth is about stuff.  He just says I

7    ain't got it.  Now he's trying to cook up some other story

8    about how he moved some other corporate asset.  No.

9         You remember, I think it was the first or the second

10   Mission Impossible movie where they've got these masks and

11   they tear them off and there you know it's the real person.

12   That's how Steven Zinnel uses corporations.  Like he creates

13   Done Deal, 4 Results, Auto and Boat Store, Corporate Control.

14   Well, those are the big ones in this case.  But you heard
                         NO MENTION OF SYSTEM 3
15   about Supply Source.  You heard others too.  And behind those

16   masks, he accomplishes his ends of asset concealment.  That's

17   the centerpiece of this case.

18        Let's look at the Schedule 202-4, please.  Here's

19   another thing he zeroed out.  "Stock and interests in

20   incorporated and unincorporated businesses.  Itemize."  He

21   says "none."

22        Now, let's compare that.  That's none.  No stock, no

23   interest, nothing.  Let's compare that to Government's

24   Exhibit 105 which is the Business Formation Agreement that he

25   signed with Tom Wilbert after they got off the boat.  That

{8 F.3d 1320}*B. The Supervisors*



Troubled as we are by Sinek's conduct, we're more troubled still by the lack of supervision and control exercised by those above him. Sinek's superiors seem to have been unaware that anything at all was amiss until after oral argument in this court. It was during that argument that Sinek first disclosed Nourian's status:

[Q]:

Was there a cooperation agreement?

Mr. Sinek:

Well, your honor, that is not something that's in the record.

[Q]:

I understand. Was there a cooperation agreement?

Mr. Sinek:

There was an agreement with the Southern District of New York and [Nourian], yes.

Transcript of 11/5/92 Oral Argument at 15.

How can it be that a serious claim of prosecutorial misconduct remains unresolved - even unaddressed - until oral argument in the Court of Appeals? Surely when such a claim is raised, we can expect that someone in the United States Attorney's office will take an independent, objective look at the issue. The claim here turned entirely on verifiable facts: A dispassionate comparison between the transcript of Sinek's statement to the jury and Nourian's plea agreement would have disclosed that the defense was right and Sinek was wrong. Yet the United States Attorney allowed the filing of a brief in our court that did not own up to the problem [a brief that itself skated perilously close to misrepresentation. *See* pp. 8303-04 & notes 7 & 8 *supra*.]

But that's not all. After the oral argument before us, we gave the government an opportunity to rethink its position. Order of 11/5/92. United States Attorney Terree A. Bowers wrote us a week later, saying he'd "now had an opportunity to review the issues raised in these appeals" and requesting that he "be afforded an opportunity to modify [his] position regarding the nature of certain statements made by government counsel during closing argument." Letter of 11/12/92. Having granted the additional time, *see* Order of 11/13/92, we infer that the Supplemental Brief filed on November 30, 1992, is the United States Attorney's reasoned response to the issue.

This supplemental brief falls disappointingly short. While for the first time "recognizing and conceding that the prosecutor's comments in closing argument were misleading" and "improper," Government Supp. Brief at 1, 11 n.2, the new brief is remarkably similar in approach to the government's original brief. Its two-part strategy is to minimize Sinek's misconduct and place the blame for it on opposing counsel. Thus, the government tells us Sinek's comments "were limited in nature and, as the district court recognized, were prompted by defense counsel's own improper attempt to focus the jury's attention on matters outside the record," *id.* at 2, and that "the prosecutor's remarks, albeit misleading, were an isolated instance of error prompted by defendants' improper reference to matters outside the record," *id.* Both prongs of the government's analysis deserve careful attention.

© 2017 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

BS 6938

# Eastern District of California
# Claims Register

<u>05-28800 Steven Keith Zinnel</u> ; **DEBTOR DISCHARGED** on 09/06/2006

**Judge:** Christopher M. Klein      **Chapter:** 7
**Office:** Sacramento               **Last Date to file claims:**
**Trustee:** Susan K. Smith          **Last Date to file (Govt):**

| Creditor:            (7783230)<br>Fog Cutter Services<br>P O Box 2665<br>Portland OR 97208-2665 | Claim No: 1<br>Doc. Locator ID: 6043513<br>Original Filed Date: 11/07/2005<br>Original Entered Date: 11/16/2005 | Status:<br>Filed by: CR<br>Entered by:<br>Modified: |
|---|---|---|

| Amount | claimed: | $10799.35 | | |
| Unsecured | claimed: | $10799.35 | | |

| History: |
|---|
| Details \| 1-1 \| 11/07/2005 \| Claim #1 filed by Fog Cutter Services, Amount claimed: $10799.35 (mfrs ) |
| Description: |
| Remarks: |

| Creditor:            (7783253)<br>Wells Fargo Card Services<br>PO Box 9210<br>Des Moines IA 50306 | Claim No: 2<br>Doc. Locator ID: 6004032<br>Original Filed Date: 11/16/2005<br>Original Entered Date: 11/17/2005 | Status:<br>Filed by: CR<br>Entered by:<br>Modified: |
|---|---|---|

| Amount | claimed: | $8506.17 | | |
| Unsecured | claimed: | $8506.17 | | |

| History: |
|---|
| Details \| 2-1 \| 11/16/2005 \| Claim #2 filed by Wells Fargo Card Services, Amount claimed: $8506.17 |
| Description: |
| Remarks: |

| Creditor:            (7783246)<br>Stuart Allan Associates<br>5447 E 5th St Ste 110<br>Tucson AZ 85711 | Claim No: 3<br>Doc. Locator ID: 6047316<br>Original Filed Date: 11/21/2005<br>Original Entered Date: 11/21/2005 | Status:<br>Filed by: CR<br>Entered by:<br>Modified: |
|---|---|---|

| Amount | claimed: | $3026.48 | | |
| Unsecured | claimed: | $3026.48 | | |

| History: |
|---|
| Details \| 3-1 \| 11/21/2005 \| Claim #3 filed by Stuart Allan Associates, Amount claimed: $3026.48 (mfrs ) |
| Description: |
| Remarks: |

BS 6939
[10/12/2016]

| History: | | | |
|---|---|---|---|
| Details | 3-1 | 11/21/2005 | Claim #3 filed by Stuart Allan Associates, Amount claimed: $3026.48 (mfrs ) |

**Description:**

**Remarks:**

---

| Creditor:        (14588661)<br>TRAVELERS CASUALTY AND<br>SURETY COMPANY<br>ATTN MICHELLE SMITH COTTO<br>1 TOWER SQUARE 4PB<br>HARTFORD CT 06183 | Claim No: 4<br>Doc. Locator ID: 6300529<br>Original Filed Date: 11/21/2005<br>Original Entered Date: 11/23/2005 | Status:<br>Filed by: CR<br>Entered by:<br>Modified: |
|---|---|---|

| Amount | claimed: | $3026.48 | | |
|---|---|---|---|---|
| Unsecured | claimed: | $3026.48 | | |

| History: | | | |
|---|---|---|---|
| Details | 4-1 | 11/21/2005 | Claim #4 filed by TRAVELERS CASUALTY AND SURETY COMPANY, Amount claimed: $3026.48 (mfrs ) |

**Description:**

**Remarks:**

---

| Creditor:        (14588744)<br>Arrow Financial Services LLC<br>PO Box 3001<br>Malvern PA 19355-0701 | Claim No: 5<br>Doc. Locator ID: 6300940<br>Original Filed Date: 11/18/2005<br>Original Entered Date: 11/23/2005 | Status:<br>Filed by: CR<br>Entered by:<br>Modified: |
|---|---|---|

| Amount | claimed: | $141.50 | | |
|---|---|---|---|---|
| Unsecured | claimed: | $141.50 | | |

| History: | | | |
|---|---|---|---|
| Details | 5-1 | 11/18/2005 | Claim #5 filed by Arrow Financial Services LLC, Amount claimed: $141.50 |

**Description:**

**Remarks:**

---

| Creditor:        (14591481)<br>MBNA America Bank<br>PO Box 15168 MS 1423<br>Wilmington DE 19850 | Claim No: 6<br>Doc. Locator ID: 6310817<br>Original Filed Date: 11/22/2005<br>Original Entered Date: 12/01/2005 | Status:<br>Filed by: CR<br>Entered by:<br>Modified: |
|---|---|---|

| Amount | claimed: | $3641.15 | | |
|---|---|---|---|---|
| Unknown | claimed: | $3641.15 | | |

| History: | | | |
|---|---|---|---|
| Details | 6-1 | 11/22/2005 | Claim #6 filed by MBNA America Bank, Amount claimed: $3641.15 (smis ) |

**Description:**

**Remarks:**

BS 6940

[10/12/2016]

| Creditor:        (21045957)<br>GENERAL INSURANCE<br>COMPANY OF AMERICA<br>James D. Curran<br>555 Montgomery Street, Suite 1100<br>San Francisco, CA<br>94111     Claimant History | Claim No: 7<br>Doc. Locator ID: 6329420<br>Original Filed Date: 12/12/2005<br>Original Entered Date: 12/14/2005<br>Last Amendment Filed: 05/05/2014<br>Last Amendment Entered: 05/06/2014 | Status:<br>Filed by: CR<br>Entered by:<br>Modified: |
|---|---|---|

| Amount claimed: $1100780.12 | | |

| History: | | | | |
|---|---|---|---|---|
| Details | | 7-1 | 12/12/2005 | Claim #7 filed by General Insurance Company Of America, Amount claimed: $200000.00 |
| Details | ◐ | 7-2 | 05/29/2012 | Amended Claim #7 filed by General Insurance Company Of America, Amount claimed: $2174980.00 (bres ) |
| Details | ◐ | 7-3 | 05/05/2014 | Amended Claim #7 filed by GENERAL INSURANCE COMPANY OF AMERICA, Amount claimed: $1100780.12 (bons ) |

| Description: |
|---|
| Remarks: |

| Creditor:        (21045958)<br>FIRST NATIONAL INSURANCE<br>COMPANY OF AMERICA<br>James D. Curran<br>555 Montgomery Street, Suite 1100<br>San Francisco, CA<br>94111     Claimant History | Claim No: 8<br>Doc. Locator ID: 6329515<br>Original Filed Date: 12/13/2005<br>Original Entered Date: 12/14/2005<br>Last Amendment Filed: 05/05/2014<br>Last Amendment Entered: 05/06/2014 | Status:<br>Filed by: CR<br>Entered by:<br>Modified: |
|---|---|---|

| Amount claimed: $723344.55 | | |

| History: | | | | |
|---|---|---|---|---|
| Details | | 8-1 | 12/13/2005 | Claim #8 filed by First National Insurance Company of America, Amount claimed: |
| Details | ◐ | 8-2 | 05/29/2012 | Amended Claim #8 filed by First National Insurance Company of America, Amount claimed: $780147.06 (bres ) |
| Details | ◐ | 8-3 | 05/05/2014 | Amended Claim #8 filed by FIRST NATIONAL INSURANCE COMPANY OF AMERICA, Amount claimed: $723344.55 (bons ) |

| Description: |
|---|
| Remarks: |

| History: | | | | |
|---|---|---|---|---|
| Details | | 9-1 | 12/13/2005 | Claim #9 filed by Safeco Insurance Comapny of America, Amount claimed: $200000.00 |
| Details | ◐ | 9-2 | 05/29/2012 | Amended Claim #9 filed by Safeco Insurance Comapny of America, Amount claimed: $7500.00 (bres ) |
| Details | ◐ | 9-3 | 05/05/2014 | Amended Claim #9 filed by SAFECO INSURANCE COMPANY OF AMERICA, Amount claimed: $7622.43 (bons ) |

| Description: |
|---|
| Remarks: |

BS 6941

[10/12/2016]

| Creditor:          (21045959)<br>SAFECO INSURANCE<br>COMPANY OF AMERICA<br>James D. Curran<br>555 Montgomery Street, Suite<br>1100<br>San Francisco, CA<br>94111     Claimant History | Claim No: 9<br>Doc. Locator ID: 6329617<br>Original Filed Date: 12/13/2005<br>Original Entered Date: 12/14/2005<br>Last Amendment Filed: 05/05/2014<br>Last Amendment Entered: 05/06/2014 | Status:<br>Filed by: CR<br>Entered by:<br>Modified: |

| Amount | claimed: | $7622.43 | | ||| |

**History:**

| Details | | 9-1 | 12/13/2005 | Claim #9 filed by Safeco Insurance Comapny of America, Amount claimed: $200000.00 |
| Details | ⊙ | 9-2 | 05/29/2012 | Amended Claim #9 filed by Safeco Insurance Comapny of America, Amount claimed: $7500.00 (bres ) |
| Details | ⊙ | 9-3 | 05/05/2014 | Amended Claim #9 filed by SAFECO INSURANCE COMPANY OF AMERICA, Amount claimed: $7622.43 (bons ) |

Description:

Remarks:

| Creditor:          (14597906)<br>The Travelers Indemnity Company<br>c/o James G. Stanley<br>PO Box 11055<br>Grange CA 92856-8155 | Claim No: 10<br>Doc. Locator ID: 6045361<br>Original Filed Date: 12/09/2005<br>Original Entered Date: 12/16/2005 | Status:<br>Filed by: CR<br>Entered by:<br>Modified: |

| Amount | claimed: | $461417.59 | | ||| |
| Unsecured | claimed: | $461417.59 | | ||| |

**History:**

| Details | | 10-1 | 12/09/2005 | Claim #10 filed by The Travelers Indemnity Company, Amount claimed: $461417.59 |

Description:

Remarks:

| Creditor:          (14191116)<br>Michelle Zinnel<br>c/o Dudugjian and Maxey<br>13 SierraGate Plaza Building B<br>Roseville, CA 95678 | Claim No: 11<br>Doc. Locator ID: 5780101<br>Original Filed Date: 01/24/2006<br>Original Entered Date: 01/24/2006 | Status:<br>Filed by: CR<br>Entered by:<br>Modified: |

| Amount | claimed: | $13634.00 | | ||| |
| Unsecured | claimed: | $13634.00 | | ||| |

**History:**

| Details | | 11-1 | 01/24/2006 | Claim #11 filed by Michelle Zinnel, Amount claimed: $13634.00 (fdis ) |

Description:

Remarks:

BS 6942

10/12/2016

| Creditor:  (14191116) Michelle Zinnel c/o Dudugjian and Maxey 13 SierraGate Plaza Building B Roseville, CA 95678 | Claim No: 12 Doc. Locator ID: 5305384 Original Filed Date: 01/24/2006 Original Entered Date: 01/26/2006 | Status: Filed by: CR Entered by: Modified: |
|---|---|---|
| No amounts claimed | | |

| History: | | | |
|---|---|---|---|
| Details | 12-1 | 01/24/2006 | Claim #12 filed by Michelle Zinnel, Amount claimed: |

| Description: (12-1) Amount Unknown |
|---|
| Remarks: |

| Creditor:  (7807852) First Bank c/o Douglas H. Kraft 1418 20th St 1st Fl Sacramento, CA 95814 | Claim No: 13 Doc. Locator ID: 5396045 Original Filed Date: 01/25/2006 Original Entered Date: 01/30/2006 | Status: Withdrawn 636 Filed by: CR Entered by: Modified: |
|---|---|---|
| Amount claimed: $115000.00 | | |
| Unsecured claimed: $115000.00 | | |

| History: | | | |
|---|---|---|---|
| Details | 13-1 | 01/25/2006 | Claim #13 filed by First Bank, Amount claimed: $115000.00 |
| | 636 | 04/07/2014 | Withdrawal of Claim Nos. 13 (First Bank) Status: Withdrawn |

| Description: |
|---|
| Remarks: |

| Creditor:  (14191116) Michelle Zinnel c/o Dudugjian and Maxey 13 SierraGate Plaza Building B Roseville, CA 95678 | Claim No: 14 Doc. Locator ID: 6147272 Original Filed Date: 03/14/2006 Original Entered Date: 03/14/2006 | Status: Withdrawn 676 Filed by: CR Entered by: Modified: |
|---|---|---|
| Amount claimed: $36965.00 | | |
| Priority claimed: $36965.00 | | |

| History: | | | |
|---|---|---|---|
| Details | 14-1 | 03/14/2006 | Claim #14 filed by Michelle Zinnel, Amount claimed: $36965.00 (smis ) |
| | 676 | 09/07/2016 | Withdrawal of Claim Nos. 14 (Michelle Zinnel) Status: Withdrawn |

| Description: |
|---|
| Remarks: |

## Claims Register Summary

**Case Name:** Steven Keith Zinnel
**Case Number:** 05-28800
**Chapter:** 7
**Date Filed:** 07/20/2005

BS 6943

10/12/2016

**Total Number Of Claims: 14**

| | |
|---|---|
| Total Amount Claimed* | $2487904.82 |
| Total Amount Allowed* | |

*Includes general unsecured claims

**The values are reflective of the data entered. Always refer to claim documents for actual amounts.**

| | Claimed | Allowed |
|---|---|---|
| Secured | | |
| Priority | $36965.00 | |
| Administrative | | |

BS 6944

10/12/2016

## I. THERE WAS A CONSTRUCTIVE AMENDMENT ON COUNTS 1 AND 2 THAT TAINTED ALL COUNTS[1]

"The Fifth Amendment's grand jury requirement establishes the 'substantial right to be tried only on charges presented in an indictment returned by a grand jury.'" *United States v. Davis*, 2017 U.S. App. LEXIS 6445 at *3 (9th Cir. April 14, 2017) (quoting *United States v. Miller*, 471 U.S. 130, 140 (1985)). "Where the trial evidence or the jury charge operates to 'broaden[] the possible bases for conviction from that which appeared in the indictment,' the indictment has been constructively amended." *United States v. Milstein*, 401 F.3d 53 (2d Cir. 2005) (quoting *Miller* at 138).

This Court has described two types of constructive amendment: (1) where "there is a complex of facts [at trial] distinctly different from those set forth in the charging instrument," and (2) where "the crime charged was substantially altered at trial, so that it was impossible to know whether the grand jury would have indicted for the crime actually proved." *Davis*, at *3-4; *United States v. Adamson*, 291 F.3d 606, 615 (9th Cir. 2002).

The government constructively amended Counts 1 and 2 using the second type of constructive amendment, by giving the jury uncharged bases (other assets Zinnel allegedly transferred or concealed, in addition to the

---

[1] Many of the "facts" stated in the government's brief are inaccurate, but Zinnel lacks enough extra space to list them here.

1

BS 6950



THIS IS WHERE
← STEVE ZINNEL
LIVES

"THE DEGREE
OF CIVILIZATION
IN A SOCIETY
CAN BE JUDGED
BY ENTERING
ITS PRISONS."
RUSSIAN WRITER
FYODOR
DOSTOEVSKY
AUTHOR OF



" STEVE ZINNEL   DERIAN EIDSON BS 6971

**J-UNIT CELL**



THIS IS WHERE ZINNEL LIVES

BS 6972

Bankruptcy Fraud Cases

| CASE NAME & CASE NUMBER | District / Year Sentenced | Convictions | Plea Or Trial | PSR/Gov't Recommendation | Actual J & S | Self Surrender |
|---|---|---|---|---|---|---|
| Burke, James 05-cr-365 FCD | E.D. Cal. 2011 | Bankruptcy Fraud (3 counts) 18 U.S.C. 152(1) **Loss: Over $7 Million** | Trial | Adj. Offense Level 28, 78 months, Restitution $7 million, Fine: $100,000 | 15 months, Restitution: $0 | Self Surrender |
| Quan, Jimmy 04-cr-323 WBS (Judge Shubb, E.D. Cal presided) | N.D. Cal. 2007 | Bankruptcy offenses (5 counts) 18 U.S.C. 152(7), 152(2), 18 U.S.C. 152(3) Money Laundering (5 counts) 18 U.S.C. 1956 **Loss: $6.5 Million** 3 BK schemes spanning 8 yrs | Trial | Adj. Offense Level 34 170 months Fine: $350,000 | 48 months Restitution: $1,477,700 each by Quan & his wife | Self Surrender |
| Bowen, Reed 09-cr-28-EJL | D. Idaho 2010 | Bankruptcy fraud **Loss: over $3 million** | Plea | Unknown | 12 mos. & 1 day | Self Surrender |
| Bussell, Letantia 01-cr-56-DOC | C.D. Cal. 2002 | Conspiracy, false statements in BK, Attempted Tax Evasion **Loss: Over $3 Million** | Trial | Unknown | 36 months Restitution: $2.4 million | Self Surrender |
| Everett, James 06-cr-775 JAT | D. Ariz. 2009 | Bankruptcy offenses, Money laundering, (33 counts total) **Loss: $335,000** | Trial | Adj. Offense Level 20 33-41 mos. | 13 months | Self Surrender |
| Yagman, Stephen 06-cr-227 SVW | C.D. Cal. 2007 | Bankruptcy fraud, Money laundering, Tax fraud (19 counts) **Loss: over $100,000** | Trial | PSR: 63 mos. Govt: 108 months | 36 months | Self Surrender |
| Vandevort, Milton 08-cr-1070 PSG | C.D. Cal. 2011 | Conceal assets in BK (2 counts) 18 U.S.C. 152(1) False oath in BK (1 count) 18 U.S.C. 152(3), False declaration in BK, Money laundering **Loss: $1.35 million** | Trial | Adj. Offense Level 26 PSR: 80 months Govt.: 96 months Restitution: $1.35 million Fine: $15,000 | 70 months Restitution: $1.35 million Fine: $12,500 | Remanded due to violence (Assaulted process server with golf club) |

ER000424

BS 6977

| Name / Case No. | Court / Year | Charges / Loss | Plea/Trial | Offense Level / PSR | Sentence / Restitution | Status |
|---|---|---|---|---|---|---|
| Reidenbach, Kenneth 10-cr-797 JKG | E.D. Pa. 2012 | Conspiracy to commit BK fraud 18 U.S.C. 371, Conceal BK assets 18 U.S.C. 152(1), Prepetition transfers 18 U.S.C. 152(7), False oath 18 U.S.C. 152(3), Conversion of BK Assets 18 U.S.C. 157 (9 counts total) Loss: $100,000 | Trial | Adj. Offense Level 20 PSR: 33-41 mos. | 33 months Restitution: $8,736 Fine: $10,000 | Self Surrender (Def. was an attorney who embezzled from clients & Lied on stand) |
| Allard, Steven 09-cr-90 DLM | D.R.I. 2010 | Bankruptcy fraud (1 count) Tax Evasion (1 count) **Loss: $2,139,739** | Plea | Adj. Offense Level 19 PSR: 30-37 mos. 22 41m | 30 months Restitution $2,139,739 | Self Surrender |
| Spaich, Gavrilo 08-cr-440 JAM | E.D. Cal. 2009 | Bankruptcy fraud, Concealment, Conspiracy Loss: Approx. $2.8 Million based on Dkt. No. 73 | Plea | Adj. Offense Level 17 Govt: 27 months 26 33M | 24 months | Remanded at Sentencing |
| Idowu, Olusola 09-cr-298 MJG | D. Md. 2010 | BK fraud, False tax returns Wire fraud (6 counts total) **Loss: $562,000** | Trial | Adj. Offense Level 24 Govt: 54 mos. | 46 months Restitution: $425,000 | Self Surrender |
| Hecker, Dennis 10-cr-32 JNE | D.Minn. 2011 | BK fraud, wire fraud (2 counts) **Loss: $31 million** | Plea | PSR: 292 to 365 months Plea Agmt: 151-188 mos. Govt. Rec.: 120 Mos. | 120 months, Restitution: $31 million | Remanded |
| Yates, Donald 09-cr-3979 JLS | S.D. Cal. 2011 | False tax return **Loss: Over $460,000 plus tax liab.** | Plea | Adj. Offense Level 19 Govt: 30 mos. | 30 months Restitution: $288,724 | Self Surrender |
| Bartee, Lin 08-cr-299 TLN | E.D. Cal. 2011 Sentenced by FCD | BK fraud Tax evasion **Loss: $473,000** | Plea | PSR: 24-30 mos. | 24 months Restitution: $239,472 | Arrested during flight to Costa Rica |
| Posada, German 11-cr-279 PMP | D. Nevada 2012 | BK fraud Tax evasion **Loss: $236,644** | Plea | PSR: 24-30 mos. Govt: 27 mos. | 18 months Restitution: $236,644 | Self Surrender |
| MacLaren, Leslie 08-cr-3031 REO | W.D. MO 2012 | BK Offenses, False tax claims, Obstructing IRS laws (9 counts total) **Intended Loss: $40 million** | Trial | Unknown | 51 months Restitution: $334,003 | Remanded at Sentencing |

ER000425

BS6978

| | | BK Offenses (3 counts) | Plea | PSR: 51-63 mos, CHC III | In custody |
|---|---|---|---|---|---|
| Dykstra, Lenny 11-cr-415 DDP | C.D. CA. 2012 | Concealment of assets Money laundering Loss: $200,000-400,000 | Plea | Govt.: 30 months Restitution: $200,000 | 6.5 months concur to already in state case. (Former Pro Baseball Star) |
| Rayner, George 11-cr-78 JAN | D. Maine 2012 | BK Fraud Loss: $259,362 | Trial | PSR: AOL 16 12 months + 1 day | Remanded |
| Edwards, Duncan 03-CR-58 DWM | D. Mont. 2004 | BK Fraud, Concealment of Assets Loss: $102,629 | Plea | PSR: 27-33 months | 5 yrs. Probation, w/ 7 mos. Elec. Monitor, House Arrest | N/A |
| Pocklington, Peter | C.D. CA 2010 | False statements in BK | Plea | Adj. Offense Level 10 (after 2-level variance) | 2 yrs probation, + 6 mos. Home Detention Fine: $3,000 | N/A |

BS1978A

--------------------------------------------------------------------------------

FROM: 66138097
TO: EIDSON, DERIAN; Luban, Suzanne
SUBJECT: Factual Inaccuracies in GB Part 1 of 2
DATE: 04/26/2017 06:06:00 PM

U.S. v. Zinnel and Eidson

To: attorney Suzanne Luban, attorney Becky James, and Derian Eidson:
[ via email to Suzanne Luban and Derian Eidson
[ via U.S. mail to attorney Becky James ]

Last updated: 4/26/17

[ Use for Reply Brief and Steve's FRAP 46 motion in the Ninth Circuit and District Court for Prosecutorial Misconduct to
comply with 18 U.S.C. 4 ]

FACTUAL INACCURACIES IN THE GOVERNMENT'S ANSWERING BRIEF - PART 1 OF 2
(bald-faced lies)

#1
Lie / Misrepresentation
1.1 "Zinnel created 4 Results to hide his ownership of Luyung Drive." (No cite to the record)
Where
1.2 GB 9:8-9
Why a lie
1.3 4 Result was actually created as "telecommunication business."
Evidence
1.4 SER 753:3-754:8

#2
Lie
2.1 "Another concealed asset, Done Deal"
Where
2.2 GB 12:1-2
Why a lie
2.3 Zinnel not charged with concealing Done Deal and there the evidence was Zinnel never was an owner of Done Deal, Inc.
Evidence
2.4 ER 179-201 (CR 63), ER 1461 & 1462
    During the 64 months after the indictment that Zinnel's bankruptcy remained re-opened, the bankruptcy trustee
    never made a claim that Done Deal was part of Zinnel's bankruptcy estate.
#3
Lie
3.1 "Through the Tom Cologna loan [Zinnel] was able to access the cash he needed to fund his next, secret business venture.
Zinnel launched a new secret business [System 3]." No cite to the record
Where
3.2 GB 12:19-_____
Why a lie
3.3 Net proceeds if the Luyung Property sale were (1) $4,742.69, (2) System 3 was incorporated on 10/3/01, (3) System 3
was funded on 10/31, 11/30/01, 12/19/01, & 5/28/01 for a total of over $400,000 (4) the source of funds were
    from Corporate Control, (5) the Luyung Property closed on 5/3/02, months later, with net proceeds of $4,742.69
Evidence
3.4 SER 57-58 (GEX 111), DEX N-21, SER 782-794, ER 1341 & 1342

#4
Lie
4.1 "Zinnel did not disclose that he was receiving rental income from System 3 for that company's use of the Luyung Drive
Property."
Where

BS6980

-----------------------------------------------------------------------------------------------------

4.2 GB 20:17-19
Why a lie
4.3 Zinnel did not receive the money, Done Deal did. Zinnel filed BK on 7/20/05; The rent was 8/1/07 to 11/30/07 - over
    two years later.
Evidence
4.4 GEX 361i

#5
Lie
5.1 "Per the terms of the Business Formation Agreement, Zinnel was paid $3,333 per month for these services."
Where
5.2 GB 18:9-10
Why a lie
5.3 Not a term of the Business Formation Agreement. Not a single reference to compensation to Zinnel.
Evidence
5.4 SER 53-56 (GEX 105)

#6
Lie
6.1 "Zinnel omitted a personal bank account Zinnel held at Washington Mutual."
Where
6.2 GB 21:14-18
Why a lie
6.3 Zinnel not charged with concealing a personal Washington Mutual Checking account.
    Zinnel made a mistake on 2 digits of the account number, but the balance of $250 is correct.

The government confirms in their answering brief Zinnel was given not notice he was going to have to defend at trial an alleged concealment if his ONLY Washington Mutual Personal Checking Account which Zinnel knew he disclosed on Schedule B of his bankruptcy schedules. ER 1362.

    The government wrote in their appellate Answering Brief:

    "Zinnel is correct that the Washington Mutual Personal Bank Account was not specifically listed in the indictment as
    an item of the bankruptcy estate." GB 54

Likewise, in the government's Trial Brief filed a mere three weeks before trial, the WAMU is not mentioned anywhere. ER 234-238.

Zinnel's only WAMU Personal Checking Account was disclosed on his bankruptcy schedules with the correct ending balance and the prosecutor knew Zinnel made a minor type with the account numbers and did not willfully conceal. In aggravation, not only was Zinnel not charged with concealing his WAMU personal checking account resulting in surprise at trial, but the government lawyers knew full well that Zinnel simply made a minor typo in two digits of the account number.

On Schedule B of his bankruptcy schedules, Zinnel listed his only WAMU personal checking account with the account ending in "9842." SER 189. Further, Zinnel listed the current market value of $250 rounded to an even number. SER 189. It is true that in discovery, the government provided Zinnel with several years of his WAMU personal bank statements that Zinnel had previously given bankruptcy trustee Steven Reynolds on 2005. The government also produced the WAMU personal Master Account Agreement that became government Exhibit 30. ER 133. The government produced tens of thousands of pages of irrelevant documents in this case during discovery in this case. The appellate record reveals the government produced at least 40,180 pages of documents in discovery. (SER 2 reflects page 40,180 and ER 204 reflects page 37,067.)

As the indictment and the government's trial brief made no mention of Zinnel's personal WAMU checking account, let alone any allegation of criminal concealment of his only WAMU personal checking account, Zinnel was not provided with fair notice that he had to defend at trail on this matter. Therefore, Zinnel was completely surprised at trial and sand bagged by the government lawyers, when appellate counsel AUSA Hemesath lead off with an alleged concealment of Zinnel's WAMU checking account at the start of her direct examination of bankruptcy trustee Stephen Reynolds. SER 547-550. This is one of the significant reasons Zinnel objected to the government's proposed jury instructions because of the WAMU account. ER 976.

Thereafter, both of appellate counsel AUSAs hammered hard at closing that Zinnel should be convicted based on the WAMU

--------------------------------------------------------------------------------------

personal checking account, thus striking foul blows.

In their closing arguments at trial, both appellate counsel utilized the persuasiveness of "primacy" on Count 2 as appellate counsel ASUA Hemesath lead off with "Zinnel's personal bank account. This is Exhibit 30. ER 1333, ER 1053.
In Zinnel's closing argument, Zinnel's trial attorney did inform the jury and the judge of the mistake in the WAMU account number on Zinnel's bankruptcy schedules by stating: "[Concerning] the WAMU [checking account]. Ms. Hemesath is right. It's a different account [number]. Is it possible that he made a mistake in the account [number]" Certainly. If he's going to hide WAMU, why put WAMU on the form at all? But she's right. That [checking account] doesn't match that account number. Is it possible that was a mistake?" ER 1091:23-1092:4.

Utilizing the same playbook as his co-counsel, when it was appellate counsel AUSA Matthew Segal's turn to lead the team, he began with what he characterized the "center piece of this case." "The [WAMU] checking account...Zinnel's personal account is not disclosed." ER 1116. Then trial/appellate counsel AUSA Matthew Segal chastises Zinnel when he knows the real truth that Zinnel listed his one and only WAMU personal account on his bankruptcy schedules. AUSA Matthew Segal tells the jury "and the big defense here is, well, he put one account at Washington Mutual down on his schedule...that's silly." ER 1116:25-1117:4.

However, the truth is Zinnel somehow made a typo OR mistake and got two numbers off in the account number on his bankruptcy schedules and neither the bankruptcy trustee or Zinnel discovered it in eight (8) years. However, after the indictment and trial brief were filed, government trial/appellate lawyers discovered it and decided to cheat and win at all costs and use the low hanging fruit as the "center-piece" of their case against Zinnel and inflame the jury and judge at the same time.

Zinnel requests that the court take judicial notice of Zinnel's WAMU bank statement, for his one and only WAMU account, for the period ending 6/13/05. This was the bank statement Zinnel used to fill out his bankruptcy Schedule B. The government bates number on the WAMU bank statement ending 6/13/05 is "ZBK 002318." The account number of 0490-00004975442 on bates number ZBK 002318 is identical to government Exhibit 30. ER 1333.

The account balance of $256.71 on the 6/13/05 statement is $6.41 different than Zinnel's bankruptcy schedules due to rounding. In continued underhandedness, government appellate counsel never solicited testimony of the value of the WAMU personal checking account nor did they move to admit the 6/13/05 bank statement they produced early in discovery as bates number ZBK 002318. The government lawyers wanted to win at all costs by striking foul blows and have the jury and the judge think an extremely valuable uncharged asset was concealed by Zinnel. It would have hurt the government's case because the amount is a non-material $256.41.

The last four digits of the personal WAMU checking account number on Zinnel's bankruptcy schedules is "9842." SER 189, Item #2. The last four digits of Zinnel's one and only actual personal WAMU checking account is "5442" as evidence by government Exhibit 30. ER 1333. Thus, Zinnel got the last two digits on "42" correct, but somehow put "98" instead of "54." Nevertheless, contrary to Justice Sutherland's eloquent words over eighty years ago regarding prosecutors not striking foul blows and his duty to refrain from improper methods, in his zeal to win at all costs, appellate counsel AUSA Matthew Segal used the WAMU account typographical error, that went unnoticed for eight years, to convict Zinnel on bankruptcy fraud concealment and then use the alleged concealment of a $256.41 asset to persuade the new district court judge that the loss enhancement value in this case was the disputed "amount scheduled for discharge" amount of $3.6 million and there were eleven victims resulting in twenty (20) Offense Levels of enhancements which added 188 months 15.63 years, of prison time in this case. (difference between O.L. 16 which had a mid-range of 24 months and O.L. 36 with a mid-range of 212 months in prison.)

Zinnel request that the court take judicial notice of the fact that Steven Zinnel has never had a personal WAMU checking account ending in "9842." In discovery, the government produced bank account records for many different bank accounts comprising of thousands of pages of discovery. However, the government DID NOT provide a single bank record for a bank account ending in "9842."

Further, Zinnel request that the court issue an Order to Show Cause to government appellate counsel AUSA Hemesath, AUSA Matthew Segal, and Acting U.S. Attorney for the Eastern District of California Phillip Talbert ordering them to file with the court forthwith any bank records that show Zinnel has ever had a WAMU personal checking account ending in "9842."

Evidence
6.4 ER 179-201, Zinnel's WAMU bank account statement for period ending 6/13/05

#7
Lie

BS 6982

-----------------------------------------------------------------------------------

7.1 "Zinnel lied: 'Corporate Control, the company's worthless, but all the assets were sold off and it went to First Bank &
     Trust back in 2002."
Where
7.2 GB 22:15-16
Why a lie
7.3 Zinnel is not charged with lying in bankruptcy. Zinnel's answer is the truth.
Evidence
7.4 ER 179-201 (CR 63)

#8
Lie
8.1 "Eidson helped him accomplish this by paying various checks out of the Done Deal account totaling $60,000 to buy
     Zinnel's house out of the bankruptcy estate."
Where
8.2 GB 25:6-8
Why a lie
8.3 The four (4) checks add up to $30,000 which is the correct figure.
Evidence
8.4 SER 225-229 (GEX 227-231)

#9
Lie
9.1 "From 2001 through 2009, Zinnel received these payments from System 3.
Where
9.2 GB 26:9-10
Why a lie
9.3 First alleged payment was at the very end of 2006 on 12/27/06 and the payment was not to Zinnel.
Evidence
9.4 ER 191 (CR 63), SER 230 (GEX 403)

#10
Lie
10.1 "Zinnel's initial capitalization of System 3 was $150,000" [no cite to record]
Where
10.2 GB 28:19-20
Why a lie
10.3 System 3's initial capitalization was $1,500 by Tom Wilbert. There was never a $150,000 check deposited into
     System 3 to capitalize it.
Evidence
10.4 DEX N-21, ER 769 (RT 594)

#11
Lie
11.1 "The paid undertaking meant that Zinnel could continue with an appeal in his child support litigation."
Where
11.2 GB 29:12-14
Why a lie
11.3 Government cite to trial testimony concerns a time period of "May 2008" and the government exhibit referenced was
     filed in state court in Zinnel's family law case on June 26, 08. However, the family law appeal referenced was
     decided four (4) months earlier on February 28, 2008. No undertaking is required to prosecute an appeal. Just to stay
     enforcement of a money judgment during the pendency of an appeal as the witness testified. Zinnel's lawyer
     clarified it had nothing to do with prosecuting an appeal.
Evidence
11.4 GEX 20, SER 588:17-22, RT 856-861

BS 6983

---------------------------------------------------------------------------------------------

FROM: 66138097
TO: EIDSON, DERIAN; Luban, Suzanne
SUBJECT: Factual Inaccuracies in GB Part 2 of 2
DATE: 04/26/2017 06:06:28 PM


U.S. v. Zinnel & Eidson

Last updated: 4/26/14

FACTUAL INACCURACIES IN THE GOVERNMENT'S ANSWERING BRIEF - PART 2 OF 2
                            (bald-faced lies)

#12
Lie
13.1 "Eidson appeared before the Grand Jury as custodian of records and produced a document
        purporting to be the assignment. The document was manufactured."
Where
12.2 GB 39:14-17
Why a lie
12.3 The assignment was created and entered into on July 13, 2004. In response to the grand jury subpoena, Steven Zinnel
        was helping Derian Eidson assemble responsive documents. Zinnel had a copy of the assignment electronically on his
        laptop computer. Zinnel was at Eidson's law office in Santa Ana, CA at Kinkle Rodiger and Spriggs and his laptop
        computer would not print to the law firm's computer so Zinnel transferred the assignment file to a USB and printed the
        file from attorney Krista Dawkins computer at Kinkle Rodiger and Sprigs.

        When the government executed a search warrant on Zinnel's mom's house on 10/29/13, the government agents
        found the USB with the assignment copy on it and seized the USB drive. Thus, that is the source of the assignment
        file not Zinnel's laptop computer. It is a lie that the assignment was created and signed in April or May 2009.
        In aggravation, Eidson wrongly received a two-level sentencing enhancement for obstruction of justice resulting
        in an additional two (2) more years in prison for her guideline prison sentence.

Evidence
12.4 ER 1269:5-8, 1289:4-19

#13
Lie
13.1 "Zinnel had fair notice that the [WAMU] personal bank account was at issue...Zinnel had fair notice that the
        personal Washington Mutual account would be at issue."
Where
13.2 GB 59:12-13 & 60:15-16
Why a lie
13.3 Not a single reference to Zinnel's one and only WAMU personal checking account (1) in the indictment, (2) in the
        government's trial brief, (3) in the government's opening statement. Further, Zinnel's WAMU personal checking
        account is listed on Zinnel's bankruptcy schedules with the correct account balance.
Evidence
13.4 ER 179-201 (CR 63), ER 233-247 (CR 169), ER 477-486 (7/1/13 RT 70-88).

#14
Lie
14.1 "The defendants' motion for a bill of particulars was filed over a year too late and before the wrong judge."
Where
14.2 GB 66:1-3
Why a lie
14.3 The superseding indictment in this case was unsealed on December 8, 2011. ER 1638, CR 63. The same day, the court
        set all pre-trial motions in this case, including a motion for a Bill of Particulars, to be heard on March 15, 2012 before the
        presiding district court judge and not a magistrate judge. ER 1638. CR 65. On January 24, 2012, the district court continued
        the pre-trial hearing to March 29, 201 and ordered all pre-trial motions filed by February 10, 2012. ER 1639, CR 76.

BS6984

-------------------------------------------------------------------------------------------

Both defendants complied with the court's pre-trial motions order and both Zinnel and Eidson filed all their pre-trial motions on February 10, 2012. ER 1639-1640. To allow them to prepare for trial and to prevent surprise at trial, Zinnel and Eidson filed a motion for a Bill of Particulars to compel identification of the precise property interest alleged in Counts 1 and 2. ER 205, CR 83, CR 77. Zinnel also joined Eidson's motion for a Bill of Particulars. CR 90.

As government appellate counsel's trial court opposition correctly states, "Fed R. Criminal P. 7(f) requires that absent 'good cause,' bill of particular motions SHOULD be filed within 14 days of arraignment." ER 209. In the same opposition, appellate counsel correctly wrote below, "Zinnel was arraigned on December 15, 2001 and Eidson on January 11, 2012." ER 210. Both defendants filed their motions for a bill of particulars on February 10, 2012. ER 205, CR 77 & 83, ER 1639 & 1640.

Therefore, contrary to the government lawyers' blatant misrepresentations to this court, less than TWO months elapsed from the filing of the indictment and the date the motions for bill of particulars were filed; "NOT over a year." Further, defendants had good cause to set the hearing before a district court judge instead of a magistrate and to file them on February 10, 2012, because government appellant counsel stipulated to it and a district court judge ordered it. ER 1638 & 1639, CR 65, CR 75, and CR 76.

In ruling on both defendants' motion for a bill of particulars at the hearing, evidently based on the first paragraph of the government's opposition writing "presented to a magistrate" the district court judge mistakenly stated in ruling:

> "This has already been RESOLVED previously by the magistrate judge. I don't see that there's any reason to go into that again. There's been no justification cited by the defendant. Motion denied." ER 13.

Rather than seeking justice and correcting the judge, both government appellate counsel remained silent knowing full well the government lawyers did not have to then "strictly adhere to answers filed in response," and they would have "no strict limits to proof within the area of the bill." ER 211

Therefore, below, there was never any ruling on either of defendants' motion for a bill of particulars on timeliness or the merits. ER 1633-1673.

#15
Lie
15.1 "The fourth and final phase of the crime was an attempt to obtain a $4 million buyout of Zinnel's ownership interest in System 3. 'ZINNEL MADE THE INITIAL REQUEST FOR THE BUYOUT'...threatened to retaliate if the $4 million was not paid under the terms ZINNEL demanded...EIDSON demand for the $4 million payout...ZINNEL instead approached his partner in his largest concealed asset and through EIDSON demanded a payout."
Where
15.2 GB 31:4-8. 33:20-22, 78:14-15, 86:14-17

Why a lie
15.3

Contrary to what the government states, neither Zinnel or Eidson demanded a $4 million payout. The government's agents, Tom Wilbert and attorney Frank Radoslovich, offered an amount to garner a mega sentencing enhancement that was not accepted by either Zinnel or Eidson. The evidence should be undisputed that Wilbert approached Zinnel (ER 1564, 1535, 1537, 1540, 1545, 1546, SER 431), as an employee and non-owner of Done Deal (ER 1464 & 1462) (FN#1), and stated his interest in terminating the relationship. (Exhibits: ER 1654, 1419, 1425-1430, 1565, 1566-1570, 1571; Testimony ER 671, 674-676, 678, 840).

FN#1
Done Deal was the true owner of a 46% ownership interest in System 3. Zinnel had assigned any interest in System 3 to Done Deal. ER 1419, 1462, ER 236.

As the government lawyers did below, on appeal, the government conveniently omits that the GOVERNMENT INVESTIGATORS AND THEIR AGENTS, not Zinnel or Eidson, initiated the settlement discussions and buyout offer resulting in the Zinnel/Wilbert settlement meeting on December 3, 2008 and the tow attorney to attorney settlement meetings in a law office conference room in February and March of 2009.

Contrary to the government's assertion (GB 85-86), Zinnel did not approach Tom Wilbert, nor were the actual owners of System 3 entitled to a payout at any specified date. Prior to the $3,944,799 initial UNSOLICITED OR EXPECTED offer, Wilbert

BS 6985

## COMPLAINT

AGAINST FIVE (5) DEPARTMENT OF JUSTICE PROSECUTING CALIFORNIA
ATTORNEYS THAT ARE CURRENTLY ASSISTANT UNITED STATES ATTORNEYS,
ALLEGING CRIMES, RULE VIOLATIONS, MISREPRESENTATIONS TO JUDGES,
VIOLATIONS OF CALIFORNIA STATE BAR RULES, CONDUCT UNBECOMING A
MEMBER OF A COURT'S BAR AND CONTRARY TO PROFESSIONAL CONDUCT,
VIOLATIONS OF (1) STANDARDS IMPOSED BY LAW, (2) APPLICABLE RULES
OF PROFESSIONAL CONDUCT, AND (3) DEPARTMENT OF JUSTICE POLICY

Submitted to:

Attorney Complaints Department
United States Court of Appeals for the Ninth Circuit
PO Box 193939
San Francisco, CA 94119-3939

Submitted by:

Steven Zinnel, #66138-097
Federal Correctional institution
Terminal Island
P.O. Box 3007
San Pedro, CA 90733-3007

Date submitted: August ___, 2017

BS 6986

Steven Zinnel, Fed # 66138-097
Federal Correctional Institution
Terminal Island
PO Box 3007
San Pedro, CA 90733-3004

Date submitted:

Attorney Complaints Department                                                  ' CASE NOS. 14-10141 or 14-10196]
United States Court of Appeals for the Ninth Circuit
PO Box 1963939                                                  [This is a misconduct complaint re attorneys that practice]
San Francisco, CA 94119-3939                                 [before the Ninth Circuit that made misrepresentations]
                                                                              [in the Government's Answering Brief filed in the above case nos.]

Re: Complaint regarding five attorneys that currently are counsel of record in a pending appeal before the Ninth Circuit
    [made under F.R.A.P. 46]

To the United States Court of Appeals for the Ninth Circuit:

Steven Zinnel (hereinafter "Claimant" or "Zinnel") hereby makes a Complaint to the United States Court of Appeals for the Ninth
Circuit regarding five Department of Justice ("DOJ") attorneys that are currently counsel of record for Plaintiff and Appellee
United States of America in a pending appeal before the United States Court of Appeals for the Ninth Circuit captioned as
United States of America v. Steven Zinnel & Derian Eidson, Court of Appeals for the Ninth Circuit nos. 14-10141 & 14-10196
(consolidated) (hereinafter "Appeal"). The appeal is taken from the United States District Court judgment in United States of
America v. Steven Zinnel & Derian Eidson, U.S.D.C. Eastern District of California, Sacramento, D.C. no. 2:11-cr-00234-TLN
(hereinafter "Criminal Case").

This complaint concerns five Department of Justice ("DOJ") attorneys, that practice before the United States Court of Appeals
for the Ninth Circuit and the United States District Court, Eastern District of California, Sacramento, that have engaged in
conduct unbecoming a member of the court's bar and contrary to professional standards subjecting the attorneys to discipline
pursuant to California Business and Professions code sections 6068, 6103, 6128 which concerns attorneys, State Bar of
California Rules of Professional Conduct, and Federal Rule of Appellate Procedure 46(c). The offending attorneys have
breached the most basic ethical tenets of candor and engaged in scorched earth litigation tactics. As prosecutors and officers
of the court, the offending DOJ attorneys had the duty to prosecute fairly. Instead, they engaged in deplorable and illegal
conduct. As a result, Steven Zinnel ("Zinnel") and attorney Derian Eidson ("Eidson") have been wrongly convicted and
irreparably harmed.

The attorneys' crimes and misconduct occurred by the misrepresentations (bald-faced lies) and alleged "facts" without citations
to the record that were made by the attorneys in the government's Answering Brief of the United States filed with the court on
February 23, 2017, in case no. 14-10141, and reflected as DktEntry: 69 (BS 6801) ["BS" refers to Bates number at the bottom
of each page on the documents submitted with this letter]. As Zinnel's appellate briefs clearly demonstrate, the United State's
Answering Brief defends the indefensible. The five government lawyers' unsupported and untrue claims without a single
citation to the record, repeated ad nauseam, does not magically make an untrue "fact" true. "Painting black lines on the side of
a horse and calling it a zebra does not make it one." United States v. Vazquez-Rivera, 135 F.3d 172, 177 (1 CA, 1998).
Further, "it is a cardinal rule of appellate practice that the facts are those found in the record and not those found in the minds of
the attorneys." United States v. Sigal, 341 F.2d 837, 850 (3 CA, 1965). Moreover, it is also alleged that three of the attorneys,
AUSA Matthew Segal, AUSA Audrey Hemesath, and AUSA Kevin Khasigian, also committed crimes and attorney misconduct
in the proceedings below in the underlying district court case that will be addressed in similar form as this submission, in a
future submission to the Court of Appeals for the Ninth Circuit, the District Court, the State Bar of California, and the
Department of Justice's Office of Professional Responsibility.

BS 6987

--------------------------------------------------------------------------------

FROM: Luban, Suzanne
TO: 66138097
SUBJECT: Do not Send
DATE: 08/28/2017 11:06:07 PM

Steve,
Please do not send anything to the court while your appeal is pending. There are many reasons, not the least of which is that it could cause delay. Please do not.

Suzanne

BS 6988

Steven Zinnel, 66138-097
Federal Correctional Institution
Terminal Island
P.O. Box 3007
San Pedro, CA  90733-3007

December 15, 2017

Suzanne Luban, Esq.
3758 Grand Ave., #4
Oakland, CA  94610

Re: <u>United States v. Steven Zinnel</u>
    Legal duty to report misrepresentations to
    the Court of Appeals by AUSAs Segal and Hemesath

Dear Ms. Luban:

I pray this letter finds you and your family well.  As you are
aware since you began representing me in late 2013, I have informed
you that lawyer ethics rules require that "A lawyer who knows that
another lawyer has committed a violation of the Rules of Professional
Conduct that raises a substantial question as to that lawyer's
honesty,trustworthiness or fitness as a lawyer in other respects
<u>shall</u> inform the appropriate professional authority."  In support
I have sent you a book excerpt from "Licensed to Lie" confirming
your legal duty to do so.  Again, I enclose a copy of the
book excerpt that I have marked as "BS 1505".

Over the last couple of years I have sent letters to law professor
Ronald Rotunda of Chapman University in Southern California.
Professor Rotunda is a nationally recognized expert on attorney
ethics.   Recently Professor Rotunda was gracious and mailed me three
legal treatises he authored entitled (1) "Legal Ethics; the Lawyer's
Deskbook on Professional Responsibility," 2017-2018 published by
the American Bar Association, (2) "Professional Responsibility"
Ninth Edition, published by West covering Black Letter Outlines,
and (3) "Selected Standards on Professional Responsibility,
including California and New York, 2017 Edition, published by
Foundation Press.

I have enclosed excerpts from "Professional Responsibility" that
confirms what I have been writing you:  "Lawyers have an
obligation to volunteer information of another lawyer's
disciplinable violations, under threat of discipline."   "Rule
8.3(a), in general, **requires** a lawyer to report **another** lawyer's
substantial violation of the Rules if the lawyer **knows** of the
violation." The court can discipline a lawyer, suspend from the
practice of law, for nothing more than failing to report another
lawyer's misconduct.  (BS 1506-1510).

When I read the United States' Answering Brief filed in my appeal,
I was appalled by the government lawyers' misrepresentations to
the Court of Appeals.  As a result and at great time and expense
to me, I prepared a detailed report of the Factual Inaccuracies

Page 1

BS 6989

in the Government's Answering Brief dated April 26, 2017 that I
transmitted to you and Derian's attorney Becky James.
(enclosed BS 6980-6985). My report was extremely detailed and
specified exactly why the government lawyers' representations
to the Court of Appeals were lies. Further, my report directed
you and attorney James to the record that proved the inaccuracies.
You refused to inform the Court of Appeals, the Department of
Justice Office of Professional Responsibility, or the State
Bar of California. After much arm-twisting and venting by me,
you put a footnote in my Reply Brief filed with the Court of
Appeals: "Many of the 'facts' stated in the government's brief
are inaccurate, but Zinnel lacks enough extra space to list them
here." (BS 6950).

Because I am so negatively affected by the government lawyers'
lies to the Court of Appeals, which are a continuation of the
same lawyers' lies to the District Court and jury, I prepared
a 256 page Complaint to be submitted to the Court of Appeals
for the Ninth Circuit reporting the government lawyers'
misconduct that I submitted relevant portions to you. (BS 6986-
6987). The Complaint contained 27 separate Claims of misconduct
in the government lawyers' filed Answering Brief. On August 28,
2017, you emailed me not to send anything to the court while
my appeal is pending. (BS 6988).

Your position not to inform the Court of Appeals of the State
Bar of bald-faced lies to the Court of Appeals, that negatively
affect me on appeal when I am appealing an almost 18 year
prison sentence goes against every fiber of my being and against
your legal and ethical duties as an attorney. I told you as such.
Since you have represented me, you have on several occations
stated you will not communicate with my co-defendant Derian
Eidson becasue of ethical concerns, but yet when government
lawyers blanantly lie to courts, you will not fulfill your
ethical duty to report them.

Based on your request, I did not submit my Complaint to the
Court of Appeals because I am represented by you in that appeal,
but in August of 2017 I did send the 256 page Complaint to the
State Bar of California and the Department of Justice's Office
of Professional Responsibility.

Since then, there was oral argument before the Court in my appeal
on November 16, 2017. I have watched the oral argument on DVD
many times and again I am appalled at AUSA Matthew Segal's and
AUSA Audrey Hemesath's bald-faced lies to the Court of Appeals
during their twenty minutes of oral argument.

BS 6990

With the government lawyers continued lies and willingness to win-at-all costs, I can no longer remain silent.  I have appended my Complaint to the Ninth Circuit to add seven (7) additional Claims of prosecutorial misconduct as a result of oral argument in my appeal on November 16, 2017.  I have enclosed Claims 28 – 34 (BS 5935 – 5966) along with Exhibits that support the Claims (BS 6081 – 6938).

Suzanne, after you review the enclosures and this letter, I implore you to fulfill your legal and ethical obligation as an attorney and inform the Court of Appeals and the State Bar of California of AUSA Matthew Segal's and AUSA Audrey Hemesath's violation of the Rules of Professional Conduct that raises a substantial question as to the lawyers' honesty, trustworthiness, and fitness as lawyers.

Respectfully submitted,

Steven Zinnel

BS 6991

Steven Zinnel, #66138-097
Federal Correctional Institution
Terminal Island
P.O. Box 3007
San Pedro, CA  90733-3007

January 22, 2018

McGregor W. Scott                        Robin C. Ashton, Counsel
United States Attorney, ED CA            Department of Justice
Office of the United States Attorney     Office of Professional
501 I Street, Suite 10-100               Responsibility
Sacramento, CA  95814                    950 Pennsylvania Ave., NW
                                         Suite 3266
                                         Washington, DC  20530-0001

Troy L. Nunley
District Court Judge, CtRm #2
United States District Court             Alex Hackert
501 I Street                             Senior Trial Counsel
Sacramento, CA  95814                    The State Bar of California
                                         845 South Figueroa Street
                                         Los Angeles, CA  90017-2515
[or the assigned judge because
 of Zinnel's Motion to Recuse,
 Disqualify Judge Nunley]

Re: United States v. Steven Zinnel, USDC ED CA case no. 2:11-cr-234
    Legal duty of attorneys to report the misrepresentations
    (bald-faced lies) to two courts made by
    AUSA Matthew D. Segal, SBN 190938,  AUSA Audrey B. Hemesath,
    SBN 212757,  AUSA Kevin C. Khasigian, SBN 251318,
    AUSA Camil A. Skipper, SBN 175895, AUSA Phillip Talbert, 145263

    State Bar of California Inquiry No. 17-15705
       Complaint respondents:  Matthew D. Segal, Audrey B. Hemesath,
    Kevin Khasigian, Camil Skipper, and Phillip Talbert

Dear Mr. Scott, Judge Nunley or the reassigned judge, Ms. Ashton
    and Mr. Hackert:

Lawyer ethics rules require that "A lawyer who knows that another
lawyer has commited a violation of the Rules of Professional
Conduct that raises a substantial question as to that lawyer's
honesty, trustworthiness, or fitness as a lawyer in other respects
shall inform the appropriate professional authority." (see Ex. A).
Over the last couple of years, 1 have sent letters to Ronald D.
Rotunda who is a distinguished law professor of jurisprudence at
Chapman University School of Law in Orange, California.
Professor Rotunda is a nationally recognized expert on attorney
ethics.  Professor Rotunda was generous and mailed me three
legal treatises he authored entitled (1) "Legal Ethics; the
Lawyer's Deskbook on Professional Responsibility," 2017-2018
published by the American Bar Association, (2) "Professional
Responsibility" Ninth Edition, published by West covering
Black Letter Outlines, and (3) "Selected Standards on Professional
Responsibility, including California and New York, 2017 Edition,
published by Foundation Press.

Page 1

BS6992

I have enclosed excerpts from "Professional Responsibility" that confirms attorneys, especially supervising attorneys such as United States Attorney McGregor W. Scott, "have an obligation to volunteer information of another lawyer's disciplinable violations, under threat of discipline." (see Ex. B, BS 1507). "This affirmative duty of whistle-blowing applies not only against a lawyer in another firm, but also against a partner or associate in the reporting lawyer's own firm." Id. Thus, not only does U.S. Attorney McGregor Scott and Counsel for the DOJ OPR Robin Ashton have responsibility to supervise their employees AUSA Matthew Segal, AUSA Audrey Hemesath, and AUSA Kevin Khasigian, but they have a legal duty as attorneys to report the offending attorneys to the State Bar of California and the Department of Justice's Office of Professional Responsibility under the threat of discipline.

"Rule 8.3(a), in general, requires a lawyer, such as U.S. Attorney McGregor Scott and Zinnel's appellate attorney Suzanne Luban, to report another lawyer's substantial violation of the Rules if the lawyer knows of the violation." (see Ex. B, BS 1508). A court can discipline a lawyer, suspend from the practice of law, for nothing more than failing to report another lawyer's misconduct. (see Ex. B BS 1509).

Steven Zinnel is a party to currently pending litigation both in the United States District Court, ED CA, case no. 2:11-cr-00234-TLN wherein he represents himself in pro se, and in the Court of Appeals for the Ninth Circuit, case no. 14-10141 wherein he is represented by attorney Suzanne Luban. Currently in District Court, Zinnel has a pending Motion to Enforce Judgment and hold Plaintiff and its attorneys Matthew Segal, Audrey Hemesath, Kevin Khasigian, and Phillip Talbert in contempt of court. (see Ex. H, pgs. 1&2, ECF #409). In the Court of Appeals, Zinnel has a pending direct appeal that is fully briefed and waiting on the court's decision.

When Zinnel read the United State's Answering Brief filed in his appeal, he was appalled by the government DOJ lawyers' misrepresentations to the Court of Appeals. As a result, Zinnel prepared a 256 page Complaint containing 27 Claims of misrepresentations (bald-faced lies) to the Court of Appeals and on August 31, 2017, Zinnel submitted the Complaint to Robin Ashton of the Department of Justice's Office of Professional Responsibility (see Ex. C) and to the State Bar of California (see Ex. D). As of the date of this letter, with almost five months elapsing, Zinnel has received no response from the DOJ's Office of Professional Responsibility. Zinnel has heard from the State Bar of California and Zinnel is encouraged that the investigation will continue.

Zinnel also reported the misrepresentations to a court by AUSA Segal and AUSA Hemesath to District Court Judges Andrew S. Hanen and Emmet G. Sullivan in August 2017. (see Exs. E & F).

BS6993

Zinnel reported the DOJ lawyers misrepresentations to courts because District Court Judge Andrew S. Hanen criticized and castigated DOJ lawyers for a "Series of Misrepresentations" to him. (see Ex. G & E and Judge Hanen's May 19, 2016 order in State of Texas, et. al. v. United States of America, et.al., U.S.D.C., Southern District of Texas, Brownsville, civil case no. B-14-254; 2016 U.S. Dist. LEXIS 79546, 5/19/16). Judge Hanen opined that "Whatever it is that the Department of Justice Office of Professional Responsibility has been doing, it has not been effective." Id. In his order, Judge Hanen blasted DOJ lawyers who had delibertly misled him. Zinnel asserts that AUSA Segal's and AUSA Hemesath's lies to two courts are orders of magnitude more egregious than Judge Hanen observed. Judge Hanen wrote in his scathing May 19, 2016 decision that the "unseemly and unprofessional conduct of these lawyers concealed the fact that Obama's order was already being implemented when they already had knowledge that this was not the case." (see Ex. G). What bothered Judge Hanen the most was that the Justice Department lawyers knew the true facts and misrepresented those facts." Id. This is exactly what happened to a much greater degree in Zinnel's case. Sadly, the judge added, "there seems to be a lack of knowledge about the adherence to the duties of professional responsibility in the halls of the Justice Departement...The Justice Department purports to represent all Americans-not just those who are in favor of whatever actions the Department is seeking to prosecute or defend. The end result never justifies misconduct." Id.

Zinnel wrote Judge Emmet Sullivan because he has chronicaled the government lawyers' specious conduct in the Senator Ted Stevens case. In a February 8, 2012 order, Judge Sullivan wrote "The Stevens case has come not only to symbolize the dangers of an overzealous prosecution and the risks inherent when the government does not abide by its discovery obligations, but it has been credited with changing the way other courts, prosecutors, and defense counsel approach discovery in criminal cases." In Re Special Proceedings, 842 F. Supp. 2d 232 (U.S.D.C. District of Columbia, 2012), 2012 U.S. Dist. LEXIS 15656 (2/8/12).

Unfortunatley, as evidenced by the bald-faced lies to courts by AUSA Segal and AUSA Hemesath in Zinnel's case, the Stevens case has not changed the Department of Justice's Assistant United States Attorneys' scortched earth litigation tactics or their drive to win at all costs. The conduct of AUSA Segal, AUSA Hemesath, and AUSA Khasigian involves dishonesty, fraud, deceit, and making false representations to several federal judges including Judge Troy L. Nunley.

Shockingly, even though Zinnel filed the aforementioned Complaints and informed two federal judges of the DOJ attorneys bad conduct, AUSA Matthew Segal lied to the Court of Appelas at oral argument in Zinnel's case on November 16, 2017. Thus, in addition to the 27 Claims of misrepresentations made by AUSA Segal and AUSA Hemesath in the Government's Answering Brief on appeal, Zinnel drafted seven (7) additional Claims of AUSA Matthew Segal and

BS 6994

AUSA Audrey Hemesath lying to the Court of Appeals at oral argument on November 16, 2017.

Recently, Zinnel detailed some of AUSA Segal, AUSA Hemesath, and AUSA Khasigian's lies to both the District Court and the Court of Appeals in two District Court filings in Zinnel's case; <u>United States v. Steven Zinnel</u>, U.S.D.C. ED CA case no. 2:11-cr-234. On December 5, 2017, Zinnel filed a Motion to Enforce Judgment and hold Plaintiff and its attorneys in contempt of court. (see Ex. H & ECF #409). On January 12, 2018, Zinnel filed a Reply to the government's oposition to the motion to enforce judgment. (see Ex. I). For the convenience of the recipients of this letter, Zinnel has enclosed the relevant portions of Zinnel's recent District Court filings detailing the lies made by the offending attorneys. (see Exs. H & I). The recipients of this letter are directed to the actual court filings to review the Exhibits referenced in the filings contained in Exs. H & I that are enclosed herein.

It is clear that Judge Andrew Hanen was spot on when he wrote in his May 19, 2016 order: "Whatever it is the Department of Justice Office of Professional Responsibility has been doing, it has not been effective." It appears that AUSA Matthew Segal has adopted Adolf Hitler's philosophy exposed in Hitler's book "Mein Kamph" that can be paraphrased as: 'The bigger the lie, the more it will be believed" and if you tell a lie enough, people will believe it's true. AUSA Matthew Segal used Hitler's philosophy at Zinnel's trial to the jury and Judge N ley and imported his tactics to the Court of Appeals. One thing is clear; AUSA Matthew D. Segal LIES A LOT, is a hypocrite, and will do anything to win-at-all costs.

After the recipients of this letter review and consider this letter, the enclosed exhibits, and Zinnel's District Court filings, I implore you to fulfill your legal and ethical obligation as an attorney and inform the affected courts, the State Bar of California, and the DOJ's Office of Professional responsibility of AUSA Matthew Segal, AUSA Audrey Hemesath, and AUSA Kevin Khasigian's violations of the Rules of Professional Conduct that raises a substantial question as to the lawyer's honesty, trustworthiness, and fitness as lawyers.

Very truly yours,

Steven Zinnel


cc: Suzanne Luban, Esq. without enclosures
    Professor Ronald D. Rotunda, Esq. without enclosures

BS6995

Steven Zinnel, #66138-097
FCI Terminal Island
PO Box 3007
San Pedro, CA 90733-3007

January 25, 2018

Robin Ashton, Counsel
Office of Professional Responsibility
Department of Justice
950 Pennsylvania Ave., NW, Suite 3266
Washington, DC 20530-0001

Re: Supplement to Complaint against five ED CA Assistant United States Attorneys and request for written status

Dear Ms. Ashton:

On August 31, 2017, I mailed you a 256-page Complaint against five Assistant United States Attorneys who prosecute criminal cases in the Eastern District of California, Sacramento. Enclosed as Exhibit A is a copy of my August 31, 2017 letter to you that was contained in the Complaint. The Complaint identifies the following offending DOJ attorneys: (1) AUSA Matthew D. Segal, (2) AUSA Audrey B. Hemesath, (3) AUSA Kevin C. Khasigian, (4) AUSA Camil A. Skipper, and (5) AUSA Phillip A. Talbert. It has been five months since I submitted my extremely-detailed Complaint to you and your office. However, I have not received any response from you or the DOJ'S Office of Professional Responsibility to my Complaint. Why? Therefore, I write to you seeking a written response as to the status of my Complaint. Further, I hereby supplement my Complaint with seven additional Claims and additional information.

1. CLAIMANT ZINNEL HEREBY SUPPLEMENTS HIS COMPLAINT OF 27 CLAIMS TO ADD AN ADDITIONAL SEVEN (7) CLAIMS OF MISREPRESENTATIONS TO A COURT BASED ON THE OFFENDING LAWYERS' LIES TO THE COURT OF APPEALS AT ORAL ARGUMENT ON NOVEMBER 16, 2017 IN ZINNEL'S CASE

Since Zinnel submitted his 256-page Complaint to the the DOJ'S Office of Professional Responsibility, two of the offending attorneys, AUSA Matthew D. Segal and AUSA Audrey B. Hemesath, made additional misrepresentations to the Court of Appeals for the Ninth Circuit at oral argument on November 16, 2017 resulting in an additional seven (7) Claims of willful misrepresentations to a court.

Enclosed herein as Exhibit D is the seven supplemental Claim numbers 28-34. Enclosed herein with Bates Numbers on the bottom right corner are the documents that are referenced in Claim numbers 28-34. Zinnel hereby supplements his August 31, 2017 Complaint to include the additional seven Claims and exhibits contained herein as Exhibits D & E.

2. WILLFULNESS CAN BE, OFTEN IS INFERRED

Day in and day out in courts across the land, government prosecutors, like the five offending lawyers here, win criminal convictions by inferring willfulness rather than presenting direct evidence of willfulness. The law is well-settled on inferring willfulness:

A willful misrepresentation is a misrepresentation that is deliberate, voluntary, and knowingly false. Forbes v. INS, 48 F.3d 439, 441 (9 CA, 1995). Proof of an intent to deceive is not required. Rather knowledge of the falsity of a representation is sufficient. Id. The Ninth Circuit has clearly defined a willful act as one done with a bad purpose or evil motive. United States v. McIntyre, 582 F.2d 1221 (9 CA, 1978).

Some courts have interpreted "willful" to include acts that involved some form of inadvertence, oversight, or negligence. Stephen J. Brogan, Analysis of the term willful in Federal Criminal Statutes, 51 Notre Dame L.Rev. 786, 787 (1976). Under this interpretation, a "judge can find an act to be willful even though it was not committed intentionally." Id.

BS6996

***Criminal intent is seldom proved by direct evidence and often must be inferred from a defendant's conduct." People v. Gilbert (1992) 5 Cal.App. 4th 1372, 1380.

***In Spies v. United States, 317 U.S. 492 (1943), the Supreme Court held that "the necessary intent may be inferred from conduct the likely effect of which would be to mislead or to conceal." The Spies Court set forth the example of the kind of conduct from which an affirmative willful attempt may be inferred:

"any conduct, the likely effect of which would be to mislead or conceal."

Here the offending government attorneys clearly engaged in conduct in which the likely effect was to mislead both the District Court and the Court of Appeals.

The offending attorneys represented to the Court of Appeals "facts" and then incredibly cite the record on appeal that clearly shows that they are lying. For example, as contained in Claim #1, the offending DOJ attorneys misrepresented to the court that Zinnel used the proceeds from the Luyung Property sale to start System 3. When the record on appeal clearly evidences that System 3 was started on October 3, 2001 and the Luyung Property was sold on May 3, 2002; 7 months later. Further, the Net Proceeds from the Luyung Property sale was a mere $4,742.39 which was barely 1% of the separate funds that did capitalize System 3 months earlier. Similarly, as contained in Claim #3, the offending government attorneys misrepresented to the court that Eidson paid $60,000. However, the government lawyers cite the record where it contains the four checks which total $30,000 which is the actual number. Thus, the government lawyers increased the amount by 100%. Therefore, the offending attorneys clearly knew that correct amount, but they doubled the number to make Zinnel and Eidson look bad. As contained in Claim #5, the offending DOJ attorneys lie to the court when they represented that "Per the terms of the Business Formation Agreement, Zinnel was paid $3,333 per month for these services." The offending attorneys correctly cite the Business Formation Agreement that is contained in the record, but nowhere in the Agreement does it have any language concerning paying Zinnel $3,333 per month. As contained in Claim # 13, the government attorneys lied to the Court of Appeals by representing that Zinnel "made the initial request for the buyout" when the true facts, as contained in the record, are that as a government agent in a sting operation, Tom Wilbert and his attorney, made an offer to Zinnel and Eidson and not the other way around. Even though the law allows a court to find willfulness from "inadvertence, oversight, or negligence," the lies to the court contained in the 27 Claims submitted, are not inadvertence or negligence. They are willful acts done with a bad purpose to win-at-all costs and to protect their unlawful conviction of Zinnel obtained by cheating and lying. Thus, the misrepresentations are deliberate, voluntarily, and knowingly false which the law cited above holds are willful misrepresentations.

3. THERE IS A HUGE DISTINCTION BETWEEN MAKING PERMISSIBLE ARGUMENT REGARDING THE LAW OR FACTS AND BLATANTLY MISREPRESENTING TO A COURT WHAT THE LAW SAYS, AND WHAT THE FACTS ARE, AS OPPOSED TO THIS IS HOW THE LAW CAN BE INTERPRETED OR ARGUING WHAT A FACT MEANS

The majority of the misrepresentations to the Court of Appeals the offending DOJ attorneys made were made in the section of the United States' Answering Brief entitled "Statement of the Case" (see Ex. B). Under Ex. C, I have enclosed relevant portions of a legal treatise entitled "Winning on Appeal, Better Briefs and Oral Argument." The treatise instructs that the Statement of the Case does not give the attorney a license to embellish or throw in irrelevant, but juicy facts. (Ex. C, p. 163). The treatise goes on to state: "The Polestar is Accuracy). The principle directive in narrating the facts is accuracy. BE HONEST. DO NOT STEAL THE FACTS." (Ex. C., p. 176). Further, "A brief writer is entitled to the greatest leeway in his law, as in his reasoning, for they are his. "But, HONESTLY ALLOWS NO LEEWAY IN HIS STATEMENT OF FACTS, for they are not his." (Ex. C, p. 177). Moreover, "Support every sentence in a statement of facts by references to the pages in the record where those facts appear...Someone other than the writer should check the final draft of statement of facts against the record." (Ex. C. p. 171). Therefore, the offending attorneys were not permitted misrepresent the actual facts in their Statement of the Case.

There is a huge difference between misrepresenting the law and facts to a court and permissible arguments of law or about facts of the case. By way of example:

PERMISSIBLE ARGUMENT

The law is the maximum speed on I-10 is 70 MPH

According to police radar Zinnel was going 68 MPH

A WILLFUL MISREPRESENTATION TO A COURT

The law is the maximum speed on I-10 is 55 MPH
[when the maximum speed is actually 70 MPH]

According to police radar Zinnel was going 75 MPH in a 55 MPH zone
[when the true fact is according to police radar

Zinnel was going 68 MPH in a 70 MPH zone]

Misstating well-settled law and/or facts to a court is NEVER permissible argument.

4. THE DOJ OPR CAN ALSO PROPERLY FIND WILLFULNESS BECAUSE THE OFFENDING ATTORNEYS, THEIR
   SUPERVISORS, AND THEIR EMPLOYER HAVE HAD MANY OPPORTUNITIES TO COME FORWARD AND ADMIT
   THEIR WRONGDOING, BUT HAVE FAILED TO DO SO

When bad actors have had many opportunities to come forward and admit wrongdoing, as the offending government DOJ
California attorneys have had here, but have never done so, a court and the DOJ OPR can properly find willfulness. Here the
offending attorneys were given notice of their willful misrepresentations several times including Zinnel informing their oversight
department the Department of Justice Office of Professional Responsibility and making the State Bar Complaint and Claims
part of District Court filings in the underlying Sacramento federal court case. Rather than correcting and mitigating their bad
conduct, two of the offending attorneys, AUSA Matthew Segal and AUSA Audrey Hemesath doubled-down and lied to the Court
of Appeals at oral argument in Zinnel's appeal on November 16, 2017.

5. ZINNEL HAS NOTIFIED THE OFFENDING ATTORNEYS' BOSS OF THE OFFENDING ATTORNEYS'
   MISREPRESENTATIONS AND HIS DUTY TO REPORT THE CONDUCT TO THE APPROPRIATE AUTHORITIES

On January 22, 2018, Zinnel wrote a letter to U.S. Attorney McGregor Scott and Robin Ashton, counsel for the Department of
Justice's Office of Professional Responsibility informing them of their legal duty as attorneys to report the misrepresentations
made to two courts by AUSA Matthew Segal, AUSA Audrey Hemesath, and AUSA Kevin Khasigian. Enclosed herein as
Exhibit F is a copy of the letter.

When the offending attorneys tell a story that is blatantly contradicted by the record and well-settled law, as we have here,
willful misrepresentations to two courts has been established by the Claimant.

Respectfully submitted,

Steven Zinnel
Claimant

cc: McGregor Scott. U.S. Attorney, ED CA without exhibits

BS 6998

## CERTIFICATE OF SERVICE

When All Case Participants, except for Steven Zinnel
are Registered for the Court's CM/ECF System

I hereby certify that on ___MAY 24, 2018___, I mailed

the foregoing to the Clerk of the Court for filing via United

States Mail, postage prepaid, by depositing the foregoing with

prison authorities at the Mail Room of the Federal Correctional

Institution at Terminal Island.  Pursuant to Houston v. Lack,

487 U.S. 266, 270-271, 108 S.Ct. 2379, 101 L.Ed.2d 245 (1988),

a Pro Se prisoner's filing is deemed filed with the Court on

the date of delivery to prison authorities for filing with

the Court.

I certify that all participants in the case, except for me,

as a Pro Se party, are registered CM/ECF users and that service

will be accomplished by the CM/ECF system.

I certify under penalty of perjury under the laws of the United

States of America that the foregoing is true and correct.

_____

Steven Zinnel, Fed. No. 66138-097
FCI Terminal Island
P.O. Box 3007
San Pedro, CA  90733- 3007